UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

YAKOV WEISLER,

                       :

               Plaintiff,                  Civil Action

                       :   No. 06-00362-GMS

         v.

                       :

TIMOTHY A. BARROWS, et al.,

                       :

             Defendants,

                       :

       and

                       :

SYCAMORE NETWORKS, INC.,

                       :

            Nominal Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPENDIUM OF UNREPORTED AUTHORITIES CITED IN DEFENDANTS'
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

Anthony W. Clark (#2051)
Robert A. Weber (#4013)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Of counsel:
James R. Carroll
Michael S. Hines
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Beacon Street
Boston, Massachusetts 02108
(617) 573-4800

Counsel for Nominal Defendant Sycamore
Networks, Inc. and Defendants Gururaj Deshpande,
Daniel E. Smith and Richard J. Gaynor

Dated: August 25, 2006

John D. Donovan, Jr.
Kelly Begg Lawrence
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110
(617) 951-7000

Counsel for Defendants
Timothy A. Barrows,
Paul W. Chisholm, Paul J. Ferri
and John W. Gerdelman

# TABLE OF AUTHORITIES

## CASES                                                            TAB

Boeing Co. v. Schrontz,
      Civ. A. No. 11273, 1992 WL 81228 (Del. Ch. April 20, 1992)................................. A

Caruana v. Saligman,
      Civ. A. No. 11135, 1990 WL 212304 (Del. Ch. Dec. 21, 1990)...............................B

CertainTeed Corp. v. Celotex Corp.,
      No. Civ. A. 471, 2005 WL 217032 (Del. Ch. Jan. 24, 2005).......................................C

In re Dean Witter P'ship Litig.,
      No. CIV. A. 14816, 1998 WL 442456 (Del. Ch. July 17, 1998) .............................. D

In re Digimarc Corp. Derivative Litig.,
      Civ. No. 05-1324-HA (LEAD), 2006 WL 2345497 (D. Or. Aug. 11, 2006) ..............E

Rattner v. Bidzos,
      Civ. A. No. 19700, 2003 WL 22284323 (Del. Ch. Oct. 7, 2003) ..............................F

In re Whitehall Jewellers, Inc. S'holder Derivative Litig.,
      No. 05 C 1050, 2006 WL 468012 (N.D. Ill. Feb. 27, 2006) ......................................G

# TAB A

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 1992 WL 81228 (Del.Ch.), 18 Del. J. Corp. L. 225
**(Cite as: Not Reported in A.2d)**

▷

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
BOEING CO., derivatively By J.H. LEVIT and Rodney B. Shields, Plaintiffs,
v.
Frank SHRONTZ, Malcolm T. Stamper, Harold W. Haynes, Robert A. Beck, Harold J. Haynes, Stanley Hiller, Jr., George M. Keller, Lee L. Morgan, Charles M. Piggott, George H. Weyerhaeuser, T.A. Wilson and David Edward Skinner, Defendants, andBoeing Co., a Delaware corporation, Nominal Defendant.
**Civ. A. No. 11273.**

Submitted: Aug. 22, 1991.
Decided: April 20, 1992.

**\*\*229** R. Bruce McNew, Pamela S. Tikellis, and Carolyn D. Mack of Greenfield & Chimicles, Wilmington, and Richard D. Greenfield, James E. Malone, Jr., Brenda M. Nelson, and Michael D. Gottsch of Greenfield & Chimicles, Haverford, Pa.; Of Counsel: William S. Lerach of Milberg, Weiss, Bershad, Specthrie & Lerach, San Diego, Cal., for plaintiffs.
**\*\*230** R. Franklin Balotti, Jesse A. Finkelstein, Anne C. Foster, Michael J. Feinstein, and Matthew J. Ferretti of Richards, Layton & Finger, Wilmington, for Individual defendants.
Rodman Ward, Jr., Edward P. Welch, and Andrew J. Turezyn of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Nominal Defendant The Boeing Company.

MEMORANDUM OPINION

BERGER, Vice Chancellor.
**\*1** This is the decision on a motion to dismiss a derivative action brought by stockholders of Boeing Co. ("Boeing") charging certain of its directors with breach of fiduciary duty. Plaintiffs maintain that defendant directors breached the fiduciary duty of control or oversight, or more generally, the duty of due care, in connection with the illegal activity of Boeing employees. In addition, plaintiffs assert a claim of waste based upon amounts paid in fines and settlements. Defendants seek dismissal on several grounds: (1) all claims arising prior to August 3, 1986, are barred by the applicable statute of limitations; (2) Boeing's Certificate of Incorporation bars any monetary claims against its directors arising after May 15, 1987; (3) the Amended Complaint fails to state any claims arising during the period between August 1986 and May 1987; and (4) in any event, plaintiffs have not satisfied the demand requirements of Chancery Court Rule 23.1.

I.

Boeing, a leading manufacturer of commercial and military aircraft, is the nation's tenth largest defense contractor. Approximately one-third of its operating revenues are generated by government contract work. The individual defendants are some of the present and former members of the board of directors of Boeing. Of the twelve individuals named as defendants, only four are past or present officers of the company-Frank Shrontz, currently Chief Executive Officer and Chairman of the Board and formerly President from 1985 to 1988; T.A. Wilson, Chief Executive Officer from 1969 to 1986 and Chairman of the Board from 1972 to 1988; Malcolm T. Stamper, President from 1972 until 1985; and Harold W. Haynes, a former Executive Vice President and Chief Financial Officer.

**\*\*231** The alleged wrongs arise out of five different fact patterns. The first involves the illegal acquisition of classified documents. From 1974 through 1986, senior Boeing marketing officers allegedly schemed to obtain classified government documents in order to gain an advantage when

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2

Not Reported in A.2d, 1992 WL 81228 (Del.Ch.), 18 Del. J. Corp. L. 225
**(Cite as: Not Reported in A.2d)**

bidding on government contracts. Boeing employee Richard Fowler ("Fowler") brought more than 600 classified defense documents into Boeing's offices, and contractors other than Boeing were allowed access to those documents in violation of applicable security regulations. In November 1989, Boeing pleaded guilty to illegally accepting two classified documents from Fowler. The company agreed to pay criminal fines, restitution and reimbursement of investigation costs totaling over $5 million. In addition, Boeing's office in Rosslyn, Virginia was suspended from dealing with the federal government for four months.

The second fact pattern involves a federal criminal investigation begun in August 1989. Kevin G. Kelly ("Kelly"), a Boeing employee, alleged that the company overcharged the government approximately $20 million in connection with work on the Stealth bomber. As a result of Kelly's " whistle-blowing," Boeing was investigated by the Air Force Office of Special Investigations, the U.S. Department of Justice and other government agencies. Kelly's allegations also allegedly prompted an audit of Boeing Military Airplanes (" BMA"), Seattle Division, by a governmental audit agency. The audit report, issued in August 1989, concluded, among other things, that lease costs and tenant improvement costs paid by BMA and billed to the government were overstated by approximately $10 million and $5 million respectively. According to the Amended Complaint, Boeing disputes the audit results.

**\*2** The Amended Complaint identifies three other incidents indicating operational problems. Plaintiffs note that BMA agreed on October 31, 1989, to an $11 million settlement with the federal government relating to overcharges for aluminum on the Air Force KC-135 contracts. Government agencies are currently investigating an alleged $25 million overcharge for research performed by Boeing's Computer Services Division. Finally, plaintiffs complain that BMA purposely bid low on a fixed price contract for special jumbo jets for the United States Air Force because Boeing officials wanted the President of the United States to fly only Boeing airplanes. According to the Air Force's estimate, Boeing's low bid will cause the company

to lose more than $385 million on the contract.

**\*\*232 II.**

Defendants first argue that any claims arising before August 23, 1986 [FN1], are precluded by the statute of limitations. Pursuant to 10 *Del.C.* § 8106, no action such as this to recover monetary damages may be maintained more than three years after the claim arose. Plaintiffs contend that § 8106 is not applicable because this action is not one for money damages alone. The remedy sought includes both damages and a declaratory judgment that the director defendants breached their fiduciary duties.

I am not persuaded by this argument. It is settled that § 8106 "applies to shareholder derivative actions which seek recovery of damages or other essentially legal relief." *Halpern v. Barran,* Del.Ch., 313 A.2d 139, 141 (1973). Here, the prayer for a declaratory judgment that the individual defendants breached their fiduciary duties is merely incident to the prayer for money damages. I find that the Amended Complaint seeks essentially legal relief and, thus, is governed by § 8106.

> FN1. Although the original complaint was not filed until December 8, 1989, defendants are using August 23, 1989, the date on which plaintiff Rodney B. Shields ( "Shields") made demand on Boeing's board of directors, as the tolling date.

Plaintiffs next argue that a statute of limitations defense may not be considered on a motion to dismiss because it is an affirmative defense. They note that in *Brown v. Dolese,* Del.Ch., 154 A.2d 233, 239-240 (1959), *aff'd,* Del.Supr., 157 A.2d 784 (1960), this Court refused to consider a statute of limitations defense on a motion to dismiss. However, in *Brown,* defendants were charged with fraudulent concealment of the facts upon which plaintiffs' action was based. This Court decided that there were sufficient facts in the complaint to potentially bring the action within the rule of *Bovay v. H.M. Byllesby & Co.,* Del.Supr., 38 A.2d 808 (1944), which removes the bar of the statute of limitations under certain circumstances. By

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1992 WL 81228 (Del.Ch.), 18 Del. J. Corp. L. 225
(Cite as: Not Reported in A.2d)

contrast, where no exceptions to the statute of limitations were found to apply, this Court has granted relief on a motion to dismiss. *Halpern v. Barran, supra.*

Accordingly, the next question is whether, based upon the allegations in the Amended Complaint, the claims fall within such an exception to the statute of limitations. Under the so-called *Bovay* exception, the statute of limitations does not apply "in extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing ... [where] corporate officers and directors ... profited personally from their misconduct." *Halpern v. Barran,* 313 A.2d at 142; *see Bovay v. H.M. Byllesby **233 & Co., supra.* Plaintiffs allege that defendants were motivated to pursue a course of action detrimental to Boeing in order to secure their positions on the board of directors and corresponding benefits. However, where only four of the twelve individual defendants are or were inside directors, such allegations have little force. They do not establish self-dealing, let alone fraudulent self-dealing. *See Halpern* at 142.

*3 Alternatively, plaintiffs contend that the statute of limitations was tolled by defendants' fraudulent concealment of the facts giving rise to the claims. In the Amended Complaint, they allege that defendants "engaged in a massive cover-up to prevent discovery of such corporate wrongdoing." Amended Complaint, ¶ 4. Plaintiffs attempt to support this conclusory statement with the allegation that Boeing failed to disclose the existence of illegal activity in filings with the Securities and Exchange Commission. The allegations of fraudulent concealment necessary to toll the statute of limitations must be set forth with the particularity required by Chancery Court Rule 9(b). *Halpern* at 143. I find that the Amended Complaint does not meet this standard. It contains no allegations as to the nature of any scheme to conceal facts from plaintiffs. The fact that illegal activity was not disclosed in SEC filings does not in any way suggest the existence of such a scheme. The nature of the SEC filings may not have called for such information, and the information may not have existed at the time the documents were filed.

Based upon the foregoing, I find that any claims arising prior to August 23, 1986, are time barred.

### III.

Although it appears that much of the alleged wrongdoing occurred prior to August 23, 1986, there are also allegations in the Amended Complaint addressing purported wrongdoing after that date. Defendants argue that the more recent claims are barred by Article Twelfth of Boeing's Certificate of Incorporation, which insulates directors from liability for monetary damages in certain circumstances. Article Twelfth, adopted by amendment on May 15, 1987, provides:

TWELFTH: To the full extent that the Delaware General Corporation Law, as it exists on the date hereof or may hereafter be amended, permits the limitation or elimination of the liability of directors, a director of the corporation shall not be liable to the corporation or its stockholders for **234 monetary damages for conduct as a director. Any amendment to or repeal of this Article TWELFTH shall not adversely affect any right or protection of a director of the corporation for or with respect to any acts or omissions of such director occurring prior to such amendment or repeal.

Such provisions are permitted pursuant to 8 *Del.C.* § 102(b)(7) and may eliminate personal liability of directors for the types of claims asserted here. *See John Hancock Capital Growth Management, Inc. v. Aris Corp.,* Del.Ch., Civil Action No. 9920, Jacobs, V.C. (August 24, 1990), slip op. at 4.

Plaintiffs do not contest the legal effect of this certificate provision. Rather, they argue that it constitutes an affirmative defense and is thus not properly before this Court on a motion to dismiss. The Court agrees. However, pursuant to Chancery Court Rule 12(b), a motion to dismiss may be converted into a motion for summary judgment if the Court considers matters not found within the complaint. Plaintiffs acknowledge the availability of this procedural device, but argue that they should be allowed to take discovery on this point before the Court rules. They suggest that discovery is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1992 WL 81228 (Del.Ch.), 18 Del. J. Corp. L. 225
**(Cite as: Not Reported in A.2d)**

Page 4

appropriate to determine whether the certificate amendment was validly adopted. In addition, counsel explained, "It's not inconceivable that in the course of discovery on [the issue of whether the provision was validly adopted] we could find out something that itself would give rise to a claim against one or more directors." Argument Trans., p. 34. This suggestion is wholly inappropriate. Parties are not entitled to discovery in search of a new cause of action. *Weinberger v. Palm Beach, Inc.,* Del.Ch., Civil Action No. 7696, Consolidated, Berger, V.C. (July 9, 1985). Very limited discovery as to the steps taken to adopt Article Twelfth, however, does appear appropriate. Accordingly, the Court will defer ruling on this aspect of defendants' motion.

## IV.

**\*4** Turning to the merits, defendants argue that the Amended Complaint fails to state a claim for waste or neglect. In order to state a claim for waste, the complaint must allege facts from which one could infer that "what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid." *Saxe v. Brady,* Del.Ch., 184 A.2d 602, 610 (1962). Here, plaintiffs claim that waste is properly inferable from three incidents: (1) the settlement arising out of Fowler's transmission of classified documents to the **\*\*235** company; (2) the settlement arising out of aluminum overcharges on Air Force contracts; and (3) the alleged low bidding in connection with presidential jets.

I find that plaintiffs' descriptions of each of these circumstances is insufficient to state a claim for waste. With respect to the two settlements, there is nothing to suggest that the amounts Boeing agreed to pay were so enormous by comparison to the company's potential liability that no one of sound mind would have agreed to the settlement. The low bidding allegations are also deficient. First, plaintiffs have not alleged that Boeing submitted its bids knowing that the contract would result in a $385 million loss. Second, there is no allegation that such losses were, in fact, incurred. Finally,

assuming both of those facts, it is still entirely possible that the value to Boeing of having the President of the United States flying on its airplanes far exceeds the amount of the "loss."

The breach of fiduciary duty claim based upon defendant directors' purported neglect is sketchy, but with the benefit of inferences favorable to plaintiffs, I find that it is sufficient to state a claim for relief. As noted earlier, the Amended Complaint identifies several instances of wrongful conduct that resulted in criminal fines and other sanctions being imposed upon Boeing. Plaintiffs allege that these specific instances of wrongdoing are but a part of an ongoing pattern of illegal conduct. The director defendants allegedly

... have long known of the illegal acts at issue and have done nothing cognizable or tangible to remedy the harm to the Company.... Specifically, the Board has for a long time been given more than ample warnings of the circumstances of illegality which led to Boeing's guilty plea, and of illegal activities which are still under investigation, yet the Board has failed to seek redress on behalf of Boeing and its shareholders.

Amended Comp., ¶ 60(b). In *Graham v. Allis-Chalmers Manufacturing Co.,* Del.Supr., 188 A.2d 125, 130 (1963), the Delaware Supreme Court described the nature of a claim for director neglect:

[T]he question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he has recklessly reposed confidence in an obviously untrustworthy employee, has refused or neglected cavalierly to perform his duty as a director, or has ignored either wilfully or through inattention**\*\*236** obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him.

**\*5** Here, plaintiffs charge that defendant directors knew of unlawful conduct for a long time and did nothing. Although the exact circumstances of when and how directors became aware of this conduct are not alleged, I find that such specificity is not required for purposes of notice pleading.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 5

Not Reported in A.2d, 1992 WL 81228 (Del.Ch.), 18 Del. J. Corp. L. 225
**(Cite as: Not Reported in A.2d)**

Accordingly, defendants' motion to dismiss the director neglect claim will be denied.

## V.

Finally, defendants argue that the complaint must be dismissed for failure to satisfy the requirements of Chancery Court Rule 23.1. One of the two plaintiffs, Shields, made demand upon Boeing's board of directors and, after the complaint was filed, the board concluded its investigation and refused to take the actions requested in the demand letter. The Amended Complaint does not include any allegations purporting to establish the wrongfulness of defendants' decision to refuse the demand.

Plaintiffs argue that they need not address this point inasmuch as J.H. Levit ("Levit") made no demand and his claims should survive if he has adequately pled demand futility. Alternatively, plaintiffs point out that the demand letter expressly stated Shields' belief that demand would be futile. Thus, plaintiffs say that the making of a demand in this case did not constitute a waiver of the demand futility argument.

I find both of plaintiffs' arguments to be without merit. The purpose and legal standards governing the demand requirement have been described in detail in numerous decisions of our Supreme Court. In brief, it is a basic premise of Delaware corporate law that directors, not stockholders, manage the company. This management responsibility includes decisions as to whether the corporation should litigate potential claims. Stockholders who bring derivative actions are impinging upon directors' managerial responsibilities and, thus, must satisfy the demand requirements of Chancery Court Rule 23.1 before they will be allowed to pursue litigation on behalf of the corporation. "The purpose of pre-suit demand is to assure that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation, to decide whether to invest the resources of the corporation in litigation, and to control any litigation which does occur." *Spiegel v. Buntrock,* Del.Supr., 571 A.2d 767, 773 (1990). Demand is excused if plaintiffs adequately allege that it **237

would have been futile. However, "[b]y making a demand, a stockholder tacitly acknowledges the absence of facts to support a finding of futility. Thus, when a demand is made, the question of whether demand was excused is moot." *Spiegel v. Buntrock* at 775 (citations omitted).

Plaintiff Shields made demand, but stated in the demand letter his belief that demand is futile. The other plaintiff, Levit, made no demand. Plaintiffs argue that either of these facts allow them to evade the holding in *Spiegel* and argue demand futility. I find otherwise. The law, as set forth in *Spiegel,* should make it clear that the demand requirement is not a mere procedural formality. Plaintiffs cannot use either of the devices suggested here to, in essence, cover all the bases. The *Spiegel* court held that stockholders must make a choice either to make demand or attempt to establish demand futility. To accept plaintiffs' argument would be to ignore *Spiegel.* Thus, the argument must be rejected.

*6 In conclusion, I find that plaintiffs have stated a claim of director neglect. However, it appears that their claim will survive only if it arose during a very short period of time, based upon the statute of limitations and the potential applicability of Article Twelfth. If plaintiffs wish to pursue this claim, they will be required to file a second amended complaint alleging the basis for their position that demand was wrongfully refused. Plaintiffs are hereby granted leave to file such an amended complaint within sixty days from the date of this decision.

IT IS SO ORDERED.

Del.Ch.,1992.
Boeing By Levit v. Shrontz
Not Reported in A.2d, 1992 WL 81228 (Del.Ch.), 18 Del. J. Corp. L. 225

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB B

Westlaw.

Not Reported in A.2d                                                                                           Page 1

Not Reported in A.2d, 1990 WL 212304 (Del.Ch.), Fed. Sec. L. Rep. P 95,889
(Cite as: Not Reported in A.2d)

c

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
John CARUANA and Loretta Caruana, Joint
Tenants in Common, Derivatively on behalf of
Interco Incorporated, a Delaware corporation,
Plaintiffs,
v.
Harvey SALIGMAN, Richard B. Loynd, R. Stuart
Moore, Charles J. Rothschild, Jr., Ronald L.
Aylward, Donald E. Lasater, Harry M. Krogh, Lee
Lieberman, Mark H. Lieberman, Robert H. Quenon,
William E. Cornelius, Marilyn S. Lewis, Zane E.
Barnes, Thomas H. O'Leary, Nathan S. Ancell,
Stanley Rubin, Douglas Hillman, Edward Frey,
Zachary Goldman and Londontown Corporation, a
Delaware Corporation, Defendants,
andInterco Incorporated, Nominal Defendant.
Civ. A. No. 11135.

Submitted: Sept. 17, 1990.
Decided: Dec. 21, 1990.

R. Bruce McNew, Pamela S. Tikellis, and Carolyn
D. Mack of Greenfield & Chimicles, Wilmington,
for plaintiffs.
H. James Conaway, Jr., Edward B. Maxwell, 2nd,
and Bruce L. Silverstein of Young, Conaway,
Stargatt & Taylor, Wilmington, and Frank,
Bernstein, Conaway & Goldman, Baltimore, Md.,
for Londontown defendants.
Thomas A. Beck, and Nathan B. Ploener of
Richards, Layton & Finger, Wilmington, for Interco
Director Defendants.
Stephen E. Jenkins, and Keith R. Sattessahn of
Ashby, McKelvie & Geddes, Wilmington, for
defendant Interco Incorporated.

MEMORANDUM OPINION

CHANDLER, Vice Chancellor.

*1 Pending are defendants' motions to dismiss
plaintiffs' derivative action. Plaintiffs, John
Caruana and Loretta Caruana, filed the underlying
derivative action on September 29, 1989, seeking
damages in connection with the sale by Interco
Incorporated ("Interco") of its then wholly-owned
subsidiary, Londontown Corporation ("Londontown
"). The Interco director defendants ("director
defendants") move to dismiss the complaint
pursuant to Chancery Court Rules 23.1 and 12(b)(6)
. Those defendants who comprise the group that
purchased Londontown, as well as Londontown
itself, separately move pursuant to Rules 23.1 and
12(b)(6), to dismiss the claim that they aided and
abetted the director defendants' alleged
transgressions. Defendants Zachary Goldman,
Edward Frey, Douglas Hillman and Stanley Rubin
further move to dismiss pursuant to Rules 12(b)(2),
(4) and (5) on the grounds of lack of jurisdiction
over the person, insufficiency of process and
insufficiency of service of process.

I.

Interco and this Court have met before. *See City
Capital Associates, L.P. v. Interco Inc.,* Del.Ch.,
551 A.2d 787, *appeal dismissed as moot,* Del.Supr.,
556 A.2d 1070 (1988). Luckily, for the sake of
brevity, the present matter concerns only one
discrete transaction. Some background,
nevertheless, is in order.

Interco, the nominal defendant, is a Delaware
corporation with its principal place of business in
St. Louis, Missouri. Interco has been engaged in
four core businesses: (1) apparel manufacturing;
(2) general retail merchandising; (3) footwear
manufacturing; and (4) furniture and home
furnishings. The following individuals were
members of the board of directors of Interco at the
time of the alleged wrongs: Harvey Saligman,
Harry M. Krogh, Ronald L. Aylward, R. Stuart
Moore, Mark H. Lieberman, Richard B. Loynd,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1990 WL 212304 (Del.Ch.),  Fed. Sec. L. Rep. P 95,889
(Cite as: Not Reported in A.2d)

Charles J. Rothschild, Jr., Zane E. Barnes, Donald E. Lasater, Lee M. Liberman, Robert H. Quenon, William E. Cornelius, Marilyn S. Lewis, Thomas H. O'Leary and Nathan S. Ancell. The current board, at the time of the complaint, is virtually identical except for the absence of Krogh, Lieberman and Ancell.

Defendant Londontown is a Delaware corporation with its principal place of business in Eldersberg, Maryland. Londontown manufactures under the label London Fog and was part of Interco's apparel group until its sale in the transaction now at issue. Prior to its sale in December of 1988, Londontown's common stock was owned entirely by Interco.

Interco placed Londontown for sale, according to plaintiffs, in August of 1988, as part of Interco's defensive restructuring which was allegedly in reaction to a takeover bid. The Interco board purportedly received "quite a few bids" for Londontown. One such bid, supposedly submitted as early as October 26, 1988, was from Burlington Coat Factory Warehouse Inc. ("Burlington"). Plaintiffs allege that while the terms of the Burlington bid were negotiable, the defendants completely disregarded and deliberately prevented Burlington from participating in the bidding process. Another bid was made, at a time undisclosed in the complaint, by Eldersberg Acquisition Corporation ("Eldersberg").

*2 On December 19, 1988, Interco announced that it had entered into a definitive agreement (the " Eldersberg Agreement") to sell Londontown to Eldersberg. Eldersberg, a Delaware corporation created to effectuate the purchase of Londontown, was formed by a group of Londontown executives, one of whom was an Interco director (the " Lieberman group"). The Lieberman group consisted of Edward Frey, Zachary Goldman, Douglas Hillman, Stanley Rubin as well as its namesake, former director Mark Lieberman. Under the terms of the agreement, the Lieberman group would pay $178 million for Londontown by means of a promissory note secured by a letter of credit or, at Interco's option, cash. In conjunction with the agreement, Interco announced that the proceeds would be used to pay a bank debt incurred in its restructuring plan.

Upon announcement of the Eldersberg agreement, Burlington allegedly indicated that it was willing to purchase Londontown on terms superior to those proposed by Eldersberg. The Interco board announced that it would consider a Burlington bid and, on December 27, 1988, Burlington submitted its bid of $190 million in cash. The complaint contains no other allegations describing the Burlington bid other than the purported assurance of Monroe Milstein, Burlington's chairman, that Burlington was willing to negotiate and was equipped with assurances and approvals, from its lenders, that it could safely proceed with its offer. Plaintiffs claim that the Interco board refused to negotiate with Burlington. On December 28, 1988, Interco rejected Burlington's bid, allegedly without justification and devoid of any exigencies.

Plaintiffs make various unsubstantiated allegations concerning Interco's rejection of the Burlington bid. One such allegation is that "analysts reported that Interco's action had the appearance of favoritism towards the subsidiary management." Another is that Interco had "thwarted Burlington's every effort to submit a full detailed offer for Londontown." Notwithstanding, Burlington purportedly announced that it would persist in bidding for Londontown.

Burlington's alleged persistence, however, came to an end on December 29, 1988, when the Interco board caused Interco to complete the $178 million transaction with the Lieberman group. On that same day, Interco evidently used approximately $150 million of the net proceeds from the sale to reduce the then current portion of its long-term debt.

II.

Plaintiffs allege that the sale of Londontown, under the circumstances described, constitutes a gross waste of corporate assets, mismanagement of Interco's affairs and breaches of the fiduciary duties of care and loyalty. In addition, plaintiffs maintain that Eldersberg and each member of the Lieberman group, except Lieberman, aided and abetted the Interco directors' breach of fiduciary duties.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1990 WL 212304 (Del.Ch.), Fed. Sec. L. Rep. P 95,889
(Cite as: Not Reported in A.2d)

Plaintiffs bring these claims derivatively in the right and for the benefit of Interco to redress the purported injuries suffered by Interco. Plaintiffs have not made demand on the present Interco board, to institute this action, due to purported futility. Demand is futile according to plaintiffs because, among other things, the Interco board directly participated in wrongs alleged and because the allegations of fact preclude protection from judicial scrutiny afforded by the business judgment rule. Defendants' motion to dismiss the complaint because no demand was made and because no basis exists to excuse demand must be addressed first.

