IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

YAKOV WEISLER, IN THE RIGHT OF AND )
FOR THE BENEFIT OF SYCAMORE )
NETWORKS, INC. )
                     )
          Plaintiff, )    Civil Action No. 06-362 GMS
                     )
         v. )
                     )
TIMOTHY A. BARROWS, PAUL W. )
CHISHOLM, GURURAJ DESHPANDE, )
PAUL J. FERRI, RICHARD J. GAYNOR, )
JOHN W. GERDELMAN, FRANCES M. )
JEWELS, and DANIEL E. SMITH, )
                     )
          Defendants. )

**COMPENDIUM OF UNREPORTED OPINIONS CITED IN
OPENING BRIEF OF DEFENDANT FRANCES M. JEWELS
IN SUPPORT OF HER MOTION TO DISMISS THE COMPLAINT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
William O. LaMotte, III (#460)
1201 N. Market Street
P. O. Box 1347
Wilmington, Delaware 19899
(302) 658-9200
  Attorneys for Defendant Frances M. Jewels

OF COUNSEL:

Michael S. Gardener
Michael F. Connolly
MINTZ, LEVIN, COHN, FERRIS
GLOVSKY and POPEO P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 542-6000

August 25, 2006

Table of Contents

| | Tab |
|---|---|
| *In re Whitehall Jewellers, Inc. Shareholder Derivative Litig.*,<br>    2006 WL 468012 (N.D. Ill. Feb. 27, 2006) | A |
| *M & M Tech., Inc. v. Gurtler Chemicals, Inc.*,<br>    2005 WL 293509 (D. Del. Feb. 8, 2005) | B |
| *Solomon v. Pathe Commc'ns Corp.*,<br>    1995 WL 250374 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35, 38<br>    (Del. 1996) | C |
| *Teacher's Retirement Sys. of La. v. Scrushy*,<br>    2004 WL 423122 (Del. Ch. March 2, 2004) | D |
| *Venoco, Inc. v. Marquez*,<br>    2003 WL 21026787 (D. Del. May 5, 2003) | E |

534322

## CERTIFICATE OF SERVICE

I, William O. LaMotte, III, Esquire, hereby certify that copies of

**COMPENDIUM OF UNREPORTED OPINIONS CITED IN OPENING BRIEF OF**

**DEFENDANT FRANCES M. JEWELS IN SUPPORT OF HER MOTION TO DISMISS**

**THE COMPLAINT** were served on August 25, 2006 as follows:

### BY ELECTRONIC FILING:

Pamela S. Tikellis, Esquire
Robert J. Kriner, Jr., Esquire
A. Zachary Naylor, Esquire
CHIMICLES & TIKELLIS LLP
One Rodney Square
P. O. Box 1035
Wilmington, DE  19899

Anthony W. Clark, Esquire
Robert A. Weber, Esquire
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899

_____
William O. LaMotte, III (#460)

**A**



Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

C
Briefs and Other Related Documents

United States District Court,N.D. Illinois, Eastern
Division.
In re WHITEHALL JEWELLERS, INC.
SHAREHOLDER DERIVATIVE LITIGATION
**No. 05 C 1050.**

Feb. 27, 2006.

David Barry Kahn, Mark E. King, David B. Kahn
& Associates, Ltd., Northfield, IL, for Plaintiff.
Michael D. Freeborn, Douglas Alan Albritton,
Matthew John Kramer, Freeborn & Peters, Walter
C. Carlson, Brendan Joseph Gardiner, Colleen M.
Kenney, Sidley Austin Brown & Wood LLP,
Stephen Jay Senderowitz, John J. Tully, Winston &
Strawn, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*
PALLMEYER, J.
**\*1** On February 22, 2005, two shareholders filed
this derivative action on behalf of Whitehall
Jewellers, Inc., (hereinafter, "Whitehall,") alleging
various state and federal law claims against a group
of Whitehall's directors. As detailed below,
Plaintiffs allege that these directors participated in a
rebate scheme that artificially inflated the value of
Whitehall's inventory and resulted in a civil suit
against Whitehall as well as regulatory and criminal
investigations. Eight months before this suit was
filed, on June 17, 2004, other Whitehall
shareholders filed a similar derivative suit in the
Circuit Court of Cook County against the same
directors named as defendants here. The Defendant
directors named in this suit have moved for the
court to stay any further action on this suit until the
resolution of that state court suit. For the reasons
explained below, the motion for stay is denied.

*STATEMENT OF FACTS* [FN1]

FN1. The facts are drawn from the
Derivative Plaintiffs' Consolidated
Amended Derivative Complaint
(hereinafter, "CAC,") and assumed to be
true for the purpose of resolving
Defendants' motion to stay.

Whitehall, a national retail jeweler, operates nearly
400 jewelry stores in thirty-eight states.[FN2]
(Consolidated Amended Derivative Complaint
(hereinafter, "CAC,") ¶¶ 10, 45.) Whitehall
purchases its inventory from an assortment of
vendors. (*Id.* at ¶ 30.) Derivative Plaintiffs allege
that Generally Accepted Accounting Principles
(hereinafter, "GAAP,") require the purchaser of
inventory to "write down" the value of the
inventory from its purchase price to its fair market
value as the inventory depreciates. (*Id.*) Contrary to
this requirement, Derivative Plaintiffs allege, the
Officer Defendants named in the case [FN3]
negotiated an inventory rebate scheme with some of
Whitehall's vendors, described more fully below. (
*Id.*)

FN2. Whitehall is also a Delaware
corporation, principally headquartered in
Illinois. (CAC ¶ 10.)

FN3. Derivative Plaintiffs named Matthew
M. Patinkin ("M.Patinkin"), a director of
Whitehall from 1989 to 2004 and
Executive Vice President of Operations
since 2000, (CAC ¶ 11); John R.
Desjardins, a director of Whitehall from
1989 to 2004, Executive Vice President
since 1989, and Chief Financial Officer
since 2003, (*id.* at ¶ 12); Manny A.
Brown, Executive Vice President of
Operations since 1997, (*id.* at ¶ 13); and
Jon H. Browne, Executive Vice President
and Chief Financial Officer up to his
termination in December of 2003. (*Id.* at ¶
14.)    These    four    defendants    are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

collectively known as the "Officer Defendants." (*Id.* at ¶ 15.)

In addition, Derivative Plaintiffs also named three Defendants referred to here as the "Audit Committee Defendants." (*Id.* at ¶ 19.) They are Richard K. Berkowitz, a Whitehall director since 1998 and Chairman of the Audit Committee, (*id.* at ¶ 16); Daniel H. Levy, a Whitehall director since 1997 and member of the Audit Committee, (*id.* at ¶ 17); and Sanford Shkolnik, a Whitehall director since 2003 and member of the Audit Committee. (*Id.* at ¶ 18.)

Finally, Plaintiffs named an additional Defendant-Norman J. Patinkin ("N.Patinkin"), who served as a director of Whitehall since 1989. (*Id.* at ¶ 20.)

The complaint does not set out the citizenship of any of the individually named Defendants.

Chief Financial Officer Browne and Executive Vice Presidents M. Patinkin, Desjardins, and Brown arranged to return depreciated inventory to Whitehall's vendors and "receive excessive discounts, reimbursements, credits, or other 'vendor allowances' " equal to the full average cost at which Whitehall had purchased the inventory. (*Id.*) In return for these credits, valued far in excess of the fair market value of the returned, depreciated inventory, Whitehall agreed to purchase new, more expensive inventory from the participating vendors. (*Id.*) The Officer Defendants' failure to adhere to GAAP and their conduct in engaging in this inventory rebate scheme resulted in an inflation of Whitehall's inventory balances and net income on the books. (*Id.* at ¶ 31.)

Meanwhile, beginning in 2001, one of Whitehall's vendors, Cosmopolitan Gem Corporation (hereinafter, "Cosmopolitan"), had run into financial trouble. (*Id.* at ¶ 33.) Capital Factors, Inc. (hereinafter, "Capital,") had "made millions of dollars" in loans to Cosmopolitan, secured by Cosmopolitan's accounts receivable. (*Id.*) When Cosmopolitan sought additional loans from Capital and asked the Officer Defendants to help conceal Cosmopolitan's precarious financial condition from

Capital, the Officer Defendants obliged. (*Id.*) With the Officer Defendants' assistance, Cosmopolitan created fictitious account statements showing receivables owed by Whitehall and payments from Whitehall applied to those receivables, totaling some $13.9 million in the several months prior to March 2002. (*Id.* at ¶¶ 34, 35.) These machinations created the illusion that Cosmopolitan was collecting its aging receivables, improving that part of Cosmopolitan's books which Capital would examine in deciding whether or not to extend Cosmopolitan additional credit. (*Id.* at ¶ 34.) Whitehall received discounts, credits, and other vendor allowances on its inventory purchases from Cosmopolitan in exchange for its participation in the scheme.[FN4] (*Id.*)

> FN4. It is unclear whether Derivative Plaintiffs are alleging that Cosmopolitan participated in Whitehall's inventory rebate scheme *in addition to* this alleged scheme to defraud Capital. What is clearly alleged is that an investigation into the relationship between Cosmopolitan and Whitehall as it related to the attempt to defraud Capital caused Whitehall's inventory rebate scheme to unravel as well.

**\*2** At Cosmopolitan's request, Whitehall designated the payments to Cosmopolitan as "on account" rather than for any particular invoice. (*Id.* at ¶ 35.) At some point (the date is not identified in the complaint), Capital asked Cosmopolitan and Whitehall to provide it with more information regarding the invoices to which Cosmopolitan applied the "on account" payments. (*Id.* at ¶ 36.) Instead of presenting Capital with any statement showing the large number of deductions and credits Whitehall had received from Cosmopolitan, Whitehall CFO Browne, Cosmopolitan's controlling shareholder Joshua Kestenbaum, and Cosmopolitan Chief Financial Officer Christopher Shaw created and presented a phony statement that did not reflect many of the deductions and credits and showed Whitehall's "on account" payments as being applied to aging Whitehall receivables. (*Id.* at ¶¶ 37, 38.) Browne, Kestenbaum, and Shaw submitted at least three such phony statements to Capital over the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 3

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

course of several months beginning in April 2002 and ending in September 2002. (*Id.* at ¶¶ 37, 39.)

Capital seems to have caught on; in August 2003, it brought a $30 million lawsuit against Whitehall and Cosmopolitan, as well as several other defendants, alleging a scheme to defraud Capital by inducing it to advance Cosmopolitan funds by means of misrepresentations concerning Cosmopolitan's financial state. (*Id.* at ¶¶ 41, 45.) Perhaps tipped off by the civil suit and by a March 5, 2003 Whitehall press release declaring an intention to restate its financial statements for the first three fiscal quarters of 2002, [FN5] the Securities and Exchange Commission (hereinafter, "SEC,") and United States Attorney for the Eastern District of New York initiated an investigation into Whitehall in November 2003. (*Id.* at ¶¶ 40, 42, 43.)

> FN5. According to the Whitehall press release:
> The cumulative impact of the adjustments for the first three fiscal quarters was to increase the Company's net loss from $0.29 per share to $0.31 per share.... The quarterly impact of these adjustments is to increase net income by $127,000 in the first fiscal quarter, reduce net income by $457,000 in the second fiscal quarter and to reduce net loss by $72,000 in the third quarter.
> (CAC ¶ 40.)

On November 21, 2003, Whitehall issued a press release announcing that its internal investigations had discovered that its Executive Vice President of Merchandising Lynn Eisenheim had violated company policy by failing to document the age of certain inventory. (*Id.* at ¶¶ 43, 45.) Whitehall asserted that Eisenheim's failures related to less than one percent of Whitehall's total current inventory and that this violation was unrelated to the Capital lawsuit. (*Id.*) On December 11, 2003, a Whitehall press release announced the termination of Jon H. Browne as Chief Financial Officer and the appointment of Executive Vice President John R. Desjardins to that position. (*Id.* at ¶ 44.) Following this announcement, Whitehall's stock value fell 75

cents to $9.04, part of a 29 percent decline in value since receiving its SEC subpoena in November. (*Id.* at ¶ 45.)

On December 22, 2003, Whitehall released its third quarter results for 2003, reporting a $0.53 per share net loss (as compared to $0.35 per share net loss for the same quarter a year earlier) and laying some of the blame on fees related to the Capital lawsuit, the SEC investigation, and the criminal inquiry. (*Id.* at ¶ 46.) Whitehall also announced that it would be restating its financial reports for 2000, 2001, 2002, and the six-month period ending in July 31, 2003. [FN6] (*Id.* at ¶¶ 46, 47.) Whitehall's press release explained that "[t]he restatements primarily reflect the Company's revision of the accounting treatment for vendor allowances associated with the Company's return of substandard inventory to vendors." (*Id.* at ¶ 46.) CFO Desjardins offered further details to analysts and investors during a December 22, 2003 phone call. (*Id.* at ¶ 47.) As recorded in a transcript of that conference call, Desjardins reported:

> FN6. According to the Whitehall press release:
> The impact of these restatements will decrease Whitehall's earnings per diluted share by $0.01 for fiscal 200, $0.03 for fiscal 2001, $0.02 for fiscal 2002 and decrease the loss by $0.01 for the six month period ended July 31, 2003.
> (CAC ¶ 46.)

**\*3** The company enjoyed strong ongoing relationships with many of its suppliers. Based upon the strength of those relationships, the company would, from time to time, negotiate separate agreements, distinct from the terms of our standard trading agreements, under which vendors accepted returns of certain substandard inventory, [sic] the full credit of the company's weighted average cost of those items. Generally these returns were accepted by the vendor in conjunction with the placement of purchase orders for fresh inventory. The company did not record a reserve associated with the impairment of substandard inventory. As a result of a reevaluation of the relevant accounting

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

guidelines, Whitehall will now record an impairment charge associated with substandard inventory in each reporting period. Thereafter, as returns of substandard inventory are made, the company will reflect the implicit benefit of the lower inventory cost related to the impairment reserves in its cost of sales over the inventory turnover period associated with the new inventory being purchased from the vendor.

(*Id.* at ¶ 47.) Litigation and investigation costs, running into the millions, continued to affect Whitehall's performance for the next four fiscal quarters. (*Id.* at ¶¶ 49-52, 55.) On September 28, 2004, Whitehall announced that it had settled the litigation with Capital by paying Capital $10.8 million. (*Id.* at ¶ 54.) The U.S. Attorney for the Eastern District of New York also agreed not to file charges against Whitehall, on the condition that Whitehall made restitution to Capital and paid $350,000 to the United States. (*Id.*)

According to Whitehall's proxy statements, the Board of Directors met eleven times during 2002 and 2003. (*Id.* at ¶ 56.) The Audit Committee, including the Audit Committee Defendants in this case, met twenty-one times during this period. (*Id.*) Derivative Plaintiffs allege that each director was in attendance at each meeting and had full knowledge of Whitehall's improper business and accounting practices. (*Id.*) Furthermore, the Officer Defendants received salaries, cash bonuses, shares of Whitehall stock, and options to purchase Whitehall stock based on the inflated financial statements initially issued for fiscal years 2000 through 2003. (*Id.* at ¶ 59.) The Officer Defendants also sold shares of Whitehall stock to unspecified purchasers at the end of March 2002 and at the beginning of June 2002, at a price which did not reflect their private knowledge that Whitehall was engaged in improper business and accounting practices that would necessitate a restatement of the company's financial statements and lower the share price. (*Id.* at ¶ 64-65.)

*PROCEDURAL HISTORY*

Myra Cureton, a California shareholder in Whitehall, filed a complaint in this court on February 22, 2005. Cureton sued derivatively on behalf of nominal defendant Whitehall and named as Defendants M. Patinkin, Desjardins, Brown, Berkowitz, Levy, Shkolnik, and N. Patinkin, as well as Whitehall President Hugh M. Patinkin.[FN7] As originally filed, the *Cureton* complaint stated a single state law claim for breach of fiduciary duty, invoking the federal court's diversity jurisdiction.

> FN7. Hugh M. Patinkin passed away in March 2005.

**\*4** On April 13, 2005, Tai Vu, also a California shareholder in Whitehall, filed a similar state law claim against the same defendants in this court. On May 25, 2005, this court granted a motion for reassignment of the *Vu* case as related to *Cureton.* Derivative Plaintiffs filed their consolidated amended derivative complaint on June 20, 2005, *sub nom, In re Whitehall Jewellers, Inc. S'holder Derivative Litig.* The complaint names M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. In addition to the original breach of fiduciary duty claim against all Defendants, Derivative Plaintiffs charged the Officer Defendants with one count for violation of § 10(b) of the Securities Exchange Act and Rule 10b-5 and two additional state law claims for unjust enrichment and a breach of the fiduciary duty of loyalty in the form of insider trading. The final count was levied against Defendant Browne alone and sought reimbursement for Whitehall pursuant to § 304 of Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7243. This complaint now asserts both diversity and federal question jurisdiction.

On July 15, 2005, Defendants filed this motion to stay proceedings pursuant to the *Colorado River* Abstention Doctrine. They ask that this court abstain from taking further action on this case pending the outcome of *Cusak v. Patinkin, et al.,* Case No. 04 CH 9705, a shareholder derivative action filed on June 17, 2004, in the Circuit Court of Cook County on behalf of Whitehall and arising from the same factual allegations set out above.

As amended,[FN8] the *Cusak* complaint names the executor of Hugh Patinkin's estate, as well as, M.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. It includes seven counts under state law: (1) breach of fiduciary duty, (2) abuse of control, (3) gross mismanagement, (4) waste of corporate assets, (5) unjust enrichment, (6) insider selling and misappropriation of information, and (7) contribution and indemnification.