### III.

**\*3** As shareholders of Interco, plaintiffs are not in a position to manage the business and affairs of Interco. Under Delaware law, the directors manage the business and affairs of the corporation they serve. 8 *Del.C.* § 141(a). Because a derivative action fetters managerial prerogative, it is regulated by Chancery Court Rule 23.1 which requires a shareholder first to demand that the directors pursue the alleged cause of action. Rule 23.1 provides in relevant part:

In a derivative action brought by one or more shareholders or members to enforce a right of a corporation ... [t]he complaint ... shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort.

A board's decision to reject the suit is part, if applicable, of the board's business judgment and will be protected by the accompanying presumptions. *Zapata Corp. v. Maldonado,* Del.Supr., 430 A.2d 779, 784 (1981).

Rule 23.1 requires the complaint to allege with particularity the plaintiffs' efforts to have the directors pursue the action or the reasons for the plaintiffs' failure to do so. In the latter situation, where the plaintiff considered such a demand to be futile, he must allege with particularity why this is so. It is the adequacy of the plaintiffs' allegations

of demand futility that I now consider.

In considering defendants' motion, I am limited to a consideration of the allegations of the complaint taking all well-pleaded averments as true. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815 (1984); *Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 622 (1984). To adequately plead demand futility, plaintiffs must allege particularized facts creating a reasonable doubt as to "(i) director disinterest or independence or (ii) whether the directors exercised proper business judgment in approving the challenged transaction." *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 186 (1988); *Aronson v. Lewis, supra.* Failure to so plead would require dismissal of plaintiffs' putative derivative complaint. *Pogostin,* 480 A.2d at 627; *Aronson,* 473 A.2d at 818.

### A. *Disinterest or Independence*

To succeed on the first prong of the demand futility test, plaintiffs must allege facts, with particularity, that raise a reasonable doubt as to the independence or disinterestedness of the Interco directors. It is generally understood that director independence can be challenged with alleged facts showing that the directors "were dominated or otherwise controlled by an individual or entity interested in the transaction." *Grobow v. Perot,* 539 A.2d at 189. The disinterest or independence prong is directed to the time the action was filed. *Pogostin,* 480 A.2d at 624. Plaintiffs have alleged no facts challenging director independence.

As to disinterest, "plaintiffs must plead particularized facts demonstrating either a financial interest or entrenchment." *Grobow v. Perot,* 539 A.2d at 188. Again, plaintiffs have alleged no facts demonstrating either a financial interest or entrenchment motive on the part of the Interco directors. Instead, plaintiffs maintain that the directors are interested because they participated in and approved the wrongs alleged and "cannot defend their actions by any alleged business judgment because each of them has acted with intentional, willful, and reckless disregard of corporate interest...." Plaintiffs' Answering Mem. at 21. Plaintiffs go on to argue that director

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1990 WL 212304 (Del.Ch.),  Fed. Sec. L. Rep. P 95,889
(Cite as: Not Reported in A.2d)

interest is further evidenced by the fact that Interco's liability insurance would not cover an action brought by the company against its own directors and that the directors recommended a charter amendment limiting their liability. These allegations, taken together, the argument goes, raise a reasonable doubt as to director disinterest.

**\*4** Plaintiffs' allegation that the entire current Interco board of directors directly participated in, and approved, the wrongs alleged is legally insufficient. Mere directorial approval of a transaction is insufficient to show interestedness on the part of directors. *Aronson*, 473 A.2d at 817. In addition, it is well-settled that an allegation that directors approved and participated in a challenged transaction will not, in and of itself, establish demand futility. *Grobow v. Perot*, Del.Ch., 526 A.2d 914, 924 (1987), *aff'd*, Del.Supr., 539 A.2d 180 (1980); *Kaufman v. Belmont*, Del.Ch., 479 A.2d 282, 288 (1984).

Plaintiffs' argument that the directors are interested both because their liability insurance has a typical exclusion from coverage of claims brought by Interco against its directors and because the directors recommended and approved a charter amendment limiting their liability has been made before. *See Decker v. Clausen*, Del.Ch., C.A. No. 10684, Berger, V.C. (Nov. 6, 1989). Indeed, plaintiffs' present argument mirrors the argument addressed in the *Decker* opinion. In *Decker*, this Court found that argument to be nothing more than " variations on the 'directors suing themselves' and ' participating in the wrongs' refrain." *Id.*, slip op. at 6. Such allegations were found to provide no particularized facts creating a reasonable doubt that the directors are disinterested or independent. I find no reason to depart from the *Decker* holding in the present situation.

Plaintiffs' next argument is that the Interco directors are interested because the prospect is very good that they will be found liable. This argument draws on language in *Aronson* suggesting that directors may be interested for purposes of the demand requirement "in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a

substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815. Since such a finding would require finding that the second prong (exercise of business judgment) of the demand futility test has been satisfied, I will address plaintiffs' argument, the question of the applicability of the business judgment rule, directly.

### B. *Exercise of Business Judgment*

The second prong of the demand futility analysis requires examination of the substantive nature of the challenged transaction and the board's approval of that transaction. In other words, the analysis looks at the substance of the transaction and the process by which the board approved it. *Grobow v. Perot*, 539 A.2d at 189. The issue is whether the complaint's well-pleaded facts support a reasonable doubt that the transaction was the product of a valid exercise of business judgment. *Id.* Plaintiffs' burden, in the present situation, is particularly heavy since the transaction challenged was approved by a majority of disinterested directors. *See Grobow*, 539 A.2d at 190.

**\*5** Concerning the substance of the transaction, plaintiffs assert that the purchase terms were so egregious as to amount to waste by the Interco directors. The test for waste is "limited solely to discovering whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid." *Saxe v. Brady*, Del.Ch., 184 A.2d 602, 610 (1962); *Grobow v. Perot*, 539 A.2d at 189. Plaintiffs' claim can therefore be understood to assert that no person of ordinary, sound business judgment would have agreed to sell Londontown for $178 million in the face of Burlington's $190 million proposal. The $12 million difference (which amounts to less than 7% on the pretax basis) cannot be said to constitute waste under the test articulated in *Saxe v. Brady*, *supra*. The monetary difference is insignificant, alone, and especially in light of factors not addressed by the complaint, *i.e.*, timing, structure and certainty of financing, that could account for the board's acceptance of the lower offer. This Court has long recognized that the highest bid is not necessarily the best bid. *See*,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 5

Not Reported in A.2d, 1990 WL 212304 (Del.Ch.),  Fed. Sec. L. Rep. P 95,889
(Cite as: Not Reported in A.2d)

e.g., *Freedman v. Restaurant Assoc. Indus., Inc.,* Del Ch., C.A. No. 9212, Allen, C., slip op. at 22 (Oct. 16, 1987). Presently, however, the complaint leaves me ill-equipped to even examine the Burlington, or for that matter any other bid. *See Stein v. Orloff,* Del.Ch., C.A. No. 7276, Hartnett, V.C., slip op. at 16-17 (May 30, 198) (the court granted a portion of defendants' motion to dismiss for failure to make presuit demand because of failure to make certain allegations creating a reasonable doubt that the board exercised its business judgment). For this reason, the plaintiffs have not alleged facts sufficient to create a reasonable doubt that the Interco board did not properly exercise its business judgment in rejecting the Burlington, or any other, bid. In other words, the Court must defer to the judgment of Interco's disinterested board.

Next and finally, plaintiffs argue that there is a reasonable doubt that the directors exercised proper business judgment with regard to procedural due care. *See Grobow,* 539 A.2d at 189; *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872-73 (1985). The gist of the allegations underlying this argument is that the director defendants did not adequately and properly consider the Burlington bid, did not scrupulously adhere to principles of fairness in conducting a sale of Londontown and favored the Lieberman group throughout the process. These allegations, as pointed out by defendants, however, are conclusory in light of the allegations that have not been made.

There are no allegations that the Interco board did not receive bids for Londontown and cooperate with interested parties. There are also no allegations that the board did not retain an investment adviser and counsel to advise it on the Londontown sale. Plaintiffs do not allege that the board was not aware of, or did not consider, the Burlington offer and any other offer. Without such particularized allegations, the complaint's process allegations are conclusory and thus fail to raise a reasonable doubt that the Interco board exercised its business judgment in conducting the sale of Londontown. *See Sumers v. Beneficial Corp.,* Del.Ch., C.A. No. 8788, Hartnett, V.C., slip op. at 9-10 (July 28, 1987).

IV.

*6 Plaintiffs' complaint is dismissed, pursuant to Chancery Court Rule 23.1, for failure to adequately plead demand futility. For this reason I need not address the alternative arguments for dismissal of the complaint.

IT IS SO ORDERED.

Del.Ch.,1990.
Carauna v. Saligman
Not Reported in A.2d, 1990 WL 212304 (Del.Ch.),  Fed. Sec. L. Rep. P 95,889

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB C

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
CERTAINTEED CORPORATION, a Delaware
corporation Plaintiff,
v.
CELOTEX CORPORATION, a Delaware
corporation, Plaintiff,
andCELOTEX ASBESTOS SETTLEMENT
TRUST, a Florida trust Defendants.
**No. Civ.A. 471.**

Submitted Oct. 25, 2004.
Decided Jan. 24, 2005.

William M. Kelleher, Ballard Spahr Andrews &
Ingersoll, LLP, Wilmington, Delaware; Harry Weiss
, and Monique Mooney, Ballard Spahr Andrews &
Ingersoll, LLP, Philadelphia, Pennsylvania, for
Plaintiff.
Richard G. Placey, and Richard M. Donaldson,
Montgomery, McCracken, Walker & Rhoads, LLP,
Wilmington, Delaware; Stephen A. Madva, and
David D. Langfitt, Montgomery, McCracken,
Walker & Rhoads, LLP, Philadelphia,
Pennsylvania, for Celotex Corporation.
R. Judson Scaggs, Jr., and Patricia R. Uhlenbrock,
Morris, Nichols, Arsht & Tunnell, Wilmington,
Delaware; Daniel J. Donnellon, Keating, Muething
& Klekamp, Cincinnati, Ohio, for Celotex Asbestos
Settlement Trust.

MEMORANDUM OPINION
STRINE, Vice Chancellor.
**\*1** Plaintiff CertainTeed Corporation purchased an
operating business and several industrial facilities
from Defendant Celotex Corporation under an asset
purchase agreement. Under the asset purchase
agreement, Celotex assumed the obligation to
indemnify CertainTeed for certain losses

CertainTeed might incur relating to the assets it was
purchasing, and more generally, for losses incurred
as a result of breach of the asset purchase agreement
itself. After closing, CertainTeed began to
experience losses of various kinds that it believed
fell within Celotex's contractual duty of
indemnification. After complying with the
contractual notification procedure and receiving no
satisfaction from Celotex, CertainTeed brought this
case alleging that Celotex is responsible for these
losses.

Celotex has filed a motion to dismiss CertainTeed's
claims as time-barred, alleging that: 1) all of
CertainTeed's claims accrued as of the August 18,
2000 closing date of the asset purchase agreement;
2) all statutes of limitation that apply (by analogy in
equity under the laches doctrine) required a filing
within three years of that date; 3) no basis for
tolling any limitation period exists; and 4)
CertainTeed filed this suit on May 28, 2004, after
the applicable limitation periods had expired.

In this opinion, I cannot find as a matter of law that
all of CertainTeed's claims accrued at closing and
became time-barred on the third anniversary of the
closing date. CertainTeed brings three general
categories of claims, each of which implicates
different principles of claim accrual and tolling.

The first category involves CertainTeed's claims for
injuries incurred because some of the acquired
facilities' environmental conditions were not as
represented and warranted in the asset purchase
agreement. Even indulging CertainTeed's argument
that these conditions were not discoverable at the
time of closing and that the applicable statutes of
limitation were therefore tolled, the complaint
demonstrates that CertainTeed was on inquiry
notice of these claims more than three years before
filing this suit. This category of claims is therefore
dismissed.

The second category of claims involves allegations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

that Celotex breached its obligation to perform certain environmental remediation and testing work after the closing date. These claims accrued, I find, as of the date of non-compliance with the asset purchase agreement. Therefore I conclude that most of these claims are not time-barred, to the extent damages for non-compliance are sought. By contrast, however, I conclude that laches bars CertainTeed from seeking specific performance of these obligations after acting so slowly in bringing suit. A demand for specific performance is akin to a request for a mandatory injunction and it is not appropriate to measure promptness by analogy to a statute of limitations for a damages claim. CertainTeed's inexcusable torpidity in bringing suit prejudices Celotex.

The final category involves a classic claim for third-party indemnification based on liabilities that CertainTeed allegedly incurred as a result of Celotex having (as operator of the business CertainTeed bought) sold defective roofing materials. As this is a claim for third-party indemnification, it did not accrue until CertainTeed settled the product claims in July 2001. CertainTeed brought suit within three years of that date, and the claim is therefore timely.

### I. Overview

**\*2** CertainTeed is a manufacturer of building materials. Celotex, now bankrupt, was formerly a manufacturer of building materials, most (in)famously asbestos. Defendant Celotex Asbestos Settlement Trust (the "Trust") is the sole stockholder of Celotex, and for purposes of the asset sale at issue in this case, is Celotex's indemnitor. For brevity's sake and because the Trust has adopted Celotex's arguments in their entirety, I will not refer to the Trust in this opinion, except with regard to one unique argument that the Trust makes on its own behalf.

The facts underlying this dispute, upon which this motion shall be considered, are as set forth in CertainTeed's amended complaint (the "Complaint" ). CertainTeed contracted with Celotex to purchase certain assets related to Celotex's roofing and

fiberglass mat businesses, including the operating assets of those businesses, and certain facilities used for manufacturing those items. On June 29, 2000, the Asset Purchase Agreement (the "Agreement") effecting this transaction was executed. Significantly, the Agreement provided a remedy to compensate CertainTeed for environmental and other liabilities incurred in connection with the facilities. The sale closed on August 18, 2000 (the "Closing Date" or "Closing"), at which time CertainTeed took title to the four facilities now at issue (the "Facilities").

In this case, CertainTeed alleges three categories of losses for which it seeks relief from Celotex. I outline those categories briefly now.

First, in the Agreement, Celotex made numerous representations and warranties concerning environmental conditions at the Facilities, the validity of various permits required for operations at the Facilities, and compliance with applicable environmental regulations. After Closing, however, CertainTeed began to discover various environmental problems that had been warranted not to exist. CertainTeed incurred losses related to these environmental problems, and sought reimbursement for these losses and certain other liabilities in accordance with the provisions of the Agreement. Celotex refused to acknowledge its liability for the claims asserted. CertainTeed has now sued, under various theories, to recover its losses in connection with the non-compliant conditions of the Facilities. I define these claims generally as the "Facilities Claims."

Second, CertainTeed has sued Celotex because Celotex allegedly failed to complete certain environmental remediation and testing activities required by the Agreement. I define these as the "Remediation Claims."

Third and finally, CertainTeed alleges that it suffered losses because Celotex had, before Closing, sold defective roofing products. CertainTeed settled claims made by a general contractor whose clients threatened to sue over damage caused by those products. It seeks indemnification for the settlement costs from

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Celotex. I call this claim the "Product Claim."

Celotex has brought this motion arguing that each category of claim was brought too late and that the Complaint should be dismissed on the basis of laches.

**\*3** The facts of this case are complex and numerous. In the interests of efficiency and readability, I will introduce most of the relevant facts in connection with the categories of claims I have outlined. Because all of CertainTeed's claims have their origins in the obligations undertaken and promises made by Celotex in the Agreement, it is necessary initially to discuss the relevant provisions of the Agreement and their implications for the pending motion.

### II. *Indemnification Provision Of The Asset Purchase Agreement*

Article 8 of the Agreement requires that Celotex reimburse CertainTeed for specified liabilities. Under the Agreement, Celotex retained liability for certain "Excluded Liabilities," including liabilities for certain environmental violations at the Facilities and third-party product liabilities. Celotex agreed to "indemnify" CertainTeed for: 1) losses related to breach of representations and warranties contained in the Agreement; 2) failure to perform covenants contained in the Agreement; and 3) the Excluded Liabilities.

As an initial matter, the potentially misleading use of the term "indemnification" in the Agreement requires clarification. CertainTeed has clung to this contractual term as a life raft against the sinking of its late-filed claims by contending that all of its claims must be considered as akin to common law claims for indemnification. Under Delaware law, claims for common law indemnity do not accrue until the indemnitee can "be confident that any claim against him ... has been resolved with certainty." [FN1] In other words, a cause of action accrues after the party seeking indemnification has made payment to the third party and the dispute with that party is finally concluded.[FN2] Because CertainTeed did not experience an ascertainable

loss on any of its claims more than three years before it filed the Complaint, it alleges that all of its claims are timely. For reasons I will now explain, that argument lacks logical, legal, or equitable force.

> FN1. *Scharf v. Edgcomb Corporation,___ A.2d ___, 2004 WL 2830885, at \*8 (Del. Dec. 7, 2004).*

> FN2. *See Breakaway Solutions, Inc. v. Morgan Stanley & Co., Inc.,* 2004 WL 1949300, at \*15 (Del. Ch. Aug. 27, 2004) ( "[I]ndemnification claims do not accrue ' until the party seeking indemnification has made payment to the injured person." ') (citing *McDermott v. New York,* 406 N.E.2d 460, 461 (N.Y.1980)); *Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland,* 410 A.2d 101, 102 (Del.Super.Mar. 30, 1979) (" [T]he [indemnity] claim accrues and the statute begins to run only when the cause of action for indemnity arises, or the indemnitee's liability is fixed and discharged. The determining factor is the point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement.")

Article 8 of the Agreement [FN3] provides a contractual remedy for Losses sustained by CertainTeed, referred to as "Indemnification." [FN4] The term "Indemnification" is used here as a contractual term of art to describe this contractual remedy. In the context of a merger or asset acquisition, the term "indemnification" refers generally to the responsibility retained by the seller to make the buyer whole for liabilities related to the assets sold or for breaches of representations and warranties.[FN5] "Indemnification," as used in Article 8, does not refer to the common law right known as "indemnity." [FN6] That is, Article 8 does not provide a general right of reimbursement for debts owed to third parties by Celotex as a secondarily-liable party. This is evidenced by language in § 8.4(c) of the Agreement that specifically distinguishes "Third Party Claims" from claims generally covered under the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

indemnification remedy.[FN7] Instead, Article 8 generally sets forth the subject matter for which CertainTeed may bring claims and procedures for bringing such claims.

FN3. By its terms, the Agreement entitles its Articles, for example, "Article 8," but identifies subsections of its Articles as, for example, "Section 8.1." In keeping with this scheme, I will refer to the contractual indemnification remedy generally as "Article 8," but I will discuss specific provisions of the Agreement by reference to the corresponding section number.

FN4. Agreement at 39.

FN5. *See* Lou R. Kling and Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries, and Divisions,* § 1.05[5], at 1-39 (2001) ( "[Indemnification] provisions grant either party (particularly, the purchaser) the right to recover, post-closing, for misrepresentations and non-compliance with covenants by the other party.").

FN6. *See* 42 C.J.S. *Indemnity* § 2 at 73 (1991) ("[Common law] indemnity is a device by which a tort-feasor 'passes through' his entire liability to a third party whom the tort-feasor alleges is the real party responsible for injury.").

FN7. Agreement at 39 (defining Third Party Claims as "any Action against the Indemnitee by a third party which ... if prosecuted successfully, would be a matter for which the Indemnitee is entitled to indemnification under this Agreement ...").

**\*4** Section 8.1 of the Agreement establishes the broad scope of coverage of the indemnification remedy, stating in relevant part that:
[Celotex agrees to] indemnify, defend and hold harmless [CertainTeed] from, against and in respect of any Losses arising from or related to:
(a) any breach or inaccuracy ... in any

representation or warranty of [Celotex] hereunder ...;
(b) the failure of [Celotex] to perform any covenant or agreement to be performed by it hereunder;
(c) any or all of the Excluded Liabilities ... [FN8]

FN8. Agreement at 39-40.

"Losses," as referenced in § 8.1, are defined in § 1.1 of the Agreement:
"Loss" means any and all claims, losses, liabilities, damages, costs and expenses (including attorney's, accountant's, consultant's and expert's fees and expenses) that are imposed upon or otherwise incurred or suffered by the relevant party.[FN9]

FN9. Agreement at 6.

"Excluded Liabilities," as referenced in § 8.1, are also defined in § 1.1 of the Agreement, which states in relevant part:
"Excluded Liabilities" means all liabilities of [Celotex] other than the Assumed Liabilities, including (without limitation): (a) any other liabilities of [Celotex] ...; (b) the Other Environmental Liabilities; (c) the Acquired Assets Environmental Liabilities; (d) the costs to complete the Remediation Projects properly ... [FN10]

FN10. Agreement at 4-5.

Section 8.3(a) of the Agreement sets temporal limitations on indemnification claims and lawsuits brought under Article 8 as follows:
[N]o claims may be made or suit instituted under any provision of this Article 8 after the second (2nd) anniversary of the Closing Date, except for:
(i) claims of the Buyer for Losses related to Acquired Assets Environmental Liabilities, which shall survive the execution and delivery of this Agreement and the Closing until the third (3rd) anniversary of the Closing Date; *provided however,* that it is of the essence that, after the third (3rd) anniversary of the Closing Date, the Buyer shall

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

have no claim, including (without limitation) any claim for indemnification or contribution, against the Seller for or with respect to Acquired Assets Environmental Liabilities other than such claims which are Reserved Claims as of that date; and
(ii) Reserved Claims which shall survive indefinitely (subject to any applicable statute of limitations). The term "Reserved Claims" means all claims: (1) as to which the Indemnitee has given the Indemnitor proper notice pursuant to § 8.4 below prior to the expiration of the applicable survival period; (2) based upon actual fraud or intentional misrepresentation on the part of the Indemnitor at or prior to the Closing; or (3) based upon Excluded Liabilities (other than Acquired Assets Environmental Liabilities) or Assumed Liabilities, as the case may be.[FN11]

FN11. Agreement at 41.

Section 8.4(a) requires that CertainTeed must provide Celotex with appropriate written notice in order to assert a valid claim:
A claim for indemnification hereunder ... shall be made by [CertainTeed] by delivery of a written notice to [Celotex] requesting indemnification and specifying in reasonable detail the basis on which indemnification is sought and the amount of the Losses incurred (if known) ... [FN12]

FN12. Agreement at 42.

**\*5** The plain language of Article 8 establishes " survival periods" during which claims may be brought or reserved. CertainTeed may bring claims after the survival periods only if they are reserved in accordance with § 8.3(a)(ii). "Reserved Claims" may be brought after the third anniversary of the Closing Date, subject to the "applicable statute of limitations," which, based on the combined effect of § 10.9 of the Agreement [FN13] and 10 *Del. C.* § 8106, is three years for contract and tort claims. [FN14] The cumulative effect of these provisions is that CertainTeed's Article 8 claims are valid only if:

FN13. Agreement at 49. Section 10.9 of the Agreement states that Delaware substantive law governs the parties' rights under the Agreement.

FN14. 10 *Del. C.* § 8106 provides a three-year statute of limitations governing actions for breach of contract (*see Fike v. Ruger,* 754 A.2d 254, 260 (Del. Ch.1999)) and actions for torts (*see Becker v. Hamada,* 455 A.2d 252, 256 (Del.1982)).

1. the asserted liability is within the scope of Article 8;
2. an indemnifiable Loss was sustained;
3. notice of the claim was filed within the applicable survival period;
4. the claim was converted to a Reserved Claim, permitting it to survive the third anniversary of the Closing Date; and
5. this action was filed within the "applicable statute of limitations" for each claim.

The cumulative impact of these provisions quickly dispels CertainTeed's key argument concerning claim accrual. CertainTeed advances a theory that statutes of limitation as to all of its claims begin to run only after the entirety of each claimed loss has been established,[FN15] citing case law supportive of the proposition that claims for indemnification accrue when an indemnifiable loss is sustained.[FN16] Although this general proposition is a correct statement of the law governing third-party indemnification,[FN17] CertainTeed's argument misconstrues the indemnification remedy provided under Article 8 of the Agreement as implicating common law theories of indemnity. At issue here is a contractual remedy, termed "Indemnification," that has no direct relation to common law indemnification. CertainTeed argues that, under its theory, indemnification claims could be brought when the first dollar of loss is sustained, but the statute of limitations would not begin to run until the last dollar of loss is sustained.[FN18] The Agreement clearly rejects that argument. Section 8.3(a)(ii) states that claims for indemnification survive subject to the "applicable statute of limitations," making clear that the timeliness of any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 6

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

claim will be measured by the statute of limitations normally applicable to such a claim. Further, the clear implication of the Agreement is that time is of the essence in submitting claims under Article 8,[FN19] and thus, absent claim-specific justifications for its application, this "last dollar" theory is invalid. Nevertheless, CertainTeed's theory is not wholly without merit, because the "applicable statute of limitations" for third-party claims could be subject to accrual principles of common law indemnity.

> FN15. Pl. Br. at 15 (citing *United States Fidelity & Guarantee Co. v. Gray's Adm'rs,* 97 A. 425 (Del.Super.1916); *Salovaara v. SSP Advisors, L.P.,* 2003 WL 23190391 (Del. Ch. Dec 22, 2003); *Shinault v. Nationwide Mut. Ins. Co.,* 1995 WL 270089 (Del.Super. Mar. 13, 1995); *Council of Unit Owners of Sea Colony, Phase III Condominium v. Carl M. Freeman Associates, Inc.,* 1989 WL 40973 (Del.Super.Apr. 11, 1989)).

> FN16. *United States Fidelity & Guarantee Co. v. Gray's Adm'rs,* 97 A. 425 (Del.Super.1916); *Chesapeake Utilities Corp. v. Chesapeake and Potomac Tel. Co. of Maryland,* 401 A.2d 101 (Del.Super.1979); *Seitz v. A-Del Const. Co.,* 1987 WL 16711 (Del.Super.Aug. 13, 1987); *Council of Unit Owners of Sea Colony, Phase III Condominium v. Carl M. Freeman Associates, Inc.,* 1989 WL 40973 (Del.Super.Apr. 11, 1989); *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* 1992 WL 65411 (Del. Ch. Mar. 30, 1992); *Getty Oil Co. v. Catalytic, Inc.,* 509 A.2d 1123 (Del.Super.1986); *Shively v. Ken-Crest Centers for Exceptional Persons,* 1998 WL 960719 (Del.Super.Nov. 19, 1998).

> FN17. *See* cases cited *supra* notes 2, 15-16.

> FN18. Transcript at 72-73.

> FN19. Agreement, § 8.3(a)(i) (stating in

relevant part that "... it is of the essence that, after the third (3rd) anniversary of the Closing Date, [CertainTeed] shall have no claim ...").

Therefore, in the case of counts for breach of contract and misrepresentation, where claims involve direct injury to CertainTeed-e.g., claims resting on the assertion that CertainTeed was injured because a Facility's environmental condition was not as represented in the Agreement-timeliness is to be measured by the statute of limitations for breach of contract and torts, respectively, with accrual occurring at the date of breach or injury, absent tolling. Only if the underlying claim for contractual indemnification is actually a claim for losses resulting from liability to a third party (i.e., like a common law indemnity claim) will CertainTeed's claim accrue at the time when the last dollar of loss is ascertainable.[FN20]

> FN20. *See* cases cited *supra* note 2.

**\*6** It should also be noted that, at this stage, I assume that all of CertainTeed's claims complied with the first four requirements of Article 8.[FN21] That is, all of CertainTeed's claims: 1) are subject to indemnification under Article 8; 2) seek indemnification for Losses sustained by CertainTeed; 3) were properly submitted to Celotex within the applicable survival period; and 4) were converted to Reserved Claims. Therefore, the validity of each of CertainTeed's claims stands or falls on its compliance with the "applicable statute of limitations."