> FN8. The record does not include the *Cusak* complaint as originally filed.

Prior to ruling on this motion, the *Cusak* action was consolidated with two additional shareholder derivative actions [FN9] filed in state court. The newly consolidated *Cusak* action is the potentially parallel state proceeding to which Defendants point in making their request for a stay.

> FN9. On April 19, 2005, *Perles v. Estate of Hugh Patinkin, et al.,* Case No. 05 CH 6926, named the executor of Hugh Patinkin's estate, and M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, N. Patinkin, and Jack A. Smith (another Whitehall director) as Defendants. The *Perles* complaint alleged the same first six causes of action as the *Cusak* complaint and added a seventh count for aiding and abetting breaches of fiduciary duty, as well as two counts specifically against Whitehall's independent auditor, Pricewaterhouse Coopers, LLP, also a party to the litigation. On June 13, 2005, *Lynch v. Berkowitz, et al.,* Case No. 05 CH 6926, named the executor of Hugh Patinkin's estate, and M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N. Patinkin as Defendants. The *Lynch* complaint, like the *Cureton* and *Vu* complaints, alleged just one count, a state law claim for the breach of fiduciary duty.

### DISCUSSION

Because the federal courts can hear state claims, *see*

28 U.S.C. §§ 1332, 1367, and state courts can hear certain federal claims, *see* Ill. Const., Art. VI, §§ 4, 9, it is possible for the same plaintiff to bring the same cause of action against the same defendant simultaneously in separate federal and state cases. " Generally as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction....' ' *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) (quoting *McClellan v. Carland,* 217 U.S. 268, 282, 30 S.Ct. 501, 54 L.Ed. 762 (1910)). Indeed a federal district court's duty to exercise its jurisdiction where the district court has it is "virtually unflagging." [FN10] *Colorado River,* 217 U.S. at 817. That said, although the circumstances in which a federal court will stay a federal action on account of the pendency of a similar state action in state court are very limited, such circumstances "do nevertheless exist." *Id.* at 818.

> FN10. Defendants have requested a stay, not an abstention *per se.* With an abstention, a court declines to exercise jurisdiction that it has over a case, while with a stay, the court is technically exercising its jurisdiction, but simply putting off taking any action in the case. Significantly, however, in cases where a stay has been requested under the *Colorado River* Abstention Doctrine, the Seventh Circuit has chosen to analyze the case as if the request were for an abstention. *See, e.g., Clark v. Lacy,* 376 F.3d 682, 685 (7th Cir.2004) (applying the two-part abstention analysis framework to a request to stay a derivative shareholder suit).

**\*5** In *Clark v. Lacy,* the Seventh Circuit had before it a federal shareholder derivative suit involving " the same factual predicate, most of the same defendants, and fundamentally the same legal issues " as a derivative shareholder suit brought by a different plaintiff in state court. 376 F.3d 682, 684 (7th Cir.2004). In considering whether the district

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

court had abused its discretion in staying the federal case, the *Clark* court adopted a two-part test. The first step in the analysis is to determine " 'whether the concurrent state and federal actions are actually parallel." ' *Id.* at 685 (quoting *LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1285, 1287 (7th Cir.1988)). Any doubt regarding the parallel nature of a federal and state action ought to be resolved in favor of the exercise of federal jurisdiction where it has been given to the federal district court. *See AAR Int'l, Inc. v. Nimelias Enter. S.A.,* 250 F.3d 510, 520 (7th Cir.2001) (finding that a federal action alleging the breach of one provision of a lease was not parallel to pending foreign litigation alleging the breach of another provision of that same lease where the claims in the federal action "are distinct from and independent of" the claims in the pending foreign litigation).

Parallelism is not, in and of itself, exceptional, and not all parallel actions merit the restraint of a federal court's exercise of granted jurisdiction, however. And when the party moving for the stay succeeds in making a showing of parallelism, it must also show that there are additional exceptional circumstances counseling for a stay. *Clark,* 376 F.3d at 685. In making this calculation, courts should consider:
(1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained by the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim.

*Id.* (citing *LaDuke,* 879 F.2d at 1559). In assessing these issues, "[n]o one factor is necessarily determinative." *Colorado River,* 424 U.S. at 819. The overall focus of the inquiry is whether or not the case before the court is so truly exceptional that a stay reflects the proper balance between the court's "virtually unflagging obligation" to exercise its jurisdiction and the promotion of "wise judicial

administration." *Id.* at 817-18.

For the reasons explained here, the court concludes that Defendants have not met the first requirement in the *Clark* court's two-step framework. Accordingly, the court need not discuss how the instant case and the *Cusak* action would have fared under the ten-factor *Clark* analysis for exceptional circumstances.

Parallel Cases

**\*6** In order to meet the test of parallelism, the two " suits need not be identical." *Clark,* 376 F.3d at 686 (citing *Interstate Material Corp. v. City of Chicago,* 847 F.2d 1285, 1288 (7th Cir.1988)). Instead, one suit will be deemed parallel to another to the extent that " 'substantially the same parties are contemporaneously litigating the same issues in another forum," ' *Clark,* 376 F.3d at 686 (quoting *Calvert Fire Ins. Co. v. Am. Mut. Reins. Co.,* 600 F.2d 1228, 1229 n. 1 (7th Cir.1979)). The *Clark* court observed: "To be sufficiently similar it is not necessary that there be formal symmetry between the two actions. Rather, there should be a substantial likelihood that the state litigation will dispose of all claims presented in the federal case." 376 F.3d at 686 (internal quotation marks and citations omitted). In determining that a federal shareholder derivative suit was parallel to a state shareholder derivative suit, the *Clark* court observed that both lawsuits involved the same or substantially the same parties of interest, the same or substantially the same factual predicate, and effectively the same or substantially the same claims. *Id.* at 686-87.

As in *Clark,* the parties to both this federal lawsuit and the state consolidated *Cusak* action are substantially the same. In a derivative shareholder action, the true party of interest is the corporation on whose behalf shareholders sue. *Clark,* 376 F.3d at 686. In both the instant federal action and *Cusak,* the shareholders prosecuting the suit, Cureton/Vu and Cusak/Perles/Lynch, respectively, do so on behalf of Whitehall. As such, the plaintiffs in both lawsuits are the same. M. Patinkin, Desjardins, Brown, Browne, Berkowitz, Levy, Shkolnik, and N.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 7

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

Patinkin are the Defendants in the case before this court. The *Cusak* action also names each of them as defendants. That the *Cusak* action names additional defendants as well does not defeat a finding of parallelism. The Seventh Circuit has held that parallelism requires the parties to be *"substantially the same-not completely identical." Id.* at 686; *see also Schneider Nat'l Carriers, Inc. v. Carr,* 903 F.2d 1154, 1156 (7th Cir.1990) (in a personal injury case, finding parallelism with federal action even though state plaintiff named additional defendants in the state action).

As was the situation in *Clark,* here the factual predicate of the pending federal case is the same as that of the state consolidated *Cusak* action. *Clark,* 376 F.3d at 687. Both actions arise from the same set of alleged facts: Whitehall directors engaged in an inventory rebate scheme that did not comport with GAAP; Whitehall assisted Cosmopolitan in defrauding Capital; Capital sued Whitehall; and regulatory and criminal investigations followed while Whitehall repeatedly restated its financial reports. Derivative Plaintiffs do not argue to the contrary.

As in *Clark,* the state law claims raised here and in the *Cusak* action appear to be parallel.[FN11] The situation here differs from *Clark,* however, in that two federal claims are raised here but not in *Cusak.* First, Derivative Plaintiffs here have alleged a claim against former CFO Browne under § 304 of the Sarbanes-Oxley Act. That section reads in relevant part:

> FN11. The fact that certain state law claims appear in the federal complaint but not in the state lawsuit would not necessarily defeat a finding of parallelism. In *Clark,* both the federal and state suits alleged a breach of fiduciary duty under state law. 376 F.3d at 684. The federal suit in *Clark* also included additional claims for abuse of control, gross mismanagement, and waste of corporate assets. *Id.* The Seventh Circuit was untroubled by these differences. The *Clark* court observed that "the parallel nature of

the actions cannot ... be dispelled by repackaging the same issue under different causes of action." *Id.* at 687. Abuse of control, gross mismanagement, and waste of corporate assets are all premised on a breach of fiduciary duty under state law and as such are treated as the same cause of action for the purpose of determining parallelism. *See id.* at 686. In any event, the three state law claims raised in the federal case before this court are also raised in the *Cusak* action.

**\*7** If an issuer is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws, the chief executive officer and chief financial officer of the issuer shall reimburse the issuer for-(1) any bonus or other incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the first public issuance or filing with the Commission (whichever first occurs) of the financial document embodying such financial reporting requirement; and (2) any profits realized from the sale of securities of the issuer during that 12-month period.

15 U.S.C. § 7243(a). Defendants argue that any claim under § 304 "is subsumed within the plaintiffs' state law claims." (Defendants' Reply in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Reply"), p. 3.) The court is uncertain of the thrust of this argument,[FN12] but Defendants point out that a predicate to § 304 liability is the proof of misconduct, itself established, like the preceding state law claims in *Clark,* by proof of a fiduciary breach. (*Id.* at 4.) Derivative Plaintiffs contest that assertion; they deny the need to plead or prove any common law violation in order to prevail on this claim. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay (hereinafter, "Pls.' Mem. "), p 8.)

> FN12. Defendants originally claimed that the § 304 claim was "subsumed by the broader remedies sought in the state court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 8

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

actions based on Defendant Browne's alleged violations of his common law duties." (Defendants' Memorandum of Law in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Mem." ), pp. 8-9.) Derivative Plaintiffs correctly pointed out that the primary thrust of the parallelism inquiry is on parallelism in the *cause of action,* not parallelism in the *remedies* sought. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay (hereinafter, "Pls.' Mem."), p 8); *see also Clark,* 376 F.3d at 687 (" Even though an additional remedy is sought in the federal action, the liability issues (which are the central issues) remain the same in both cases.").

The court concludes it need not resolve this dispute. The Derivative Plaintiffs' allegation of a violation of Sarbanes-Oxley drops out of the analysis for the purpose of determining parallelism between the instant federal action and the pending state action because § 304 does not give rise to a private right of action. In their reply memorandum, Defendants note doubt as to whether Congress intended to create a private right of action in § 304 of the Sarbanes-Oxley Act. (Defs.' Reply, pp. 2-3.) At the time of briefing only one federal district court had gone so far as to explicitly hold that § 304 did not create a private right of action, *Neer v. Pelino,* 389 F.Supp.2d 648 (E.D.Pa.2005), but other courts have since followed. *See, e.g., In re Bisys Group Inc. Derivative Action,* 396 F.Supp.2d 463 (S.D.N.Y.2005) (following *Neer* ); *see also* Don Zupanec, *Sarbanes-Oxley Act-Private Right of Action,* 20(11) Federal Litigator 4 (Nov.2005) (" There is some risk in concluding, based on a single decision, that there is no implied right of action under § 304. Yet it is difficult to discern any clear Congressional intent to allow private enforcement." ). For the reasons explained here, this court, too, agrees with *Neer.*

Section 304 calls for the forfeiture of bonuses and profits by a corporation's CEO or CFO when material noncompliance with reporting requirements and misconduct require the restatement of a corporation's financial statements.

*See* 15 U.S.C. § 7243(a). Section 304 does not explicitly create a private cause of action,[FN13] nor has any court recognized an implied private right of action. *Bisys Group,* 396 F.Supp.2d at 464; *Neer,* 389 F.Supp.2d at 652. Under the familiar four-part test set out in *Cort v. Ash,* an implicit private cause of action is more likely to be found when: (1) a plaintiff is part of the class for whose benefit Congress enacted the statute; (2) there is an indication of the existence of a private right based on the common tools of statutory interpretation including an examination of legislative history and the structure of the statute; (3) a remedy would be consistent with the legislative scheme; and (4) the cause of action is not one traditionally relegated to state law. 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The *Neer* court reached its conclusion that no private right of action exists under § 304 after examining several textual arguments, the structure of other provisions of Sarbanes-Oxley, and the legislative history of the enactment of § 304. 389 F.Supp.2d at 653-57.

> FN13. In *Neer v. Pelino,* the derivative plaintiff cited the statutory language "the chief executive officer and chief financial officer of the issuer shall reimburse the issuer" in support of the proposition that § 304 of the Sarbanes-Oxley Act explicitly creates a private right of action in the issuer. 389 F.Supp.2d 648, 653 (E.D.Pa.2005). The *Neer* court observed that "[a]lthough Congress created a remedy that would indirectly benefit ... shareholders, 'whether Congress intended additionally that [this] provision[ ] would be enforced through private litigation is a different question.' " *Id.* at 653-54 (quoting *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)).

**\*8** Such an extensive analysis is arguably unnecessary here. The Supreme Court noted in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* "there is no need for us to 'trudge through all four of the [*Cort* ] factors when the dispositive question of legislative intent has been resolved." '

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 9

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

456 U.S. 353, 388, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (concluding that a private right of action survived the 1974 amendments to the Commodities Exchange Act) (quoting *California v. Sierra Club,* 451 U.S. 287, 302, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (Rehnquist, J., concurring) (no implied right of action for violation of the Rivers and Harbors Appropriation Act)). The *Bisys Group* court pointed out that

there is nothing in the legislative history [of Sarbanes-Oxley] to suggest an intention to create a private right of action. In fact, the legislative history suggests strongly that Congress intended that Section 304 be enforced only by the Securities and Exchange Commission. This stands in sharp contrast to Section 306, which expressly creates a private cause of action to recover profits by officers and directors from insider trading during pension fund blackout periods.

396 F.Supp.2d at 464 (citations omitted). At least for the purpose of the parallelism inquiry here, this court is inclined to concur with its colleagues in *Neer* and *Bisys Group* that no private right of action is available under § 304; thus, that federal claim effectively drops out of the case for the purpose of determining the parallel nature of this action and *Cusak.*

The second federal claim asserted by Derivative Plaintiffs, a securities violation under Rule 10b-5, cannot be discounted so readily, however. Defendants argue that the securities claim should also be set aside. Defendants initially speculate that Derivative Plaintiffs are engaged in gamesmanship to avoid an unfavorable ruling on this motion, calling the Rule 10b-5 federal claim "transparently frivolous," "wholly without merit," and "contrived" to avoid abstention. (Defendants' Memorandum of Law in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Mem."), p. 9.) The Derivative Plaintiffs' motivations to one side, it is settled law that private parties may sue for violations of § 10(b) of the Exchange Act, *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev.,* 291 F.3d 1000, 1017 (7th Cir.2002) (offering a brief history of the judicial creation of the private right of action). Plaintiffs attempting to do so must meet certain pleading requirements: "To

state a valid Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *In re Healthcare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir.1996). Moreover, the Private Securities Litigation Reform Act (hereinafter, "PSLRA"), 15 U.S.C. § 78u-4(b), imposes heightened pleading requirements for allegations of securities fraud:

**\*9** Under the PSLRA, a securities fraud complaint must (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed" and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

*Makor Issues & Rights, Ltd. v. Telltabs, Inc.,* 437 F.3d 588, 2006 WL 172142, \*4 (7th Cir.2006) (quoting 15 U.S.C. § 78u-4(b)(1), (2)).

Defendants argue that Derivative Plaintiffs have failed to meet this heightened pleading standard with respect to the Rule 10b-5 claim because Derivative Plaintiffs have not alleged fraud *in connection with the purchase or sale* of Whitehall stock *by Whitehall itself.* (Defs.' Reply, p. 6.) Derivative Plaintiffs allege that M. Patinkin, Desjardins, Brown, and Browne sold very specific quantities of Whitehall shares on very specific dates in late March and early June of 2002 at a price that reflected their misstatements and omissions related to the alleged inventory rebate scheme. (CAC ¶¶ 64-66.) These *sales* do not form the basis of the derivative 10b-5 claim against these Whitehall directors, however. Instead, Derivative Plaintiffs allege that these directors deceived Whitehall in connection with the *issuance* "of Whitehall restricted stock and options to purchase Whitehall common stock" as part of the Whitehall executive compensation package. (*Id.* at ¶ 76.) Derivative Plaintiffs are far less specific about the relevant quantities and dates pertaining to these transactions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                              Page 10

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

than they were about the March and June 2002 sales by the Whitehall directors.

The complaint sets out the value of the restricted shares Defendants M. Patinkin, Desjardins, Brown, and Browne received from Whitehall as part of their executive compensation package. It does not, however, state when Whitehall issued those shares, beyond setting out the year in which the transaction occurred, nor does the complaint even note how many of these shares Whitehall issued to the Officer Defendants. (*Id.* at ¶ 59.) Such a cursory allegation with respect to an essential element of the Rule 10b-5 claim might fall below the PSLRA threshold of particularity for fraud-style actions. *See, e.g., In re: VMS Sec. Litig.,* 752 F.Supp. 1373, 1393 (N.D.Ill.1990) (dismissing a securities fraud complaint for the same deficiency under the arguably more forgiving pre-PSLRA pleading requirements). In the ordinary instance, however, a plaintiff whose complaint is dismissed for failure to meet particular pleading rules will have leave to file an amended complaint.[FN14]

> FN14. Defendants also allege that Derivative Plaintiffs have not pleaded scienter with the requisite level of specificity. (Defendants' Reply in Support of the Outside Directors' Motion to Stay (hereinafter, "Defs.' Reply"), p. 6.) Derivative Plaintiffs allege that:
> The Individual Defendants ... had actual knowledge of Whitehall's improper business and accounting practices ... In breach of their fiduciary duty of good faith, the Individual Defendants willfully ignored the Company's obvious and pervasive misconduct.
> (CAC ¶¶ 56-57.) Derivative Plaintiffs also allege that this knowledge came from the attendance of particular meetings during particular years. (*Id.* at ¶ 56.)
> Even if this court were inclined to agree with Defendants, its conclusion on whether or not this deficiency should warrant a stay of the Derivative Plaintiff's entire federal action rather than merely leave to file a more particular amended complaint would

be the same. Defendants can, of course, make a separate motion to dismiss the Derivative Plaintiffs' Rule 10b-5 claim if they wish.