> FN21. There may be one exception to this general statement. The Complaint does not allege that CertainTeed's claim for losses incurred at the Russellville, Alabama Facility was submitted to Celotex in accordance with the requirements of § 8.4 of the Agreement. But Celotex does not argue this point, and I assume that such notice was given.

III. *Legal Standard For A Motion to Dismiss*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 7

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

The timeliness of claims may be determined on a motion to dismiss if the facts pled in the complaint, and the documents incorporated within the complaint, [FN22] demonstrate that the claims are untimely .[FN23] In considering such a motion, the court applies the plaintiff-friendly principles of Rule 12(b)(6), namely that well-pled allegations in the complaint be accepted as true, and that reasonable inferences be drawn in favor of the plaintiff. [FN24] At the same time, however, when a plaintiff seeks to excuse a late filing by invoking a tolling exception to the statute of limitations, the plaintiff bears the burden to plead facts demonstrating the applicability of the exception.[FN25] When that burden is not met, the court must dismiss the complaint if filed after expiration of the limitations period.[FN26]

> FN22. CertainTeed has submitted a substantial volume of exhibits as an appendix to its Amended Complaint. Court of Chancery Rule 10(c) states that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Exhibits submitted by CertainTeed are thus appropriately considered here.

> FN23. See, e.g. In re Dean Witter Partnership Litigation, 1998 WL 442456, at *3 (Del. Ch. July 17, 1998); Kahn v. Seaboard Corp., 625 A.2d 269, 277 (Del. Ch.1993).

> FN24. See Dean Witter, 1998 WL 442456, at *4.

> FN25. See id. at *6 ("[T]he party asserting that tolling applies ... bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.").

> FN26. See id. at *4.

While statutes of limitation do not formally apply in equity, this court typically applies statutes of limitation by analogy in addressing a laches

argument.[FN27] In this case, the parties have not argued for any general departure from the typical approach, and I adhere to it for the most part. Importantly, however, I note that CertainTeed seeks specific performance of certain affirmative obligations Celotex allegedly failed to perform in accordance with its duties under the Agreement. A claim for specific performance is a specialized request for a mandatory injunction, requiring a party to perform its contractual duties.[FN28] Like any request for an injunction, such a claim necessarily invokes a stricter requirement for prompt action by the plaintiff, and a plaintiff may not wait the full period of three years set forth in § 8106 to seek such relief.[FN29] Laches, rather, will arise much earlier, if a plaintiff sits on its claim and does not demand prompt action.

> FN27. See generally U.S. Cellular Inv. Co. of Allentown v. Bell Atlantic Mobile Systems, Inc., 677 A.2d 497, 502 (Del.1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period."); Kahn, 625 A.2d at 272 ("where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter.").

> FN28. See Donald J. Wolfe and Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery, § 12-3, 12-34 (2004).

> FN29. A request for specific performance may be defeated by a laches defense. See Wolfe & Pittenger at § 12-3, 12-49. Specific performance is regarded as a serious remedy, however, that is only available when monetary damages are inadequate. See id. at 12-35. The seriousness of the specific performance remedy justifies elevation of aspects of the burden of persuasion of the plaintiff in proving a contractual violation. To obtain specific performance, a plaintiff must prove "the existence and terms of an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

enforceable contract by clear and convincing evidence." *Id.* As a result, it seems plain that mandatory relief of this kind invokes the same requirement of alacrity that applies to any other request for an injunction. *See Carey v. Landy,* 1989 WL 44051, at *3 (Del. Ch. Apr. 27, 1989) ("Injunctive relief will be denied where a plaintiff inexcusably delays for several years before taking action."); *Hollingsworth v. Szczesiak,* 84 A.2d 816, 822 (Del. Ch.1951) (holding that, where a plaintiff is guilty of inexcusable delay, a grant of mandatory injunction may be inequitable).

### IV. *Statute Of Limitations Analysis*

CertainTeed brings claims for various breaches of contract and for tortious misrepresentations. Celotex argues that all of these claims are time-barred. There is no dispute that the "applicable statute of limitations" for each of CertainTeed's claims is three years, however, this limitations period is subject to tolling in certain circumstances that are arguably present here. The statute of limitations analysis differs for each of the subsets of claims that CertainTeed asserts.

In addressing the timeliness of the various claims made by CertainTeed, I am required to apply settled principles of law recently reiterated by the Delaware Supreme Court in *Wal-Mart Stores Inc. v. AIG Life Ins. Co.*[FN30] Those principles require the court to consider three major issues before deciding that a claim is time-barred when a plaintiff contends that a tolling exception to the statute of limitations applies.

FN30. 860 A.2d 312 (Del.2004).

*7 First, the court must ascertain the date of accrual of the cause of action. *Wal-Mart* holds that a cause of action accrues "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." [FN31] The "wrongful act" is a general concept that varies depending on the nature of the claim at issue. For breach of contract claims, the wrongful

act is the breach, and the cause of action accrues at the time of breach.[FN32] For tort claims, the wrongful act is a tortious act causing injury, and the cause of action accrues at the time of injury.[FN33] Where the claim is one for indemnification or contribution for damages paid to a third party, a cause of action accrues only after the party seeking indemnification has made payment to the third party. [FN34]

FN31. *Id.* at 319.

FN32. *See Ambase Corp. v. City Investing Co.,* 2001 WL 167698, at *14 n. 4 (Del. Ch. Feb. 7, 2001).

FN33. *See Kaufman v. C.L. McCabe & Sons,* 603 A.2d 831, 834 (Del.1992).

FN34. *See* cases cited *supra* notes 2, 15-16.

Second, the court must determine whether the statute of limitations has been tolled. Generally, the statute of limitations runs from the date of accrual, except when the plaintiff shows that a tolling exception applies. Such exceptions include the doctrines of fraudulent concealment,[FN35] inherently unknowable injury,[FN36] and equitable tolling.[FN37] When a tolling exception applies, the statute of limitations will not run until the plaintiff is on inquiry notice of her claims.

FN35. *See Halpern v. Barran,* 313 A.2d 139, 143 (Del.Ch.1973).

FN36. *See Isaacson, Stolper & Co. v. Artisan's Savings Bank,* 330 A.2d 130, 132 (Del.1974).

FN37. *See Dean Witter,* 1998 WL 442456, at *6.

Assuming a tolling exception applies, the third step that is required under *Wal-Mart* is to consider when the plaintiff received inquiry notice, because when that occurs, the statute of limitations begins running. Inquiry notice does not require actual discovery of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 9

the reason for injury.[FN38] Rather, it exists when the plaintiff becomes aware of "facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery [of injury]." [FN39]

> FN38. *Id.* at *7 (emphasis omitted).

> FN39. *Wal-Mart,* 860 A.2d at 319 (citations and emphasis omitted).

This court, and our Supreme Court, have emphasized that a plaintiff is expected to act with alacrity once she has reason to suspect that her rights have been violated, and that the statute of limitations runs from the point at which the plaintiff, by exercising reasonable diligence, should have discovered her injury.[FN40]

> FN40. *Dean Witter,* 1998 WL 442456, at *6; *U.S. Cellular,* 677 A.2d at 504 n. 7.

With these principles in mind, I turn to addressing the categories of claims brought by CertainTeed. That task is unduly complicated by the Complaint, which unnecessarily proliferates redundant counts based on identical conduct, dividing single claims involving breaches of the Agreement into multiple counts. For the sake of analytical clarity, I have organized the claims into more readily understandable categories.

### V. *Application Of The Statute Of Limitations Analysis To Each Category Of Claims*

#### A. *Facilities Claims*

The first category of claims is the largest in number and in economic importance, or so it appears. This category involves claims that the environmental conditions existing at four of the Facilities were inconsistent with the conditions represented and warranted in the Agreement. Although CertainTeed has pled these claims confusingly, in essence it alleges that Celotex breached representations and warranties in the Agreement-a breach of contract claim-and seeks contractual indemnification under the Agreement. CertainTeed has repetitively pled contractual claims based on the same non-compliance under different rubrics, including contractual indemnification, breach of contract, specific performance, and declaratory judgment. [FN41] Nonetheless, each is ultimately a claim for breach of contract. Under 10 *Del. C.* § 8106, a three-year statute of limitations applies.

> FN41. Complaint, Counts I, II, V, VI, and VII.

**\*8** Despite what appears to be the plain language of § 8.3(c) of the Agreement, which precludes CertainTeed from suing for fraud as to false representations and warranties,[FN42] CertainTeed has also pled that Celotex committed fraudulent misrepresentation by providing false representations and warranties of the conditions of the Facilities. Even assuming these claims are viable, under 10 *Del. C.* § 8106, CertainTeed's misrepresentations are also subject to a three-year statute of limitations, and whether treated as breach of contract or as tort, the accrual date as to all of these claims was the date of Closing. On that date, CertainTeed's contractual rights were breached and it was injured by receiving Facilities the value and nature of which were not as represented. Because the Complaint was filed more than three years after Closing, the key question as to this category becomes whether a tolling exception applies and, if so, when CertainTeed was on inquiry notice of its claims. A category-wide discussion of these issues is useful as precedent to considering each Facility individually.

> FN42. Agreement, § 8.3(c) (stating in relevant part: *"Sole Remedy* . The indemnification remedy provided in this Article 8 shall be [CertainTeed's] sole and exclusive remedy for breaches of the representations and warranties of [Celotex] ...").

CertainTeed explicitly argues only one tolling exception-fraudulent concealment. But a claim of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fraudulent concealment must be supported by a showing that a defendant knowingly took affirmative steps to prevent a plaintiff from learning facts or otherwise made misrepresentations intended to "put the plaintiff off the trail of inquiry." [FN43] In its Complaint, exhibits, and other pleadings, CertainTeed alleges no post-Closing acts by Celotex attempting to cover up non-compliant conditions at the Facilities. Further, after Closing, the Facilities were under CertainTeed's own dominion. And, as will be seen, CertainTeed discovered the non-compliant conditions at various of the facilities almost immediately upon assuming ownership, rendering the fraudulent concealment exception even less applicable to this case.

FN43. *Halpern,* 313 A.2d at 143.

Implicitly,[FN44] but a bit more logically, CertainTeed argues that the non-compliant conditions at the Facilities were inherently undiscoverable and, for that reason, the statute of limitations was tolled. Frankly, that argument, at first blush, appears wholly strained. Any purchaser of industrial manufacturing facilities in our society knows of the serious risk that there will be conditions on the property, resulting from past operations, that violate relevant environmental laws and that will have to be cleaned up by the present owner. That is why purchasers of such properties procure environmental audits before buying.[FN45] To apply the inherently unknowable injury doctrine, which originally addressed situations where surgeons left items within the bodies of their patients, in a dissimilar circumstance so as to excuse a tardy filing by a sophisticated, multi-billion dollar corporation like CertainTeed has no apparent commercial or equitable logic.[FN46] Rather, one would think that the law should expect such purchasers to do appropriate due diligence before purchase.

FN44. CertainTeed did not squarely invoke the inherently unknowable injury exception in its brief, but explicitly raised it and directly relied upon it at oral argument.

FN45. By way of example, when CertainTeed sold the Los Angeles Facility to the University of Southern California less than one year after the Closing Date, USC insisted upon such environmental audits as a condition precedent to closing, and further, in connection with that sale, extracted from CertainTeed an obligation to remediate all environmental damage discovered on that property.

FN46. Admittedly, the doctrine of inherently unknowable injury has been applied in cases when a defendant's wrongdoing was unknowable because evidence of a defendant's negligence was, for example, buried underground. In *Rudginski v. Pullella* (378 A.2d 646 (Del.Super.1977)), purchasers of a new septic system were held to have had no reason to suspect the new system they had purchased was defective until it malfunctioned. Here, however, CertainTeed was not purchasing a new underground product that it would have been entitled to assume was in proper working order. It was purchasing industrial facilities of more than modest vintage, on which it was already aware of some environmental problems and on which it should have suspected that other problems might also exist.

*9 There are arguably two reasons why the doctrine might credibly apply in a situation like this one. Assume the purchaser of an industrial facility extracted from the seller the pre-closing obligation to have independent environmental audits performed and to receive clean results of those audits. In such cases, the buyer could reasonably be considered to have acted diligently by, in essence, extracting from the seller the conduct of responsible due diligence that should have detected non-compliant conditions.[FN47] Having done so, the buyer would be entitled to assume that facilities were as contractually warranted until inquiry notice to the contrary arose. Why? Because one would assume that the non-compliant conditions, if discoverable, would have been detected by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

pre-Closing audits.

> FN47. *See, e.g., Pack & Process, Inc. v. Celotex Corp.,* 503 A.2d 646, 650-1 (Del.Super.1985) (holding that where, in accordance with a contractual relationship, a buyer relied on a seller's expertise and assurances in determining the existence and cause of damages to the subject property, and where the buyer could only discover the failure of the seller to perform in good faith and in accordance with the seller's contractual obligations through hiring an independent specialist to make the same inspections required of the seller, the buyer could be "blamelessly ignorant" for the purposes of tolling analysis).

By contrast, CertainTeed acted here with much less diligence, extracting as to each Facility representations and warranties that environmental conditions were acceptable, and the right to receive any environmental audits that had been conducted by Celotex in the past five years. That is, CertainTeed did not act prudently in ascertaining the true conditions of the Facilities before Closing. In my view, CertainTeed's argument that procuring the representations and warranties themselves as to the compliant conditions of the Facilities was sufficient to invoke the inherently unknowable injury doctrine is a non-sequitur. It is the breach of these very representations and warranties that creates a claim; the question is whether the breach is reasonably discoverable. Otherwise, any claim for breach of a contractual representation would toll the statute of limitations on the grounds that the representation itself somehow rendered the breach of the representation undetectable. CertainTeed's own Complaint, as we shall see, refutes the notion that a party using rational commercial practices could not have discovered the non-compliant conditions.

As a result, CertainTeed is, in my view, in a weak position to invoke the inherently unknowable injury doctrine. But a recent decision of our Supreme Court makes it arguable that CertainTeed can invoke the doctrine, even on this record and even

given its lack of reasonable prudence. In *Wal-Mart,* the Supreme Court held that one of America's largest corporations, despite having a huge legal department and access to the best outside legal advice money could buy, could not be expected to discover that its utilization of a tax-avoidance strategy advocated by insurance brokers might be ruled by the Internal Revenue Service to be improper.[FN48] This ruling sets a low threshold for the use of the doctrine of inherently unknowable injury, but one that is hard for a trial court to ignore.

> FN48. 860 A.2d 312.

Given that the conditions CertainTeed claims could not be detected were at least as hidden as the legal risk Wal-Mart supposedly could not identify, I accept solely for the sake of argument that the misrepresented environmental conditions at the Facilities were not discoverable and that the statute of limitations was tolled with respect to the Facilities Claims until CertainTeed was on inquiry notice.

*10 At the same time, however, the commercial context does, to my mind, matter. CertainTeed premises its claims on one Asset Purchase Agreement. Once it had reason to suspect, despite the pre-Closing representations and historical environmental audits to be provided to it by Celotex, that some of the Facilities did not comply with their warranted condition, CertainTeed was not entitled to lean back in the recliner and not investigate whether, as to other of the Facilities, similar breaches also existed. Rather, knowing that it could not rely on Celotex's pre-Closing representations and audits, CertainTeed was duty-bound to investigate and to try to discover all of its claims against Celotex.[FN49] With this in mind, I next turn to determining when CertainTeed was on inquiry notice, which must be analyzed on a facility-by-facility basis.

> FN49. *See U.S. Cellular,* 677 A.2d at 509, n. 7 ("[W]hatever is notice calling for inquiry is notice of everything to which such inquiry might have led.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 12

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

### 1. *The Birmingham Facility*

The Complaint alleges that the Birmingham, Alabama Facility was non-compliant because soil and groundwater were contaminated with naphthalene, coal tar, and other hazardous substances. But the Complaint also admits that the non-compliance was suspected before Closing [FN50] and confirmed in October 2000.[FN51] Thus, at the very latest, inquiry notice triggered the running of the statute of limitations in October 2000, but CertainTeed waited more than three years after that date to file suit. Even after receiving formal notice of a permit violation, CertainTeed took almost two more years to sue.

> FN50. Complaint ¶ 78.
>
> FN51. Complaint Ex. K at 4 (noting that Water Quality Data recorded between August and October 2000 "demonstrated naphthalene concentrations far in excess of targeted federal and state water quality criteria").

The existence of coal tar waste in the soil was ascertained at the Birmingham Facility soon after Closing. Naphthalene contamination was found in groundwater between August and October 2000, [FN52] and in the soil in February 2001. [FN53] On July 30, 2002, CertainTeed received notification that the Birmingham Facility was not in compliance with its National Pollution Discharge Elimination System Permit.[FN54] Making all inferences in favor of CertainTeed, the statute of limitations was tolled until October 2000 at the latest, when groundwater contamination was first ascertained. Although other injuries were discovered after October 2000, the initial discovery constituted "the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery" of other contamination and noncompliance with permit requirements.[FN55] Thus, the applicable statute of limitations began to run soon after the Closing Date and expired soon after the third anniversary of the Closing Date, in October 2003. As to the Birmingham Facility, the Facilities Claims filed May 28, 2004 are therefore

time-barred.

> FN52. *Id.*
>
> FN53. *Id.*
>
> FN54. Complaint Ex. L at 5.
>
> FN55. *Wal-Mart,* 860 A.2d at 319.

### 2. *The Cincinnati Facility*

At the Cincinnati, Ohio Facility, shortly after Closing, CertainTeed discovered liquid hydrocarbons floating on groundwater.[FN56] On an unspecified date thereafter, CertainTeed also discovered petroleum and tar contamination in the soil.[FN57] Here again, discovery of groundwater contamination constituted inquiry notice for other environmental liabilities. The statute of limitations was tolled only until "shortly after the Closing Date. " [FN58] The Facilities claims relating to the Cincinnati Facility were not filed within the limitations period that began to run shortly after Closing, and are thus time-barred.

> FN56. Complaint ¶ 101.
>
> FN57. Complaint ¶ 103.
>
> FN58. Discovery of contamination at the Cincinnati facility is characterized as having occurred "shortly after closing," and the actual date is not specified. In order for this action filed May 28, 2004 to have been timely, however, discovery would have to have been sometime after May 28, 2001, more than nine months after the Closing Date. While I am obliged to make plaintiff-friendly inferences, I am not obliged to make unreasonable inferences.

### 3. *The Los Angeles Facility*

**\*11** Based on conditions that had already been discovered at the Birmingham and Cincinnati Facilities, by October 2000, CertainTeed should

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 13

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

have suspected that environmental conditions at the other acquired Facilities were also potentially non-compliant and begun to undertake diligent discovery efforts. Having been given reason to suspect two very serious breaches, CertainTeed could not fail to act with diligence as to other possible instances of non-compliance by taking prudent steps to ascertain the environmental condition of each Facility.

In this regard, the plain averments of the Complaint implicitly but unmistakably concede that CertainTeed was on inquiry notice as to possible non-compliance at the Los Angeles Facility more than three years before it filed its May 28, 2004 Complaint. In the Complaint, CertainTeed alleges that non-compliance at Los Angeles was first confirmed on May 31, 2001 in an Environmental Site Assessment report disclosing the existence of contamination. [FN59] But, the Assessment obviously does not reflect results discovered the very day that the report was completed or the date when results were first delivered to CertainTeed. Rather, it manifests the results of CertainTeed's actions in response to earlier inquiry notice. As of May 31, 2001, CertainTeed indisputably should have been on actual notice of the non-compliance, but the statute of limitations had already begun running no later than the time when CertainTeed first initiated the Assessment, which was obviously many months before then.

> FN59. Complaint Ex. G at 1-2. CertainTeed alleges that it did not actually receive the Environmental Site Assessment dated May 31, 2001 until mid-July 2001. CertainTeed evidently failed to inquire as to the results of an environmental assessment in progress that indisputably would have constituted inquiry notice as early as May 31. Instead, CertainTeed passively waited to be informed of contamination more than one month after it was discovered. CertainTeed's failure to monitor results of an environmental assessment as they became available supports a general conclusion that its failure to discover injuries at the Los

Angeles Facility was due more to a lack of diligence than to inherent undiscoverability.

After receiving actual notice in mid-July of injuries that could have been ascertained on May 31, 2001, CertainTeed also learned of the existence of underground storage tanks that had leaked other contaminants. Instead of acting promptly in the face of this information, CertainTeed waited until May 28, 2004 to sue on its Facilities Claims. This was clearly more than three years after inquiry notice existed. For this reason, the Los Angeles Facilities Claims are untimely and shall be dismissed.

The Los Angeles Facilities Claims are also untimely for a related, although not identical reason. As noted earlier, CertainTeed's notice of non-compliant conditions at Birmingham and Cincinnati shortly after Closing triggered a more general duty of inquiry on CertainTeed's part. CertainTeed should have suspected non-compliance might exist at the Los Angeles Facility after deficient conditions were discovered at Birmingham and Cincinnati.[FN60] Notably, the Birmingham and Cincinnati Facilities, like the Los Angeles Facility, were used for the manufacture of roofing materials. All three of these Facilities used asphalt in their manufacturing processes and maintained asphalt storage tanks on the premises.[FN61] All three of these facilities maintained storage tanks for diesel fuel, waste oil, or other petroleum products on the premises.[FN62] Contamination ultimately discovered at all three of these Facilities involved hydrocarbons and tar. Given the similarities between the Facilities and the environmental conditions allegedly concealed at each of them, a person of ordinary intelligence and prudence would have been on inquiry notice of the injurious conditions at the Los Angeles Facility shortly after the Closing Date, when injurious conditions were discovered at the Birmingham and Cincinnati Facilities. On these facts, the statute of limitations for bringing claims related to the Los Angeles Facility began to run, at the latest, from the earlier of the date when groundwater contamination was discovered at the Birmingham facility in October 2000 or the date when CertainTeed commissioned the Assessment, a date clearly earlier than May 31, 2001, when results of Phase I of that assessment were reported. Under either date, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
(Cite as: Not Reported in A.2d)

Los Angeles Claims were filed too late, and this action, filed May 28, 2004, is time-barred.

> FN60. *See* Complaint Ex. P at 2. The similarity of the injuries at the Facilities was not lost on CertainTeed. In a letter to Celotex disclosing conditions at the Cincinnati facility, CertainTeed noted that " material discovered at the Cincinnati Facility is similar to the material discovered at the Birmingham Facility, which we have discovered is coal tar, a hazardous substance."

> FN61. Agreement, Schedule 4.18.

> FN62. *Id.*

### 4. The Russellville Facility

**\*12** CertainTeed brings claims for losses at the Russellville Alabama Facility related to the condition of a regenerative thermal oxidizer ("RTO" ) used at that Facility to reduce air emissions to a level in compliance with air pollution standards. In accordance with the Agreement, Celotex conducted tests to assure that the RTO achieved required levels of emissions abatement before Closing.[FN63] After the Closing Date, CertainTeed questioned the validity of testing conducted by Celotex,[FN64] but waited until November 2003, several years later, to conduct its own testing of the RTO. It was only then that CertainTeed supposedly discovered that the RTO did not achieve the necessary level of emissions abatement, in violation of the facility's Air Pollution Control Permit.[FN65]

> FN63. Complaint ¶ 109.

> FN64. Complaint ¶ 120.

> FN65. Complaint ¶¶ 111-126.

The Russellville Claims are time-barred because CertainTeed was on inquiry notice more than three years before it filed this lawsuit. Given CertainTeed's own admission that it immediately suspected the reliability of the pre-Closing test results, and its own immediate discovery of non-compliant conditions at other facilities, CertainTeed should have tested the performance of the RTO itself soon after Closing. By waiting until more than three years after Closing to test for itself, CertainTeed unreasonably delayed and let the statute of limitations lapse.[FN66]

> FN66. Celotex has advanced the theory that CertainTeed lacks standing to sue because title to the Russellville facility was transferred at Closing to Vetrotex, a subsidiary of CertainTeed. Because CertainTeed's claims with respect to the Russellville facility can be dismissed on other grounds, the question of standing need not be addressed here.

### B. Remediation Claims

CertainTeed's Remediation Claims comprise the second category of claims against Celotex. In the Agreement, Celotex covenanted to perform, after Closing, certain environmental remediation, monitoring, and testing obligations related to known or suspected environmental conditions at the Cincinnati [FN67] and Birmingham [FN68] Facilities. Celotex's obligations are set out in § 6.13 and Disclosure Schedule 6.13 of the Agreement.

> FN67. Complaint ¶¶ 145, 147, 166, and 217(a).

> FN68. Complaint ¶¶ 141, 165 and 217(a).

CertainTeed alleges that Celotex failed to perform these post-Closing remediation obligations at the Cincinnati and Birmingham Facilities, and requests an order for specific performance here, or alternatively, damages. CertainTeed's claims for failure of Celotex to meet its remediation obligations are breach of contract claims that accrued on the date of the breach. Section 6.13(a) of the Agreement requires that Celotex complete all remediation projects no later than one year from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Closing Date, on August 18, 2001, and CertainTeed argues that any cause of action for breach of Celotex's failure to meet its remediation obligations accrued at the time performance was due on that date. Celotex argues that breach occurred much earlier, alleging that CertainTeed either refused performance or Celotex notified CertainTeed that it would not comply with its obligations at each of these Facilities shortly after Closing.

Celotex suggests that frustration of performance by CertainTeed or its own anticipatory repudiation of its performance obligations set the three-year statute of limitations running soon after the Closing Date, and that CertainTeed's claims as to both Facilities are now time-barred. Those arguments rely on facts outside the Complaint, and cannot serve as a basis for granting a motion to dismiss here. If the facts are reasonably construed in favor of CertainTeed, the statute of limitations for its Remediation Claims would have expired on August 18, 2004, three years after Celotex's performance of its obligations was due, and this action for breach of contract was timely filed on May 28, 2004. Accordingly, CertainTeed's claim for damages as a result of the failure of Celotex to perform its remediation obligations cannot be dismissed.

**\*13** The remediation claims, however, raise distinct considerations in an important respect. Although Celotex's remediation claims may have accrued on August 18, 2001, the doctrine of laches does not permit CertainTeed to obtain an order of specific performance at this late stage. As discussed earlier, a request for specific performance is a specialized demand for a mandatory injunction. As a result, it is not the case that the statute of limitations applies by analogy. Rather, a party seeking specific performance must act with alacrity or lose its rights.[FN69] Here, CertainTeed's tardiness was unreasonable, and is unfairly prejudicial. Celotex covenanted under the Agreement to address environmental conditions at the Facilities that existed at Closing. Implicit in this covenant is that Celotex was required to rectify problems that it created. With the passage of time, Celotex's responsibility for current environmental conditions at those Facilities grows more and more tenuous, and requiring performance by Celotex four years

after it relinquished control over the Facilities would be unreasonable and prejudicial to Celotex. Further, specific performance is an equitable remedy normally applicable only in exigent circumstances, for example, in situations where an assessment of money damages would be impracticable or would somehow fail to do justice.[FN70] Here, there are no exigencies suggestive of a need for specific performance. A monetary assessment covering the cost of remediation services is an adequate remedy here.

> FN69. *See supra* notes 28-9 and accompanying text.

> FN70. *E.g., Equitable Trust Co. v. Gallagher,* 102 A.2d 538, 546 (Del.1954).