Defendants here argue that giving Derivative Plaintiffs an opportunity to amend their complaint would be futile. (Defs.' Reply, p. 7.) Derivative Plaintiffs will be unable to establish the necessary element of reliance by Whitehall, Defendants contend, as they have already alleged that "all of the directors knew of the alleged fraud when they issued stock-based compensation to the officer defendants." (*Id.*) Because a corporation can only act through its directors and officers, Defendants point out, the Whitehall corporation, which is the true plaintiff in this action, knows everything its directors and officers know, and could not have been misled. (*Id.*) Where all of the directors and officers know that Whitehall's financial statements are lies, Whitehall cannot deceive itself into believing the lie when issuing stock-based compensation back to these same directors and officers. (*Id.*)

*10 Defendants cite *Ray v. Karris,* 780 F.2d 636 (7th Cir.1985), in support of this proposition. (Defs.' Reply, p. 7.) In *Ray,* the Seventh Circuit affirmed the dismissal of the plaintiffs' derivative Rule 10b-5 claim where the plaintiffs alleged that, after learning that federal banking regulations would require the divestment of certain assets held by the bank through a wholly-owned subsidiary, defendant bank directors offered to sell the bank's shares in the subsidiary to the bank's shareholders. 780 F.2d at 638-39, 643. These directors depressed the selling price of these shares by encumbering the subsidiary's primary asset and issuing an allegedly falsely gloomy memorandum regarding the value of shares in the subsidiary. *Id.* at 639. This enabled the bank's crooked directors themselves to buy a disproportionate quantity of the bank's stock in its subsidiary and deprived the bank of the full sale value of its divested assets. *Id.* The *Ray* court was particularly interested in the facts that one of the plaintiffs, himself a former bank director, knew of the defendant directors' proposed scheme and that minority shareholders in the bank had unsuccessfully attempted to enjoin the sale before it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 11

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

occurred. *Id.* at 643. In dismissing the *Ray* plaintiffs' derivative Rule 10b-5 claim, the Seventh Circuit held that where disinterested directors and minority shareholders know about the fraud that is about to be perpetuated on the corporation, the court will impute the knowledge of the crooked directors to the corporation. *Id.* at 641-42. Accordingly, the corporation will be unable to establish a securities fraud claim. *Id.*

The instant case is similar to *Ray,* Defendants suggest, citing the Derivative Plaintiffs' allegation that "[t]he Company's executive officers, with knowledge and approval of the other Individual Defendants, regularly and systematically engaged in a fraudulent scheme." (CAC ¶ 3.) In the court's view, however, this passage plainly does not imply that minority shareholders in Whitehall knew of the "fraudulent scheme" before it occurred-it says nothing about the knowledge of minority shareholders at all. Nor does this passage say anything about the knowledge of disinterested Whitehall directors.

Because Defendants have not sketched out this argument much beyond a citation of *Ray* and recitation of its holding, the court is uncertain about how exactly Defendants believe it applies. The allegation Defendants have quoted states that all of the Defendants knew about the inventory rebate scheme, yet Derivative Plaintiffs are suing only the Officer Defendants under Rule 10b-5 claim. Perhaps Defendants believes that the other individual Defendants-those not facing the 10b-5 claim-are "disinterested." An investigation into the origin of the Seventh Circuit's decision in *Ray* defeats any such argument.

*Dasho v. Susquehanna Corp.* established the right of a shareholder to bring a derivative suit under Rule 10b-5 in the Seventh Circuit. 380 F.2d 262 (7th Cir.1967). The *Dasho* court recognized the awkward position that a derivative plaintiff is in with respect to pleading the requisite elements of a Rule 10b-5 claim: the plaintiff must avoid negating the element of reliance despite the standard notion that a corporation knows what its directors and officers, crooked or not, know. The Second Circuit had issued inconsistent panel decisions on just this

issue a few years earlier. In *Ruckle v. Roto Am. Corp.,* the Second Circuit rejected the proposition that the knowledge of a few defrauding directors would be attributed to the defrauded corporation, thereby eviscerating its necessary claim to deception. 339 F.2d 24, 29 (2d Cir.1964). The *Ruckle* court observed:

**\*11** When it is practical as well as just to do so, courts have experienced no difficulty in rejecting such cliches as the directors constitute the corporation and a corporation, like any other person, cannot defraud itself. If, in this case, the board defrauded the corporation into issuing shares either to its members or others, we can think of no reason to say that redress under Rule 10B-5 is precluded, though it would have been available had anyone else committed the fraud. There can be no more effective way to emasculate the policies of the federal securities laws than to deny relief solely because a fraud was committed by a director rather than by an outsider. Denial of relief on this basis would surely undercut the congressional determination to prevent the public distribution of worthless securities.

*Id.* at 29. Less than a month later, another panel of the Second Circuit declined to follow *Ruckle* where the entire board of directors was involved in the suspect transaction, instead imputing the knowledge of the directors to the corporation to undercut the derivative 10b-5 action. *O'Neill v. Maytag,* 339 F.2d 764, 767 (2d Cir.1964). In a "concurring" opinion signed by two of the three judges on the Seventh Circuit panel in *Dasho,* our Court of Appeals sided with the *Ruckle* rationale and concluded that a different rule-depending on whether some or all of a corporation's directors were involved in the alleged fraud-was unnecessary. 380 F.2d at 270 (Fairchild, J. and Cummings, J., concurring).

In 1977, the Supreme Court constricted the scope of the private right of action under Rule 10b-5 by exempting from the scope of federal securities law breaches of state law fiduciary duty not involving a stock issuer's disclosure obligations. *Santa Fe Indus. v. Green,* 430 U.S. 462, 477-80, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Following this decision, the Second Circuit reaffirmed the validity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

of the derivative 10b-5 action under limited circumstances in *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir.1977). The Seventh Circuit interpreted *Goldberg* in *Ray,* explaining, "the basis of this type of action is that the full disclosure policy, which is the fundamental purpose of the [Exchange] Act according to *Santa Fe ...* is implicated even in cases of breaches of state fiduciary law where deception serves to deprive the corporation of its preventative remedies under state law." *Ray,* 780 F.2d at 642 (internal quotation marks and citations omitted) (citing *Goldberg,* 567 F.2d at 218).

The *Ray* court acknowledged that "[g]enerally the ' knowledge' of the corporate entity will turn on whether a disinterested majority of the shareholders or directors ... ratified the securities transference after full disclosure [by the potentially defrauding directors]." *Id.* The *Ray* court concluded, nevertheless, that a corporation may be found to know what its defrauding directors know without disclosure and ratification where disclosure was unnecessary to alert disinterested directors and minority shareholders that they should avail themselves of state law remedies to protect the corporation. 780 F.2d at 642 (citations omitted). In *Ray,* the plaintiff director was on the bank's board of directors when the board made the decision to transfer some of the bank's assets to the subsidiary, giving him knowledge about the true value of shares in the subsidiary. *See id.* at 638. That plaintiff director had resigned, however, and, because he did not participate with the other defendant directors in the encumbering of the subsidiary's assets or the publication of an overly pessimistic statement about the value of the subsidiary, he had no liability under state law. *See id.* at 638-39. Thus the plaintiff director in *Ray* was disinterested and had knowledge that would have equipped him to defend the bank via state law remedies, even without a disclosure on the part of the defendant directors.

**\*12** Any Whitehall director not charged with the Rule 10b-5 violation in the instant case is not similarly independent. For instance, the Audit Committee Defendants certainly knew, according to the allegations, that the Officer Defendants had misstated the financial statements in order to induce Whitehall to issue them more shares at an

artificially higher price as part of their executive compensation package. Unlike the disinterested director in *Ray,* these members of the Audit Committee could not protect Whitehall by availing themselves of state law remedies because in doing nothing to stop the inventory rebate scheme, the Audit Committee Defendants themselves had violated state law fiduciary duties. The Derivative Plaintiffs' complaint here does not allege the existence of any directors who might have been able to blow the whistle on the Officer Defendants prior to the alleged securities violation. *Ray* is, thus, inapplicable. This court applies instead the general rule that the knowledge of the allegedly defrauding directors will not be imputed to the corporation to negate reliance without disclosure by the allegedly defrauding directors and ratification by the remaining directors or shareholders. *See Dasho,* 380 F.2d at 270 ("concurring" opinion). Under this rule, Defendants' argument that Derivative Plaintiffs have pleaded themselves out of court fails.[FN15]

> FN15. Defendants also argue that this Rule 10b-5 claim is part of the class pending before Judge St. Eve (also of the Northern District of Illinois) in *Greater Pennsylvania Carpenters Pension Fund v. Whitehall Jewellers, Inc.,* Case No. 04 C 1107. (Defs.' Reply, pp. 7-8.) That action arises out of the same inventory rebate scheme alleged in the instant action, but plaintiffs in the case before Judge St. Eve have sought certification of a class including:
>
> [A]ll persons and entities who purchased or otherwise acquired publicly traded common stock of Whitehall Jewelers, Inc ... . during the class period beginning November 19, 2001 through December 10, 2003.... Excluded from the class are: (I) defendants.... Defendants in this action include Whitehall.
>
> (Plaintiff's Motion for Class Certification, p. 1, n. 1.) The Derivative Plaintiffs' Rule 10b-5 claim appears to be specifically excluded from the putative class, although the parties before Judge St. Eve are still briefing the class certification issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                         Page 13

Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716
**(Cite as: Slip Copy)**

*CONCLUSION*

The Derivative Plaintiffs' Rule 10b-5 claim renders the instant federal action non-parallel to the pending *Cusak* action which does not include a Rule 10b-5 claim. Thus, although both this case and *Cusak* involve the same parties and are predicated on the same facts, this court cannot conclude that these two actions are parallel. Defendants' motion to stay proceedings (21) is denied without prejudice. Should the Derivative Plaintiffs' Rule 10b-5 claim drop out of the case as the litigation unfolds, this court would, upon motion of Defendants, revisit this decision.

N.D.Ill.,2006.
In re Whitehall Jewellers, Inc. Shareholder Derivative Litigation
Slip Copy, 2006 WL 468012 (N.D.Ill.), Fed. Sec. L. Rep. P 93,716

Briefs and Other Related Documents (Back to top)

• 2006 WL 1416236 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Agreed Motion to Stay Proceedings Pending Completion of Whitehall's Publicly Disclosed Merger (Apr. 17, 2006) Original Image of this Document (PDF)
• 2005 WL 2870444 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Stay Based on the Colorado River Abstention Doctrine (Aug. 16, 2005) Original Image of this Document (PDF)
• 2005 WL 2241603 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of the Outside Directors' Motion to Stay Based Upon the Colorado River Abstention Doctrine (Jul. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 694986 (Trial Pleading) Verified Derivative Complaint (Feb. 22, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B**



Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2005 WL 293509 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
M & M TECHNOLOGIES, INC., Plaintiff,
v.
GURTLER CHEMICALS, INC.,
Defendant/Third-Party Plaintiff,
v.
BURLINGTON CHEMICAL CO., INC.,
Third-Party Defendant.
**No. Civ.A. 03-994 GMS.**

Feb. 8, 2005.

George Pazuniak, Gerard M. O'Rourke, Connolly, Bove, Lodge & Hutz, Wilmington, DE, for Plaintiff and Counter-Defendant.
William J. Wade, Steven J. Fineman, Richards, Layton & Finger, Rex A. Donnelly, IV, Ratner & Prestia, Wilmington, DE, Kevin W. Goldstein, Stradley Ronon Stevens & Young, LLP, for Defendant, Third-Party Plaintiff and Counter-Claimant.

*MEMORANDUM*
SLEET, J.

### I. INTRODUCTION

**\*1** On October 30, 2003, the plaintiff, M & M Technologies, Inc. ("M & M"), filed this patent infringement action against Gurtler Chemicals, Inc. ( "Gurtler"). Presently before the court is a motion to dismiss for lack of personal jurisdiction filed by third-party defendant Burlington Chemical Company, Inc. ("Burlington"). For the following reasons, the court will grant the motion.

### II. BACKGROUND

The patent-in-suit, U.S. Patent No. 6,159,548 (the "

'548 patent"), allegedly is owned by M & M. The patented invention is a method for oilproofing and waterproofing previously manufactured fabric with an aerosol spray containing a diluted fluoroacrylate emulsion. The complaint alleges that Gurtler has infringed, induced infringement of, or contributorily infringed the method claims of the '548 patent.

On July 12, 2004, Gurtler filed a motion to file a second amended answer, counterclaim, and third-party complaint. The court granted Gurtler's motion on September 22, 2004. Gurtler named Burlington as a third-party defendant and brought claims against Burlington for negligent misrepresentation and violation of the Uniform Commercial Code, Section 2-312, *i.e.* breach of warranty. The third-party complaint alleges in Count I that: (1) Gurtler makes its allegedly infringing product merely by adding water to Burcopel CAT, a product sold to it by Burlington; (2) at the time Burlington began selling Burcopel CAT to Gurtler, Burlington orally represented and warranted that Gurtler's use of the product would not infringe, induce infringement of, or contributorily infringe the '548 patent; and (3) Burlington breached its warranty against infringement. Count II alleges that: (1) Burlington's representation that Burcopel CAT was not infringing was a false representation of fact; (2) Burlington made the false representation because of its lack of reasonable care in ascertaining the facts; (3) Burlington made the false representation with an intention to induce Gurtler to act; (4) Gurtler justifiably relied on the false representation; and (5) Burlington's actions caused Gurtler to incur damages.

Burlington is a North Carolina corporation, with no place of business in Delaware. It neither owns nor leases any property in Delaware. Burlington is not registered with the Secretary of State to do business in Delaware. It maintains no office, local telephone listing, or bank accounts in Delaware, and similarly, has no employees in Delaware. It has not paid taxes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 293509 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

or franchise fees in Delaware. Burlington has never commenced any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware, except in the current litigation.

Burlington entered into an agreement with Gurtler for the sale of Burcopel CAT, a chemical that adheres to fabric causing it to become water resistant. Pursuant to the terms of the Memorandum of Sale, the product was shipped collect to Gurtler in South Holland, Illinois.[FN1] After receiving the Burcopel CAT, Gurtler dilutes it with water, and distributes and sells the product to its United States and international customers under its "Pulse Shield" trademark.

> FN1. Gurtler is an Illinois Corporation with an established place of business in Sought Holland, Illinois.

**\*2** Burlington does not sell Burcopel CAT to any customers in Delaware. Burlington's sales of products to Delaware customers in 2001, 2002, and 2003 were less than $1,000.00 each year, and comprised approximately 0.0007% of Burlington's annual sales revenues. In 2004, Burlington directly sold products to three customers in Delaware. Burlington had sales of $4,000.00 to one Delaware customer, $70.00 to a second Delaware customer, and $16,000 .00 to a Delaware distributor. These sales comprised approximately 0.14% of Burlington's 2004 sales revenues.

### III. STANDARD OF REVIEW

Burlington moves to dismiss the third-party complaint for lack of personal jurisdiction over the defendant. "Rule 12(b)(2) of the Federal Rules of Civil Procedure requires a court to dismiss a case when the court lacks personal jurisdiction over the defendant[ ]." *E.I. DuPont de Nemours & Co. v. Rhodia Fiber & Resin Intermediates,* 197 F.R.D. 112, 119 (D.Del.2000). In determining whether personal jurisdiction exists, courts engage in a two step analysis. First, the court must decide whether jurisdiction is authorized by the long-arm statute of

the state in which the court sits. *Transportes Aeros de Angola v. Ronair, Inc.,* 544 F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* (noting, however, " intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elec., Inc.,* 948 F.Supp. 338, 342 (D.Del.1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend ' traditional notions of fair play and substantial justice." ' *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted). Specifically, Gurtler must show that Burlington "purposefully avail[ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 108-09, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Unless the contacts are continuous and systematic, they must be related to the present cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

In determining the jurisdictional question, the court must accept as true the allegations in the complaint, *Altech Indus., Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982), but Gurtler bears the burden of alleging facts sufficient to make a *prima facie* showing of personal jurisdiction over Burlington. *ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F.Supp.2d 268, 270-71 (D.Del.2001). To meet this burden, Gurtler must adduce facts which 'establish with reasonable particularity' that jurisdiction over the movant exists. *Id.* (quoting *Joint Stock Soc'y v. Heublein, Inc.,* 936 F.Supp. 177, 193 (D.Del.1996)).

### IV. DISCUSSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3

Not Reported in F.Supp.2d, 2005 WL 293509 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

### A. Delaware's Long-Arm Statute

**\*3** The first step in the court's analysis is to determine whether any of the provisions of Delaware's long-arm statute, Del.Code Ann. tit. 10 § 3104, warrant the exercise of jurisdiction over Burlington. Burlington contends that the court has no basis to assert jurisdiction, while Gurtler maintains that the conduct of Burlington satisfies the requirements of subsections (c)(1) and (c)(4) of the long-arm statute. The court will address each of these sections below.