Although I will not deny CertainTeed the chance to recover the reasonable costs of performing, on its own, the remediation activities specifically identified in the Agreement, the intervening period of time must equitably be taken into consideration in that calculus as well. That will require CertainTeed to demonstrate not only what it spent to perform the remediation activities, but also to prove that no intervening events occurred since CertainTeed assumed ownership of the Facilities that made the work more expensive to complete.

CertainTeed also claims that Celotex failed to perform certain testing obligations at the Russellville Facility in an acceptable manner.[FN71] Section 6.13(b) of the Agreement requires that air emission "stack testing" be performed at the Russellville Facility by an independent third-party contractor in accordance with requirements set forth in Schedule 6.13(a) of the Agreement.[FN72] Notably, § 6.13(b) requires that this testing be performed no later than July 14, 2000.[FN73] Any claim for breach of contract accrued, at the latest, at the time performance was due, which was July 14, 2000. The three-year statute of limitations for bringing a claim for that breach thus expired on July 14, 2003, and this action, filed May 28, 2004, is time-barred as to the Russellville Remediation Claims.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 16

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
(Cite as: Not Reported in A.2d)

FN71. Complaint ¶¶ 167-168.

FN72. Agreement at 34.

FN73. *Id.*

### C. *Product Liability Claims*

CertainTeed's claims for product liability comprise the third category of claims considered here. Celotex, in the Agreement, assumed liability for claims related to products sold before the Closing Date.[FN74] Celotex manufactured and sold a line of algae-resistant shingles, the granular coating of which, in conjunction with certain unfavorable environmental conditions, is alleged to have caused the corrosion of gutters and other aluminum fixtures on the houses of certain consumers in two California neighborhoods who had purchased and installed the shingles on their roofs.[FN75] CertainTeed received complaints from consumers whose homes had been damaged by the shingles, demanding the replacement of corroded aluminum fixtures, primarily gutters, with copper fixtures.[FN76] When this occurred, CertainTeed promptly notified Celotex. Celotex acknowledged that the product claims were Excluded Liabilities under Section 2.2 of the Agreement and stated that it would exercise its right to provide a defense against the third-party claims.[FN77] On July 18, 2000, a homeowners' association in one of the neighborhoods stated its intent to sue the builder who built their homes for damages related to the algae-resistant shingles. The builder, in turn, communicated to CertainTeed that, due to the unacceptable delay in resolving the claims of the affected consumers, he was not inclined to use CertainTeed products in the future.[FN78] On July 19, 2001, CertainTeed, evidently pressured to resolve these claims quickly,[FN79] indicated that if Celotex did not act, CertainTeed would undertake the replacement of the corroded aluminum gutters on July 25, 2001.[FN80]

FN74. The assumption of product liabilities by Celotex is somewhat circuitous. Section 8.1 of the Agreement defines the scope of the Indemnification clause under which Celotex is bound to compensate CertainTeed for losses. Indemnifiable losses include, under § 8.1(c), Excluded Liabilities. Section 2.2 defines Excluded Liabilities as including " all liabilities of the Seller, other than the Assumed Liabilities." Section 2.2 defines Assumed Liabilities as including "all Assumed Product Claims." Section 2.2 further defines Assumed Product Claims as including "all liabilities related to the resolution of product claims," but excluding "product claims to the extent arising from or related to damage to property, bodily injury, or death." Thus, under § 8.1, Celotex retains liability for product claims related to damage to property, such as those at issue here.

FN75. Complaint ¶¶ 174-178 and Ex. R.

FN76. Complaint ¶¶ 175-178 and Ex. R at 2. The chemical reaction that damaged the aluminum gutters was specific to aluminum metal, and did not corrode copper. Replacement of aluminum gutters with copper gutters was supposedly the most practical means of solving the problem.

FN77. Complaint, ¶ 180 and Ex. S.

FN78. Complaint Ex. S at 2.

FN79. Complaint Ex. T at 2. CertainTeed alleges that, although Celotex stated its intent to assume a defense of the third-party claims, it failed to do so in a timely manner. Presumably, this failure of Celotex to consider the matter quickly prompted the builder to issue an ultimatum that required immediate action by CertainTeed.

FN80. Complaint Ex. S.

**\*14** The principles of accrual and tolling applicable to CertainTeed's Product Liability Claims differ from those applicable to its Facilities Claims. These

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 17

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Product Liability Claims are not direct claims against Celotex, but claims for damages paid to third parties. Claims for third-party liabilities accrue in accordance with principles of common law indemnity. Under this standard, CertainTeed's Product Liability Claims accrued, and the statute of limitations began to run, when the indemnifiable losses to the third parties were incurred and the dispute with them concluded,[FN81] which was when CertainTeed settled its third-party claims.

     FN81. *See* cases cited *supra* notes 2, 15-16.

Making inferences favorable to CertainTeed, its Product Liability Claims accrued when the consumer claims were settled, sometime after July 25, 2001. The statute of limitations began to run when the claims were settled and expired on the third anniversary of that date in 2004. This action, filed May 28, 2004, is therefore timely as to CertainTeed's Product Liability Claims. [FN82]

     FN82. Celotex argues that CertainTeed failed to comply with other requirements of the Agreement in asserting its Product Liability Claims. That may well be the case. There is language in the Agreement permitting Celotex to provide a defense against third-party claims, and Celotex alleges that, although it had indicated to CertainTeed that it wished to provide a defense for claims related to the algae-resistant shingles, CertainTeed nevertheless settled the claims unilaterally, in contravention of the terms of the Agreement. This is an argument on the merits, however, that depends on facts and documents outside the Complaint, and is not appropriately resolved on this motion to dismiss.

## VI. *Remaining Issues*

The timeliness of the Facilities, Remediation, and Product Liability Claims is the central issue on this motion. In their sprawling papers, the parties also tangled over a few other issues, which I next

address.

### A. *The Viability Of CertainTeed's Claims That Celotex Breached Its Contractual Obligation To Mediate*

CertainTeed has pled, as supposedly independent claims, counts alleging that Celotex breached the Agreement by refusing to participate in the mediation process contemplated by § 8.4 of the Agreement in order to resolve the various Article 8 claims the timeliness of which this opinion has just addressed. CertainTeed seeks specific performance or, in the alternative, damages for these supposed breaches. As with the other claims for specific performance, I conclude that CertainTeed's torpor renders it guilty of laches and bars its request for an order of specific performance. If CertainTeed wished to compel mediation-a process that by its nature has no guaranteed outcome-it should have filed suit much earlier.

As important, I conclude that the only possible relief CertainTeed could receive for any failure of Celotex to mediate is an order of specific performance. By its very nature, an obligation to mediate is simply an obligation to attempt, with the aid of a third party neutral, to resolve a dispute in good faith. It is an "agreement to try to agree." Under the Agreement as written, the pendency of mediation did not excuse the party seeking relief from making a timely filing in order to satisfy the statute of limitations.[FN83] CertainTeed cannot revive its time-barred substantive claims through the guise of arguing that Celotex's failure to mediate them somehow tolled the statute of limitations as to those claims.

     FN83. Agreement at 42. Section 8.4(b) states that "[C]elotex may file an Action during the Negotiation Period or the Mediation Period if the indemnification would otherwise be subject to dismissal for a failure to file within applicable statutes of limitation."

Nor is there any basis for this court to render a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 18

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

damages award based on its approximation of the level at which the parties might have hypothetically settled after mediation. Even in circumstances when commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of this state, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree.[FN84] That reasoning applies with even greater force when, as here, a party seeks after long delay to recover damages because its contractual party failed to honor an "agreement to try to agree" on terms for the settlement of a dispute. Therefore, these counts of the Complaint are dismissed.

> FN84. *See, e.g., International Equity Capital Growth Fund, L.P. v. Clegg,* 1997 WL 208955, at *9 n. 3 (Del. Ch. Apr. 22, 1997) ("Delaware law ... require[s] the parties to have reached agreement on all material terms before an 'agreement to agree' will be enforced.").

### B. *Celotex's Motion To Dismiss Aspects Of CertainTeed's Request For Damages*

**\*15** Celotex has argued that the ad damnum clause of the Complaint contains requests for damages that are excluded under the Agreement. Section 8.3(b)(iii) of the Agreement states that the "Buyer may not assert a claim for indemnification for Losses for ... special or consequential damages except to the extent such damages are part of a Loss arising from a Third Party Claim." Celotex claims that this exclusion bars CertainTeed's requests for awards of lost profits, attorney's and consultant's fees, and costs to bring this suit. CertainTeed retorts citing the general definition of "Loss" in § 1 .1 of the Agreement, which includes "any and all ... costs and expenses (including attorney's, accountant's, consultant's and expert's fees and expenses) that are imposed upon or otherwise incurred ... by the relevant party."[FN85] Further, CertainTeed looks to § 3 of the Trust Indemnification Agreement, under which the Trust assumed liability as a third party indemnitor for claims asserted by CertainTeed against Celotex, stating that "The Trust hereby

agrees to pay any and all expenses (including attorneys' fees and expenses) reasonably incurred by [CertainTeed] in enforcing any rights under this Indemnification Agreement."[FN86]

> FN85. Agreement at 6.

> FN86. Trust Indemnification Agreement at 4.

Frankly, the parties' briefing on this issue is inadequate to reach any definitive resolution on this difference of opinion. It appears certain that CertainTeed cannot receive an award of lost profits for its surviving Remediation Claims, and its claim for that category of damages is therefore dismissed. It is not apparent, however, that the other recompense it seeks falls outside the contractual definition of Loss and within the category of consequential damages, particularly given the specific language of § 1.1 of the Agreement and the lack of sufficient briefing on this question. Therefore, I will not preclude CertainTeed from pressing forward with its claims for the other relief it has requested. If it becomes necessary later in the case, when the question of damages is before the court in a more concrete context, Celotex can again present the argument that certain remaining categories of relief sought constitute excludable consequential damages.

### C. *The Trust's Motion To Dismiss On The Ground That The Claims Against It Are Not Ripe*

The Trust has moved to dismiss all of CertainTeed's claims on ripeness grounds, arguing that, consistent with accrual principles of common law indemnity, [FN87] as Celotex's indemnitor, its third-party liability to CertainTeed accrues only after a judgment has been rendered against Celotex. Thus, the Trust contends, it is not a proper defendant in the present action.

> FN87. *See* cases cited *supra* notes 2, 15-16.

The Trust's obligations to indemnify CertainTeed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                     Page 19

Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

are limited, and contingent upon a judgment against Celotex. As to the claims pled in the Complaint, CertainTeed has no right to assert claims for losses against the Trust until Celotex's assets, under a specific letter of credit, are exhausted.[FN88] That has not occurred yet. Give that reality, and given that the Trust conceded that it will be bound by and have no right to relitigate any judgment against Celotex,[FN89] CertainTeed has sued the Trust prematurely and the claims against the Trust are dismissed without prejudice. When CertainTeed's contractual right to seek indemnity against the Trust ripens, it will be free to reassert these claims, which will depend for their force on CertainTeed's ability to obtain a judgment against Celotex.

> FN88. Trust Indemnification Agreement at 3. Section 2(c) states that "CertainTeed will not be entitled to assert claims for Losses directly against the Trust until the Letter of Credit is exhausted ..."

> FN89. Transcript at 128-9.

### VII. Conclusion

*16 For all the foregoing reasons, Celotex's motion to dismiss the Facilities Claims is GRANTED; its motion to dismiss the Remediation Claims is GRANTED as to CertainTeed's demand for specific performance and is otherwise DENIED; its motion to dismiss the Product Liability Claims is DENIED; its motion to dismiss CertainTeed's claim that Celotex failed to mediate in accordance with the Agreement is GRANTED; and its motion to dismiss CertainTeed's request for lost profits as to the Facilities Claims (which are barred on other grounds) and Remediation Claims is GRANTED. The Trusts's motion for dismissal on ripeness and contractual grounds is GRANTED.

Within ten days, Celotex and the Trust shall, upon notice as to form by CertainTeed, submit an implementing order dismissing the relevant counts of the Complaint addressed by this opinion. CertainTeed has pled counts for declaratory judgment that track the Facilities and Remediation Claims categories. The parties shall also include in

the implementing order language that dismisses those counts to the extent that the related counts for damages have not survived and permitting those counts to remain to the extent that the related counts for damages have weathered this motion.

Del.Ch.,2005.
Certainteed Corp. v. Celotex Corp.
Not Reported in A.2d, 2005 WL 217032 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 1339885 (Trial Pleading) Answer and Affirmative Defenses of Defendant Celotex Corporation (Mar. 9, 2005) Original Image of this Document (PDF)
• 2004 WL 3370541 (Trial Motion, Memorandum and Affidavit) Defendant Celotex Asbestos Settlement Trust's Motion to Dismiss the Amended Complaint (Sep. 20, 2004) Original Image of this Document (PDF)
• 2004 WL 3370542 (Trial Motion, Memorandum and Affidavit) Defendant Celotex Corporation's Motion to Dismiss the Amended Complaint (Sep. 20, 2004) Original Image of this Document (PDF)
• 2004 WL 3370540 (Trial Pleading) Ÿamended¨ Complaint (Sep. 10, 2004) Original Image of this Document (PDF)
• 2004 WL 3370538 (Trial Motion, Memorandum and Affidavit) Defendant Celotex Asbestos Settlement Trust's Motion to Dismiss the Complaint (Jun. 22, 2004) Original Image of this Document (PDF)
• 2004 WL 3370539 (Trial Motion, Memorandum and Affidavit) Defendant Celotex Corporation's Motion to Dismiss the Complaint (Jun. 22, 2004) Original Image of this Document (PDF)
• 2004 WL 3370537 (Trial Pleading) Verified Complaint (May 28, 2004) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB D

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

**H**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re DEAN WITTER PARTNERSHIP
LITIGATION
No. CIV. A. 14816.

July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner,
Jr., Esquire, of Chimicles, Jacobsen & Tikellis,
Wilmington, Delaware; of Counsel: Nicholas E.
Chimicles, Esquire, Denise Davis Schwartzman,
Esquire, Francis J. Farina, Esquire, and M.
Katherine Meermans, Esquire, of Chimicles,
Jacobsen & Tikellis, Haverford, Pennsylvania,
Attorneys for Plaintiffs.
Kenneth J. Nachbar, Esquire, of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware; of
Counsel: Martin London, Esquire, Richard A. Rosen
, Esquire, Robert N. Kravitz, Esquire, and Tracy
Anbinder Baron, Esquire, of Paul, Weiss, Rifkind,
Wharton & Garrison, New York, New York,
Attorneys for Defendants.

MEMORANDUM OPINION
CHANDLER, Chancellor.
*1 Investors, owners of interests in numerous real
estate limited partnerships, seek an accounting and
damages from general partners and financial
advisors for breaches of the fiduciary duties of care,
loyalty and candor. Information available to the
investors long before these lawsuits were instituted
put the investors on notice of the wrongs about
which they now complain. Therefore, all of the
investors' claims are barred by operation of the
applicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions
brought by plaintiff investors against defendants
Dean Witter, Discover & Co. ("Dean Witter
Discover"), Dean Witter Reynolds, Inc. ("Dean
Witter Reynolds"), Dean Witter Realty, Inc. ("Dean
Witter Realty") (collectively "Dean Witter"), the
managing and associate general partners of seven
Dean Witter real estate limited partnerships, and
Tempo-GP, Inc. ("Tempo-GP"), the general partner
of Dean Witter/Coldwell Banker Tax Exempt
Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund
").[FN1]

> FN1. An Order of Consolidation dated
> August 16, 1996, consolidated three
> actions filed in the Court of Chancery-
> *Segel v. Dean Witter, Discover & Co.,*
> C.A. No. 14816 (filed Feb. 6, 1996);
> *Schectman v. Dean Witter, Discover & Co.,*
> C.A. No. 14829 (filed Feb. 9, 1996);
> *Dosky v. Dean Witter, Discover & Co.,*
> C.A. No. 14838 (filed Feb. 15, 1996)-and
> added to the consolidated action plaintiffs
> from two other suits, one pending in the
> Southern District of New York-*Grigsby v.
> Dean Witter Reynolds, Inc.,* S.D .N.Y.,
> No. 96 Civ. 4064(LAP) (originally filed
> Dec. 27, 1995)-and one pending in the
> District of Maryland-*Young v. Dean
> Witter, Discover & Co.,* C.A. No.
> H-96-1139 (D.Md.) (originally filed Feb.
> 6, 1996). *See* Order of Consolidation
> (Aug. 16, 1996) (Docket No. 9).

Plaintiffs are customers of Dean Witter Reynolds,
who between 1984 and 1989, purchased from Dean
Witter Reynolds units of the following limited
partnerships: Dean Witter Realty Income
Partnership I, L.P. ("Income I"); Dean Witter
Realty Income Partnership II, L.P. ("Income II");
Dean Witter Realty Yield Income Partnership III,
L.P. ("Income III"); Dean Witter Realty Income
Partnership IV, L.P. ("Income IV"); Dean Witter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable").[FN2] With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> FN2. These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, *i.e.,* all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate general partners of the Proprietary Partnerships.[FN3] Officers and employees of Dean

Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> FN3. Managing and associate general partners will be referred to collectively as the "general partners."

*2 Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.-the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities.[FN4]

> FN4. In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.*, Del.Supr., 657 A.2d 254, 264 (1995).

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present.[FN5] Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants.[FN6]

> FN5. First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint* ]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

> FN6. Complaint ¶ 3.

**\*3** Plaintiffs assert that Dean Witter sold the

Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. [FN7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation, [FN8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

> FN7. Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition* ].

> FN8. Complaint ¶ 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones.[FN9]

> FN9. Pls.' Memo. in Opposition at 2.

Defendants filed a motion to dismiss on December 10, 1996.[FN10] The motion cites several grounds for dismissal, including: (1) that the claims are time-barred; (2) that plaintiffs' allegations fail to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims. [FN11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

> FN10. Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

> FN11. Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations.[FN12] This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.[FN13] Moreover, it is " well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." [FN14]

> FN12. *Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

> FN13. *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993). *See also United States Cellular Inv. Co. v. Bell Atlantic*

*Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

> FN14. *Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

**\*4** In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (*i.e.,* nonconclusory) allegations of the complaint for purposes of the motion.[FN15] I am also required to draw from the complaint all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein.[FN16] Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them.[FN17] In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint.[FN18]

> FN15. *Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

> FN16. *Id.*

> FN17. *In re Santa Fe Pac. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

> FN18. Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14, 1994), *aff'd,* Del.Supr., 642 A.2d 837 (1994).
> Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04-289, Goldstein, J. (Sept. 15, 1992), for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder*. *Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id* . at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz*, op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer*, Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

## III. ANALYSIS

### A. Statute of Limitations

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.[FN19] With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by Dean Witter and the general partners of the

Partnerships. [FN20] Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

> FN19. 10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

> FN20. Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-*Segel*-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶¶ 1, 9.

### B. Time of Accrual

The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action. [FN21] Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants [FN22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

> FN21. *David B. Lilly Co. v. Fisher,* D. Del., 18 F.3d 1112, 1117 (1994); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* Del.Supr., 330 A.2d 130, 132 (1974)
>
> .

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 6
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

> FN22. Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint ¶¶ 266-68.

Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations. [FN23] Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989.[FN24] Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1992-years before plaintiffs filed their Amended Complaint.

> FN23. *Seidel v. Lee,* D. Del., C.A. No. 93-494-JJF, at 16, Farnen, C.J. (Dec. 30, 1996) (applying Delaware law) (fiduciary duty claim accrues when breach accomplished). *See also In re Merrill Lynch Ltd. Partnerships Litig.,* S.D.N.Y., No. 95 Civ. 10657(MBM), at 11-20 (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).

> FN24. Complaint ¶¶ 9-23.

**\*5** With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer

injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s.[FN25] Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989.[FN26] Plaintiffs filed their complaint on February 6, 1996-well past the expiration of the three-year limitations period. *Absent tolling,* therefore, all of plaintiffs' claims fall outside the statutory period and would be time-barred.

> FN25. *See, e.g.,* Complaint ¶¶ 91-121 (Yield Plus), ¶¶ 129-35 (Yield Plus II), ¶¶ 136-46 (Yield Plus & Yield Plus II), ¶¶ 156-79 (Growth Properties), ¶¶ 193-98 (Income I), ¶¶ 209-16 (Income II), ¶¶ 233-39 (Income II, III & IV).

> FN26. *Dofflemyer,* 558 F.Supp. at 379 (fiduciary duty claim accrues at time of breach).

### C. Tolling

Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal* [FN27] -reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement fund might be established-first put them on notice of their potential claims.[FN28] Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them.[FN29]

> FN27. This article will be referred to as the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 7

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

"*Wall Street Journal* article" or the "article."

FN28. Pls.' Memo. in Opposition at 9.

FN29. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as ' inherently unknowable' injuries or fraudulent concealment.").

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility.[FN30] For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. [FN31] Often, plaintiffs can establish " blameless ignorance" by showing justifiable reliance on a professional or expert whom they had no ostensible reason to suspect of deception.[FN32] This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. [FN33]

FN30. *Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

FN31. *Seidel,* op. at 17.

FN32. *See, e.g., Isaacson,* 330 A.2d at 133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

FN33. *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth.[FN34] Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry.[FN35] "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." [FN36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. [FN37]

FN34. *Litman,* op. at 8.

FN35. *Halpern,* 313 A.2d at 143.

FN36. *Id.*

FN37. *Id.*

**\*6** Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.[FN38] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]." [FN39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.[FN40]

FN38. *Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of limitations.).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 8

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

FN39. *Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

FN40. *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.[FN41] Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. [FN42] Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice.[FN43] Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not* on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim).[FN44]

FN41. *United States Cellular,* 677 A.2d at 504; *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 35, Allen, C. (Nov. 21, 1995).

FN42. *In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F.Supp. 527, 554 (1994) (inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

FN43. *See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts sufficient to place them on inquiry notice of an injury); *Seaboard,* 625 A.2d at 275

(equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern,* 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence). *See also Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

FN44. Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.,* Del.Supr., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., C.A. Nos. 12111 & 12353, at 13, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court that all of the necessary information was not only publicly available, but already in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

plaintiffs' hands at least as far back as 1990-an entirely different situation than the one presented to the *In re Maxxam* Court.

### D. Were Plaintiffs on Inquiry Notice?

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published.[FN45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

FN45. *See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships.[FN46] As a matter of law, defendants assert, disclosures in any of those documents-the sole source of plaintiffs' allegations-were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

FN46. According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.
The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint. *Glaser v. Norris,* Del. Ch., C.A. No. 9583, at 9 n. 1, Chandler, V.C. (Jan. 6, 1992).

*7 Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a result of defendants' misrepresentations regarding the health of their Partnership investments. Until

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                     Page 10

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

reading the *Wall Street Journal* article, plaintiffs assert that they relied-and were entitled to rely-on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i.e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct. [FN47] Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

       FN47. Pls.' Memo. in Opposition at 3.

As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury. [FN48] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.[FN49] Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? [FN50]

       FN48. *In re ML-Lee Acquisition Fund II, L.P. Litig.,* 848 F.Supp. at 554 (defendants' misrepresentations were unknowable until

publication of the Annual Report disclosing particular investment and its lack of success).

       FN49. *McCoy v. Goldberg,* S.D.N.Y., 748 F.Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc.,* E.D. Mich., 785 F.Supp. 626, 633 (1992) (citations omitted), *aff'd,* 6th Cir., 35 F.3d 565 (1994).

       FN50. Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits. [FN51] For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." [FN52] In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. [FN53]

       FN51. *See, e.g., Income III,* 1990 Annual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 11

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

FN52. Pls.' Memo. in Opposition at 51.

FN53. *Id.* at 48.

**\*8** Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment."[FN54] Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%."[FN55] But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

FN54. *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

FN55. Yield Plus II, 1990 Annual Report

at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting."[FN56] Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries.[FN57] As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations.[FN58] But, the trusting plaintiff still must be *reasonably attentive* to his interests. " *[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings.*"[FN59] Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.[FN60]

FN56. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

FN57. *See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) (" Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

FN58. *Seaboard,* 625 A.2d at 275.

FN59. *Seidel,* op. at 18 (emphasis added).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

Page 12

FN60. *Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights. ").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed. FN61 Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure.FN62 In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989.FN63 Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor-and should have prompted an inquiry by plaintiffs into the health of their investments. FN64

FN61. Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

FN62. For the fiscal year 1989, the Income

II Partnership shows a net income figure of $7,043,996 and cash distributions of $13,768,450. *Id.* at 7.

FN63. *Id.*

FN64. *In re Prudential Sec. Inc. L.P. Litig.,* S.D.N.Y., 930 F.Supp. 68, 76 (1996) (" Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

*9 The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. FN65 Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. FN66 Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims.FN67

FN65. *See, e.g.,* Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

(attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

FN66. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern,* 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

FN67. *See Ruger v. Funk,* op. at 6 (" Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").
The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions-described in these annual reports as "annualized returns"-and the declining partners' capital and net income lower than the distributions should have

caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

## IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants.[FN68] Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim).[FN69] The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. [FN70]

FN68. Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 14

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig.,* 930 F.Supp. at 76-77; (2) that some investors in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales practices or the investments in question, nor mentioned by name the limited partnership defendants in this case, thus raising a serous doubt as to how the article alone could have prompted such an inquiry.

FN69. *Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

FN70. Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late. *Glaser v. Norris,* Del. Ch., C.A. No. 9538, at 30-31, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

IT IS SO ORDERED.

Del.Ch.,1998.
In re Dean Witter Partnership Litigation
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB E

Westlaw.

Slip Copy

Page 1

Slip Copy, 2006 WL 2345497 (D.Or.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
In re DIGIMARC CORPORATION Derivative
Litigation.
**Civil No. 05-1324-HA (LEAD).**

Aug. 11, 2006.

Paul H. Trinchero, Grenley Rotenberg Evans Bragg
& Bodie PC, Portland, OR, for Patrick Sheehan.
Beth A. Keller, Nadeem Faruqi, Faruqi & Faruqi,
LLP, New York, NY, for Digimarc Corporation
Derivative Litigation.
Brian J. Robbins, San Diego, CA, Jeffrey P. Fink,
Robbins Umeda & Fink, LLP, Gary I. Grenley, for
Patrick Sheehan and Digimarc Corporation
Derivative Litigation.
Richard L. Baum, Perkins Coie, LLP, Portland, OR,
for Bruce Davis, E.K. Ranjit, Phillip J. Monego,
Peter W. Smith, Alty Van Luijt, Brian J. Grossi, Jim
Roth, James T. Richardson, John Taysom, William
A. Krepick and Geoffrey Rhoads.

OPINION AND ORDER

HAGGERTY, Chief Judge.

*1 Nominal defendant Digimarc is a publicly
owned Delaware corporation with its headquarters
and principal place of business in Washington
County, Oregon. The individual defendants are all
current or former officers or directors of Digimarc.
Plaintiffs George Diaz (Diaz) and Patrick Sheehan
(Sheehan) are citizens of New York and were at all
material times shareholders of Digimarc. They have
brought this action on behalf of Digimarc, alleging
that the individual defendants breached their
fiduciary duties to the company and its shareholders
by issuing misleading financial statements and
misrepresenting the business and prospects of the
company.