### 1. Delaware Long-Arm Statute § 3104(c)(1)

Under subsection (c)(1), the court may exercise jurisdiction over a nonresident who transacts any business or performs any character of work or service in the State. Del.Code Ann. tit. 10 § 3104(c)(1). Gurtler asserts that Burlington has acted in consort with Gurtler to place Burcopel CAT into a nationwide distribution network and, as a result, Burcopel CAT may have found its way to Delaware. Thus, Burlington has availed itself of the benefits of the State of Delaware. The court disagrees.

Delaware courts construe the long-arm statute broadly to confer jurisdiction to the maximum extent possible so as to "provide residents a means of redress against those not subject to personal service within the state." *Boone v. Oy Partek Ab,* 724 A.2d 1150, 1156-57 (Del.Super.1997). The Delaware Supreme Court has interpreted subsection (c)(1) as a specific jurisdiction provision that requires a "nexus" between the plaintiff's cause of action and the conduct of the defendant that is used as a basis for jurisdiction. *See LaNuova D & B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del.1986). In order to meet the requirements of subsection (c)(1), Burlington's actions must be directed at residents of Delaware and the protection of Delaware laws. *Thorn EMI N. Am. Inc. v. Micron Tech., Inc.,* 821 F.Supp. 272, 274 (D.Del.1993). However, when a manufacturer passes title to goods to a third party outside of Delaware, it has not performed an act in Delaware. *Boone,* 724 A.2d at

1156. In the present case, Burlington did not pass title to Gurtler in Delaware. Rather, Burlington passed title to the Burcopel CAT in South Holland, Illinois. (D.I. 52 ¶ 4). In addition, Burlington's sales of products in Delaware are unrelated to Gurtler's claims and, therefore, cannot give rise to specific jurisdiction. *See ICT Pharms., Inc. v. Boehringer Ingelheim Pharms ., Inc.,* 147 F.Supp.2d 268 (D.Del.2001).

Gurtler maintains that Burlington's actions were directed at Delaware because it engaged Gurtler as a nationwide distributor of Burcopel CAT. Gurtler further asserts that where a party contracts to have its product distributed by another throughout the United States, it contracts to have its product distributed to each state as an individual forum. *See Boone,* 724 A.2d at 1160. The court agrees that a party who contracts to have its product distributed throughout the United States is subject to jurisdiction in any state. There is no evidence in the record, however, that Gurtler was acting as Burlington's distributor of Burcopel CAT. Indeed, Gurtler purchased Burcopel CAT from Burlington, diluted it with water and sold it under Gurtler's "Pulse Shield" trademark. Moreover, the Burcopel CAT does not maintain a separate identity in Gurtler's product and Burlington is not identified to the end user. As such, subsection (c)(1) is not a basis for the exercise of jurisdiction over Burlington.

### 2. Delaware Long-Arm Statute § 3104(c)(4)

**\*4** Additionally, Gurtler asserts that Burlington has, within the meaning of subsection (c)(4), availed itself of the general jurisdiction of Delaware. Under subsection (c)(4), the court may exercise personal jurisdiction over anyone who "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State. Del.Code Ann. tit. 10 § 3104(c)(1). Gurtler contends that jurisdiction is proper under subsection (c)(4) because Burlington's actions with respect Burcopel CAT have caused tortious injury in Delaware, Burlington maintains

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 293509 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

significant contacts with the District of Delaware, and Burlington receives substantial revenue from the sale of Burcopel CAT to Gurtler.

Delaware courts have interpreted § 3104(c)(4) as a general jurisdiction provision. *See Bell Helicopter Textron, Inc. v. C & C Helicopter Sales, Inc.,* 295 F.Supp.2d 400, 405 (D.Del.2002); *Boone,* 724 A.2d at 1155 (citing *Outokumpu Engineering Enterprises, Inc. v. Kvaerner Enviropower, Inc.,* 685 A.2d 724, 727–28 (Del.Super.1996)). This general jurisdiction provision allows the court to exercise jurisdiction when the defendant's contacts with the forum state are unrelated to the cause of action. *Bell Helicopter,* 295 F.Supp.2d at 405.

First, the court must determine if the alleged acts set forth in the third-party complaint constitute a tortious injury for the purposes of jurisdiction. A tortious act under § 3104(c)(4) is an act "which involves a breach of duty to another and makes the one committing the act liable in damages." *Magid v. Marcal Paper Mills, Inc.,* 517 F.Supp. 1125, 1130 (D.Del.1981). Applying Delaware law, the court finds that the alleged breach of warranty and negligent misrepresentation by Burlington each constitute a breach of duty owed to Gurtler.

Next, the court must determine if Burlington regularly does or solicits business in Delaware. The court concludes that Burlington does not regularly do business in Delaware. As previously discussed, Burlington is a North Carolina corporation, with no office or place of business in Delaware. (D.I. 52 ¶ 2). Burlington has not appointed any agent for service of process in Delaware and is not registered to do business in Delaware. (*Id.*) It has no local telephone listing, bank accounts, real estate or employees in Delaware. (*Id.*) It has not paid any taxes or franchise fees in Delaware. (*Id.*) It has never commenced any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware, except for the current litigation. (*Id.*) The court also concludes that Burlington does not regularly solicit business or advertise in Delaware. Further, while Burlington does maintain an Internet website that it can use to solicit business from Delaware, the mere existence of its website does not rise to the level of regularly

soliciting business in Delaware. *See Motorola Inc. v. PC-Tel,* 58 F.Supp.2d 349, 352 (D.Del.1999) (discussing extensive advertising by the defendant, both nationwide and in Delaware through newspapers, magazines, and catalogs). Thus, the court concludes that Burlington does not regularly do or solicit business in Delaware.

*5 Lastly, the court must determine whether Burlington derives substantial revenue from services or things used or consumed in Delaware. Delaware courts have broadly construed the term "substantial revenue" to mean that two to three percent of total revenue is sufficient to confer jurisdiction. *See United States v. Consolidated Rail Corp.,* 674 F.Supp. 138, 144 (D.Del.1987). However, when a defendant's sales to customers in Delaware constitute less than one percent of total revenue, it is not substantial enough to warrant an exercise of jurisdiction. *Bell Helicopter,* 295 F.Supp.2d at 405. In the present case, Burlington's sales of products to customers in Delaware in 2001, 2002, and 2003 were about $1,000.00 each year, representing 0.0007% of Burlington's annual sales revenues. (D.I. 53, at 2-3). In 2004, Burlington had sales to three customers in Delaware that totaled approximately $20,070.00. (*Id.* at 3). While Burlington's sales of products to Delaware customers grew in 2004, its Delaware revenue only comprised approximately 0.14% of its total annual sales. (*Id.*) Because Burlington's Delaware revenue was less than 1% of its total annual revenue, it is not substantial enough to warrant an exercise of general jurisdiction. The court, therefore, finds that even though the acts alleged in the third-party complaint, if proved, might constitute a breach of duty owed by Burlington, Gurtler has not made a *prima facie* showing of personal jurisdiction over Burlington under § 3104(c)(4) of the Delaware long-arm statute.

## B. Due Process

The second step in the court's analysis is to determine whether exercising jurisdiction comports with the requirements of the Due Process Clause. The Due Process Clause requires that, in order to subject a defendant who is "not present within the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 5

Not Reported in F.Supp.2d, 2005 WL 293509 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

territory of the forum" to personal jurisdiction, the court must first make sure that the party "ha[s] certain minimum contacts with [the forum] such that the maintenance of the suit does not offend ' traditional notions of justice and fair play." ' *See International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In order to give non-residents "fair warning" that a particular activity may subject them to litigation within the forum, these "minimum contacts" must be purposeful. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). In other words, the defendant's contact must be of the nature that would cause it to reasonably foresee that it might be "haled before a court" in the forum as a result of its conduct. *See World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). [FN2] Finally, "even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *See Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1568 (Fed.Cir.1994).

> FN2. The United States Supreme Court has explained that:
> [t]he "substantial connection" ... between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State.... The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the

forum State. But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum state.
> *ICT Pharms.,* 147 F.Supp.2d at 272 (quoting *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)).

**\*6** Gurtler first asserts that the court should exercise jurisdiction over Burlington because Burlington has purposeful minimum contacts with the State of Delaware of the quantity and type to cause it to reasonably foresee that it would be "haled before a court" located in Delaware. Jurisdiction is proper, according to Gurtler, because it informed Burlington that it diluted Burcopel CAT with water to produce Pulse Shield, which, in turn, it placed into a distribution chain that consisted of laundering facilities across the United States. (D.I. 56, at 4). Burlington, therefore, knew that its Burcopel CAT was shipped nationally as the sole compositional ingredient in Pulse Shield. (*Id.*) Thus, Burlington has minimum contacts to satisfy due process requirements by contracting for the sale of Burcopel CAT to Gurtler, thereby directing its product into the stream of commerce of the United States and Delaware. Gurtler further asserts that, at the time this litigation was brought, Gurtler and Burlington were involved in significant business negotiations involving Burcopel CAT, which included a proposal by Gurtler that Burlington dilute the Burcopel CAT, affix Gurtler's labeling, and ship it directly to Gurtler's clients. (*Id.* at 5). However, as Gurtler points out, a final contract was never entered. Gurtler contends that these negotiations put Burlington on notice that by providing Burcopel CAT to Gurtler, Burlington would be submitting to the jurisdiction of the districts to which the Gurtler product was shipped. Gurtler relies on *Boone* and *Motorola* to support its stream of commerce theory. Gurtler argues that, as in *Boone* and *Motorola,* the defendant seeking to be dismissed, *i.e.* Burlington, engaged a distributor, *i.e.* Gurtler, who shipped the defendant's product across the country. Thus, not only did Burlington anticipate the fact that its

Not Reported in F.Supp.2d                                                                                Page 6

Not Reported in F.Supp.2d, 2005 WL 293509 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

product would be distributed in all states including Delaware, it took affirmative steps to direct its product to Delaware by and through its agreement with Gurtler. (D.I. 56, at 5).

After reviewing the record, the court finds that Gurtler's reliance on *Boone* and *Motorola* is misplaced because both cases are distinguishable from the present case. First, there is no evidence in the record that Burlington engaged Gurtler to be its exclusive distributor of Burcopel CAT in the United States, which was a critical factor in *Boone*. The court in *Boone* found that the defendant had exhibited an intent to serve the Delaware market because it engaged a resident company as the exclusive distributor of its product in the United States and directly benefitted from the distribution. *Boone*, 724 A.2d at 1160. As previously discussed, Gurtler purchased Burcopel CAT from Burlington, diluted it with water and sold it as Pulse Shield. These actions are not consistent with a distributor/distributee relationship. In addition, the record shows that Burlington does not benefit directly from Gurtler's "distribution." Gurtler asserts that Burlington has received approximately $66,770.00 for purchases of Burcopel CAT. However, Gurtler does not assert that the money was a direct benefit from its distribution of Pulse Shield. Rather, it was money that Burlington received from the sale of Burcopel CAT to Gurtler alone. This situation is distinguishable from *Boone*, where the defendant earned $270,000 from sales of its product by its distributor in Delaware. *See id.* at 1158.

*7 Likewise, *Motorola* is distinguishable. First, the *Motorola* defendant's product was integrated into a variety of consumer products manufactured by well-known multi-national corporations.[FN3] The goods produced by the corporations were then placed for sale in well-known retail stores, including Caldor and Circuit City, which all had outlets in Delaware. Further, the products were advertised extensively, both nationwide and in Delaware through newspapers, magazines, and catalogs. *Motorola*, 58 F.Supp.2d at 352. While Burcopel CAT is integrated into Gurtler's Pulse Shield, there is no evidence in the record that Gurtler places the Pulse Shield for sale in

well-known retail stores with outlets in Delaware. The record is also devoid of evidence that Gurtler advertises the Pulse Shield, either nationwide or in Delaware.

> FN3. The *Motorola* defendant's product was a softmodem that was integrated into Compaq, Phillips, Samsung, Sharp, and Sony consumer electronic products.

More important, the *Motorola* court found that the licensing fees and royalties from which the defendant derived its revenues "appear[ed] to be based upon the sale to *end users* of products containing its softmodems." *Id.* Indeed, the court noted that the "End User distribution channel" of the defendant's licensing agreement "contemplate[d] sale to retail consumers including consumers in Delaware of 'Shipped End User Product[s]' through retail outlets." *Id.* In the present case, Gurtler does not assert that Burlington derives revenue based on the sale of the Pulse Shield to end users. Conversely, Gurtler asserts that Burlington derives revenue based on its sale of Burcopel CAT to Gurtler.

Another important distinction between *Motorola* and the present case is that the *Motorola* defendant maintained an interactive website from which end users could download modem control commands to their computers to enable them to perform certain functions with the defendant's softmodems. In addition, the customers could order products to test their softmodems and obtain customer support directly from the defendant by telephone and Internet. The record also indicated that Delaware customers had utilized the features of the defendant's support network. *Id.* In the present case, Burlington does not offer the same type of customer support network. According to Gurtler, Burlington maintains an Internet website that allows potential clients in Delaware to access certain advertisements. The website also provides a toll free phone number for client communication and order solicitation. Burlington's website offerings are not nearly as extensive as those offered by the defendant in *Motorola*. Moreover, Gurtler has not asserted that end users of its Pulse Shield can obtain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

customer support from Burlington's website or toll free number.

Finally, Gurtler asserts that Burlington has admitted that it transacts certain business in Delaware and, therefore, has not only availed itself to Delaware by implicitly soliciting business in the state, but also it has derived substantial revenue from Delaware. The court disagrees. As previously discussed, Burlington's Delaware revenue for the years 2001 through 2004 was less than 1% of its total annual revenue for each year and, therefore, not substantial enough to warrant an exercise of jurisdiction. Thus, Burlington does not have sufficient contacts with this forum to compel its appearance here without offending the Due Process Clause.[FN4]

FN4. The court need not address whether jurisdiction in Delaware comports with the "minimum requirements inherent in the concept of 'fair play and substantial justice ' ' because Burlington's contacts with Delaware are insufficient to cause it to reasonably foresee being haled before a Delaware court.

### ORDER

**\*8** For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED that:
1. Burlington Chemical Company's Motion to Dismiss for Lack of Personal Jurisdiction (D.I.51) is GRANTED.

D.Del.,2005.
M & M Technologies, Inc. v. Gurtler Chemicals, Inc.
Not Reported in F.Supp.2d, 2005 WL 293509 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182402 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendant's Motion to Reconsider the Court's February 23, 2006 Order Denying Gurtler's Motions in Limine (Mar. 1,

2006) Original Image of this Document (PDF)
• 2006 WL 809084 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Gurtler Chemicals, Inc.'s Consolidated Motions in Limine (Feb. 9, 2006) Original Image of this Document (PDF)
• 2006 WL 809083 (Trial Motion, Memorandum and Affidavit) Gurtler Chemicals, Inc.'s Opposition to Plaintiff's Motion in Limine Regarding Pulse Shield Profit Analysis (Feb. 3, 2006) Original Image of this Document (PDF)
• 1:03cv00994 (Docket) (Oct. 30, 2003)

END OF DOCUMENT

**C**



Not Reported in A.2d                                                           Page 1

Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**(Cite as: Not Reported in A.2d)**

H

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle County.

Robert SOLOMON, Plaintiff,

v.

PATHE COMMUNICATIONS CORPORATION, Credit Lyonnais Bank Nederland N.V., Dennis Stanfill, Alan Ladd, Jr., Charles Meeker, Rene Claude Jouannet, Bahman Naraghi, and Guy Etienne Dufour, Defendants.

CIV. A. 12563.

Submitted: Feb. 15, 1995.
Decided: April 21, 1995.

Irving Morris, Karen L. Morris, Abraham Rappaport, Patrick F. Morris and Seth D. Rigrodsky, of Morris and Morris, Wilmington, for plaintiff.

Samuel A. Nolen, and Scott R. Haiber, of Richards, Layton & Finger, Wilmington, of counsel: White & Case, New York City, for defendants.

MEMORANDUM OPINION

ALLEN, Chancellor.

*1 The suit grows out of the tail-end of a commercial debacle in which Credit Lyonnais Banque Nederland N.V. ("CLBN"), on its way to losing a huge sum, was forced to exercise certain contractual rights and its rights as a secured party, first to take over the management and later the legal ownership of MGM/UA Communications Corp. (" MGM") and, incidentally thereto, of Pathe Communications Corporation. This suit arises from the second of these steps: the foreclosure by a CLBN affiliate of CLBN's perfected security interest in substantially all of the stock of MGM and its parent Pathe, and out of a concurrent tender offer for the 10% of Pathe stock that CLBN did not acquire in the foreclosure. Plaintiff purports to represent the class of public shareholders who owned 10% of Pathe's common stock.

This court is well familiar with many of the background facts alleged in the amended complaint. *See Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* Del.Ch., C.A. No. 12150, Allen, C. (Dec. 30, 1991); *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* Del.Ch., C.A. No. 12188, Allen, C. (Mar. 9 & 23, 1992).

Below I sketch that story, but here for summary purposes, I note that in May 1992 CLBN held a perfected security interest in 98% of MGM's stock, which CLBN had acquired in connection with a $400 million loan to Pathe, the then owner of the MGM stock. CLBN acquired at the same time a perfected security interest in 89% of Pathe's stock, from Pathe's "parent" Melia International N.V. (" Melia"). MGM was the operating entity; it owned a film studio, interests in Europe and other assets (e.g., the remnants of a film library). Pathe owned operating assets through its ownership of MGM. Am.Cplt. ¶ 13. CLBN came, as a creditor, to control MGM and Pathe. Thereafter, CLBN whose large loans to Pathe, Melia and MGM were in default, elected to exercise its rights as a secured party to foreclose on the MGM stock. Pathe did not attempt to prevent this; plaintiff does not allege that any ground existed for it to do so in good faith. CLBN concurrently elected to foreclose on the 89% of Pathe stock that secured its loans to Melia.