Individual defendants Bruce Davis, E.K. Ranjit,

Philip J. Monego, Peter W. Smith, Alty Van Luijt,
Brian J. Grossi, Jim Roth, James T. Richardson,
John Taysom, William A. Krepick, and Geoffrey
Rhoads (Individual Defendants), are all present or
former Digimarc officers or directors. They move to
dismiss plaintiffs' Complaint in its entirety for lack
of subject matter jurisdiction pursuant to Federal
Rule of Civil Procedure 12(b)(1). Specifically,
Individual Defendants move to dismiss plaintiffs'
federal claim, an alleged violation of Section 304 of
the Sarbanes-Oxley Act of 2002 (Sarbanes-Oxley or
Section 304) for lack of standing on grounds that
there is no private cause of action for a violation of
Section 304. Individual Defendants further move to
dismiss plaintiffs' remaining state law claims for
lack of diversity jurisdiction. For the following
reasons, Individual Defendants' Motion to Dismiss
is granted.

**BACKGROUND**

In September 2004, plaintiff Zucco Partners LLC
filed a federal securities class action complaint in
this court against Digimarc and two of the
Individual Defendants, Bruce Davis (Digimarc's
Chief Executive Officer), and E.K. Ranjit
(Digimarc's former Chief Financial Officer). In
October 2004, while this class action lawsuit was
pending, Diaz and Sheehan filed two shareholder
derivative complaints on behalf of Digimarc against
nominal defendant Digimarc and certain Individual
Defendants in the California Superior Court for San
Luis Obispo County. The California court
consolidated these two actions (California Action).
The plaintiffs in the California Action asserted state
law claims for breach of fiduciary duty, abuse of
control, gross mismanagement, waste or corporate
assets, unjust enrichment, and violation of the
California Corporations Code.

In November 2004, another Digimarc shareholder,
Christopher Beasley (Beasley), demanded that
Digimarc's Board of Directors remedy the alleged

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

**Slip Copy, 2006 WL 2345497 (D.Or.)**
**(Cite as: Slip Copy)**

breaches of fiduciary duties described in the California Action. In response, Digimarc's Board appointed an independent Special Litigation Committee (SLC) to investigate claims asserted by Diaz, Sheehan, and Beasley. In February 2005, the SLC sent Beasley's counsel a letter inviting Beasley to participate in its investigation. In April 2005, Beasley filed a shareholder derivative action against Digimarc and several Individual Defendants in the Circuit Court of Oregon for Washington County (Beasley Action).

**\*2** In July 2005, the court in the California Action granted a motion from Digimarc and the Individual Defendants staying the action on grounds that the defendants had no substantive contacts with San Luis Obispo County. The court directed Diaz and Sheehan to re-file their claims in Washington County Circuit Court.[FN1]

> FN1. The California Court's order provided in pertinent part:
> 1. The motion is granted. These consolidated actions are hereby stayed in favor of a shareholder derivative action to be filed by plaintiffs in the Circuit Court of the State of Oregon, for the County of Washington.
> 2. This order is conditioned on the agreement by Digimarc and the Individual Defendants (a) to submit to the jurisdiction of the Circuit Court of the State of Oregon, for the County of Washington, in connection with a shareholder derivative action to be filed in that court by plaintiffs..
> ..
> Baum Decl., Ex. 5.

Instead, Diaz and Sheehan each filed a new shareholder derivative action in this court against Individual Defendants in August 2005, alleging that Individual Defendants' reckless mismanagement caused Digimarc to capitalize expenses, inventory, and assets improperly, resulting in a need to restate its financial results for the 2003 fiscal year and the first quarter of 2004. These Complaints also contain a claim against Individual Defendants Bruce Davis and E.K. Ranjit for disgorgement under Section 304.

## ANALYSIS

### 1. Do plaintiffs have standing to sue under Section 304 of Sarbanes-Oxley?

Section 304 provides for the disgorgement of bonuses and profits by certain corporate officers if the corporation is "required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws." 15 U.S.C. § 7243. That there is no private cause of action explicitly stated in Section 304 is beyond dispute. *See, e.g., Kogan v. Robinson,* 432 F.Supp.2d 1075, 1078 (S.D.Cal.2006) (citation omitted) (the court agreed with "all other courts that have considered this issue, and conclude[d] Section 304 does not explicitly create a private remedy"); *Neer v. Pelino,* 389 F.Supp.2d 648, 652 (E.D.Penn.2005) (footnote omitted) ("Section 304 does not explicitly afford a private right of action").

Individual Defendants contend that because there is no private cause of action for a violation of Section 304, this court has no jurisdiction. Accordingly, plaintiffs lack standing to assert the only federal law claim alleged in the Complaint. *See Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 215 n. 5 (1974) (no federal question jurisdiction if plaintiffs lack standing). Plaintiffs disagree, arguing that Section 304's text, the Act's statutory construction and legislative history, and the purpose underlying Section 304 all favor finding the existence of an implied private right of action.

In *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court explained that the "central inquiry" in determining whether a private remedy is implicit in a statute in which no private remedy is explicitly stated is " whether Congress intended to create, either expressly or by implication, a private cause of action." *Id.* at 575. Other factors, such as language and focus of the statute, its legislative history, and its purpose, are "traditionally relied upon in determining legislative intent." *Id.* at 575-76.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2345497 (D.Or.)
**(Cite as: Slip Copy)**

Every court that has considered the issue directly has concluded that Section 304 contains no implied private right of action. *In re BISYS Group Inc. Derivative Action,* 396 F.Supp.2d 463, 464 (S.D.N.Y.2005) (citation omitted) ("This court holds that there is no private right of action under Section 304 of Sarbanes-Oxley"); *Kogan,* 432 F.Supp.2d at 1076 ("Section 304 neither expressly or implicitly confers a private right of action"); *Neer,* 389 F.Supp.2d at 657 ("In light of the text and structure of the Act and its legislative history, we find that Congress did not intend to create an implied cause of action in Section 304").

**\*3** At the time that Individual Defendants' initial brief was filed, *Neer* was the most helpful authority available. Plaintiffs neglected to cite to *BISYS* in their Response. Subsequently *BISYS* and *Kogan* were decided in accordance with *Neer.*

In *Neer,* the Eastern District Court of Pennsylvania conducted a thorough analysis of legislative intent under the *Cort* test and concluded that Congress did not intend to create an implied cause of action in Section 304. *Neer,* 389 F.Supp.2d at 657. The *Neer* court first acknowledged that although Congress had created disgorgement as a remedy that would benefit shareholders indirectly, this did not indicate an intent that the provision would be enforced through a private right of action in those shareholders. *Id.* at 653. The court considered the text of Section 304, the Act as a whole, and the legislative history and scheme, and concluded that there was no private right of action contained in Section 304. *Id.*

The two other post-*Neer* published opinions on this issue have also held that Section 304 does not create a private right of action. *BISYS,* 396 F.Supp.2d at 464; *Kogan,* 432 F.Supp.2d at 1082. This court holds that Section 304 contains neither an explicit nor an implied private cause of action for its violation.

**2. Is there diversity jurisdiction?**

Plaintiffs Diaz and Sheehan are both citizens of New York, and assert diversity jurisdiction under

28 United States Code Section 1332, based on the fact that all individual defendants, as well as Digimarc, are citizens of Oregon. Individual Defendants argue that diversity is destroyed when Digimarc is aligned properly as a plaintiff for purposes of diversity jurisdiction. They rely upon *Duffey v. Wheeler,* 820 F.2d 1161, 1163 (11th Cir.1987) (citing *Koster v. Lumbermens Mutual Casualty Co.,* 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067. 522-23 (1947)), for the "general rule that the corporation is properly realigned as a plaintiff since it is the real party in interest" in derivative shareholder litigation.

There is a narrow exception to this general rule, pursuant to which a court may align a corporation as a defendant where the corporation is "actively antagonistic" to the derivative plaintiff. *Duffey,* 820 F.2d at 1163 (citations omitted). One way of determining whether such antagonism exists is asking whether there is a "real collision between the stockholder and his [or her] corporation." *See Smith v. Sperling,* 354 U.S. 91, 97-98 (1957). Mere inaction or inability to act on the part of the corporation is insufficient. *Duffey,* 820 F.2d at 1163 . Instead, the corporation must have either refused to take action requested by the shareholder or it must be evident that the corporation is electing to refuse to acquiesce to the shareholder's demands, despite an ability to do so. *Id.*

Plaintiffs assert that Digimarc is actively antagonistic, placing this case within the *Duffey* exception. Plaintiffs cite *Reilly Mortgage Group, Inc. v. Mt. Vernon Sav. & Loan Assoc.,* 568 F.Supp. 1067, 1073 (E.D.Va.1983), arguing that this court should look no further than the Complaint to determine the presence of antagonism. Alternatively, they argue that even if the court were to look to outside factors, the exception would apply for the following reasons: (1) the SLC was established to investigate Beasley's action, not the action brought by Diaz and Sheehan; (2) presumably the SLC has decided not to pursue plaintiffs' claims; and (3) the SLC's invitation to plaintiffs to participate in its investigation fails to nullify the antagonism evident in the Complaint. Plaintiffs also contend that Digimarc's SEC filings in response to allegations against Individual

Slip Copy                                                                                    Page 4

Slip Copy, 2006 WL 2345497 (D.Or.)
**(Cite as: Slip Copy)**

Defendants belie any alleged receptivity to plaintiffs' claims or ongoing cooperation with plaintiffs.

**\*4** Individual Defendants argue that this exception is inapplicable. Digimarc has never refused a demand from Diaz and Sheehan, and there is no evidence that Digimarc would have done so had Diaz and Sheehan made such a demand. Additionally, Digimarc effectively granted Beasley's demand when it appointed an independent SLC and empowered it to take "any necessary action " in investigating claims and to "determine whether or not [Digimarc] shall undertake or defend against any litigation against one or more of the present or former directors or officers of the Company." Baum Decl., Ex. 3. The SLC's findings and determinations will be "final," not subject to review by the Board of Directors, and will be "binding upon the Company." *Id.* The SLC has invited Diaz and Sheehan, as well as Beasley, to participate in their investigation. *See* Baum Decl., Ex. 4, 6-7.

The Supreme Court has rejected the formulaic use of fixed rules such as that being advanced by plaintiffs regarding this issue. *Smith,* 354 U.S. at 97. Moreover, the *Reilly* decision specifically demonstrates that it may be appropriate for the court to look at matters "beyond the complaint and answer" in determining the issue of antagonism. *Reilly,* 586 F.Supp. at 1074. The court in *Reilly* considered, and ultimately relied upon, numerous facts outside the pleadings, including how the corporation reacted to: (1) warnings from state and federal regulators; (2) the shareholders' initial attempts to remedy the perceived wrongdoing; and (3) the plaintiff's lawsuit itself. *Id.*

This court concludes that evaluating the existence of antagonism may include consideration of matters beyond the pleadings. Here, Digimarc has not only taken no action directly opposed to plaintiffs' claims, but has cooperated with plaintiffs by investigating their claims actively and inviting them to participate in that investigation. While Individual Defendants concede that the SLC's invitation to plaintiffs' counsel to attend its October meeting was extended after plaintiffs filed this lawsuit, the formation of the SLC and Beasley's initial invitation

to participate in the investigation took place well before Diaz and Sheehan filed their claims in this court. The subsequent invitation to attend the October meeting is consistent with the SLC's earlier invitations.

It is also true that Digimarc stated in its SEC filings that it believed the company had substantial defenses to the parallel securities class action lawsuit. *See* Zollinger Decl., Ex. 5. However, the claims in that case are distinct. The only statement contained in Digimarc's SEC filings that is relevant here is that Digimarc "has appointed a committee to investigate the claims" made by plaintiffs in the California Action. *Id.,* Ex. 5 at 2. This falls short of establishing antagonism.

This court concludes that plaintiffs have failed to demonstrate the sort of active antagonism necessary to invoke the narrow exception created by *Duffey.* Digimarc is properly realigned as a plaintiff for the purposes of this litigation. Therefore, there is no basis for diversity jurisdiction under 28 United States Code Section 1332.

**\*5** Additionally, this court notes that the class action securities fraud case, *Zucco Partners, LLC, et al. v. Digimarc Corp., et al.,* 2006 WL 2252557 (D.Or.), which gave rise to these derivative shareholders actions, was dismissed with prejudice on August 4, 2006. *See* Individual Defendants' Notice of Action in Related Case [33]. As plaintiffs' claims here are based in part on damage allegedly caused to Digimarc by the Individual Defendants as a result of the filing of the *Zucco Partners* case, the dismissal of the class action provides additional support for dismissal of this case.

### CONCLUSION

Individual Defendants' Motion to Dismiss [8] plaintiffs' Complaint in its entirety for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) is granted. Plaintiffs' federal claim, an alleged violation of Section 304, is dismissed for lack of standing on grounds that there is no private cause of action for a violation of Section 304. The remaining state law claims are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5

Slip Copy, 2006 WL 2345497 (D.Or.)
**(Cite as: Slip Copy)**

dismissed because there is no basis for diversity jurisdiction. Individual Defendants are ordered to confer with all parties and submit a proposed judgment for the court's consideration by September 1, 2006.

IT IS SO ORDERED.

D.Or.,2006.
In re Digimarc Corp.
Slip Copy, 2006 WL 2345497 (D.Or.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3285722 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Individual Defendants' Motion to Dismiss Consolidated Complaint (Nov. 14, 2005) Original Image of this Document (PDF)
• 2005 WL 3285716 (Trial Motion, Memorandum and Affidavit) Individual Defendants' Memorandum in Support of Motion to Dismiss Consolidated Complaint (Oct. 17, 2005) Original Image of this Document (PDF)
• 2005 WL 3285719 (Trial Motion, Memorandum and Affidavit) Individual Defendants' Memorandum in Support of Motion to Dismiss Consolidated Complaint (Oct. 17, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB F

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

**C**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Barbie RATTNER, Plaintiff,
v.
D. James BIDZOS, Stratton D. Sclavos, Timothy
Tomlison, Roger H. Moore, David J. Cowan, Anil
H.P. Pereira, Douglas L. Wolford, Robert J.
Korzeniewski, James M. Ulam, Quentin P.
Gallivan, Dana L. Evan, Kevin R. Compton,
William L. Chenevich, Gregory L. Reyes and Scott
G. Kriens, Defendants,
andVERISIGN, INC., a Delaware corporation,
Nominal Defendant.
**No. Civ.A. 19700.**

Submitted April 7, 2003.
Decided Sept. 30, 2003.
As Revised Oct. 7, 2003.

James S. Green, and Kevin A. Guerke, of Seitz,
Van Ogtrop & Green, P.A., Wilmington, Delaware;
Peter D. Bull, and Joshua M. Lifshitz, of Bull &
Lifshitz, LLP, New York, New York, for Plaintiff,
of counsel.
David C. McBride, of Young Conaway Stargatt &
Taylor, LLP, Wilmington, Delaware; David M.
Furbush, and Noah D. Boyens, of O'Melveny &
Myers LLP, Menlo Park, California, for
Defendants, of counsel.

MEMORANDUM OPINION
NOBLE, Vice Chancellor.
*1 Plaintiff Barbie Rattner ("Rattner") brings this
derivative action on behalf of Nominal Defendant
VeriSign, Inc. ("VeriSign" or the "Company")
alleging that Defendants James D. Bidzos ("Bidzos"
), Stratton D. Sclavos ("Sclavos"), Timothy
Tomlinson ("Tomlinson"), Roger H. Moore ("
Moore"), David J. Cowan ("Cowan"), Anil H.P.
Pereira ("Pereira"), Douglas L. Wolford ("Wolford"

), Robert J. Korzeniewski ("Korzeniewski"), James
M. Ulam ("Ulam"), Quentin P. Gallivan ("Gallivan"
), Dana L. Evan ("Evan"), Kevin R. Compton ("
Compton"), William L. Chenevich ("Chenevich"),
Gregory L. Reyes ("Reyes") and Scott G. Kriens ("
Kriens") (collectively, the "Individual Defendants")
breached their fiduciary duties owed to the
Company and its shareholders. Specifically, Rattner
asserts that the Individual Defendants breached
their fiduciary duty of care by inadequately
maintaining accounting controls and utilizing
improper accounting and audit practices. Rattner
also contends that certain Individual Defendants
sold securities while in possession of material inside
information, thereby breaching their fiduciary
duties, and that the remaining Individual
Defendants have committed waste. In addition,
Rattner seeks contribution and indemnification from
the Individual Defendants for claims that have been
or may be pursued against the Company based upon
the Individual Defendants' alleged misconduct.

Defendants have moved to dismiss each of Rattner's
claims under Court of Chancery Rule 23.1 for
failure to make a demand upon the VeriSign board
of directors (the "Board"). They argue that the
conclusory allegations of the Stockholder's
Amended Derivative Complaint (the "Amended
Complaint") fail to create a reasonable doubt as to
whether a majority of the Board is capable of
rendering an impartial decision regarding the
pursuit of this derivative litigation. Defendants have
also moved to dismiss, under Court of Chancery
Rule 12(b)(6), Rattner's claims for breach of
fiduciary duty and waste.

For the reasons that follow, I conclude that, because
demand is not excused under Court of Chancery
Rule 23.1, this action must be dismissed.

I. BACKGROUND [FN1]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 2

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
(Cite as: Not Reported in A.2d)

FN1. This background is taken from the allegations of the Amended Complaint. *White v. Panic,* 783 A.2d 543, 547 n. 5 (Del.2001).

### A. *The Parties*

Rattner is, and has been at all relevant times, a common stock shareholder of VeriSign. VeriSign, a Delaware corporation, was founded in April 1995. It is a leading provider of digital trust services, enabling various Internet users to engage in secure digital commercial transactions and communications.

The Individual Defendants are the current directors and the senior officers of the Company. Sclavos is the Chairman of the Board and Bidzos is the Vice Chairman of the Board. The remaining directors on the eight member Board are Moore, Cowan, Compton, Chenevich, Reyes and Kriens (collectively, along with Sclavos and Bidzos, the " Director Defendants"). Of the current Board members, the only director who held a senior management position at the time this action was filed [FN2] is Sclavos, who is also VeriSign's President and Chief Executive Officer.[FN3] Bidzos served as Chairman of the Board (April 1995 through March 12, 2002) and Chief Executive Officer (April 1995 through July 1995). Prior to becoming a VeriSign director in February 2002, Moore had been President and Chief Executive Officer of Illuminet Holdings, Inc. ("Illuminet") from December 1995 until December 2001, when VeriSign acquired Illuminet.

FN2. This action was filed on June 12, 2002; Rattner lodge her Amended Complaint on October 4, 2002.

FN3. Sclavos has served as the Company's President and Chief Executive Officer since April 1995.

**\*2** The remaining Individual Defendants, with the exception of Tomlinson, [FN4] are senior officers of the Company. Pereira is VeriSign's Executive Vice President and General Manager, Enterprise and Service Provider Division, who formerly, from October 2000 to January 2001, served as VeriSign's Senior Vice President and Group General Manager of the Enterprise and Service Provider Division. Wolford serves as VeriSign's Senior Vice President and Group General Manager of Web Presence Services. Korzeniewski is the Executive Vice President of Corporate and Business Development, and has held that position since June 2000. Ulam, since October 2001, has been Senior Vice President, General Counsel of the Company; previously he served as Vice President, General Counsel of VeriSign from the time of his joining the Company in June 2000. Gallivan is VeriSign's Executive Vice President, Worldwide Sales and Services, a position he has held since April 1, 1999. Finally, Evan has served, since January 1, 2001, as the Company's Executive Vice President of Finance and Administration and Chief Financial Officer.

FN4. Tomlinson served as a director (April 1995 until May 2002) and as the Company's Secretary (April 1995 through October 2000). Tomlinson is also a partner in the law firm of Tomlinson, Zisko & Master LLP (the "Tomlinson Firm"). In 2000, VeriSign paid approximately $900,000 to the Tomlinson Firm.

### B. *The Misstatements*

Rattner principally complains of alleged insider trading and a failure to oversee properly the accounting practices at VeriSign. Common to both allegations is a series of allegedly misleading statements made over a twelve-month period from January 2001 through January 2002 (the "Relevant Period"). On January 24, 2001, VeriSign released its fourth quarter and fiscal 2000 financial results (the "January 24 Release"). The release noted that during the fourth quarter, the Company earned revenues of $197.4 million, representing a 613% increase over the previous year's fourth quarter results. For fiscal 2000, VeriSign reported revenues of $474.8 million, amounting to a 460% increase over revenues in the previous fiscal year. These revenues resulted in pro forma net income for the quarter, excluding the amortization of goodwill and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 3

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
(Cite as: Not Reported in A.2d)

intangible assets and acquisition-related charges of $45.5 million, equivalent to $0.21 diluted earnings per share; pro forma net income for fiscal 2000 was $129.1 million. However, after including the charges for amortization of goodwill and intangible assets and other acquisition related charges, the fiscal 2000 net loss was $3.1 billion.[FN5] The release also highlighted the international expansion undertaken by the Company in fiscal year 2001. However, Rattner alleges that the picture was not as rosy as was portrayed.

FN5. Amended Compl. ¶ 48.

In the Amended Complaint, Rattner asserts that, because of a failure to maintain and oversee properly the accounting practices at VeriSign, the statements contained in the January 24 Release conveyed inaccurate information. Specifically, VeriSign improperly recorded "round trip revenue" and barter transactions, thus artificially inflating the Company's reported revenues for fiscal 2000. VeriSign also failed to record impairments in the value of certain investments it made in other companies during a round of private equity financing that commenced in the third quarter of 2000 .[FN6] Thus, Rattner concludes that because the Company failed to record revenues accurately and write down impaired asset values on a timely basis, in violation of Generally Accepted Accounting Principles ("GAAP"), the earnings projections and financial statements contained in the January 24 Release were overly optimistic and materially misleading.

FN6. Charges related to these investments were $74 million in fiscal 2001 and $94.8 million in the first half of fiscal 2002. Id. ¶ 49.

**\*3** Other undisclosed accounting practices of the Company also are claimed to have contributed to an inflated market price for VeriSign common stock. Rattner alleges that the Individual Defendants either "were manipulating" [FN7] or "should have been aware of the manipulation" [FN8] of the reported days sales outstanding (DSO) by including the

deferred revenue, and excluding the accounts receivable, of companies acquired by VeriSign. Furthermore, Rattner also contends that there were other material misstatements made during the Relevant Period. Rattner notes that:

FN7. Id. ¶ 47; cf. id. ¶ 62 (noting that " VeriSign" engaged in manipulation).

FN8. Id. ¶ 70.

[t]he Company also failed to disclose that (i) the integration of Illuminet and H.O. Systems failed as the number of enterprise clients declined after the acquisitions; (ii) the Company would incur almost $80 million in charges, engage a[sic] massive restructuring and layoff a substantial portion of its workforce as a result of the acquisitions of Illuminet and H.O. Systems; [and] (iii) the Company would need to massively increase its allowance for doubtful accounts.[FN9]

FN9. Id. ¶ 47. The Amended Complaint only informs that the acquisition of H.O. Systems, Inc. ("H.O.Systems") closed on February 8, 2002. Id. ¶ 76.

These allegedly improper accounting practices and material misstatements reappeared in numerous financial statements, releases and public statements during the Relevant Period, rendering each materially misleading for the reasons previously noted. To this end, the Amended Complaint quotes extensively from myriad sources publicly disseminated by the Company during the Relevant Period, each allegedly materially misleading, including: statements made by Sclavos at a February 1, 2001, analysts' meeting, the Company's 10K report for fiscal year 2000 issued on March 28, 2001; an April 26, 2001, press release; a July 26, 2001, press release; a September 24, 2001, article in *Bloomberg;* an October 25, 2001, press release; and a January 24, 2002, press release. [FN10] The alleged effect of these numerous material misstatements was to inflate artificially the stock price of VeriSign over the course of the Relevant Period.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                           Page 4

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

FN10. *See id.* ¶¶ 50-55, 57, 58, 60, 64-69.

### C. *Alleged Wrongdoing by the Individual Defendants*

With the knowledge that the market price of VeriSign stock was artificially inflated, and while in possession of other material non-public information, during the Relevant Period "certain defendants" sold over 875,000 shares of VeriSign stock for proceeds in excess of $47 million, and Moore sold approximately 995,000 shares of Illuminet stock for over $37 million.[FN11] Specifically:

> FN11. A central problem with the Amended Complaint is that one is never certain who is selling how much and which sales are being challenged. As with questions surrounding which Director Defendants have been implicated in certain federal securities class action lawsuits, *see infra* text accompanying note 79, this defect stems from the inconsistent use of defined terms and a failure to use defined terms. Often in the Amended Complaint, Rattner notes that "certain defendants" engaged in allegedly illicit transactions, but nowhere are these ambiguous assertions clarified. Particularly unhelpful is the definition provided in the Third Cause of Action, well after the discussion of the underlying facts of this dispute:
> 108. Certain defendants (the "Insider Trading Defendants"), at all relevant times, occupied fiduciary positions with VeriSign and were privy to confidential material inside information concerning VeriSign and its operations.
> Amended Compl. ¶ 108.
> I draw the inference that the challenged sales include all of the sales by Individual Defendants during the Relevant Period. Therefore, at issue are the sales of VeriSign common stock and Illuminet options by Bidzos, Cowan, Evan, Gallivan, Korzeniewski, Pereira, Sclavos, Tomlinson, Ulam, Wolford, and Moore

(collectively, the "Selling Defendants") so noted. *See id.* ¶ 37.

a) Bidzos sold 15,000 shares of VeriSign common stock on May 22, 2001, for net proceeds of $991,890;
b) Cowan sold 20,800 shares on February 1, 2001; 53,125 shares during the period of May 1-2, 2001; and 22,000 shares on November 13, 2001 (a total of 95,925 shares), of VeriSign common stock for total net proceeds of $5,132,773;
c) Evan sold 500 shares on January 31, 2001; 6,500 shares during the period of February 1-28, 2001; 3,000 shares on March 1, 2001; 60,100 shares during the period of May 1-31, 2001; 4,000 shares during the period of May 17-21, 2001; 12,500 shares during the period of August 1-29, 2001; and 10,000 shares during the period of November 13-14, 2001 (a total of 96,600 shares), of VeriSign common stock for total net proceeds of $5,025,988;
*4 d) Gallivan sold 37,000 shares during the period of February 6-28, 2001; 3,000 shares on March 1, 2001; and 82,994 shares during the period of May 2-8, 2001 (a total of 122,994 shares), of VeriSign common stock for total net proceeds of $7,164,007;
e) Korzeniewski sold 15,000 shares on February 2, 2001; 25,000 shares on May 3, 2001; 74,626 shares during the period of May 3-31, 2001; 15,000 shares on August 27, 2001; and 33,700 shares during the period of November 2-13, 2001 (a total of 163,326 shares), of VeriSign common stock for total net proceeds of $8,442,775;
f) Pereira sold 800 shares on January 31, 2001; 9,700 shares during the period of February 6-28, 2001; 2,500 shares on March 1, 2001; 47,600 shares during the period of May 2-31, 2001; 11,000 shares during the period of August 3-31, 2001; and 15,000 shares during the period of November 7-30, 2001 (a total of 86,600 shares), of VeriSign common stock for total net proceeds of $4,676,900;
g) Sclavos sold 50,000 shares on February 28, 2001; 135,000 shares during the period of May 7-31, 2001; and 60,375 shares during the period of August 3-29, 2001 (a total of 245,375 shares), of VeriSign common stock for total net proceeds of $13,229,650;
h) Tomlinson sold 875 shares on January 30, 2001; 1,875 shares on February 26, 2001; 1,875 shares during the period of May 1-21, 2001; 1,775 shares

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
(Cite as: Not Reported in A.2d)

on August 1, 2001; and 2,400 shares during the period of November 7-13, 2001 (a total of 8,800 shares), of VeriSign common stock for total net proceeds of $476,827;

i) Ulam sold 8,000 shares on March 1, 2001; 2,711 shares during the period of May 22-31, 2001; and 2,500 shares on August 3, 2001 (a total of 13,211 shares), of VeriSign common stock for total net proceeds of $697,925; and

j) Wolford sold 5,000 shares on January 31, 2001, and 12,900 shares on May 8, 2001 (a total of 17,900 shares), of VeriSign common stock for total net proceeds of $1,174,000.[FN12]

> FN12. Amended Compl. ¶ 37.