In connection with the foreclosure sale of the MGM and Pathe stock, CLBN (or affiliates) extended to the public (10%) shareholders of Pathe an opportunity to sell their stock to CLBN at the market price of $1.50 per share. In exchange for an agreement to extend such an offer to Pathe's public stockholders a special committee of the Pathe board had agreed not to attempt to interfere with the foreclosure on the MGM stock. Owning a 10% minority share in a corporation (Pathe) that shortly would own practically no assets, no doubt would strike most of us as an unattractive option. Plaintiff however sees the option to tender all shares to CLBN at a market price as an equitable wrong.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**(Cite as: Not Reported in A.2d)**

He brought suit immediately (May 1992) but did not seek to enjoin the transaction, and until March 14, 1994 when he filed an amended complaint, plaintiff did essentially nothing to pursue the case. On April 22, 1994 defendants moved to dismiss the complaint.

**\*2** A number of theories can be extracted from the amended complaint.

First. Most globally, it is asserted that the $1.50 cash tender offer and the agreement to take no action to interfere with the foreclosure, constituted self-interested action that was unfair in several respects, specified below.

Second. It is claimed that the Pathe board did not exercise informed judgment in agreeing to not oppose the MGM foreclosure.

Third. It is claimed, remarkably if obliquely, that the Pathe board failed to negotiate with all interested companies "in an attempt to obtain the best value for members of the class" in connection with a sale of the 10% public minority. ¶ 37(b)

Fourth. The board "failed to assure that no conflicts of interest existed." ¶ 37(d)

Fifth. The board failed to retain independent representatives to act solely on behalf of the members of the class for purposes of negotiating the terms of the Tender Offer. ¶ 38

Sixth. The $1.50 price was "inadequate and therefore unfair." ¶ 40

Seventh. The tender offer was designed to be coercive (¶¶ 44, 45), was "grossly unfair," and was made through a disclosure that failed "to disclose ... either the true value of the assets of MGM and Pathe or the future prospects of Pathe." ¶ 44

In evaluating the sufficiency of the amended complaint I turn first to a more complete statement of the pleading's allegations.

I.

Given the prior adjudications in this court among CLBN, Pathe and MGM, certain of the background facts are not susceptible of dispute. CLBN is a banking institution organized and existing under the laws of the Netherlands and is a subsidiary of Banque Credit Lyonnais, a French corporation. Pathe is a Delaware corporation with its principal offices located in Culver City, California. CLBN, no doubt to its deep regret, was a primary lender to Pathe, its former Chief Executive Officer Giancarlo Parretti ("Parretti") and his affiliated companies including Comfinance SA and Melia International N.V. CLBN provided financing to Pathe for various purposes relating to the development, production and distribution of motion pictures, most notably for Pathe's acquisition of substantially all of the stock of MGM.

In March 1990 Parretti became interested in acquiring through Pathe substantially all of the stock of MGM.[FN1] On November 1, 1990 Pathe and MGM completed the private transaction in which Pathe acquired 98.5% of outstanding shares of MGM. Am.Cplt. ¶ 2. As the prior trial showed this was done for all practical purposes entirely with borrowed funds; CLBN was the principal lender.

> FN1. MGM's name was changed to MGM-Pathe Communications Co. after Pathe acquired MGM/UA Communications Co.

From the outset, things went badly for Parretti/Pathe and consequently for CLBN. Within months (March 29, 1991) a creditor's involuntary petition in bankruptcy was filed under Chapter 7 of the Bankruptcy Code against MGM. After hurried negotiations, on May 16, 1991 CLBN extended a new $145 credit facility to MGM that enabled MGM to reach an accord with the creditors and emerge from the bankruptcy proceeding.

**\*3** To induce CLBN to extend this new credit facility, Melia and its affiliated companies pledged to CLBN all of their shares in Pathe, representing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**(Cite as: Not Reported in A.2d)**

approximately 89.5% of Pathe's outstanding stock. Am.Cplt. ¶ 3. In addition, Pathe itself pledged to CLBN its 98.5% ownership of MGM to secure all indebtedness owing in connection with CLBN's financing of the MGM acquisition by Pathe.

Moreover, in exchange for the new credit, CLBN acquired the right under two voting trust agreements dated April 15, 1991 (the "Voting Trust Agreements ") to vote, as voting trustee, 89.5% of the outstanding voting stock of Pathe and 98.5% of the outstanding voting stock of MGM. Pathe, Parretti and Melia also entered into two separate Corporate Governance Agreements with CLBN concerning the management of Pathe (the "Pathe-CGA") and MGM (the "MGM-CGA"). Am.Cplt. ¶ 4.

As a result of certain actions by Parretti in violation of the MGM-CGA, CLBN exercised its voting rights under the Voting Trust Agreements and acted on June 16, 1991 to remove Parretti, his wife, Ms. Maria Cecconi, and Mr. Yorum Globus as directors of MGM. Am.Cplt. ¶ 5. Similarly, on July 8, 1991, CLBN exercised its voting rights under the Voting Trust Agreements to oust Parretti and his affiliates from Pathe's board. Am.Cplt. ¶ 7. CLBN then initiated two separate actions in this court to confirm the validity of its removal of Parretti and his affiliates from the Board of Directors of Pathe and MGM. After a lengthy trial this court affirmed the validity of actions taken by CLBN as it found that Parretti had wilfully breached his obligations set forth in the MGM-CGA.

By 1992 CLBN loans to Parretti-controlled companies (Melia, Pathe, and MGM) amounted to over $1 billion.[FN2] The number is undoubtedly higher today.

> FN2. According to the complaint, as of May 5, 1992, Pathe owed CLBN an aggregate amount of approximately $140 million. Also as of such date, MGM owed CLBN an aggregate amount of approximately $568 million. As of March 17, 1992, the aggregate principal and overdue interest owed by Melia to CLBN totalled approximately $397 million.

Pathe's stock ownership of MGM represented virtually all of Pathe's assets. Only "through MGM [did] Pathe continue to engage in financing, production and worldwide distribution of theatrical motion pictures, television series, and made-for-television features and specials, and operation of motion picture theaters in the United Kingdom, the Netherlands, and Denmark." Am.Cplt. ¶ 13.

Once Mr. Parretti and his associates were removed from Pathe's and MGM's Board of Directors, CLBN replaced them with its designees. Am.Cplt. ¶¶ 5-6. Parretti and his associates, however, continued in Italian courts to challenge CLBN's attempt to exercise control over Pathe and MGM. Am.Cplt. ¶ 27. On April 28, 1992 Mr. Parretti apparently obtained an order of an Italian court which contradicted this court's prior decisions and placed CLBN's control of Pathe and MGM in jeopardy. *See* Notice pp. 7-8. CLBN then proceeded to foreclose on its security agreement, which reached the 89.5% of Pathe stock the legal title to which was in various Parretti associated entities (e.g., Melia) and on the 98% of MGM stock owned legally by Pathe. Am.Cplt. ¶¶ 9, 29.

In connection with the foreclosure, on April 17, 1992 CLBN sent a letter to a special committee of the Board of Directors of Pathe (the "Special Committee") consisting of Messrs. Stanfill and Meeker notifying them of its intended action. This letter stated CLBN's belief that Pathe had no basis to initiate legal proceedings to forestall the foreclosure of its MGM stock and stated that any attempt to do so would only cause harm to all parties including Pathe's bondholders and stockholders. To obtain an agreement that Pathe would not take action to attempt to forestall or delay the foreclosure, CLBN expressed willingness to provide certain benefits to holders of the public shares of Pathe's common stock and to holders of Pathe's bonds including purchasing a portion of the outstanding bonds and making a tender offer for an unspecified number of Pathe's public shares of common stock. Notice pp. 9-10. In responding to this letter, the Special Committee retained its own legal and financial advisors. Am.Cplt. ¶ 49; Notice p. 10.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**(Cite as: Not Reported in A.2d)**

**\*4** On May 1, 1992, Pathe and CLBN executed an agreement whereby Pathe agreed that it would not take any action to attempt to forestall or delay the foreclosure and CLBN agreed to make the tender offer of $1.50 per share for up to 5.8 million unencumbered outstanding shares and to make debt offers to purchase outstanding Pathe bonds at specified discounted prices. In addition, as part of the Agreement, CLBN agreed to provide credit support for a portion of the principal and interest on the outstanding Pathe bonds. CLBN initiated the foreclosure by announcing a public auction to take place on May 7, 1992 in Wilmington, Delaware.

In preparation of the foreclosure, Credit Lyonnais, CLBN's parent company, formed MGM Holdings Corporation, ("Holdings") in the State of Delaware. Holdings is a wholly-owned subsidiary of Credit Lyonnais. CLBN assigned its security interest in MGM stock to Holdings which thereafter pursued the foreclosure in its name. On May 7, 1992, CLBN commenced the tender offer.

The day before the commencement of the tender offer, Mr. Solomon filed his complaint. He amended his class action complaint on March 14, 1994.[FN3]

> FN3. Mr. Solomon failed to properly serve defendant CLBN after filing the Complaint, however. He first attempted to serve CLBN by serving Pathe's registered agent in Delaware. CLBN, as a foreign corporation, does not retain a registered agent in this state. Moreover, after filing the Amended Complaint, Plaintiff served CLBN with a copy of the original Complaint rather than a copy of the Amended Complaint.

Defendants have moved to dismiss the amended complaint claiming that it fails to state a claim upon which relief can be granted. In addition, defendant CLBN has sought dismissal from this action claiming that this court lacks personal jurisdiction over it and that plaintiff's service of process upon it was ineffective.

II.

For the reasons that follow it is my opinion that the amended complaint fails to allege facts that, if true, state a claim upon which relief may be granted. In so concluding I am mindful that on such a motion all well-pleaded factual allegations are to be treated as true and that all permissible inferences from the well-pleaded facts should be drawn in the pleader's favor. *Rales v. Blasband,* Del.Supr., 634 A.2d 927, 931 (1993); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988). I am mindful as well, however, that plaintiff's pleading obligations, especially when he purports to sue in a stockholders' class action or derivatively, cannot be satisfied by pleading conclusions such as that the transaction is "unfair" or "coercive" or that disclosure is "inadequate." *Rabkin v. Philip A. Hunt Chemical Corp.,* Del.Supr., 498 A.2d. 1099, 1105 (1985) ("a plaintiff's mere allegation of "unfair dealing, without more, cannot survive a motion to dismiss"); *Grobow,* 539 A.2d at 187 n. 6 ("neither inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true.").

It is a fact evident to all of those who are familiar with shareholder litigation that surviving a motion to dismiss means, as a practical matter, that economical rational defendants (who are usually not apt to be repeat players in these kinds of cases [FN4]) will settle such claims, often for a peppercorn and a fee. This fact causes one to apply the pleading test under Rule 12 with special care in such suits. The court cannot be satisfied with mere conclusions, as it might, for example, in an auto-accident case, because in this sort of litigation the risk of strike suits means that too much turns on the mere survival of the complaint.

> FN4. One empirical study found that "shareholder suits are rare ... Litigation frequency is one shareholder suit [for each sample company] every 48 years." Roberta Romano *The Shareholder Suit: Litigation Without Foundations?* 7 Journal of Law, Econ. & Org. 55, 59

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**(Cite as: Not Reported in A.2d)**

(1991).

**\*5** In my opinion the amended complaint weaves together a tangle of conclusions about fairness and coercion, etc., but the facts it alleges fail to state a claim.[FN5] In so concluding I do accept for these purposes plaintiff's position that the Pathe " disinterested directors" were in fact appointed by and accountable to CLBN and their decision is not entitled to the presumption of the business judgment rule. Nevertheless I do not understand that in alleging this much, plaintiff has filed a complaint that states a claim. Even in a self-interested transaction in order to state a claim a shareholder must allege some facts that tend to show that the transaction was not fair. Plaintiff has not done so here.

> FN5. Plaintiff cites three facts to support his assertion that the transaction is unfair. None can be said to arouse as much as a fleeting doubt of the fairness of the foreclosure or the $1.50 tender offer. Plaintiff's complaint states:
> "(i) in the year prior to the offer, Pathe's shares had traded as high as $3.25 per share; (ii) MGM, and therefore, Pathe, through its ownership of 98.5% of the common shares of MGM, had a substantial and valuable asset, including MGM's valuable film and television libraries and profitable chain of theaters in Europe; and (iii) prior to the Tender Offer, stable, proven executive management had been installed at both Pathe and MGM."
> The market price of Pathe stock a year earlier cannot provide any basis for currently valuing the stock of Pathe since all of its assets, the MGM stock, now was being foreclosed. For the same reason, plaintiff's argument that Pathe possesses valuable entertainment assets fails. Insofar as the facts alleged show, Pathe has no legitimate claim to those assets as it was in default of its obligations secured by its MGM stock. *See* pp. 14-15 *infra.*

III.

I turn initially to clearing away some of the debris that is strewn about in the amended complaint.

First, the adequacy of the price in a tender offer does not raise a triable issue unless price is connected to valid claims of breach of fiduciary duty, such as disclosure problems or actionable coercion. So long as a free choice to accept or reject a tender offer is present, courts do not attempt to protect any right to receive a "fair price" in a tender offer. *In re Ocean Drilling & Exploration Co. Shareholders Litig.,* Del.Ch., C.A. No. 11,898, Chandler, V.C. (April 30, 1991). *See also Lynch v. Vickers Energy Corp.,* Del.Ch., 351 A.2d 570, 576 (1976), *rev'd on other grounds,* Del.Supr., 383 A.2d 278 (1977); *Lewis v. Fuqua Indus., Inc.,* Del.Ch., C.A. No. 6534, slip. op. at 7, Hartnett, V.C. (Feb. 16, 1982) ("[B]ecause this is a tender offer which the individual stockholder may accept or reject as they wish and not a freeze out merger, the defendants had no duty to offer any particular sum to the stockholders as long as they complied with the requirements of full disclosure with complete candor.")

Plaintiff claims here that the $1.50 offer was " coercive" and that, as a result, CLBN had a duty to offer a fair price, which it breached.

How the tender offer was coercive is less clear. Plaintiff alleges, as I understand it, that Pathe's directors failed "to protect" the minority interest ( *see* pp. 8-9 *supra* ) in breach of their fiduciary duties (by not being informed, independently advised, and independent) and thus the tender offer became coercive.

In the present case, CLBN, as a security holder of the 98.5% of MGM stock was legally entitled to commence foreclosure proceedings upon default by Pathe. *See* UCC 8-313, 8-321, 9-503, 9-504. Even if the consequences of that foreclosure were, for example, to render the value of the minority Pathe stock worthless, the secured creditor would have no obligation to forego or delay exercising its legal rights as a creditor. A controlling shareholder is not required to give up legal rights that it clearly possesses; this is certainly so when those legal rights arise in a non-stockholder capacity. Thus, the tender offer in this case cannot be said to be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123
**(Cite as: Not Reported in A.2d)**

actionably coercive simply because CLBN opted to exercise a legally entitled right. "Actionable coercion does not exist, however, simply because a tender offer price is too good to pass up." *Cottle v. Standard Brand Paint Co.,* Del.Ch., C.A. No. 9342, slip op. at 8, Berger, V.C. (Mar. 22, 1990). Yet given the effect of the foreclosure, that is the core " coercive" factor present.

**\*6** Nevertheless, as I assume that there was a lack of independence by the members of the Special Committee, plaintiff would state a claim if he alleged that Pathe *had* valid legal grounds to oppose or forestall the foreclosure, which it did not exercise. In that event a breach of loyalty would arguably be provable. But here there is no allegation that Pathe did possess rights or claims that could have been used by Pathe legitimately to thwart the foreclosure. Failing to allege such facts, plaintiff cannot substantiate his claim that the tender offer was actionably coercive. Of course the minority shareholders may have felt financial pressure to tender their shares in light of the likelihood that their shares would have little value after the foreclosure. This type of financial pressure, however, does not render the tender offer actionably coercive. Indeed, financial downfall of a company is one of the risks assumed by the minority shareholders when they invested in the common stock of Pathe. Thus I find that plaintiff has failed to state a claim on his allegation of an actionably coercive tender offer by CLBN.

The other asserted claims are even more clearly inadequate to state a claim. That the Pathe board was (assumedly) under the control of CLBN does not alone constitute a wrong. The alleged failure to retain independent advisers; the alleged failure "to assure that no conflict of interest existed" are restatements of the same complaint. But I re-iterate the opinion that a plaintiff must do more than allege that a transaction is a self-interested one in order to state a claim. He or she must as well allege some facts which if true would render the transaction unfair.

In this instance plaintiff has simply alleged that the transaction was a self-dealing one and, in conclusionary fashion, that it was ill-informed,

coercive, grossly unfair, etc. This is insufficient to state a claim. *See C.f. Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701, 703 (1983) (Even where a majority shareholder orchestrates a cash-out merger, the defendant majority shareholder need not prove the entire fairness of the transaction, unless the plaintiff first demonstrates some basis for invoking the fairness obligation, beyond the fact that the majority shareholder benefitted from the transaction. Considering all of the circumstances, I conclude that this effort to leverage some additional money from the secured-creditor/new majority shareholder out of this 1992 mop-up operation fails to state a claim upon which relief may be granted.