Thus, during the Relevant Period, the Selling Defendants (except Moore) sold a total of 875,731 shares of VeriSign common stock for aggregate net proceeds of $47,512,615. Moore disposed of 995,000 in-the-money, unexercised Illuminet stock options at some point between March 26, 2001 and April 3, 2002, earning net proceeds of $37,113,500.[FN13]

> FN13. *Id.* The per option value received by Moore was estimated by Rattner based upon the market value of Illuminet common stock as of December 12, 2001, the closing date of the merger between Illuminet and VeriSign, less the per share exercise price.

Moreover, the material misstatements which opened the door for the Selling Defendants to engage in improper insider trading were allegedly the products of the Individual Defendants' breaches of fiduciary duty in failing to oversee adequately the Company's accounting procedures. The Amended Complaint maintains that the Individual Defendants "knew, or were reckless in not knowing, the facts which indicated that the fiscal 2000 and 2001 Form 10-Ks and all of the Company's interim financial statements, press releases, public statements, and filings with the SEC" were misleading.[FN14] Moreover, it is alleged, the Individual Defendants

systematically failed to assure VeriSign's compliance with applicable federal and state laws, SEC rules and regulations, FASB Statements of Concepts and GAAP.

> FN14. *Id.* ¶ 94.

### D. *Subsequent Events*

*5 In February 2002, rumors began circulating as to the accounting practices employed by VeriSign.[FN15] On March 19, 2002, the Company, in its 10-K for 2002, disclosed that 10% of its 2001 revenues were derived from reciprocal deals with either its customers or other companies in which it had invested. That day, the price of VeriSign shares fell by more than 9%, closing down $2.61 to $26.42.[FN16] On April 25, 2002, a VeriSign press release noted, in addition to its financial and operating results for the first quarter of 2002, that DSO had increased to 81 days, and that the Company was restructuring its operations in order to best accommodate the recently acquired companies of Illuminet and H.O. Systems. Upon this news, the price of VeriSign shares tumbled from $18.24 to $9.89.[FN17] A July 25, 2002 press release noted that the Company had recorded a $4.6 billion charge in connection with a non-cash charge relating to a portion of the Company's goodwill and intangible assets, as directed by FASB Statement No. 142.[FN18] On August 7, 2002, VeriSign announced that its marketing practices were under investigation by the Federal Trade Commission, regarding allegedly misleading direct-mail advertising campaigns. The Company is also the target of several securities fraud class action lawsuits filed in the Northern District of California.

> FN15. *Id.* ¶ 71.
>
> FN16. *Id.* ¶¶ 72-73.
>
> FN17. When the Amended Complaint was filed, VeriSign traded at $4 per share.
>
> FN18. Amended Compl. ¶ 79.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 6

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

## II. CONTENTIONS

In the Amended Complaint, Rattner primarily advances two theories of wrongdoing by the Individual Defendants. First, Rattner alleges that the Selling Defendants, in violation of their fiduciary duties, engaged in insider trading; that is, the Selling Defendants profited from selling VeriSign common stock (or, in the case of Moore, selling Illuminet options) while knowing that improper accounting practices at VeriSign, the products of which were publicly disseminated through material misstatements, created an inflated market price. [FN19] In support of this claim, Rattner notes several aspects of the challenged stock sales executed during the Relevant Period. First, the Individual Defendants, by virtue of their positions, were privy to material, undisclosed information concerning the alleged accounting improprieties. Second, the timing of the sales, in that many of the Individual Defendants sold their holdings simultaneously and on days immediately following the release of allegedly misleading information or, in the case of Moore, after the announcement of the acquisition of Illuminet yet before that acquisition's closing, raises suspicions that the sales were part of an overall scheme of insider trading. Third, Rattner alleges that the sales of VeriSign stock (or Illuminet options) by the Selling Defendants during the Relevant Period were not consistent with the Individual Defendants' previous trading activity. Finally, Rattner notes that many of the Individual Defendants sold substantial portions of their VeriSign (or Illuminet) holdings for millions of dollars. Rattner further contends that all of the Director Defendants committed waste by allowing the Selling Defendants to misappropriate a valuable asset, in the form of proprietary information, of the Company.[FN20]

> FN19. Rattner also alleges that some of the Individual Defendants participated in or encouraged the improper accounting practices. *Id.* ¶ 47.

> FN20. These claims will be referred to collectively as the "Insider Trading Claims."

*6 Rattner also presses a second set of claims concerning the alleged dissemination of misleading statements to the market and the improper oversight exercised in failing to assure the accuracy of VeriSign's accounting systems. Rattner charges the Individual Defendants with inadvertent, if not knowing, misdeeds in maintaining accurate financial reporting and recording systems, conduct which ultimately permitted the Selling Defendants to engage in insider trading and resulted in damages to the Company.[FN21] More pertinently, in the demand excusal context, and in essence, Rattner alleges that the Director Defendants "have engaged in a sustained and systematic failure to exercise their oversight responsibilities to ensure that VeriSign complied with Federal and State Laws, rules and regulations and to ensure the integrity of its financial reporting." [FN22] Thus, by failing to oversee adequately the Company's financial reporting and recording systems, the Director Defendants breached their fiduciary duties.[FN23]

> FN21. Amended Compl. ¶¶ 98, 101.

> FN22. *Id.* ¶ 100.

> FN23. Collectively, these claims will be referred to as the "Accounting Oversight Claims."

Because of the Individual Defendants' misdeeds, Rattner claims that the Company has suffered harm in that VeriSign's goodwill and integrity in the market have been impugned. Furthermore, the Company has been injured by bearing the cost of defense and being subjected to potential liability stemming from the pending class actions in federal court. Rattner thus requests that the following relief be granted: (1) that the Individual Defendants account to VeriSign for all damages and costs sustained now or in the future; (2) that the Individual Defendants return to VeriSign all salaries and remuneration of any kind received while the Individual Defendants were in breach of their fiduciary duties; (3) that a constructive trust be imposed on all profits derived from insider trading by the Selling Defendants; and (4) a declaration that VeriSign is entitled to contribution and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 7

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
(Cite as: Not Reported in A.2d)

indemnification for any claims that have been, or may be, asserted against it in connection with the Individual Defendants' alleged misconduct.

In response to the Amended Complaint, Defendants have moved to dismiss this action for failure to comply with Court of Chancery Rule 23.1.[FN24] Defendants argue that Rattner has not pled with particularity in the Amended Complaint facts which demonstrate that demand is futile. They contend that Rattner, in the Amended Complaint, does not allege with particularity facts that would constitute insider trading, and thus a disabling interest, by a majority of the Board. Similarly, Rattner fails to allege with particularity that the Board failed to exercise proper oversight regarding the Company's financial recording and reporting systems. Moreover, Defendants note that merely because the Director Defendants would be asked to authorize suit against themselves does not necessarily prevent a majority of the Board from exercising disinterested and independent business judgment in deciding the merits of, and whether to pursue, Rattner's claims. Therefore, Defendants request that this action be dismissed.

> FN24. The Defendants have also moved to dismiss this action pursuant to Court of Chancery Rule 12(b)(6). However, given my disposition of the Defendants' motions to dismiss under Court of Chancery Rule 23.1, the Defendants' motion to dismiss under Court of Chancery Rule 12(b)(6) will not be addressed. Similarly, I do not address Defendants' contention that this action should be dismissed because " prosecution of this amended action is not in the best interests of the Company." Op. Br. in Supp. of Defs.' Mot. to Dismiss at 13.

### III. ANALYSIS

*7 Court of Chancery Rule 23.1 requires that, in derivative actions, "[t]he complaint shall ... allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the

reasons for the plaintiff's failure to obtain the action or for not making the effort." The demand requirement embodied in Court of Chancery Rule 23.1 is an acknowledgement that a shareholder's prosecution of a derivative action necessarily impinges upon the power and autonomy of a board of directors to manage the affairs of the corporation, including whether or not to pursue a cause of action belonging to the corporation.[FN25] The hurdle of proving demand futility also serves an important policy function of promoting internal resolution, as opposed to litigation, of corporate disputes and grants the corporation a degree of control over any litigation brought for its benefit.[FN26]

> FN25. *Spiegel v. Buntrock,* 571 A.2d 767, 773 (Del.1990); *Aronson v. Lewis,* 473 A.2d 805, 811-12 (Del.1984).

> FN26. *Spiegel,* 571 A.2d at 773; *In re Delta & Pine Land Co. S'holders Litig.,* 2000 WL 875421, at *5 (Del.Ch. June 21, 2000).

A critical requirement of Court of Chancery Rule 23.1 is that the complaint must allege *with particularity* the reasons for demand excusal.
Those pleadings must comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings governed solely by Chancery Rule 8(a). Rule 23.1 is not satisfied by conclusory statements or mere notice pleading.... What the pleader must set forth are particularized factual statements that are essential to the claim.... A prolix complaint larded with conclusory language ... does not comply with these fundamental pleading mandates.[FN27]

> FN27. *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000) (footnotes omitted).

In considering whether a derivative plaintiff has satisfied Court of Chancery Rule 23.1, I am confined to reviewing the well-pled allegations of the complaint.[FN28] While I am unable to accept cursory contentions of wrongdoing in light of the

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

obligation to plead facts with particularity, I must accept as true all well-pled allegations of fact in the complaint, and all reasonable inferences from non-conclusory allegations contained in the complaint must be drawn in favor of the plaintiff. [FN29] With these principles in mind, I turn to the question of whether Rattner has pleaded with particularity that demand upon the Board would be futile and, thus, is excused.

> FN28. *White,* 783 A.2d at 547 n. 5; *Zimmerman v. Braddock,* 2002 WL 31926608, at *7 (Del.Ch. Dec.20, 2002); *Ash v. McCall,* 2000 WL 1370341, at *6 (Del.Ch. Sept.15, 2000).

> FN29. *Grobow v. Perot,* 539 A.2d 180, 187 (Del.1988).

The business judgment rule and demand excusal are "inextricably bound." [FN30] When a derivative suit challenges decisions made by directors in accordance with their managerial authority, " stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim. " [FN31] However, it is also recognized that the business judgment rule only operates in instances of action by the board of directors or a conscious decision to refrain from acting. [FN32] The business judgment rule has no role in the case of inaction by the board of directors. [FN33] From this dichotomy, two overlapping yet different tests have been developed to determine whether demand is excused.

> FN30. *Aronson,* 473 A.2d at 812.

> FN31. *Rales v. Blasband,* 634 A.2d 927, 933 (Del.1993).

> FN32. *Aroson,* 473 A.2d at 813.

> FN33. *Id.; Guttman v. Huang,* 823 A.2d 492, 499-500 (Del.Ch.2003); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *14 n. 39 (Del.Ch. Dec.18, 2002).

**\*8** If a derivative suit challenges a decision made by a board of directors, then demand futility is properly evaluated under that test announced in *Aronson v. Lewis.* [FN34] Under the *Aronson* test, " [t]o determine whether demand would be futile, the Court must determine whether the particular facts, as alleged, create a reason to doubt that: '(1) the directors are disinterested and independent' or '(2) the challenged transaction was otherwise the product of a valid exercise of business judgment." ' [FN35] Thus, *Aronson* adopted a two-pronged analysis for determining whether demand is futile: the first prong inquires into the independence and disinterestedness of the directors, and the second prong focuses on the substantive nature of the challenged transaction and the directors' approval thereof. [FN36]

> FN34. *Rales,* 634 A.2d at 933 ("The essential predicate for the *Aronson* test is the fact that a *decision* of the board of directors is being challenged in the derivative suit."); *Haseotes v. Bentas,* 2002 WL 31058540, at *4 (Del.Ch. Sept.3, 2002).

> FN35. *In re Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 285 (Del.Ch.2003) (quoting *Aronson,* 473 A.2d at 814).

> FN36. *Pogostin v. Rice,* 480 A.2d 619, 624 (Del.1984); *Aronson,* 473 A.2d at 814.

The parties, however, agree that, here, because Rattner does not challenge any particular action undertaken by the Board as a whole, the standard established in *Rales v. Blasband* governs the determination of demand futility. Thus, under the *Rales* test,

a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. If the derivative plaintiff satisfies this burden, then demand will be excused as futile. [FN37]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 9

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
(Cite as: Not Reported in A.2d)

FN37. *Rales,* 634 A.2d at 934.

Because there has been no action or decision by a board of directors, a premise of the *Aronson* test, that of the application of the business judgment rule, is lacking, and accordingly it is under the *Rales* test that the fundamental right of boards of directors to manage the affairs of corporations is recognized.[FN38] Thus, in examining "whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations," [FN39] the focus is upon the disinterestedness and the independence of a majority of the board of directors in responding to a demand.

> FN38. *In re Fuqua Indus., Inc. S'holders Litig.,* 1997 WL 257460, at *13 (Del.Ch. May 13, 1997); *Kohls v. Duthie,* 791 A.2d 772, 780 (Del.Ch.2000); *see also Rales,* 634 A.2d at 933 ("[t]he absence of board action ... makes it impossible to perform the essential inquiry contemplated by *Aronson*-whether the directors have acted in conformity with the business judgment rule [in consciously deciding to act or refrain from acting]").

> FN39. *Rales,* 634 A.2d at 934.

Under the *Rales* test, demand is excused if the particularized facts of the Amended Complaint create a reasonable doubt that, at the time the original complaint was filed, a majority of the Board could have exercised disinterested and independent business judgment in responding to Rattner's demand. Rattner does not challenge the independence of any Director Defendant; thus, the inquiry turns to the disinterestedness of the Director Defendants at the time this action was filed. Directors are considered disinterested for purposes of determining demand futility when they "appear on both sides of a transaction [or] expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." [FN40] Directorial interest may also be said to exist when " 'a corporate decision will have a materially

detrimental impact on a director, but not on the corporation and the stockholders." ' [FN41]

> FN40. *Aronson,* 473 A.2d at 812; *see also Orman v. Cullman,* 794 A.2d 5, 23 (Del.Ch.2002).

> FN41. *Orman,* 794 A.2d at 23 (quoting *Rales,* 634 A.2d at 936).

*9 Often, as is the case here, a derivative suit essentially asks the directors to authorize a suit against themselves and, thus, to act against their own personal interests.
The conundrum for the law in this area is well understood. If the legal rule was that demand was excused whenever, by mere notice pleading, the plaintiffs could state a breach of fiduciary duty claim against a majority of the board, the demand requirement of the law would be weakened and the settlement value of so-called "strike suits" would greatly increase, to the perceived detriment of the best interests of stockholders as investors. But, if the demand excusal test is too stringent, then stockholders may suffer as a class because the deterrence effects of meritorious derivative suits on faithless conduct may be too weak.[FN42]

> FN42. *Guttman,* 823 A.2d at 500.

Except in "egregious circumstances," the "mere threat" of personal liability does not constitute a disabling interest for a director considering a derivative plaintiff's demand.[FN43] "[H]owever, a ' substantial likelihood' of personal liability prevents a director from impartially considering a demand." [FN44] It is this difference, between a "mere threat" of personal liability and (i) "a substantial likelihood" of personal liability or (ii) a "mere threat" in " egregious circumstances," as addressed in the context of the first prong of *Aronson* [FN45] and the test established in *Rales,* [FN46] that accommodates and balances the competing policy concerns of adequately policing boards of directors while guarding against strike suits. With this framework in mind, I turn to determining whether, at the time this

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 10

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
(Cite as: Not Reported in A.2d)

action was originally filed, a majority of the Board could have impartially considered a demand made upon the Board and, thus, whether demand is excused. [FN47]

> FN43. *H-M Wexford LLC v. Encorp, Inc.*, 2003 WL 21254843, at *14 (Del.Ch. May 27, 2003) (citing *Aronson,* 473 A.2d at 815; *Malpiede v. Towson,* 780 A.2d 1075, 1085 (Del.2001)).

> FN44. *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995) (quoting *Rales,* 634 A.2d at 936); *see also Benerofe v. Cha,* 1996 WL 535405, at *6 (Del.Ch. Sept.12, 1996).

> FN45. *See, e.g., Malpiede,* 780 A.2d at 1085; *Kohls,* 791 A.2d at 782 n. 36 (noting that "[i]n a way, this inquiry [into whether a defendant director was interested in the decision to bring litigation because of a substantial threat of personal liability] is *related* to the second prong of the *Aronson test."* ) (emphasis added); *Katz v. Halperin,* 1996 WL 66006, at *8-*9 (Del.Ch. Feb.5, 1996).

> FN46. *See, e.g., Rales,* 634 A.2d at 936; *In re Baxter Int'l, Inc. S'holders Litig.,* 654 A.2d 1268, 1269 (Del.Ch.1995).

> FN47. Accordingly, for purposes of determining demand futility, the Individual Defendants who are not Director Defendants are largely irrelevant.

For demand to be excused, the particularized facts of the Amended Complaint must create a reasonable doubt that, at the time this action was filed, four of the eight directors on the Board could have exercised their disinterested business judgment in considering a demand. [FN48] Rattner argues that demand is excused for both the Insider Trading Claims and the Accounting Oversight Claims for several reasons. Rattner asserts that demand would have been futile because "[c]ertain defendants personally profited from the wrongful activities

alleged by selling VeriSign stock at artificially inflated prices." [FN49] While this allegation carries some uncertainty, [FN50] I understand Rattner to contend that because four of the eight directors are alleged to have traded VeriSign (or Illuminet) securities on the basis of non-public and material knowledge, a majority of the Board is not disinterested and, thus, is incapable of impartially considering a demand. Next, Rattner claims that demand would have been futile because all of the Director Defendants are accused of breaching their fiduciary duties by having failed to exercise adequate oversight over the Company's financial recording and reporting systems, thereby leading to the wrongful conduct complained of in this action. Finally, Rattner notes that "[c]ertain of the Individual Defendants are defendants in the federal securities class action suits described [in the Complaint], and face a substantial likelihood of liability given the misstatements" made during the Relevant Period. [FN51]

> FN48. *See In re The Limited, Inc. S'holders Litig.,* 2002 WL 537692, at *7 (Del.Ch. Mar.27, 2002); *Beneville v. York,* 769 A.2d 80, 85-87 (Del.Ch.2000). Again, because Rattner never seriously argues that any member of the Board lacks independence, the sole focus of my inquiry is into the disinterestedness of a majority of the Board.

> FN49. Amended Compl. ¶ 102(a). The Defendants argue that the allegation that " certain defendants" are incapable of considering a demand is itself plead with insufficient particularity. However, I will presume that, in the context of an effort to justify a failure to make demand upon the Board, Rattner is referring to those Defendants who are directors and who sold shares of VeriSign.

> FN50. *See supra* note 11.

> FN51. Amended Compl. ¶ 102(d)

>     A. *The Insider Trading Claims*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 11

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

**\*10** In order for demand to be excused with respect to the Insider Trading Claims, a reasonable doubt must exist that four of the eight VeriSign directors are incapable of exercising their disinterested business judgment in considering a demand. Rattner contends that this requirement for demand futility is satisfied as "[f]our of the directors who sold their shares on the basis of inside information are interested because each of them received a personal financial benefit from those transactions." [FN52] With respect to the Insider Trading Claims, Rattner does not challenge the disinterestedness of four (Compton, Chenevich, Reyes, and Kriens) of the directors. Therefore, were Rattner's attack upon any of the remaining four directors (Bidzos, Sclavos, Moore and Cowan) unsuccessful, a "majority" of the Board would not be implicated and demand would not be excused.

FN52. Pl.'s Answering Br. at 10.

Before I begin my analysis of demand excusal with respect to the Insider Trading Claims, it is important to note what facts, in connection with the Insider Trading Claims, are *not* alleged, at all or with particularity, in the Amended Complaint. Rattner merely posits, without any particularized facts, that the Director Defendants knew of inside information, and that they knew of (or directly participated in) the allegedly material misstatements. [FN53] Thus, absent from the particularized allegations of the Amended Complaint are the " precise roles that [the Director Defendants] played at the [C]ompany [and] the information that would have come to their attention in those roles." [FN54] The Amended Complaint is also devoid of any particularized facts that could lead to the inference that the timing of the trades reflected the Selling Defendants' impermissible insider trading. The Amended Complaint contains no particularized facts regarding the timing of the Director Defendants' trades in relation to permitted trading periods; while the pattern observed does reflect trading activity on behalf of the Director Defendants after the release of allegedly misleading statements, no particularized allegation of the Amended Complaint answers whether this temporal proximity was in fact part of the Company's practice

to prevent Company insiders from improperly benefiting from informational asymmetries. [FN55] Moreover, although Rattner cursorily alleges that there were differences between prior years and the Relevant Period, [FN56] the Amended Complaint does not shed light upon the trading practices of the Director Defendants prior to the Relevant Period. [FN57] Finally, the Amended Complaint often refers to allegedly improper sales by the Director Defendants as occurring over nearly a one-month time span. While not determinative, certainly the failure of Rattner to pinpoint the timing of the challenged sales detracts from her alleged theory of selling soon after the release of misleadingly bullish statements.

FN53. Rattner's best effort toward alleging with particularity the Director Defendants' knowledge, and how they acquired such knowledge, is set forth in Paragraph 33 of the Amended Complaint:

33. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors['] meetings and committees thereof and via reports and other information provided to them in connection therewith.

Although Rattner may have sought to satisfy the requirement to plead facts with particularity, Paragraph 33 of the Amended Complaint charges directors, solely upon the basis of their status as directors, with knowledge of alleged corporate activity. The conclusory assertions contained in Paragraph 33 fail to allege with particularity what information the directors knew and how they acquired

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

such knowledge. The conclusory nature of Rattner's allegations is perhaps most obvious in Paragraph 34 of the Amended Complaint which provides in part:
34. It is appropriate to treat the Individual Defendants as a group for pleading purposes and *to presume* that the false, misleading and incomplete information they conveyed in the Company's public filings and press releases as alleged herein are the collective actions of the narrowly defined group of defendants identified above .... (emphasis added).

FN54. *Guttman*, 823 A.2d at 503.

FN55. *See id.* at 503-04.

FN56. Amended Compl. ¶ 85(c).

FN57. *See Guttman*, 823 A.2d at 498.

Rattner argues that, with respect to the Insider Trading Claims, demand is excused because four of the eight directors have been implicated in alleged insider trading. Delaware has recognized a cause of action against directors who abuse their knowledge of a corporation's private information at the expense of unwitting purchasers of their stock.[FN58] Recently, however, this Court noted the differences between archetypical claims of self-dealing and insider trading claims, concluding:

FN58. *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del.Ch.1949).

*11 As a matter of course, corporate insiders sell company stock and such sales, in themselves, are not quite as suspect as a self-dealing transaction in which the buyer and seller can be viewed as sitting at both sides of the negotiating table. Although insider sales are (rightly) policed by powerful forces-including the criminal laws-to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director " interested" whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the

market at a time when he possessed material, non-public information.[FN59]

FN59. *Guttman,* 823 A.2d at 502. The Court further explained:
This would create the same hair-trigger demand excusal that *Aronson* and *Rales* eschewed. The balanced approach that is more in keeping with the spirit of those important cases is to focus the impartiality analysis on whether the plaintiffs have pled particularized facts regarding the directors that create a sufficient likelihood of personal liability because they have engaged in material trading activity at a time when (one can infer from particularized pled facts that) they knew material, non-public information about the company's financial condition.
*Id.*

Thus, critically, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." [FN60]

FN60. *Stepak v. Ross,* 1985 WL 21137, at *5 (Del.Ch. Sept.5, 1985); *see also Guttman,* 823 A.2d at 505 ("Delaware case law makes the same policy judgment as federal law does, which is that insider trading claims depend importantly on proof that the selling defendants acted with scienter."); *Rosenberg v. Oolie,* 1989 WL 122084, at *3 (Del.Ch. Oct.16, 1989) (" [I]f 'a person "in a confidential or fiduciary position, in breach of his duty, *uses his knowledge* to make a profit for himself, he is accountable for such profit" ' ") (quoting *Brophy,* 70 A.2d at 8).

After reviewing the Amended Complaint, I conclude that Rattner has not pleaded facts with particularity that create a reasonable doubt that a majority of the Board is disinterested with respect to the Insider Trading Claims. It is important to note that only one Director Defendant is a senior

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 13

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
(Cite as: Not Reported in A.2d)

manager of the Company; that is, only Sclavos held a senior management position with VeriSign at the time this action was filed. The Amended Complaint alleges general knowledge in a conclusory fashion on behalf of the Director Defendants, explained solely by virtue of their service in their various capacities. Thus, even somehow assuming Sclavos suffers from a disabling interest, nothing has been pleaded with particularity as to the scienter of seven of the eight members of the Board.[FN61]

> FN61. As noted above, Rattner has not questioned the independence from Sclavos of the seven other directors.

The Amended Complaint's allegations implicating Moore's sale of unexercised Illuminet options also fail to taint the disinterestedness of Moore in considering a demand made upon the Board. On September 23, 2001, VeriSign and Illuminet entered into a merger agreement. As consideration, VeriSign would exchange 0.93 shares of VeriSign common stock for each outstanding share of Illuminet and, thus, would issue 30.4 million shares for the outstanding shares of Illuminet, as well as assume Illuminet's outstanding employee stock options. [FN62] Rattner complains that "[a]t some point after announcement of the Illuminet acquisition, but prior to being elected to the [Board], Moore exercised Illuminet options (or VeriSign options exchanged in the Merger) and sold the underlying stock." [FN63] The Complaint fails to allege with any specificity when the sales were made or whether the shares were all sold at one time.[FN64] Moreover, if trading resulting from the Illuminet options is assumed to be relevant to the purpose of determining demand futility with respect to the Insider Trading Claims, the Amended Complaint still fails to allege particularized facts that compromise Moore's impartiality. Not one particularized allegation in the Amended Complaint explains what inside knowledge Moore traded upon or how he gleaned such information.[FN65] Therefore, I conclude that the Amended Complaint fails to allege the particularized facts necessary to raise a reasonable doubt as to Moore's ability to exercise his disinterested business judgment.

> FN62. Amended Compl. ¶ 63.

> FN63. *Id.* ¶ 20. The Illuminet acquisition was announced in September 2001; Moore became a director of VeriSign in February 2002. Rattner also alleges that "rather than convert his Illuminet options into VeriSign options, defendant Moore exercised and sold off his Illuminet options." *Id.* ¶ 63. Rattner also contends that Moore's disposition of his Illuminet interest was " unusual in nature and timing," *id.* ¶ 85, because the "sales occurred after announcement of the acquisition of Illuminet by VeriSign and prior to closing of that transaction." *Id.* ¶ 85(e).

> FN64. Rattner alleges that, in March 2001, Moore held 995,000 "in the money" options and by April 2002 had disposed of them. *Id.* ¶ 37 n. 1.

> FN65. Rattner asserts that "Moore, while in possession of other material adverse non-public information, sold approximately 995,000 of his privately-held Illuminet stock." *Id.* ¶ 82. Rattner does not identify that "material adverse non-public information" to which she refers.