Del.Ch.,1995.
Solomon v. Pathe Communications Corp.
Not Reported in A.2d, 1995 WL 250374 (Del.Ch.), 20 Del. J. Corp. L. 1123

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**D**

Westlaw.

Not Reported in A.2d                                                                                      Page 1

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

ℍ
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
TEACHERS' RETIREMENT SYSTEM OF
LOUISIANA, derivatively and on behalf of all
those similarly situated, Plaintiffs,
v.
Richard M. SCRUSHY, William T. Owens, John S.
Chamberlin, Joel C. Gordon, C. Sage Givens, Jon F.
Hanson, Charles W. Newhall, III, Larry D. Striplin,
Jr., George H. Strong, Aaron Beam, Jr., James P.
Bennett, P. Daryl Brown, Thomas W. Carman,
Richard F. Celeste, Edwin M. Crawford, Raymond
J. Dunn, III, Patrick A. Foster, William W. Horton,
Larry R. House, Jan L. Jones, Michael D. Martin,
Malcolm E. McVay, Weston L. Smith, Anthony J.
Tanner, Larry D. Taylor, Robert E. Thomson,
Philip C. Watkins, Ernst & Young LLP, UBS
Warburg, LLC, Source Medical Solutions, Inc.,
Medcenterdirect.com, Inc., Comphealth, Inc., and
G.G. Enterprises, Inc., Defendants,
andHEALTHSOUTH CORPORATION, a
Delaware Corporation, Nominal Defendant.
**No. Civ.A. 20529.**

Submitted Feb. 11, 2004.
Decided March 2, 2004.

Stuart M. Grant, John C. Kairis, and Marlon Q. Paz,
Grant & Eisenhofer, P.A., Wilmington, Delaware,
for Plaintiff.
William D. Johnston, SaraBeth Reyburn, and Dawn
M. Jones, Young Conaway Stargatt & Taylor, LLP,
Wilmington, Delaware; Thomas J. Hall, Thomas V.
Sjoblom, and Scott S. Balber, Chadbourne & Parke
LLP, New York, New York, for Defendant Richard
M. Scrushy.
Richard M. Donaldson, Montgomery, McCracken,
Walker & Rhoads, LLP, Wilmington, Delaware, for
Defendant Edwin M. Crawford.

Michael A. Weidinger, Morris James Hitchens &
Williams LLP, Wilmington, Delaware, for
Defendant Michael D. Martin.
Robert J. Katzenstein, and Joelle E. Polesky, Smith,
Katzenstein & Furlow LLP, Wilmington, Delaware,
for Defendant Aaron Beam, Jr.
Henry E. Gallagher, Jr., and Christos T.
Adamopoulos, Connolly Bove Lodge & Hutz LLP,
Wilmington, Delaware; Don B. Long, Jr., and
James F. Henry, Johnston Barton Proctor & Powell
LLP, Birmingham, Alabama, for Defendant James
P. Bennett.
John C. Phillips, Jr., Phillips, Goldman & Spence,
P.A., Wilmington, Delaware; James C. Huckaby, Jr.
, John W. Scott, and Julie N. Ehinger, Huckaby
Scott & Dukes, P.C., Birmingham, Alabama, for
Defendant Source Medical Solutions, Inc.
Richard L. Horwitz, Stephen C. Norman, and Erica
L. Niezgoda, Potter Anderson & Corroon LLP,
Wilmington, Delaware, for Defendants Chamberlin,
Givens, Gordon, Newhall, Striplin, Strong, Carman,
Celeste, Foster, Horton, Jones, Taylor, and Watkins.
Martin P. Tully, Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; Robert J. Giuffra, Jr., and
Thomas R. Leuba, Sullivan & Cromwell LLP, New
York, New York, for Defendant UBS Securities
LLC.
Edward P. Welch, Stephen D. Dargitz, Julie A.
Tostrup, Michael A. Barlow, Kay Lawson, and
Katherine J. Neikirk, Skadden, Arps, Slate,
Meagher & Flom LLP, Wilmington, Delaware, for
Nominal Defendant HealthSouth Corporation.

MEMORANDUM OPINION
STRINE, Vice Chancellor.
**\*1** This is one of the many lawsuits involving
alleged wrongdoing at HealthSouth Corporation.
This case happens to be a derivative action. In this
opinion, I address the motions brought by a
multitude of defendants to stay this action in
deference to a prior-filed derivative action in
Alabama. The plaintiff in this action, the Teachers'
Retirement System of Louisiana ("Teachers"),
resists this motion, essentially on the grounds that it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 2

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

believes itself to be best positioned to represent HealthSouth as a derivative plaintiff and that this court, rather than an Alabama court, should address the derivative claims because those claims arise under Delaware law.

For many reasons, I grant the defendants' motion to stay this action. In another prior-filed derivative action involving HealthSouth that remains pending in this court, I initially refused to grant a motion to stay in favor of the prior-filed Alabama action. At that time, it was not at all clear that the Alabama plaintiffs would adequately represent HealthSouth or that their slight timing advantage should give them a decisive edge over Delaware plaintiffs who had filed a superior complaint a few weeks later. But, at the same time, I recognized that it would become necessary in the future to determine the forum in which the derivative claims should proceed and encouraged the Delaware plaintiffs to work with the Alabama plaintiffs towards a mutually satisfactory resolution of that question.

Simultaneously, judges in the Alabama state and federal courts also were encouraging rationality and cooperative behavior by the Alabama derivative plaintiffs, as well as on the part of plaintiffs in related federal securities actions pending in the Alabama federal court. These judicial efforts ultimately involved, among other things, the appointment of steering committees to coordinate discovery, the appointment of lead counsel, and judicially supervised settlement discussions. With urging from all the affected courts, the derivative plaintiffs in all the then-pending actions forged an agreement on where the derivative claims should be prosecuted, with this court being the forum for a particular claim, and the rest to be litigated in state court in Alabama. The Delaware derivative plaintiffs - as they existed at that time -were parties to that accord and supported it fully.

Only after all this progress was achieved did Teachers file its complaint. It now seeks to disrupt all this progress by being permitted to proceed with a derivative action in this court that is largely co-extensive with the derivative claims pending in Alabama state court and to thereby disrupt the harmony that has been achieved by plaintiffs'

counsel and the various courts involved in the HealthSouth cases. Notably, Teachers has made no attempt to intervene in the Alabama state court actions or to work with counsel in those actions, despite admonitions from this court to do so.

In view of these realities, a stay of this action is clearly in order. Through their active handling of the cases before them, the Alabama state and federal judges have displayed great concern over the HealthSouth cases. Their involvement gives me confidence that HealthSouth's stockholders will be adequately represented by the lead counsel who have been appointed in the Alabama state derivative actions, especially because the operative complaint in that forum has been greatly improved and a number of qualified firms are working together to prosecute the derivative claims there. Their number includes the respected Delaware counsel who filed the first derivative actions in this court and who won an important summary judgment motion in this court on behalf of HealthSouth.

**\*2** Given the need for the derivative claims involving HealthSouth to proceed in one forum first and the obvious convenience of Alabama state court as a forum, it would be inefficient, unjust, and injurious to comity among the States to deny the defendants' motion to stay. The good work of various courts to coordinate their efforts should not be tossed aside simply because a late-filing plaintiff believes itself to be superior to all others. The plaintiff's high regard for itself and its lawyers may be justified but the presence of effective, experienced plaintiffs' lawyers in the prior-filed actions renders their pride an insufficient ground upon which to rest the denial of a stay. Furthermore, although this court takes pride in its ability to interpret our state's law, it also recognizes that other courts - such as the Alabama state courts - also are equipped to perform that task competently, particularly when, as in the HealthSouth cases, most of the claims turn on the application of settled principles of Delaware law to a factual record.

I. *Factual Background*

A. *This Action*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                              Page 3

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

The plaintiff in this action is the Teachers' Retirement System of Louisiana. Teachers used to own a very large block of stock in HealthSouth but sold the bulk of its position. It retains control over 69,400 Healthsouth shares.

Teachers first became a litigant against HealthSouth when it filed an action in this court seeking books and records. That action under 8 *Del. C.* § 220 was filed on November 27, 2002. The trial in the books and records case was completed on March 18, 2003 and Teachers prevailed. The books and records the court ordered be produced to Teachers were received by mid-April 2003, consistent with this court's order.

Nearly five months later, Teachers brought this action by filing a detailed and lengthy complaint. In the "Teachers' Complaint," a wide variety of transactions, expenditures, and stock sales were challenged. It is unnecessary to summarize all the claims here, except to observe that the Teachers Complaint essentially alleges that HealthSouth was run corruptly, with its Chairman and CEO, defendant Richard Scrushy, using the company as a personal candy store by which he and other high-level HealthSouth officials could satisfy their personal hunger for lucre and prestige at the expense of the company's public stockholders. As part of this improper course of self-dealing, the insider defendants are alleged to have falsified HealthSouth's financial statements in order to prop up the company's stock price. The defendants from outside HealthSouth are alleged to have been complicit in various transactions that formed part of the massive tapestry of fiduciary misconduct weaved by the HealthSouth insiders sued in the complaint.

Consistent with this description, the defendants in this action include current and former directors and officers of HealthSouth. Several of these defendants are former HealthSouth officers who never served on the board of directors and over whom the maintenance of personal jurisdiction in this court is doubtful, to put it mildly.

**\*3** The remaining defendants are various entities that transacted business with HealthSouth. Some of them provided services to HealthSouth - such as audit and investment banking services - and supposedly facilitated wrongdoing by HealthSouth insiders. Others were on the other side of transactions with HealthSouth that Teachers alleges were unfair to HealthSouth.

The Teachers' Complaint contained one count that was different in focus than the other counts in that it was not filed primarily with the objective of obtaining remedial relief for past wrongdoing. That count was brought under 8 *Del. C.* § 211 and sought an order requiring an annual meeting of the HealthSouth stockholders.

Litigation on that count was expedited by this court last autumn. The case was tried. At the request of the parties, this court did not issue its decision in order to give Teachers and HealthSouth a chance to resolve their dispute over this issue amicably. They soon did so, with Teachers withdrawing its request for an annual meeting in exchange for an agreement whereby most of the HealthSouth directors who were in office during the past periods for which the company has been forced to withdraw its financial statements and during which the transactions challenged in the Teachers' Complaint transpired would resign, to be replaced by independent directors through a process that Teachers found trustworthy. The § 211 count was dismissed by agreement of the parties.

Thus, the only counts of the Teachers' Complaint that remain are those that seek remedial relief for the pattern of fiduciary misconduct briefly described above. As we will now see, the Teachers' Complaint was preceded by several others filed in various courts that seek virtually indistinguishable relief.

### B. *The Prior Pending Actions*

As discussed in prior opinions of this and other courts, public scrutiny of HealthSouth's financial integrity first became intense in the summer of 2002. At that time, HealthSouth announced that a new policy regarding reimbursement issued by the federal Centers for Medicare and Medicaid Services

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
(Cite as: Not Reported in A.2d)

(the "CMS Policy") would have a large, detrimental effect on the company's revenues. Put simply, many stockholders - and their attorneys - were deeply suspicious about HealthSouth's announcement, given that the CMS Policy had, according to them, been expected for some time. In particular, they suspected that HealthSouth insiders - many of whom had engaged in large transactions involving sales of HealthSouth stock earlier that year - had concealed the effect of the CMS Policy in order to keep HealthSouth's stock price artificially high.

The expected two types of filings were soon made. Less relevant here was the spate of federal securities suits filed on August 28, 2002 alleging violations of Sections 10(b) and 20(b) of the Securities Exchange Act. For ease of reference, I call these the "Federal Securities Actions."

The second and more relevant kind of case was also filed. On August 28, 2002, the first of several derivative actions was filed in the state courts of Alabama (the "Alabama Derivative Actions"). The first complaint, the "Tucker Complaint," challenged a wide array of transactions entered into by HealthSouth insiders over the course of several years. Many of these transactions eventually also became the subject of the Teachers' Complaint. As a last minute add-on, the Tucker Complaint also briefly challenged certain conduct relating to the CMS Policy; namely, the Tucker Complaint alleged that HealthSouth's then-CEO, Richard Scrushy, had sold a large block of stock back to the company shortly before HealthSouth disclosed the adverse impact of the CMS Policy. As this court noted in an earlier opinion, the original Tucker Complaint was hardly a model of good pleading practice.[FN1] It barely addressed the need to plead demand excusal, a major problem in a derivative case. Moreover, many of the counts in the Tucker Complaint were alleged against placeholder defendants, who were named as fictitious defendants, but who were not identified.

> FN1. *See Biondi v. Scrushy,* 820 A.2d 1148, 1153-54 (Del. Ch.2003).

**\*4** On September 13, 2002 and October 8, 2002,

two additional derivative actions were filed in this court (the "Delaware Derivative Actions"). The Delaware Derivative Actions were focused more narrowly than the Alabama Derivative Actions, centering primarily on recouping improper trading and contract profits HealthSouth insiders had allegedly reaped while HealthSouth was inflating its results by not disclosing more promptly the adverse effects of the CMS Policy. Unlike the Tucker Complaint, which is the key complaint in the Alabama Derivative Actions, the complaints in the Delaware Derivative Actions also asserted that HealthSouth insiders other than Scrushy had sold HealthSouth stock into a market inflated by its ignorance of the effect of the CMS Policy on HealthSouth. In comparison to the Tucker Complaint, the complaints in the Delaware Derivative Actions reflected, as a prior opinion of this court indicates, much greater research and a proper understanding of the need to plead demand excusal.[FN2]

> FN2. Ronald Brown of Prickett, Jones & Elliott is Delaware counsel in the Delaware Derivative Actions, and worked with Frank P. DiPrima, a New Jersey lawyer, to bring those Actions.

On October 18, 2002, the first of two derivative suits was filed in the United States District Court for the Northern District of Alabama (those and later suits filed in that court being referred to hereafter as the "Federal Derivative Actions"). The claims in the Federal Derivative Actions overlapped with claims already asserted in the Alabama and Delaware Derivative Actions with immaterial exceptions.

### C. *The Previous Motion To Dismiss Or Stay*

Early in one of the Delaware Derivative Actions, HealthSouth and the defendants moved to dismiss or stay that case. There were two primary bases for that motion, which the plaintiffs in the Delaware Derivative Actions adamantly opposed. The first was that a special litigation committee ("SLC") had been established by HealthSouth to investigate the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 5

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

wrongdoing challenged in the Delaware Derivative Actions and that that Action should therefore be stayed, per the line of cases beginning with *Zapata v. Maldonado.*[FN3] That argument - which is routinely a winning one - was rejected by this court because the HealthSouth SLC, due to its own conduct and composition, could never have made a decision to terminate the litigation that would have commanded respect.[FN4]

FN3. 430 A.2d. 779 (Del.1981).

FN4. *Biondi,* 820 A.2d at 1165-66.

The defendants' second argument was that this court should defer to the prior-filed Alabama Derivative Actions. That argument was rejected for the following reasons:

The application of the *McWane* doctrine to representative actions - *i.e.,* class and derivative actions - is troublesome. In that context, the *McWane* doctrine is both most useful and most difficult to apply. Representative actions present the greatest chance for identical claims to be presented to multiple courts at the same time. Hence, there is utility to a legal rule of decision that promotes comity and judicial economy by reducing the likelihood for duplicative effort and unseemly wrestling over which forum should take hold of a matter. At the same time, representative actions pose certain dangers - in particular, the potential divergence in the best interests of the plaintiffs' attorneys and the plaintiffs they are purporting to represent - that are not addressed, and indeed may be exacerbated, by a legal rule that places determinative weight on which complaint was filed first.

**\*5** Because of these competing considerations, this court has proceeded cautiously when facing the question of whether to defer to a first-filed representative action and has given much less weight to first-filed status than is required in the non-representation action context. In particular, that caution has been motivated by a concern that the underlying client in interest in a representative action - the class or, in the case of a derivative action, the corporation - be represented effectively and faithfully. The mere fact that a lawyer filed first

for a representative client is scant evidence of his adequacy and may, in fact, support the contrary inference. For those reasons, this court will not grant a stay simply because there is a prior-filed representative action in a court capable of doing prompt and complete justice. Instead, the court will examine more closely the relevant factors bearing on where the case should best proceed, using something akin to a *forum non conveniens* analysis.

This does not mean that the question of first-filed status is irrelevant. Rather, it means that the first-filed factor typically becomes decisively important only when: (1) a consideration of other relevant factors does not tilt heavily in either direction and there is a need for an objective tie-breaker to promote comity and assure litigative efficiency or (2) the court is assured by virtue of a judicial finding in the first-filed representative action (through a class certification ruling under Rule 23 or selection of lead counsel under the Private Securities Litigation Reform Act of 1995) or other record evidence that the plaintiffs in the action for which a stay was sought are adequately represented in the first-filed action.

In this case, the SLC has not convinced me that first-filed status, without more, counsels in favor of an immediate stay. Read charitably, the original Tucker Complaint pled but one of the claims, as to only one of the transactions, addressed in the Delaware Complaint. Even that one claim was pled cursorily and as an aside to a host of other broad-ranging and thinly-pled complaints about Scrushy's compensation from and management of HealthSouth. The Tucker Complaint did not even attempt to plead demand excusal with particularity.

By contrast, the Delaware Complaint dealt comprehensively with a series of trades and transactions by HealthSouth directors that the plaintiffs allege were consummated when the directors knew of the adverse effect the [CMS Policy] would have on HealthSouth, but the market did not. As important, the Delaware Complaint pled demand excusal with particularity.