*12 Additionally, I note that the Amended Complaint fails to allege any facts with particularity that would permit me to draw a reasonable inference that the challenged sales were executed upon the basis and because of non-public information. Much is made about the timing and size of the sales. However, as has been noted,[FN66] the Amended Complaint does not assist in determining whether the pattern of executed trades was the product of an orchestrated scheme to defraud the market and the Company's shareholders or good faith adherence to Company policy or consistent with prior individual practices. Additionally, while several Individual Defendants disposed of large percentages of their stock holdings, of the four Director Defendants, only two (Cowan and Moore) can be characterized as having disposed of a "large" percentage of their holdings.

Not Reported in A.2d                                                                          Page 14

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

FN67 Essentially, Rattner seeks to impose liability and excuse demand on the basis that the Director Defendants sold VeriSign stock (or Illuminet options) during the Relevant Period. If accepted, Rattner's theory would take a step toward the implementation of the very common law rule warned of in *Guttman*. It is a step which I decline to take. Thus, I conclude that, with respect to the Insider Trading Claims, Rattner has failed to plead with particularity factual allegations which, at the time this action was filed, create a reasonable doubt that a majority of the Board was disinterested and therefore incapable of impartially considering a demand.

> FN66. *See supra* notes 53-55 and accompanying text.

> FN67. In determining whether demand is excused, I am confined to the controlling complaint and may consider documents referred to in the complaint when such documents are integral to a plaintiff's claim or are incorporated into the complaint by reference. *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *4-*6 (Del.Ch. Jan.11, 2001). Rattner, in her brief, argues that the large percentages disposed of by the Individual Defendants support her alleged theory of insider trading. *See* Pl.'s Answering Br. at 12 n. 7 (citing "2002 Proxy"). However, nowhere in the Amended Complaint did Rattner allege the total personal holdings of the individual Director Defendants. Here, the "2002 Proxy," a citation subject to uncertainty, was not referred to in the Amended Complaint. Also, the document is not integral to Rattner's claim.

### B. *The Accounting Oversight Claims*

Rattner also claims that demand is excused with respect to the Accounting Oversight Claims because all of the members of the Board are potentially liable for failure to exercise proper supervision over VeriSign's financial recording and reporting systems. In this situation, the *Rales* test, in examining the "interest" of the challenged directors, asks whether "the directors face a 'substantial likelihood' of personal liability, [and thus whether] their ability to consider a demand impartially is compromised ..., excusing demand." FN68

> FN68. *Guttman,* 823 A.2d at 501.

Rattner's Accounting Oversight Claims are best described as a type of *Caremark* FN69 claim. As was noted in *In re Caremark International Derivative Litigation,* a claim for failure to exercise proper oversight is one of, if not the, most difficult theories upon which to prevail.FN70 In the typical *Caremark* case, "[i]n order to hold the directors liable, [a] plaintiff will have to demonstrate that they were grossly negligent in failing to supervise these subordinates." FN71 Here, once again, it is instructive to review not what facts the Amended Complaint alleges, but what facts the Amended Complaint fails to allege, with particularity.

> FN69. *In re Caremark Int'l Deriv. Litig.,* 698 A.2d 959 (Del.Ch.1996).

> FN70. *Id.* at 967; *see also Guttman,* 823 A.2d at 505-06.

> FN71. *Seminaris,* 662 A.2d at 1355.

The Amended Complaint sets forth vast tracts of quoted materials from public sources, detailing wrongdoings in the form of alleged misstatements. The Amended Complaint also summarizes numerous SEC rules and regulations, and FASB and GAAP standards. However, conspicuously absent from any of the Amended Complaint's allegations are particularized facts regarding the Company's internal financial controls during the Relevant Period, notably the actions and practices of VeriSign's audit committee.FN72 The Amended Complaint also is similarly wanting of any facts regarding the Board's involvement in the preparation of the financial statements and the release of financial information to the market.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 15

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
(Cite as: Not Reported in A.2d)

FN72. As has been noted, relevant facts include "whether the company had an audit committee during that period, how often and how long it met, who advised the committee, and whether the committee discussed and approved any of the allegedly improper accounting practices." *Guttman*, 823 A.2d at 498.

*13 Rattner calls attention to what she suggests should have been a "red flag" to the Director Defendants, placing them on notice of the systematic failure of the Company's internal controls. The Amended Complaint, relatively briefly, attempts to explain that the Defendant Directors should have been on notice of certain alleged misstatements, noting that "VeriSign" purchased companies with large amounts of deferred revenues, allegedly in order to manipulate its DSO by increasing its deferred revenue and excluding its accounts receivables, thereby creating the false impression of growth. [FN73] Specifically, the Amended Complaint alleges that DSO were steadily rising from the second quarter of 2000 (DSO of 32) through the first quarter of 2002 (when DSO peaked at 81), which should have signaled to the VeriSign directors that something was amiss, given that VeriSign's revenue stream is "mainly derived from subscription based products and services (over 85% of revenue) which are recognized ratably and ordinarily should carry a low DSO of 45-50 days or less." [FN74] However, it is again important to recall the structure of the Board, in that only one Director Defendant is alleged to have been a senior manager of the Company at the time this action was filed. There is nothing alleged with particularity in the Amended Complaint that would either demonstrate or permit me to draw the reasonable inference that the Director Defendants were aware of a possibly onerous elevation in a single financial statistic.[FN75] As has been noted, claimed red flags "are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer." [FN76] Thus, the Amended Complaint, in the one instance it alleges a reason why the Director Defendants could somehow have been aware of alleged misdoings at the Company, still falls short of pleading with particularity facts that would excuse demand.

FN73. Amended Compl. ¶ 62.

FN74. *Id.* ¶ 70.

FN75. *See In re Citigroup Inc. S'holders Litig.*, 2003 WL 21384599, at *2 (Del.Ch. June 5, 2003).

FN76. *Id.*

None of these allegations contained in the Amended Complaint (individually or collectively) pleads with particularity sufficient to sustain an inference that the Defendant Directors were guilty of gross negligence. While the Amended Complaint is quick to prattle off numerous alleged infractions of laws, rules and principles, Rattner never notes the accounting procedures employed by the Company or the Board's involvement in VeriSign's financial recording and reporting systems. The only information one can snare from the Amended Complaint is that there exists a body of rules regarding the accuracy of recording and reporting financial information which may have been violated. Equally as important, I am unable, from the face of the Amended Complaint, to determine what role, if any, the Board or its members played in the internal processes of collecting and disseminating financial information. The most I can safely admit knowledge of is that Compton, Chenevich and Kriens were members of the Audit Committee during the Relevant Period and, thus, that the Company had an Audit Committee.[FN77] Therefore, I am unable to conclude that a majority of the Board faces a substantial likelihood of liability for failing to oversee VeriSign's compliance with required accounting and disclosure standards. [FN78]

FN77. Ironically, these Director Defendants are three of the four directors who were not alleged to have engaged in insider trading.

FN78. To the extent that Rattner alleges intentional wrongdoing by the Director Defendants, I note that, for the same reasons set forth above, the Amended

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

Complaint does not allege with particularity facts that at all show knowing participation by any of the Director Defendants (with the possible exception of Sclavos as the only management director). I also observe that, in contrast to Rattner's alternative theories of wrongdoing, the issue of demand futility with respect to claims of intentional wrongdoing would be judged under the two-pronged *Aronson* standard. *See supra* text accompanying note 35. However, given the highly conclusory nature of the Amended Complaint, the Amended Complaint fails to plead with particularity demand futility under either prong

*14 Finally, Rattner asserts another theory as to why demand is excused: because "[c]ertain of the Individual Defendants are defendants in ... federal securities class action suits ... and face a substantial likelihood of liability given the misstatements of VeriSign' [sic] earnings and the trading in VeriSign stock during the stated class period in those actions."[FN79] Here, too, the Amended Complaint leaves far too much to the imagination. The only particularized facts contained in the Amended Complaint regarding the federal securities class action lawsuits are that such suits were filed and are pending in the Northern District of California. One is left to guess at which of the Individual Defendants, indeed if any of the Director Defendants, are defendants in the federal securities class action lawsuits. These conclusory and cryptic allegations are insufficient to satisfy the demand excusal requirements of Court of Chancery Rule 23.1.

FN79. Amended Compl. ¶ 102(d).

Thus, a symptomatic and ultimately fatal defect to all of Rattner's claims is a failure to plead facts with particularity. Here, the cause of this systematic failure is left to supposition, although one suspects that the "first to file custom" and the resulting "unseemly race to the court house" may be at fault.[FN80] In her brief, Rattner noted:

FN80. *Rales,* 634 A.2d at 934-35 n. 10; *see also In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1.

[I]t is unclear from a review of public filings how exactly Moore's Illuminet options were disposed. Indeed, prior to filing the Amended Complaint, plaintiff's counsel requested an explanation from defendants' counsel regarding Moore's disposition since it is critical to the demand futility analysis. After taking the matter under advisement, defendants' counsel refused to provide any information.[FN81]

FN81. Pl.'s Answering Br. at 12 (citation omitted).

Our cases have consistently advised would-be derivative plaintiffs to utilize the "tools at hand" before filing complaints.[FN82] In particular, the books and records provisions of 8 *Del. C.* § 220 may be quite helpful for derivative plaintiffs confronted with the need to satisfy the pleading requirements of Court of Chancery Rule 23.1 [FN83] They might have been helpful here; Rattner has never stated whether she availed herself of the tools at hand before embarking upon what is now discovered to have been an ultimately-at least in this venue-unsuccessful journey. Thus, both the causes of the Amended Complaint's deficiencies and whether an often overlooked tool for plaintiffs could have been useful remain a mystery. What is clear is that the Amended Complaint fails to set forth particularized facts that create a reasonable doubt as to the disinterest or independence of a majority of the Board at the time this action was filed so as to excuse demand.

FN82. *See Brehm,* 746 A.2d at 266-67; *In re Citigroup Inc. S'holders Litig.,* 2003 WL 21384599, at *1; *Guttman,* 823 A.2d at 504.

FN83. *See e.g., In re The Walt Disney Co. Deriv. Litig.,* 825 A.2d 275, 279 (Del.Ch.2003).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 17

Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612
**(Cite as: Not Reported in A.2d)**

### IV. CONCLUSION

For the foregoing reasons, the Amended Complaint will be dismissed.[FN84] An order will be entered in accordance with this Memorandum Opinion.

> FN84. The dismissal as to Rattner will be with prejudice. *See* Court of Chancery Rule 15(aaa).

### ORDER

AND NOW, this *30th* day of September, 2003, for the reasons set forth in the Court's Memorandum Opinion of even date,

**\*15** IT IS HEREBY ORDERED that the above-entitled action be, and the same hereby is, dismissed. This dismissal is with prejudice as to Plaintiff Bobbie Rattner.

Del.Ch.,2003.
Rattner v. Bidzos
Not Reported in A.2d, 2003 WL 22284323 (Del.Ch.), 29 Del. J. Corp. L. 612

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB G

Westlaw.

Slip Copy                                                                                     Page 1

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
(Cite as: Slip Copy)

C
Briefs and Other Related Documents

United States District Court,N.D. Illinois, Eastern
Division.
In re WHITEHALL JEWELLERS, INC.
SHAREHOLDER DERIVATIVE LITIGATION
No. 05 C 1050.

Feb. 27, 2006.

David Barry Kahn, Mark E. King, David B. Kahn
& Associates, Ltd., Northfield, IL, for Plaintiff.
Michael D. Freeborn, Douglas Alan Albritton,
Matthew John Kramer, Freeborn & Peters, Walter
C. Carlson, Brendan Joseph Gardiner, Colleen M.
Kenney, Sidley Austin Brown & Wood LLP,
Stephen Jay Senderowitz, John J. Tully, Winston &
Strawn, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*
PALLMEYER, J.

**\*1** On February 22, 2005, two shareholders filed
this derivative action on behalf of Whitehall
Jewellers, Inc., (hereinafter, "Whitehall,") alleging
various state and federal law claims against a group
of Whitehall's directors. As detailed below,
Plaintiffs allege that these directors participated in a
rebate scheme that artificially inflated the value of
Whitehall's inventory and resulted in a civil suit
against Whitehall as well as regulatory and criminal
investigations. Eight months before this suit was
filed, on June 17, 2004, other Whitehall
shareholders filed a similar derivative suit in the
Circuit Court of Cook County against the same
directors named as defendants here. The Defendant
directors named in this suit have moved for the
court to stay any further action on this suit until the
resolution of that state court suit. For the reasons
explained below, the motion for stay is denied.

*STATEMENT OF FACTS* [FN1]

FN1. The facts are drawn from the
Derivative Plaintiffs' Consolidated
Amended Derivative Complaint
(hereinafter, "CAC,") and assumed to be
true for the purpose of resolving
Defendants' motion to stay.

Whitehall, a national retail jeweler, operates nearly
400 jewelry stores in thirty-eight states.[FN2]
(Consolidated Amended Derivative Complaint
(hereinafter, "CAC,") ¶¶ 10, 45.) Whitehall
purchases its inventory from an assortment of
vendors. (*Id.* at ¶ 30.) Derivative Plaintiffs allege
that Generally Accepted Accounting Principles
(hereinafter, "GAAP,") require the purchaser of
inventory to "write down" the value of the
inventory from its purchase price to its fair market
value as the inventory depreciates. (*Id.*) Contrary to
this requirement, Derivative Plaintiffs allege, the
Officer Defendants named in the case [FN3]
negotiated an inventory rebate scheme with some of
Whitehall's vendors, described more fully below. (
*Id.*)

FN2. Whitehall is also a Delaware
corporation, principally headquartered in
Illinois. (CAC ¶ 10.)

FN3. Derivative Plaintiffs named Matthew
M. Patinkin ("M.Patinkin"), a director of
Whitehall from 1989 to 2004 and
Executive Vice President of Operations
since 2000, (CAC ¶ 11); John R.
Desjardins, a director of Whitehall from
1989 to 2004, Executive Vice President
since 1989, and Chief Financial Officer
since 2003, (*id.* at ¶ 12); Manny A.
Brown, Executive Vice President of
Operations since 1997, (*id.* at ¶ 13); and
Jon H. Browne, Executive Vice President
and Chief Financial Officer up to his
termination in December of 2003. (*Id.* at ¶
14.) These four defendants are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
(Cite as: Slip Copy)

collectively known as the "Officer Defendants." (*Id.* at ¶ 15.)

In addition, Derivative Plaintiffs also named three Defendants referred to here as the "Audit Committee Defendants." (*Id.* at ¶ 19.) They are Richard K. Berkowitz, a Whitehall director since 1998 and Chairman of the Audit Committee, (*id.* at ¶ 16); Daniel H. Levy, a Whitehall director since 1997 and member of the Audit Committee, (*id.* at ¶ 17); and Sanford Shkolnik, a Whitehall director since 2003 and member of the Audit Committee. (*Id.* at ¶ 18).

Finally, Plaintiffs named an additional Defendant-Norman J. Patinkin ("N.Patinkin"), who served as a director of Whitehall since 1989. (*Id.* at ¶ 20.)

The complaint does not set out the citizenship of any of the individually named Defendants.

Chief Financial Officer Browne and Executive Vice Presidents M. Patinkin, Desjardins, and Brown arranged to return depreciated inventory to Whitehall's vendors and "receive excessive discounts, reimbursements, credits, or other 'vendor allowances' " equal to the full average cost at which Whitehall had purchased the inventory. (*Id.*) In return for these credits, valued far in excess of the fair market value of the returned, depreciated inventory, Whitehall agreed to purchase new, more expensive inventory from the participating vendors. (*Id.*) The Officer Defendants' failure to adhere to GAAP and their conduct in engaging in this inventory rebate scheme resulted in an inflation of Whitehall's inventory balances and net income on the books. (*Id.* at ¶ 31.)

Meanwhile, beginning in 2001, one of Whitehall's vendors, Cosmopolitan Gem Corporation (hereinafter, "Cosmopolitan"), had run into financial trouble. (*Id.* at ¶ 33.) Capital Factors, Inc. (hereinafter, "Capital,") had "made millions of dollars" in loans to Cosmopolitan, secured by Cosmopolitan's accounts receivable. (*Id.*) When Cosmopolitan sought additional loans from Capital and asked the Officer Defendants to help conceal Cosmopolitan's precarious financial condition from

Capital, the Officer Defendants obliged. (*Id.*) With the Officer Defendants' assistance, Cosmopolitan created fictitious account statements showing receivables owed by Whitehall and payments from Whitehall applied to those receivables, totaling some $13.9 million in the several months prior to March 2002. (*Id.* at ¶¶ 34, 35.) These machinations created the illusion that Cosmopolitan was collecting its aging receivables, improving that part of Cosmopolitan's books which Capital would examine in deciding whether or not to extend Cosmopolitan additional credit. (*Id.* at ¶ 34.) Whitehall received discounts, credits, and other vendor allowances on its inventory purchases from Cosmopolitan in exchange for its participation in the scheme.[FN4] (*Id.*)

> FN4. It is unclear whether Derivative Plaintiffs are alleging that Cosmopolitan participated in Whitehall's inventory rebate scheme *in addition to* this alleged scheme to defraud Capital. What is clearly alleged is that an investigation into the relationship between Cosmopolitan and Whitehall as it related to the attempt to defraud Capital caused Whitehall's inventory rebate scheme to unravel as well.

**\*2** At Cosmopolitan's request, Whitehall designated the payments to Cosmopolitan as "on account" rather than for any particular invoice. (*Id.* at ¶ 35.) At some point (the date is not identified in the complaint), Capital asked Cosmopolitan and Whitehall to provide it with more information regarding the invoices to which Cosmopolitan applied the "on account" payments. (*Id.* at ¶ 36.) Instead of presenting Capital with any statement showing the large number of deductions and credits Whitehall had received from Cosmopolitan, Whitehall CFO Browne, Cosmopolitan's controlling shareholder Joshua Kestenbaum, and Cosmopolitan Chief Financial Officer Christopher Shaw created and presented a phony statement that did not reflect many of the deductions and credits and showed Whitehall's "on account" payments as being applied to aging Whitehall receivables. (*Id.* at ¶¶ 37, 38.) Browne, Kestenbaum, and Shaw submitted at least three such phony statements to Capital over the

Case 1:06-cv-00362-GMS    Document 37-4    Filed 08/25/2006    Page 8 of 18

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
(Cite as: Slip Copy)

course of several months beginning in April 2002 and ending in September 2002. (*Id.* at ¶¶ 37, 39.)

Capital seems to have caught on; in August 2003, it brought a $30 million lawsuit against Whitehall and Cosmopolitan, as well as several other defendants, alleging a scheme to defraud Capital by inducing it to advance Cosmopolitan funds by means of misrepresentations concerning Cosmopolitan's financial state. (*Id.* at ¶¶ 41, 45.) Perhaps tipped off by the civil suit and by a March 5, 2003 Whitehall press release declaring an intention to restate its financial statements for the first three fiscal quarters of 2002, [FN5] the Securities and Exchange Commission (hereinafter, "SEC,") and United States Attorney for the Eastern District of New York initiated an investigation into Whitehall in November 2003. (*Id.* at ¶¶ 40, 42, 43.)

> FN5. According to the Whitehall press release:
> The cumulative impact of the adjustments for the first three fiscal quarters was to increase the Company's net loss from $0.29 per share to $0.31 per share.... The quarterly impact of these adjustments is to increase net income by $127,000 in the first fiscal quarter, reduce net income by $457,000 in the second fiscal quarter and to reduce net loss by $72,000 in the third quarter.
> (CAC ¶ 40.)

On November 21, 2003, Whitehall issued a press release announcing that its internal investigations had discovered that its Executive Vice President of Merchandising Lynn Eisenheim had violated company policy by failing to document the age of certain inventory. (*Id.* at ¶¶ 43, 45.) Whitehall asserted that Eisenheim's failures related to less than one percent of Whitehall's total current inventory and that this violation was unrelated to the Capital lawsuit. (*Id.*) On December 11, 2003, a Whitehall press release announced the termination of Jon H. Browne as Chief Financial Officer and the appointment of Executive Vice President John R. Desjardins to that position. (*Id.* at ¶ 44.) Following this announcement, Whitehall's stock value fell 75

cents to $9.04, part of a 29 percent decline in value since receiving its SEC subpoena in November. (*Id.* at ¶ 45.)

On December 22, 2003, Whitehall released its third quarter results for 2003, reporting a $0.53 per share net loss (as compared to $0.35 per share net loss for the same quarter a year earlier) and laying some of the blame on fees related to the Capital lawsuit, the SEC investigation, and the criminal inquiry. (*Id.* at ¶ 46.) Whitehall also announced that it would be restating its financial reports for 2000, 2001, 2002, and the six-month period ending in July 31, 2003. [FN6] (*Id.* at ¶¶ 46, 47.) Whitehall's press release explained that "[t]he restatements primarily reflect the Company's revision of the accounting treatment for vendor allowances associated with the Company's return of substandard inventory to vendors." (*Id.* at ¶ 46.) CFO Desjardins offered further details to analysts and investors during a December 22, 2003 phone call. (*Id.* at ¶ 47.) As recorded in a transcript of that conference call, Desjardins reported:

> FN6. According to the Whitehall press release:
> The impact of these restatements will decrease Whitehall's earnings per diluted share by $0.01 for fiscal 200, $0.03 for fiscal 2001, $0.02 for fiscal 2002 and decrease the loss by $0.01 for the six month period ended July 31, 2003.
> (CAC ¶ 46.)

**\*3** The company enjoyed strong ongoing relationships with many of its suppliers. Based upon the strength of those relationships, the company would, from time to time, negotiate separate agreements, distinct from the terms of our standard trading agreements, under which vendors accepted returns of certain substandard inventory, [sic] the full credit of the company's weighted average cost of those items. Generally these returns were accepted by the vendor in conjunction with the placement of purchase orders for fresh inventory. The company did not record a reserve associated with the impairment of substandard inventory. As a result of a reevaluation of the relevant accounting

Slip Copy                                                                    Page 4

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
(Cite as: Slip Copy)

guidelines, Whitehall will now record an impairment charge associated with substandard inventory in each reporting period. Thereafter, as returns of substandard inventory are made, the company will reflect the implicit benefit of the lower inventory cost related to the impairment reserves in its cost of sales over the inventory turnover period associated with the new inventory being purchased from the vendor. (*Id.* at ¶ 47.) Litigation and investigation costs, running into the millions, continued to affect Whitehall's performance for the next four fiscal quarters. (*Id.* at ¶¶ 49-52, 55.) On September 28, 2004, Whitehall announced that it had settled the litigation with Capital by paying Capital $10.8 million. (*Id.* at ¶ 54.) The U.S. Attorney for the Eastern District of New York also agreed not to file charges against Whitehall, on the condition that Whitehall made restitution to Capital and paid $350,000 to the United States. (*Id.*)

According to Whitehall's proxy statements, the Board of Directors met eleven times during 2002 and 2003. (*Id.* at ¶ 56.) The Audit Committee, including the Audit Committee Defendants in this case, met twenty-one times during this period. (*Id.*) Derivative Plaintiffs allege that each director was in attendance at each meeting and had full knowledge of Whitehall's improper business and accounting practices. (*Id.*) Furthermore, the Officer Defendants received salaries, cash bonuses, shares of Whitehall stock, and options to purchase Whitehall stock based on the inflated financial statements initially issued for fiscal years 2000 through 2003. (*Id.* at ¶ 59.) The Officer Defendants also sold shares of Whitehall stock to unspecified purchasers at the end of March 2002 and at the beginning of June 2002, at a price which did not reflect their private knowledge that Whitehall was engaged in improper business and accounting practices that would necessitate a restatement of the company's financial statements and lower the share price. (*Id.* at ¶ 64-65.)

*PROCEDURAL HISTORY*

Myra Cureton, a California shareholder in Whitehall, filed a complaint in this court on February 22, 2005. Cureton sued derivatively on behalf of nominal defendant Whitehall and named as Defendants M. Patinkin, Desjardins, Brown, Berkowitz, Levy, Shkolnik, and N. Patinkin, as well as Whitehall President Hugh M. Patinkin.[FN7] As originally filed, the *Cureton* complaint stated a single state law claim for breach of fiduciary duty, invoking the federal court's diversity jurisdiction.

    FN7. Hugh M. Patinkin passed away in March 2005.

*4 On April 13, 2005, Tai Vu, also a California shareholder in Whitehall, filed a similar state law claim against the same defendants in this court. On May 25, 2005, this court granted a motion for reassignment of the *Vu* case as related to *Cureton.* Derivative Plaintiffs filed their consolidated amended derivative complaint on June 20, 2005, *sub nom, In re Whitehall Jewellers, Inc. S'holder Derivative Litig.* The complaint names M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. In addition to the original breach of fiduciary duty claim against all Defendants, Derivative Plaintiffs charged the Officer Defendants with one count for violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 and two additional state law claims for unjust enrichment and a breach of the fiduciary duty of loyalty in the form of insider trading. The final count was levied against Defendant Browne alone and sought reimbursement for Whitehall pursuant to § 304 of Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243. This complaint now asserts both diversity and federal question jurisdiction.

On July 15, 2005, Defendants filed this motion to stay proceedings pursuant to the *Colorado River* Abstention Doctrine. They ask that this court abstain from taking further action on this case pending the outcome of *Cusak v. Patinkin, et al.,* Case No. 04 CH 9705, a shareholder derivative action filed on June 17, 2004, in the Circuit Court of Cook County on behalf of Whitehall and arising from the same factual allegations set out above.

As amended,[FN8] the *Cusak* complaint names the executor of Hugh Patinkin's estate, as well as, M.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 5

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. It includes seven counts under state law: (1) breach of fiduciary duty, (2) abuse of control, (3) gross mismanagement, (4) waste of corporate assets, (5) unjust enrichment, (6) insider selling and misappropriation of information, and (7) contribution and indemnification.

> FN8. The record does not include the *Cusak* complaint as originally filed.

Prior to ruling on this motion, the *Cusak* action was consolidated with two additional shareholder derivative actions [FN9] filed in state court. The newly consolidated *Cusak* action is the potentially parallel state proceeding to which Defendants point in making their request for a stay.

> FN9. On April 19, 2005, *Perles v. Estate of Hugh Patinkin, et al.,* Case No. 05 CH 6926, named the executor of Hugh Patinkin's estate, and M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, N. Patinkin, and Jack A. Smith (another Whitehall director) as Defendants. The *Perles* complaint alleged the same first six causes of action as the *Cusak* complaint and added a seventh count for aiding and abetting breaches of fiduciary duty, as well as two counts specifically against Whitehall's independent auditor, Pricewaterhouse Coopers, LLP, also a party to the litigation. On June 13, 2005, *Lynch v. Berkowitz, et al.,* Case No. 05 CH 6926, named the executor of Hugh Patinkin's estate, and M. Patinkin, Desjardins, Brown, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. The *Lynch* complaint, like the *Cureton* and *Vu* complaints, alleged just one count, a state law claim for the breach of fiduciary duty.

## DISCUSSION

Because the federal courts can hear state claims, *see*

28 U.S.C. §§ 1332, 1367, and state courts can hear certain federal claims, *see* Ill. Const., Art. VI, §§ 4, 9, it is possible for the same plaintiff to bring the same cause of action against the same defendant simultaneously in separate federal and state cases. " Generally as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction....'' ' *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (quoting *McClellan v. Carland,* 217 U.S. 268, 282, 30 S.Ct. 501, 54 L.Ed. 762 (1910)). Indeed a federal district court's duty to exercise its jurisdiction where the district court has it is "virtually unflagging." [FN10] *Colorado River,* 217 U.S. at 817. That said, although the circumstances in which a federal court will stay a federal action on account of the pendency of a similar state action in state court are very limited, such circumstances "do nevertheless exist." *Id.* at 818.