Although I do not doubt the competence of the Alabama Circuit Court to handle the claims pled in the Delaware Complaint with skillful dispatch, the reality is that deferring to the Tucker Action requires me to give determinative weight to a pleading that evidenced far more concern for speed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

in filing than adequacy of content. This is demonstrated by the original failure of Tucker to even identify the directors of HealthSouth other than Scrushy, to attack any of the sales in HealthSouth stock made by other HealthSouth directors, or to challenge the Buyback [by HealthSouth of Scrushy's shares in summer 2002] on grounds other than corporate waste. By contrast, the Delaware Complaint, although - or perhaps more accurately, *because* - it was filed two weeks later, is thorough and fact-laden, demonstrating that the plaintiffs' lawyers used the time between the announcement by HealthSouth of the [CMS Policy's] effect and the filing of their complaint to perform diligent research.

**\*6** Indeed, because the Tucker Action focused largely on other transactions and did not address most of the transactions contained in the Delaware Complaint, it is difficult to say that the original complaint in that case raised claims that were functionally identical to those raised in the Delaware Complaint, nor is it apparent that the parties are substantially the same, given the failure of the original Tucker Complaint to plead claims against the other HealthSouth directors. For those same reasons, it is not apparent why it should be influential in the representative action context that that the later amended complaint in the Tucker Action added challenges to some, but not all, of the other sales attacked in the Delaware Complaint. The only transaction relevant to the Delaware Action that was challenged specifically in the original Tucker Complaint is the Buyback [of Scrushy's shares by HealthSouth in summer 2002]. Because the amended Tucker Complaint alleged wholly new claims against defendants who were not even named in the original complaint in that case, the "what" and "who" of those claims were not presaged in any way by the text of the earlier complaint. Even as to Scrushy, the amended Tucker Complaint challenges an earlier stock sale that was not even mentioned in the original complaint, despite the practical requirement under Delaware law that derivative claims be pled with particularity.

In concluding that it would be inappropriate to stay the Delaware Action at this time, I am particularly mindful of the Delaware Supreme Court's repeated admonitions to derivative counsel to undertake diligent research before filing their complaints.

These admonitions reflect the important value our state places on the enforcement of the legal and equitable duties of directors of Delaware corporations. By investing in a corporation chartered in Delaware, stockholders seek out and are entitled to the protections afforded by our law. As a practical matter, these protections are often assured by the filing of representative actions like this one, making it important that the quality of representation afforded by plaintiffs' counsel in these cases be high. The importance of quality lawyering at the pleading stage of derivative cases is obvious, given the higher pleading burdens applicable to derivative complaints. For this reason, Delaware law places more emphasis on quality than speed when assessing derivative complaints.
....
The public policy interest favoring the submission of thoughtful, well-researched complaints - rather than ones regurgitating the morning's financial press - would be disserved by granting a stay in this case.

That said, I am equally mindful of the need for comity with our sister state and federal courts, as well as the practical reality that identical derivative claims should not be tried in separate forums. At a later stage, the question of where the claims raised in the Delaware Action should proceed can be revisited, and I am confident that an efficient and fair resolution to the forum issue can be forged, with cooperation among the litigating parties and among the affected courts. In this respect, one final note is advisable.

**\*7** In its opening papers, the SLC did not ask me to stay the Delaware Action in favor of the Federal Securities Actions. Because the Delaware Action largely involves claims that are substantively indistinguishable from federal insider trading claims, it may well be that the federal adjudications should precede the determination of the state law issues and that any schedule in this case should reflect that consideration. Although in one important respect there are state law issues that diverge to some extent from the basis for the federal suits - *i.e.,* the question of whether the Buyback was an unfair interested transaction under state law - in most respects it would seem to be helpful to have a prior federal adjudication of whether the trading directors possessed material, non-public information at the time of their trades and acted

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 7

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

with *scienter.*

For now, however, I simply deny the SLC's application for a stay in deference to the Tucker Action, without prejudice to a later, similar motion.
FN5

FN5. *Id.* at 1158-63 (footnotes omitted).

### D. *The Corporate Cataclysm At HealthSouth*

Shortly after this court denied the motion to dismiss or stay, HealthSouth's predicament went from bad to awful. In March 2003, federal civil and criminal authorities went public with concerns they had about the integrity of HealthSouth's financial statements. To summarize a complicated situation simply, the federal government believed that the corporate books of HealthSouth had been intentionally manipulated to overstate the company's health. Within the coming weeks, the SEC had filed a civil suit against HealthSouth and former senior executives of HealthSouth began pleading guilty to financial crimes. The company's founder and largest stockholder, Richard Scrushy, was fired as CEO but insisted on remaining on the board, which formed a special committee excluding Scrushy. The committee has largely governed the company since new outside advisors were brought in to replace the company's former advisors.

After HealthSouth's stock was delisted and its trading price became measured in pennies, the company began the difficult task of rebuilding. This process obviously was complicated by an ever-growing number of lawsuits. As the additional revelations of possible accounting fraud became public, the complaints in the various pending suits were amended and new suits were filed. Meanwhile, Congress also held hearings into the company's financial practices.

As of the time of these developments, the Teachers' Complaint still had not been filed.

### E. *The Courts Involved In The Various Suits Encourage Coordination*

As the prior opinion denying the motion to stay or dismiss the Delaware Derivative Actions indicated, this court was sensitive to the eventual need to sort out where the fiduciary duty claims, and claims related to those claims, would ultimately be litigated. To that end, this court, among other efforts towards this end, encouraged counsel in the Delaware Derivative Actions to engage in discussions with their colleagues in the Alabama and Federal Derivative Actions with the hope that they could agree on a division of labor and of forums that would make sense.

**\*8** At the same time, Judge Karon O. Bowdre of the U.S. District Court for the Northern District of Alabama was also urging efficiency and cooperation among counsel in the various actions. Among other efforts to rationalize the process, Judge Bowdre appointed a steering committee comprised of representatives of counsel from the various actions, including representatives of the Federal Derivative Actions. The federal committee was responsible for coordinating discovery in all the actions involving stockholders of HealthSouth from 1998 until 2002 that were then pending in her court. Importantly, this federal committee was also charged with coordinating discovery with a committee to be appointed by Judge Allwin E. Horn III, the Alabama Circuit Court Judge who was handling the Alabama Derivative Actions. On August 24, 2003, Judge Horn appointed the state committee, which included derivative counsel from the Alabama Derivative Actions.

By this time, several notable developments had already occurred. In Alabama state court, the Tucker Complaint, as amended, became the focal point of the Alabama Derivative Actions, Several other cases were "abated" in favor of the Tucker Complaint, the functional equivalent of consolidation.

The encouragement to counsel in the Delaware, Alabama and Federal Derivative Actions from all the affected courts eventually paid off. In orders entered by Judge Horn, Judge Bowdre, and me, the following division of labor was agreed upon by the then-existing derivative plaintiffs: 1) the Federal Derivative Actions would be stayed in favor of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Alabama Derivative Actions and the Delaware Derivative Actions; 2) the plaintiffs in the Delaware Derivative Actions would prosecute claims relating to Scrushy's sale of HealthSouth stock back to the company in summer 2000 (the so-called "Buyback" ) in this court; and 3) the remainder of the derivative claims would be prosecuted before Judge Horn in the Alabama Derivative Actions under the aegis of the Tucker Complaint. By this time, the counsel in the Delaware Derivative Actions were participating and conferring with counsel in the Alabama Derivative Actions and developing joint plans for prosecution of all the derivative claims. To that end, the Tucker Complaint was amended a third time in August 2003 to add yet more claims. By this time, the Tucker Complaint covered all the claims raised in the Delaware Derivative Actions and purported to state a wide variety of other claims that are largely co-extensive with the claims raised in the Teachers' Complaint.

Furthermore, Judges Bowdre and Horn had already personally worked together to bring the parties to the various actions together for confidential settlement discussions. They also worked together to coordinate the timing and scope of discovery, in view of the PSLRA [FN6] and the desirability of avoiding duplicative discovery that could tax HealthSouth's already strained resources. By autumn 2003, each Judge had put in place an order identifying lead counsel in the actions pending before them,[FN7] and their appointees continued to work together on the discovery steering committees they previously established. In December 2003, Judge Horn denied a motion by counsel for another derivative plaintiff to be appointed to the HealthSouth steering committee,[FN8] finding that " it is in the best interests of all parties to this action to continue forward with the current plan and method of administering and handling this complex litigation." [FN9] His ruling was based, in part, on objections made by lead counsel in the Alabama Derivative Actions, objections which were joined by counsel in the Delaware Derivative Actions. That objection stated in part that:

FN6. *See* 15 U.S.C. § 78u-4(b)(3)(B)-(D) (PSLRA provisions governing discovery).

FN7. In an order entered July 14, 2003, Judge Horn indicated that lead counsel already had been appointed in the Alabama Derivative Actions as of that date. Def's Supp. Submission Ex. 16. Additional co-lead counsel were appointed by Judge Horn in an order entered January 8, 2004. Def's Supp. Submission Ex. 3.

FN8. That counsel represented derivative plaintiffs who first filed a suit in 1998. They then asked that their suit be placed on ice. When events at HealthSouth became a focus of public attention in 2002, these plaintiffs attempted to defrost their action. I do not focus on that action because the other actions I mention were all filed before the Teachers' Complaint and do not involve the indolence of the action filed in 1998.

FN9. Dargitz Reply Aff. Ex. 22.

**\*9** The courts of three jurisdictions - this one, the U.S. District Court for the Northern District of Alabama, and the Delaware Chancery Court, all urged various derivative plaintiffs to work together. They have done so, and we have formed a highly co-operative unit with mutual respect among all counsel. We do not want to put this at risk.[FN10]

FN10. Dargitz Reply Aff. Ex. 15.

### F. *The Teachers' Complaint Is Finally Filed*

Only after a large amount of effort had been expended by Judge Bowdre, Judge Horn, this court, and the parties to the various HealthSouth actions to secure a rational approach to the procession of those actions did the Teachers' Complaint get filed. That occurred on September 8, 2003. Rather than dilate on that Complaint's quality, it suffices to say that the Teachers' Complaint is a high-quality effort that reflects a great deal of work. But it also bears noting that the Complaint largely covers the same ground already trod by the Tucker Complaint, as amended. Although Teachers pokes at the Tucker Complaint, as amended that pleading is much

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                       Page 9

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

improved from on its original form and is a substantial, fact-laden document that also reflects a good deal of work.

More problematic, of course, was the timing of the filing of the Teachers' Complaint. By that time, the judges of three different courts had successfully encouraged a wide array of counsel to come up with a plan for the rational procession of the various cases affecting HealthSouth. The advisability of that goal for stockholder-plaintiffs is rather obvious but I suppose needs explicit recitation: It was in the interests of all those plaintiffs that HealthSouth's resources be preserved and that the company's financial health be nurtured. A restoration of HealthSouth's strength would help the derivative plaintiffs. A bankruptcy was not in their interest and that was not an unrealistic possibility.

Fortunately, by the late summer of 2003, HealthSouth - led by new management and advisors - had made major strides in stabilizing its finances and instilling confidence in its creditors. Although the company's previous financial statements were so materially inaccurate that the company had to withdraw them and could not estimate when accurate financials for those periods could be filed, HealthSouth was able to provide prospective information. The stock price of the company began to trade in dollars rather than pennies and has remained at that level.

On the litigation front, important events had also transpired. By autumn 2003, fifteen former HealthSouth executives had pled guilty to financial crimes committed in their official capacities at the company. Those crimes principally involved what was allegedly a widespread conspiracy by top-ranking HealthSouth management to manipulate the company's financial statements in order to paint an unrealistically rosy picture of HealthSouth's financial performance. HealthSouth's former Chairman and CEO, Richard Scrushy, was indicted on numerous counts alleging that he was the primary leader of that conspiracy.

**\*10** On the civil front, the plaintiffs in the Delaware Derivative Actions prosecuted and won a grant of summary judgment against Scrushy as to the

Buyback, using theories that did not depend on Scrushy's knowing participation in the preparation of false financial statements.[FN11] That order was reduced to an enforceable judgment under Rule 54(b). Soon thereafter, the plaintiffs in the Alabama Derivative Actions began prosecuting a similar motion addressing other transactions involving Scrushy and using the theories advanced in the Delaware Derivative Actions. Counsel for the plaintiffs in the Delaware Derivative Actions worked with counsel in the Alabama Derivative Actions in preparing this motion.

> FN11. *In re Healthsouth Corp. S'holders Litig.,* 2003 WL 22769045 (Del. Ch. Nov. 24, 2003) (holding Scrushy liable for unjust enrichment and equitable fraud).

Meanwhile, Teachers made progress of its own. After a trial on its § 211 claim, Teachers extracted a settlement from HealthSouth that resulted in an agreement requiring a majority of the HealthSouth board to resign within the next year, with the resigning directors to be replaced by new independent directors. The resigning directors were those directors who had been in office during the time of the alleged financial fraud. Director Scrushy refused to resign.

## II. *Legal Analysis*

The defendants premise their motion on the *McWane* doctrine.[FN12] That doctrine requires that Delaware trial courts exercise their discretion " freely in favor of a stay when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties, and the same issues." [FN13] The purpose of the *McWane* doctrine is to avoid "the wasteful duplication of time, effort, and expense that occurs when judges, lawyers, parties, and witnesses are simultaneously engaged in the adjudication of the same cause of action in two courts." [FN14]

> FN12. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* 263 A.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

281 (Del.1970).

FN13. *Id.* at 283.

FN14. *Id.*

Here, there is no question that the Teachers' Complaint raises claims that, for purposes of applying *McWane,* involve substantially the same parties and same issues as the prior-filed Alabama Derivative Actions, the Federal Derivative Actions, and the Delaware Derivative Actions. Most pertinently, the Teachers' Complaint and the Tucker Complaint are largely overlapping documents, with exceptions that are immaterial for *McWane* purposes.[FN15] Furthermore, to the extent that the Teachers' Complaint attempts to raise certain disclosure claims on behalf of HealthSouth stockholders, it also overlaps with the Federal Securities Actions, which were first-filed.

> FN15. Under *McWane,* all that is required is substantial identity of the claims and the parties, and the mere fact, for example, that Teachers has styled certain of its claims as "class claims" does not destroy the identity that exists between this case and the other pending derivative actions. *See, e.g., AT & T Corp. v. Prime Sec. Distribs., Inc.,* 1996 WL 633300, at *2 (Del. Ch. Oct. 24, 1996) ("To grant a stay, it is not required that the parties and issues in both actions be identical. Substantial or functional identity is sufficient."); *Schnell v. Porta Sys. Corp.,* 1994 WL 148276, at *4 (Del. Ch. Apr. 12, 1994) (stating that " all claims arising from a common nucleus of operative facts [should] be brought at the same time whenever possible" and finding that fiduciary duty claims were functionally similar to prior-pending federal securities claims); *In re Westell Techs., Inc. Deriv. Litig.,* 2001 WL 755134, at *2 (Del. Ch. June 28, 2001) (concluding that claims for breach of fiduciary duty were functionally similar to prior-filed federal securities claims).

There also is no question that the prior-filed cases are all pending in courts of competent jurisdiction. This court has repeatedly acknowledged that in most circumstances, federal courts and the courts of sister states can apply Delaware law competently.[FN16] The Delaware law claims raised in the Teachers' Complaint and the prior-filed actions are not so novel as to preclude the Alabama state and federal courts from adjudicating them expertly.

> FN16. *E.g., Corwin v. Silverman,* 1999 WL 499456, at *6 (Del. Ch. June 30, 1999).

Likewise, to the extent that *forum non conveniens* factors are relevant, it is evident that Alabama is a convenient place to litigate the claims raised in the Teachers' Complaint given that HealthSouth's headquarters are in Birmingham, Alabama. Indeed, it is worth noting that the Teachers' Complaint seeks relief against a number of former HealthSouth officers who never served on the company's board. Yet, the Teachers' Complaint alleges no acts that these former officers undertook in Delaware and they are sued for conduct that pre-dates our state's new service of process statute addressing corporate officers.[FN17] It is probable, therefore, that this court cannot exercise personal jurisdiction over these defendants. By contrast, each of these defendants worked at HealthSouth's headquarters in Alabama at relevant times and many are Alabama residents, giving the Alabama courts easy access to jurisdiction over their persons.

> FN17. *See* 10 *Del. C.* § 3114(b) (providing that persons who accept positions as officers of Delaware corporations after January 1, 2004 are thereby deemed to consent to service of process in Delaware as to suits against them in their official capacities).

**\*11** In view of these factors, the only genuine issue of concern regarding a stay is whether there is some basis to conclude that HealthSouth and its stockholders are not adequately represented in the prior-pending cases, most notably the Alabama

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 11

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Derivative Actions. At an earlier time, it is clear that I harbored doubt on that score, as my prior decision denying the previous motion to stay or dismiss indicates.

Despite Teachers' attempts to pretend that circumstances are the same as when I denied the earlier motion for a stay, they are not. The defendants have submitted "record evidence that the plaintiffs" in this action "are adequately represented" in the Alabama Derivative Actions - as well as the Federal Securities Actions.[FN18] For that reason, it becomes appropriate for me to give full force to the fact that the Teachers' Complaint was filed long after the Alabama Derivative Actions, the Delaware Derivative Actions, the Federal Derivative Actions, and the Federal Securities Actions.[FN19] This record evidence indicates that: 1) Judges Horn and Bowdre have actively coordinated and supervised the various actions pending in Alabama, including all the derivative actions pending in their courts; 2) lead counsel has been appointed in the relevant Alabama Derivative Actions; 3) respected Delaware counsel are participating in the prosecution of the Alabama Derivative Actions and consented to the procession of the remainder of their derivative claims in the Alabama state courts; and 4) a number of other qualified plaintiffs' firms are working together to prosecute the Alabama Derivative Actions.