> FN10. Defendants have requested a stay, not an abstention *per se.* With an abstention, a court declines to exercise jurisdiction that it has over a case, while with a stay, the court is technically exercising its jurisdiction, but simply putting off taking any action in the case. Significantly, however, in cases where a stay has been requested under the *Colorado River* Abstention Doctrine, the Seventh Circuit has chosen to analyze the case as if the request were for an abstention. *See, e.g., Clark v. Lacy,* 376 F.3d 682, 685 (7th Cir.2004) (applying the two-part abstention analysis framework to a request to stay a derivative shareholder suit).

*5 In *Clark v. Lacy,* the Seventh Circuit had before it a federal shareholder derivative suit involving " the same factual predicate, most of the same defendants, and fundamentally the same legal issues " as a derivative shareholder suit brought by a different plaintiff in state court. 376 F.3d 682, 684 (7th Cir.2004). In considering whether the district

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

court had abused its discretion in staying the federal case, the *Clark* court adopted a two-part test. The first step in the analysis is to determine " 'whether the concurrent state and federal actions are actually parallel." ' *Id.* at 685 (quoting *LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1285, 1287 (7th Cir.1988)). Any doubt regarding the parallel nature of a federal and state action ought to be resolved in favor of the exercise of federal jurisdiction where it has been given to the federal district court. *See AAR Int'l, Inc. v. Nimelias Enter. S.A.,* 250 F.3d 510, 520 (7th Cir.2001) (finding that a federal action alleging the breach of one provision of a lease was not parallel to pending foreign litigation alleging the breach of another provision of that same lease where the claims in the federal action "are distinct from and independent of" the claims in the pending foreign litigation).

Parallelism is not, in and of itself, exceptional, and not all parallel actions merit the restraint of a federal court's exercise of granted jurisdiction, however. And when the party moving for the stay succeeds in making a showing of parallelism, it must also show that there are additional exceptional circumstances counseling for a stay. *Clark,* 376 F.3d at 685. In making this calculation, courts should consider: (1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim.

*Id.* (citing *LaDuke,* 879 F.2d at 1559). In assessing these issues, "[n]o one factor is necessarily determinative." *Colorado River,* 424 U.S. at 819. The overall focus of the inquiry is whether or not the case before the court is so truly exceptional that a stay reflects the proper balance between the court's "virtually unflagging obligation" to exercise its jurisdiction and the promotion of "wise judicial

administration." *Id.* at 817-18.

For the reasons explained here, the court concludes that Defendants have not met the first requirement in the *Clark* court's two-step framework. Accordingly, the court need not discuss how the instant case and the *Cusak* action would have fared under the ten-factor *Clark* analysis for exceptional circumstances.

Parallel Cases

*6 In order to meet the test of parallelism, the two " suits need not be identical." *Clark,* 376 F.3d at 686 (citing *Interstate Material Corp. v. City of Chicago,* 847 F.2d 1285, 1288 (7th Cir.1988)). Instead, one suit will be deemed parallel to another to the extent that " 'substantially the same parties are contemporaneously litigating the same issues in another forum," ' *Clark,* 376 F.3d at 686 (quoting *Calvert Fire Ins. Co. v. Am. Mut. Reins. Co.,* 600 F.2d 1228, 1229 n. 1 (7th Cir.1979)). The *Clark* court observed: "To be sufficiently similar it is not necessary that there be formal symmetry between the two actions. Rather, there should be a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." 376 F.3d at 686 (internal quotation marks and citations omitted). In determining that a federal shareholder derivative suit was parallel to a state shareholder derivative suit, the *Clark* court observed that both lawsuits involved the same or substantially the same parties of interest, the same or substantially the same factual predicate, and effectively the same or substantially the same claims. *Id.* at 686-87.

As in *Clark,* the parties to both this federal lawsuit and the state consolidated *Cusak* action are substantially the same. In a derivative shareholder action, the true party of interest is the corporation on whose behalf shareholders sue. *Clark,* 376 F.3d at 686. In both the instant federal action and *Cusak,* the shareholders prosecuting the suit, Cureton/Vu and Cusak/Perles/Lynch, respectively, do so on behalf of Whitehall. As such, the plaintiffs in both lawsuits are the same. M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

Patinkin are the Defendants in the case before this court. The *Cusak* action also names each of them as defendants. That the *Cusak* action names additional defendants as well does not defeat a finding of parallelism. The Seventh Circuit has held that parallelism requires the parties to be "*substantially the same*-not completely identical." *Id.* at 686; *see also Schneider Nat'l Carriers, Inc. v. Carr,* 903 F.2d 1154, 1156 (7th Cir.1990) (in a personal injury case, finding parallelism with federal action even though state plaintiff named additional defendants in the state action).

As was the situation in *Clark,* here the factual predicate of the pending federal case is the same as that of the state consolidated *Cusak* action. *Clark,* 376 F.3d at 687. Both actions arise from the same set of alleged facts: Whitehall directors engaged in an inventory rebate scheme that did not comport with GAAP; Whitehall assisted Cosmopolitan in defrauding Capital; Capital sued Whitehall; and regulatory and criminal investigations followed while Whitehall repeatedly restated its financial reports. Derivative Plaintiffs do not argue to the contrary.

As in *Clark,* the state law claims raised here and in the *Cusak* action appear to be parallel.[FN11] The situation here differs from *Clark,* however, in that two federal claims are raised here but not in *Cusak.* First, Derivative Plaintiffs here have alleged a claim against former CFO Browne under § 304 of the Sarbanes-Oxley Act. That section reads in relevant part:

> FN11. The fact that certain state law claims appear in the federal complaint but not in the state lawsuit would not necessarily defeat a finding of parallelism. In *Clark,* both the federal and state suits alleged a breach of fiduciary duty under state law. 376 F.3d at 684. The federal suit in *Clark* also included additional claims for abuse of control, gross mismanagement, and waste of corporate assets. *Id.* The Seventh Circuit was untroubled by these differences. The *Clark* court observed that "the parallel nature of the

the actions cannot ... be dispelled by repackaging the same issue under different causes of action." *Id.* at 687. Abuse of control, gross mismanagement, and waste of corporate assets are all premised on a breach of fiduciary duty under state law and as such are treated as the same cause of action for the purpose of determining parallelism. *See id.* at 686. In any event, the three state law claims raised in the federal case before this court are also raised in the *Cusak* action.

*7 If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for-(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and (2) any profits realized from the sale of securities of the issuer during that 12-month period.
15 U.S.C. § 7243(a). Defendants argue that any claim under § 304 "is subsumed within the plaintiffs' state law claims." (Defendants' Reply in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Reply"), p. 3.) The court is uncertain of the thrust of this argument,[FN12] but Defendants point out that a predicate to § 304 liability is the proof of misconduct, itself established, like the preceding state law claims in *Clark,* by proof of a fiduciary breach. (*Id.* at 4.) Derivative Plaintiffs contest that assertion; they deny the need to plead or prove any common law violation in order to prevail on this claim. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay (hereinafter, "Pls.' Mem. "), p 8.)

> FN12. Defendants originally claimed that the § 304 claim was "subsumed by the broader remedies sought in the state court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
(Cite as: Slip Copy)

actions based on Defendant Browne's alleged violations of his common law duties." (Defendants' Memorandum of Law in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Mem." ), pp. 8-9.) Derivative Plaintiffs correctly pointed out that the primary thrust of the parallelism inquiry is on parallelism in the *cause of action*, not parallelism in the *remedies* sought. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay (hereinafter, "Pls.' Mem."), p 8); *see also Clark*, 376 F.3d at 687 (" Even though an additional remedy is sought in the federal action, the liability issues (which are the central issues) remain the same in both cases.").

The court concludes it need not resolve this dispute. The Derivative Plaintiffs' allegation of a violation of Sarbanes-Oxley drops out of the analysis for the purpose of determining parallelism between the instant federal action and the pending state action because § 304 does not give rise to a private right of action. In their reply memorandum, Defendants note doubt as to whether Congress intended to create a private right of action in § 304 of the Sarbanes-Oxley Act. (Defs.' Reply, pp. 2-3.) At the time of briefing only one federal district court had gone so far as to explicitly hold that § 304 did not create a private right of action, *Neer v. Pelino*, 389 F.Supp.2d 648 (E.D.Pa.2005), but other courts have since followed. *See, e.g., In re Bisys Group Inc. Derivative Action*, 396 F.Supp.2d 463 (S.D.N.Y.2005) (following *Neer* ); *see also Don Zupanec, Sarbanes-Oxley Act-Private Right of Action*, 20(11) Federal Litigator 4 (Nov.2005) (" There is some risk in concluding, based on a single decision, that there is no implied right of action under § 304. Yet it is difficult to discern any clear Congressional intent to allow private enforcement." ). For the reasons explained here, this court, too, agrees with *Neer*.

Section 304 calls for the forfeiture of bonuses and profits by a corporation's CEO or CFO when material noncompliance with reporting requirements and misconduct require the restatement of a corporation's financial statements.

*See* 15 U.S.C. § 7243(a). Section 304 does not explicitly create a private cause of action,[FN13] nor has any court recognized an implied private right of action. *Bisys Group*, 396 F.Supp.2d at 464; *Neer*, 389 F.Supp.2d at 652. Under the familiar four-part test set out in *Cort v. Ash*, an implicit private cause of action is more likely to be found when: (1) a plaintiff is part of the class for whose benefit Congress enacted the statute; (2) there is an indication of the existence of a private right based on the common tools of statutory interpretation including an examination of legislative history and the structure of the statute; (3) a remedy would be consistent with the legislative scheme; and (4) the cause of action is not one traditionally relegated to state law. 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The *Neer* court reached its conclusion that no private right of action exists under § 304 after examining several textual arguments, the structure of other provisions of Sarbanes-Oxley, and the legislative history of the enactment of § 304. 389 F.Supp.2d at 653-57.

> FN13. In *Neer v. Pelino*, the derivative plaintiff cited the statutory language "the chief executive officer and chief financial officer of the issuer shall reimburse the issuer" in support of the proposition that § 304 of the Sarbanes-Oxley Act explicitly creates a private right of action in the issuer. 389 F.Supp.2d 648, 653 (E.D.Pa.2005). The *Neer* court observed that "[a]lthough Congress created a remedy that would indirectly benefit ... shareholders, 'whether Congress intended additionally that [this] provision[ ] would be enforced through private litigation is a different question.' " *Id.* at 653-54 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 18, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)).

**\*8** Such an extensive analysis is arguably unnecessary here. The Supreme Court noted in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, "there is no need for us to 'trudge through all four of the [*Cort* ] factors when the dispositive question of legislative intent has been resolved.' "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

456 U.S. 353, 388, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (concluding that a private right of action survived the 1974 amendments to the Commodities Exchange Act) (quoting *California v. Sierra Club,* 451 U.S. 287, 302, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (Rehnquist, J., concurring) (no implied right of action for violation of the Rivers and Harbors Appropriation Act)). The *Bisys Group* court pointed out that
there is nothing in the legislative history [of Sarbanes-Oxley] to suggest an intention to create a private right of action. In fact, the legislative history suggests strongly that Congress intended that Section 304 be enforced only by the Securities and Exchange Commission. This stands in sharp contrast to Section 306, which expressly creates a private cause of action to recover profits by officers and directors from insider trading during pension fund blackout periods.

396 F.Supp.2d at 464 (citations omitted). At least for the purpose of the parallelism inquiry here, this court is inclined to concur with its colleagues in *Neer* and *Bisys Group* that no private right of action is available under § 304; thus, that federal claim effectively drops out of the case for the purpose of determining the parallel nature of this action and *Cusak.*

The second federal claim asserted by Derivative Plaintiffs, a securities violation under Rule 10b-5, cannot be discounted so readily, however. Defendants argue that the securities claim should also be set aside. Defendants initially speculate that Derivative Plaintiffs are engaged in gamesmanship to avoid an unfavorable ruling on this motion, calling the Rule 10b-5 federal claim "transparently frivolous," "wholly without merit," and "contrived" to avoid abstention. (Defendants' Memorandum of Law in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Mem."), p. 9.) The Derivative Plaintiffs' motivations to one side, it is settled law that private parties may sue for violations of § 10(b) of the Exchange Act, *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev.,* 291 F.3d 1000, 1017 (7th Cir.2002) (offering a brief history of the judicial creation of the private right of action). Plaintiffs attempting to do so must meet certain pleading requirements: "To

state a valid Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *In re Healthcare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir.1996). Moreover, the Private Securities Litigation Reform Act (hereinafter, " PSLRA"), 15 U.S.C. § 78u-4(b), imposes heightened pleading requirements for allegations of securities fraud:
\*9 Under the PSLRA, a securities fraud complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

*Makor Issues & Rights, Ltd. v. Telltabs, Inc.,* 437 F.3d 588, 2006 WL 172142, \*4 (7th Cir.2006) (quoting 15 U.S.C. § 78u-4(b)(1), (2)).

Defendants argue that Derivative Plaintiffs have failed to meet this heightened pleading standard with respect to the Rule 10b-5 claim because Derivative Plaintiffs have not alleged fraud *in connection with the purchase or sale* of Whitehall stock *by Whitehall itself.* (Defs.' Reply, p. 6.) Derivative Plaintiffs allege that M. Patinkin, Desjardins, Brown, and Browne sold very specific quantities of Whitehall shares on very specific dates in late March and early June of 2002 at a price that reflected their misstatements and omissions related to the alleged inventory rebate scheme. (CAC ¶¶ 64-66.) These *sales* do not form the basis of the derivative 10b-5 claim against these Whitehall directors, however. Instead, Derivative Plaintiffs allege that these directors deceived Whitehall in connection with the *issuance* "of Whitehall restricted stock and options to purchase Whitehall common stock" as part of the Whitehall executive compensation package. (*Id.* at ¶ 76.) Derivative Plaintiffs are far less specific about the relevant quantities and dates pertaining to these transactions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 10

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
(Cite as: Slip Copy)

than they were about the March and June 2002 sales by the Whitehall directors.

The complaint sets out the value of the restricted shares Defendants M. Patinkin, Desjardins, Brown, and Browne received from Whitehall as part of their executive compensation package. It does not, however, state when Whitehall issued those shares, beyond setting out the year in which the transaction occurred, nor does the complaint even note how many of these shares Whitehall issued to the Officer Defendants. (*Id.* at ¶ 59.) Such a cursory allegation with respect to an essential element of the Rule 10b-5 claim might fall below the PSLRA threshold of particularity for fraud-style actions. *See, e.g., In re: VMS Sec. Litig.,* 752 F.Supp. 1373, 1393 (N.D.Ill.1990) (dismissing a securities fraud complaint for the same deficiency under the arguably more forgiving pre-PSLRA pleading requirements). In the ordinary instance, however, a plaintiff whose complaint is dismissed for failure to meet particular pleading rules will have leave to file an amended complaint.[FN14]

> FN14. Defendants also allege that Derivative Plaintiffs have not pleaded scienter with the requisite level of specificity. (Defendants' Reply in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Reply"), p. 6.) Derivative Plaintiffs allege that:
> The Individual Defendants ... had actual knowledge of Whitehall's improper business and accounting practices ... In breach of their fiduciary duty of good faith, the Individual Defendants willfully ignored the Company's obvious and pervasive misconduct.
> (CAC ¶¶ 56-57.) Derivative Plaintiffs also allege that this knowledge came from the attendance of particular meetings during particular years. (*Id.* at ¶ 56.)
> Even if this court were inclined to agree with Defendants, its conclusion on whether or not this deficiency should warrant a stay of the Derivative Plaintiff's entire federal action rather than merely leave to file a more particular amended complaint would

be the same. Defendants can, of course, make a separate motion to dismiss the Derivative Plaintiffs' Rule 10b-5 claim if they wish.

Defendants here argue that giving Derivative Plaintiffs an opportunity to amend their complaint would be futile. (Defs.' Reply, p. 7.) Derivative Plaintiffs will be unable to establish the necessary element of reliance by Whitehall, Defendants contend, as they have already alleged that "all of the directors knew of the alleged fraud when they issued stock-based compensation to the officer defendants." (*Id.*) Because a corporation can only act through its directors and officers, Defendants point out, the Whitehall corporation, which is the true plaintiff in this action, knows everything its directors and officers know, and could not have been misled. (*Id.*) Where all of the directors and officers know that Whitehall's financial statements are lies, Whitehall cannot deceive itself into believing the lie when issuing stock-based compensation back to these same directors and officers. (*Id.*)

**\*10** Defendants cite *Ray v. Karris,* 780 F.2d 636 (7th Cir.1985), in support of this proposition. (Defs.' Reply, p. 7.) In *Ray,* the Seventh Circuit affirmed the dismissal of the plaintiffs' derivative Rule 10b-5 claim where the plaintiffs alleged that, after learning that federal banking regulations would require the divestment of certain assets held by the bank through a wholly-owned subsidiary, defendant bank directors offered to sell the bank's shares in the subsidiary to the bank's shareholders. 780 F.2d at 638-39, 643. These directors depressed the selling price of these shares by encumbering the subsidiary's primary asset and issuing an allegedly falsely gloomy memorandum regarding the value of shares in the subsidiary. *Id.* at 639. This enabled the bank's crooked directors themselves to buy a disproportionate quantity of the bank's stock in its subsidiary and deprived the bank of the full sale value of its divested assets. *Id.* The *Ray* court was particularly interested in the facts that one of the plaintiffs, himself a former bank director, knew of the defendant directors' proposed scheme and that minority shareholders in the bank had unsuccessfully attempted to enjoin the sale before it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

occurred. *Id.* at 643. In dismissing the *Ray* plaintiffs' derivative Rule 10b-5 claim, the Seventh Circuit held that where disinterested directors and minority shareholders know about the fraud that is about to be perpetuated on the corporation, the court will impute the knowledge of the crooked directors to the corporation. *Id.* at 641-42. Accordingly, the corporation will be unable to establish a securities fraud claim. *Id.*

The instant case is similar to *Ray,* Defendants suggest, citing the Derivative Plaintiffs' allegation that "[t]he Company's executive officers, with knowledge and approval of the other Individual Defendants, regularly and systematically engaged in a fraudulent scheme." (CAC ¶ 3.) In the court's view, however, this passage plainly does not imply that minority shareholders in Whitehall knew of the "fraudulent scheme" before it occurred-it says nothing about the knowledge of minority shareholders at all. Nor does this passage say anything about the knowledge of disinterested Whitehall directors.

Because Defendants have not sketched out this argument much beyond a citation of *Ray* and recitation of its holding, the court is uncertain about how exactly Defendants believe it applies. The allegation Defendants have quoted states that all of the Defendants knew about the inventory rebate scheme, yet Derivative Plaintiffs are suing only the Officer Defendants under Rule 10b-5 claim. Perhaps Defendants believes that the other individual Defendants-those not facing the 10b-5 claim-are "disinterested" An investigation into the origin of the Seventh Circuit's decision in *Ray* defeats any such argument.

*Dasho v. Susquehanna Corp.* established the right of a shareholder to bring a derivative suit under Rule 10b-5 in the Seventh Circuit. 380 F.2d 262 (7th Cir.1967). The *Dasho* court recognized the awkward position that a derivative plaintiff is in with respect to pleading the requisite elements of a Rule 10b-5 claim: the plaintiff must avoid negating the element of reliance despite the standard notion that a corporation knows what its directors and officers, crooked or not, know. The Second Circuit had issued inconsistent panel decisions on just this

issue a few years earlier. In *Ruckle v. Roto Am. Corp.,* the Second Circuit rejected the proposition that the knowledge of a few defrauding directors would be attributed to the defrauded corporation, thereby eviscerating its necessary claim to deception. 339 F.2d 24, 29 (2d Cir.1964). The *Ruckle* court observed:

**\*11** When it is practical as well as just to do so, courts have experienced no difficulty in rejecting such cliches as the directors constitute the corporation and a corporation, like any other person, cannot defraud itself. If, in this case, the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10B-5 is precluded, though it would have been available had anyone else committed the fraud. There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief solely because a fraud was committed by a director rather than by an outsider. Denial of relief on this basis would surely undercut the congressional determination to prevent the public distribution of worthless securities.

*Id.* at 29. Less than a month later, another panel of the Second Circuit declined to follow *Ruckle* where the entire board of directors was involved in the suspect transaction, instead imputing the knowledge of the directors to the corporation to undercut the derivative 10b-5 action. *O'Neill v. Maytag,* 339 F.2d 764, 767 (2d Cir.1964). In a "concurring" opinion signed by two of the three judges on the Seventh Circuit panel in *Dasho,* our Court of Appeals sided with the *Ruckle* rationale and concluded that a different rule-depending on whether some or all of a corporation's directors were involved in the alleged fraud-was unnecessary. 380 F.2d at 270 (Fairchild, J. and Cummings, J., concurring).

In 1977, the Supreme Court constricted the scope of the private right of action under Rule 10b-5 by exempting from the scope of federal securities law breaches of state law fiduciary duty not involving a stock issuer's disclosure obligations. *Santa Fe Indus. v. Green,* 430 U.S. 462, 477-80, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Following this decision, the Second Circuit reaffirmed the validity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
(Cite as: Slip Copy)

of the derivative 10b-5 action under limited circumstances in *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir.1977). The Seventh Circuit interpreted *Goldberg* in *Ray*, explaining, "the basis of this type of action is that the full disclosure policy, which is the fundamental purpose of the [Exchange] Act according to *Santa Fe* ... is implicated even in cases of breaches of state fiduciary law where deception serves to deprive the corporation of its preventative remedies under state law." *Ray*, 780 F.2d at 642 (internal quotation marks and citations omitted) (citing *Goldberg*, 567 F.2d at 218).

The *Ray* court acknowledged that "[g]enerally the ' knowledge' of the corporate entity will turn on whether a disinterested majority of the shareholders or directors ... ratified the securities transference after full disclosure [by the potentially defrauding directors]." *Id.* The *Ray* court concluded, nevertheless, that a corporation may be found to know what its defrauding directors know without disclosure and ratification where disclosure was unnecessary to alert disinterested directors and minority shareholders that they should avail themselves of state law remedies to protect the corporation. 780 F.2d at 641 (citations omitted). In *Ray*, the plaintiff director was on the bank's board of directors when the board made the decision to transfer some of the bank's assets to the subsidiary, giving him knowledge about the true value of shares in the subsidiary. *See id.* at 638. That plaintiff director had resigned, however, and, because he did not participate with the other defendant directors in the encumbering of the subsidiary's assets or the publication of an overly pessimistic statement about the value of the subsidiary, he had no liability under state law. *See id.* at 638-39. Thus the plaintiff director in *Ray* was disinterested and had knowledge that would have equipped him to defend the bank via state law remedies, even without a disclosure on the part of the defendant directors.

**\*12** Any Whitehall director not charged with the Rule 10b-5 violation in the instant case is not similarly independent. For instance, the Audit Committee Defendants certainly knew, according to the allegations, that the Officer Defendants had misstated the financial statements in order to induce Whitehall to issue them more shares at an

artificially higher price as part of their executive compensation package. Unlike the disinterested director in *Ray*, these members of the Audit Committee could not protect Whitehall by availing themselves of state law remedies because in doing nothing to stop the inventory rebate scheme, the Audit Committee Defendants themselves had violated state law fiduciary duties. The Derivative Plaintiffs' complaint here does not allege the existence of any directors who might have been able to blow the whistle on the Officer Defendants prior to the alleged securities violation. *Ray* is, thus, inapplicable. This court applies instead the general rule that the knowledge of the allegedly defrauding directors will not be imputed to the corporation to negate reliance without disclosure by the allegedly defrauding directors and ratification by the remaining directors or shareholders. *See Dasho*, 380 F.2d at 270 ("concurring" opinion). Under this rule, Defendants' argument that Derivative Plaintiffs have pleaded themselves out of court fails.[FN15]

FN15. Defendants also argue that this Rule 10b-5 claim is part of the class pending before Judge St. Eve (also of the Northern District of Illinois) in *Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.*, Case No. 04 C 1107. (Defs.' Reply, pp. 7-8.) That action arises out of the same inventory rebate scheme alleged in the instant action, but plaintiffs in the case before Judge St. Eve have sought certification of a class including:
[A]ll persons and entities who purchased or otherwise acquired publicly traded common stock of Whitehall Jewelers, Inc ... . during the class period beginning November 19, 2001 through December 10, 2003.... Excluded from the class are: (I) defendants.... Defendants in this action include Whitehall.
(Plaintiff's Motion for Class Certification, p. 1, n. 1.) The Derivative Plaintiffs' Rule 10b-5 claim appears to be specifically excluded from the putative class, although the parties before Judge St. Eve are still briefing the class certification issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                         Page 13

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

### CONCLUSION

The Derivative Plaintiffs' Rule 10b-5 claim renders the instant federal action non-parallel to the pending *Cusak* action which does not include a Rule 10b-5 claim. Thus, although both this case and *Cusak* involve the same parties and are predicated on the same facts, this court cannot conclude that these two actions are parallel. Defendants' motion to stay proceedings (21) is denied without prejudice. Should the Derivative Plaintiffs' Rule 10b-5 claim drop out of the case as the litigation unfolds, this court would, upon motion of Defendants, revisit this decision.

N.D.Ill.,2006.
In re Whitehall Jewellers, Inc. Shareholder Derivative Litigation
Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716

Briefs and Other Related Documents (Back to top)

• 2006 WL 1416236 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Agreed Motion to Stay Proceedings Pending Completion of Whitehall's Publicly Disclosed Merger (Apr. 17, 2006) Original Image of this Document (PDF)
• 2005 WL 2870444 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay Based on the Colorado River Abstention Doctrine (Aug. 16, 2005) Original Image of this Document (PDF)
• 2005 WL 2241603 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Outside Directors' Motion to Stay Based Upon the Colorado River Abstention Doctrine (Jul. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 694986 (Trial Pleading) Verified Derivative Complaint (Feb. 22, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## <u>CERTIFICATE OF SERVICE</u>

I, Robert A. Weber, do hereby certify that on August 25, 2006, I caused Compendium of Unreported Authorities Cited In Defendants' Memorandum Of Law In Support Of Their Motion to Dismiss to be served upon the following counsel of record:

### <u>BY HAND</u>

Pamela S. Tikellis
Robert J. Kriner, Jr.
A. Zachary Naylor
CHIMICLES& TIKELLIS LLP
One Rodney Square
P.O. Box 1035
Wilmington, Delaware 19899

Michael S. Gardener
Michael F. Connolly
MINTZ, LEVIN, COHN, FERRIS
  GLOVSKY & POPEO P.C.
One Financial Center
Boston, Massachusetts 02111

### <u>BY FEDEX</u>

Jeffrey G. Smith
Lawrence P. Kolker
Gustavo Bruckner
Martin Restituyo
WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
270 Madison Avenue
New York, New York 10016

Jacob T. Fogel
LAW OFFICES OF
  JACOB T. FOGEL
32 Court Street
Suite # 602
Brooklyn, New York 11201

William O. LaMotte, III
MORRIS, NICHOLS, ARSHT
  & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

 /s/ Robert A. Weber
Robert A. Weber (#4013)