> FN18. *Biondi,* 820 A.2d at 1159.

> FN19. *Id.*

In the face of this record, Teachers has mostly pointed out relatively minor foibles on the part of counsel in the Alabama Derivative Actions, complained about the pace at which the prior-filed Actions have proceeded, and proclaimed its own superiority - and that of its counsel - as champions for the HealthSouth stockholders. Put simply, Teachers' arguments are not convincing.

It may be true that counsel in the Alabama Derivative Actions got off to a bit of a rocky start. But, by now, the Tucker Complaint is vastly improved and Delaware counsel are working with

lead counsel in the Alabama Derivative Actions to prosecute a motion for summary judgment. Moreover, Teachers seems to ignore the obvious, which is that the criminal charges pending against many of the defendants in the derivative actions necessarily complicate the procession of the lawsuits, as does the relation of the derivative suits to the Federal Securities Actions. In view of the need for rationality in discovery, the speed at which the prior-filed cases have proceeded is not a reason to deny a stay. Perhaps most importantly, it is clear that the plaintiffs in the prior-filed Actions made a great deal of progress *as derivative plaintiffs* before Teachers even became a derivative plaintiff.[FN20]

> FN20. The letter from Ronald A. Brown of the Prickett, Jones firm opposing Teachers' desire to prosecute its claims here - a wish Mr. Brown rightly believes would upset the prior coordination order this court entered in the Delaware Derivative Actions as well as the similar orders entered by Judges Bowdre and Horn - succinctly details the numerous productive actions taken by the plaintiffs in the prior-filed Actions and persuasively contrasts that progress with the relatively leisurely schedule by which Teachers simply filed its initial pleading in this action. *See* Brown Letter, dated Dec. 22, 2003. As Mr. Brown shows, Teachers' timing cannot be compared with that of the plaintiffs in the Delaware Derivative Actions, who successfully balanced the need for careful research with the utility of responsible alacrity in filing. Teachers did not even file its books and records action until over a month after the Delaware Derivative Actions were commenced.

This is especially the case when one considers the pace with which Teachers acted. Although this court does encourage the filing of well-researched complaints - like the ones filed in the Delaware Derivative Actions - this court must also recognize that timely filings have value, too. In this regard, Teachers did not even file its § 220 action until after the Alabama and Delaware Derivative Actions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 12

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

were filed. Even after it received books and records, Teachers took several months to file its Complaint. Notably, Teachers sat idly by while three courts worked together with litigants in pending actions to forge a rational path forward. Those efforts succeeded and were reflected in orders of each of those courts, indicating where derivative claims involving HealthSouth would proceed. While Teachers was free to set its own schedule, it cannot be surprised if this court refuses to disrupt the settled expectation of the parties to the prior-filed Actions and to undo the good work of Judges Bowdre and Horn at its tardy instance.

**\*12** In this respect, it bears noting that this court encouraged Teachers to file suit in Alabama and to attempt to join in the prosecution of the derivative claims in the Alabama Derivative Actions. Teachers refused to do so.

Apparently, its reluctance to do so rests on its desire to be the sole captain of the ship and to proceed in this court, or no other. In support of that desire, Teachers trumpets its prosecution of its § 211 claim, claiming (with justification) that this victory produced a valuable benefit for HealthSouth's stockholders.[FN21] Less attractively, however, Teachers has denigrated the efforts and capability of counsel in the prior-filed Actions. Without belaboring the point, I simply note that I do not share Teachers' view that counsel in the Alabama Derivative Actions are inadequate to the task. Among their number are experienced lawyers from many states. These lawyers include Delaware counsel - Prickett, Jones & Elliott [FN22] - from the Delaware Derivative Actions - a firm with a well-deserved reputation as effective plaintiffs' counsel, which has already achieved a substantial judgment against defendant Richard Scrushy in this court. Given this reality, and Judge Horn's active oversight of the Alabama Derivative Actions, I am satisfied that the interests of HealthSouth's stockholders will be competently championed in Alabama. If Teachers wishes to make sure that is so, its able counsel should intervene in the Alabama Derivative Actions and engage their fellow plaintiffs' lawyers in discussions with a view toward helping with the effective prosecution of the derivative claims in that forum.

FN21. Teachers also claims that it is a very sophisticated institutional investor, whose savvy will benefit HealthSouth. Although its counsel might be indulged some self-congratulatory comments, the record in the § 220 action does not demonstrate that Teachers' own staff were unusually diligent observers of HealthSouth.

FN22. Mr. Brown's corresponding counsel in the Delaware Derivative Actions, Mr. Frank DiPrima, signed the transmittal affidavits supporting the summary judgment motions filed in the Alabama Derivative Actions. These motions, as noted, seek to build on success achieved in the Delaware Derivative Actions and demonstrate the coordination that is now being displayed among counsel for the various derivative plaintiffs.

### III. *Conclusion*

For the foregoing reasons, the defendants' motion for a stay is hereby GRANTED.[FN23] IT IS SO ORDERED.

FN23. Even *if McWane* were not to require a stay, the various considerations I have outlined would justify a stay under a *forum non conveniens* analysis.

Del.Ch.,2004.
Teachers' Retirement System of Louisiana v. Scrushy
Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 23305481 (Trial Pleading) Defendant Richard M. Scrushy's Reply Submission in Support of his Motion to Dismiss or Stay (Dec. 23, 2003)
• 2003 WL 23305480 (Trial Pleading) UBS Securities' Reply Memorandum of Law in Support of its Motion to Dismiss or to Stay the Action (Dec. 22, 2003)
• 2003 WL 23305482 (Trial Pleading) Reply Brief in Further Support of Defendants Chamberlin, Givens, Gordon, Newhall, Striplin, Strong, Brown,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 13

Not Reported in A.2d, 2004 WL 423122 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Carman, Celeste, Foster, Horton, Jones, Taylor, Thomson, House, and Watkins' Motions to Dismiss or Stay Plaintiff's Complaint (Dec. 22, 2003)
• 2003 WL 22341535 (Trial Pleading) Complaint (Sep. 8, 2003)
• 2003 WL 22341533 (Trial Pleading) Complaint (Sep. 3, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**E**



Not Reported in F.Supp.2d                                                                                        Page 1

Not Reported in F.Supp.2d, 2003 WL 21026787 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
VENOCO, INC., a Delaware corporation, Plaintiff
v.
Timothy M. MARQUEZ, Defendant.
**No. 02-1685 GMS.**

May 5, 2003.

*MEMORANDUM AND ORDER*

SLEET, J.

## I. INTRODUCTION

**\*1** On November 19, 2002, Venoco, Inc. ("Venoco"), a Delaware corporation, filed a complaint for declaratory relief against Timothy M. Marquez ("Marquez"), a director and shareholder of Venoco, in the Court of Chancery of the State of Delaware, New Castle County. On November 20, 2002, Marquez filed a shareholder derivative action in the United States District Court for the Central District of California seeking, on behalf of Venoco, to recover damages caused by the payment of a cash dividend. On December 18, 2002, Marquez timely removed the declaratory relief action to this court.

Presently before the court is Marquez's motion to dismiss, or alternatively, to transfer this case to the Central District of California, or to stay this case pending the outcome of the derivative shareholder litigation (D.I.4). For the reasons that follow, the court grant Marquez's motion to dismiss.

## II. BACKGROUND

Founded in 1992, Venoco is an oil and gas company, incorporated in Delaware, with its principal place of business in California. Pl.'s Compl. ¶ 2. Marquez, a Colorado resident, is a stockholder and Director of Venoco and was the Chief Executive Officer (CEO) of the company from 1992 until he was terminated in June of 2002. *Id.* ¶ 3. Venoco has two preferred stockholders, Joint Energy Development Investments II Limited Partnership ("JEDI II"), and ECTMI Trutta Holdings LP ("Trutta"), both of which are affiliates of Enron Corporation ("Enron"). Collectively, JEDI II and Trutta own 8192.90 shares, or all of Venoco's outstanding Series A preferred stock. *Id.* ¶¶ 5, 6. Venoco had certain dividend obligations on the preferred stock, which it failed to meet in full. *Id.* ¶¶ 10-15. On June 30, 2002, Venoco's Board of Directors ("Board") met to consider its preferred dividend obligations, and decided by vote to pay a cash dividend of $2,048,000 to the Enron affiliates. *Id.* ¶ 15. Marquez voted against payment of the dividend and subsequently, after the dividend was paid, made a demand regarding the dividend. Pl.'s Compl. ¶ 16-17. Marquez asserted that " 'no Director of Venoco in the proper exercise of his/her reasonable business judgment could have believed that the cash dividend was in the best interest of the corporation." ' *Id.* ¶ 17. Additionally, Marquez demanded that Venoco " 'take all steps necessary, including an action against the holders of the Series A, to obtain the return of the cash dividend, including but not limited to an action against those Directors who, in breach of their fiduciary duties to Venoco, approved the cash dividend." ' *Id.* ¶ 17.

On November 14, 2002, the Board met and formed a committee to consider Marquez's demand and make a recommendation to the entire Board. *Id.* ¶ 18. On November 18, 2002, after investigating and meeting, the committee unanimously determined and recommended that the full Board reject Marquez's demand. The full Venoco Board met and subsequently rejected Marquez's demand. *Id.* ¶ 18-20. On November 19, 2002, Venoco filed its complaint in the Court of Chancery of the State of Delaware, New Castle County, seeking declaratory judgments that the Board's decision rejecting the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                              Page 2

Not Reported in F.Supp.2d, 2003 WL 21026787 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

demand is valid and protected by the business judgment rule and that any Venoco shareholder be precluded from pursuing a derivative claim relating to the dividend. *Id.* ¶ 1. On November 20, 2002, Marquez filed a shareholder derivative action on behalf of Venoco in the Central District of California. On December 18, 2002, Marquez removed the above captioned case from the Chancery Court to this court. On January 7, 2003, Marquez filed the present motion to dismiss, or alternatively, to stay or transfer the action to the Central District of California.

### III. STANDARD OF REVIEW

**\*2** Marquez moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b) for lack of jurisdiction over the defendant. In determining the presence or absence of personal jurisdiction, courts engage in a two step analysis. First, the court must decide whether the long-arm statute of the state in which the court sits authorizes jurisdiction. *Transportes Aeros de Angola v. Ronair, Inc.,* 544 F.Supp. 864-65 (D.Del.1982). If jurisdiction is proper per the long-arm statute, the court must then determine whether exercising jurisdiction comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *Id.* (noting, however, " intent of the legislature to exercise jurisdiction over non-residents whenever feasible"); *Compaq Computer Corp. v. Packard Bell Elec., Inc.,* 948 F. Supp 338, 342 (D.Del.1996) (citation omitted). To satisfy the second prong of this analysis, the court must find the existence of "minimum contacts" between the defendant and the forum state, "such that the maintenance of the suit does not offend ' traditional notions of fair play and substantial justice." ' *International Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (citation omitted). Specifically, the plaintiff must show that the defendant "purposefully avail [ed] itself of the privilege of conducting activities within the forum State." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)); *see also Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 108-09 (1987). Unless the contacts are continuous and systematic, they must be related to the plaintiff's

cause of action. *Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414-15 (1984) . In determining the jurisdictional question, the court must accept as true the allegations in the complaint. *Altech Industries, Inc. v. Al Tech Specialty Steel Corp.,* 542 F.Supp. 53, 55 (D.Del.1982).

### IV. DISCUSSION

Because Marquez has challenged the propriety of personal jurisdiction, it is Venoco's initial burden to demonstrate that Marquez's activities fall within the ambit of the long-arm statute. *Jeffreys v. Exten,* 784 F.Supp. 146, 151 (D.Del.1992). According to the statute, a non-resident person or corporation is deemed to submit to the jurisdiction of the Delaware courts by committing any one of several acts. Del.Code Ann. tit. 10, § 3104(b). These acts are: (1) transacting any business or performing any character of work within the state; (2) contracting to supply services or things in Delaware; (3) causing tortious injury in Delaware through an act committed in Delaware; (4) causing tortious injury in Delaware through an act committed outside Delaware if the person solicits business in Delaware, engages in regular conduct in Delaware or derives substantial revenue from Delaware contacts; (5) having an interest in, using, or possessing real property in Delaware; or (6) contracting to act as a surety for a contract or other such obligation located, executed, or to be performed within Delaware at the time the contract is made. *Id.* § 3104(c)(1)-(6).

**\*3** The plaintiff urges that § 3104(c)(1) applies to the defendant. Venoco contends that Marquez has transacted business in this state by his position as a director and stockholder of Venoco, a Delaware corporation, and through his previous litigation in a Delaware state court.[FN1] Even when construed in the light most favorable to Venoco, however, the court cannot conclude that these acts constitute " transacting business" within the state.

FN1. *See* Pl.'s Ans. Br. at 10 (citing *Venoco, Inc. v. Eson,* 2002 WL 12288703

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 21026787 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(Del. Ch.2002)).

First, the mere ownership of stock in a Delaware corporation does not constitute "transacting business" in the state as contemplated by the long arm statute. The plaintiff has presented no support for this contention, and the court has found none. In any case, it is well-established that ownership of stock is not sufficient to establish personal jurisdiction consistent with due process. *See In re DaimlerChrysler AG Securities Litigation,* 197 F.Supp.2d 86, 98 (D.Del.2002) ("[S]tock ownership has not been found to be sufficient to support the exercise of personal jurisdiction.") (citing *Shaffer v. Heitner,* 433 U.S. 186 (1977)); *see also Hana Ranch, Inc. v. Lent,* 424 A.2d 28, 31 (Del. Ch.1980) ("a valid cause of action against a non-resident defendant for acts within the scope of a directorship was a *sine qua non* to a successful assertion of a claim against such a non-resident in his capacity as stockholder").

Neither is the mere holding of a directorship sufficient to establish jurisdiction over Marquez via the long-arm statute. *See, e.g., Pestolite, Inc. v. Cordura Corp.,* 449 A.2d 263, 267 (Del.Super.1982) ("the mere status as director of a Delaware corporation, standing alone, is not a significant basis for the individual Defendants to reasonably anticipate being haled into this Court"). Again, the plaintiff has cited no caselaw, and the court has found none, to suggest that the mere holding of a directorship constitutes "transacting business" or "performing work" for purposes of the statute. Furthermore, as in *Hana Ranch,* Venoco has not filed an action against Marquez for acts within the scope of his directorship, but has filed an action against Marquez as a common shareholder.

Finally, Marquez's involvement in prior litigation in Delaware is not sufficient to bring him within the ambit of the long-arm statute. *See, e.g., Hartford Cas. Ins. Co. v. Petrolon Mgmt., Inc.,* 1995 U.S. Dist. LEXIS 22086 (D.Del.1995) (defendant's participation as third-party defendant in a previous suit in Delaware not sufficient to confer personal jurisdiction over it via long-arm statute). The previous litigation in Delaware was initiated by Venoco. Marquez, though stating he had a personal interest in remaining CEO of the company, testified as a witness only in his capacity as a director and CEO of Venoco. The court declines to hold that testifying as a witness in an official capacity constitutes transacting business or performing work in the state sufficient to confer personal jurisdiction pursuant to the long-arm statute.

**\*4** Venoco has offered no other grounds for finding that Marquez falls within the ambit of the long-arm statute, and it appears that no other such basis exists. It appears the defendant has no other contact with Delaware beyond those alleged connections already discussed. He has no office or property in Delaware, conducts no business in the state, and is not registered to do business in Delaware. There is no suggestion that the defendant has committed any tortious act in Delaware, or otherwise caused any injury in the state. In short, there is no asserted connection to Delaware as required by § 3104. As such, the long-arm statute does not authorize the exercise of jurisdiction over Marquez.

Because the court has found that personal jurisdiction over Marquez is not authorized by the Delaware long-arm statute, it need not address the constitutional dimension of the jurisdictional question. *See, e.g., Intel Corp. v. Silicon Storage Tech.,* 20 F.Supp.2d 690, 699 (D.Del.1998) ("[T]he Delaware long-arm statute [does not] authorize this court to exercise jurisdiction over [the defendant]. Therefore, the court need not analyze whether exercising such jurisdiction would comport with the Due Process Clause."). In addition, the court need not address Marquez's motion to dismiss on other grounds, or his motion to transfer or stay the case. Finally, the plaintiff's motions to remand to the Chancery Court (D.I.7) and to expedite the proceedings (D.I.15) are deemed moot.

### V. CONCLUSION

For the aforementioned reasons,

IT IS HEREBY ORDERED that:
1. The defendant's Motion to Dismiss Action for Lack of Personal Jurisdiction; Dismiss or Stay Action in Favor of Parallel Action; or Transfer

Not Reported in F.Supp.2d                                                                                   Page 4

Not Reported in F.Supp.2d, 2003 WL 21026787 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Venue of Action to California (D.I.4) is GRANTED;
2. This action is DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction over the defendant;
3. The plaintiff's Motion to Remand to the Court of Chancery of the State of Delaware (D.I.7) is DENIED as moot;
4. The plaintiff's Motion to Expedite Proceedings (D.I.15) is DENIED as moot;
5. The Clerk of the Court is directed to close the case.

D.Del.,2003.
Venoco, Inc. v. Marquez
Not Reported in F.Supp.2d, 2003 WL 21026787 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:02CV01685 (Docket) (Dec. 18, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.