UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| YAKOV WEISLER, IN THE RIGHT OF AND FOR THE BENEFIT OF SYCAMORE NETWORKS, INC., | |
| Plaintiff, | Civil Action No.06-00362-GMS |
| v. | JURY TRIAL DEMANDED |
| TIMOTHY A. BARROWS, PAUL W. CHISHOLM, GURURAJ DESHPANDE, PAUL J. FERRI, RICHARD J. GAYNOR, JOHN W. GERDELMAN, FRANCES M. JEWELS, DANIEL E. SMITH, ANITA BREARTON, KURT TRAMPEDACH, JEFFRY A. KIEL, KEVIN J. OYE, | |
| Defendants, | |
| and | |
| SYCAMORE NETWORKS, INC., | |
| Nominal Defendant. | |

## AMENDED DERIVATIVE ACTION COMPLAINT

Plaintiff, Yakov Weisler, derivatively on behalf of Sycamore Networks, Inc. ("Sycamore" or the "Company"), alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding Sycamore as follows:

## NATURE OF THE ACTION

1.      This is a stockholders' derivative action brought on behalf of Nominal Defendant Sycamore against: Sycamore's Board of Directors (the "Board") which includes defendants Gururaj Deshpande, Daniel E. Smith, Timothy A. Barrows, Paul W. Chisholm, Paul J. Ferri, John W. Gerdelman, and the Company's past and present officers Richard J. Gaynor, Frances M. Jewels, Anita Brearton, Kurt Trampedach, Jeffry A. Kiel, and Kevin J. Oye, (collectively, "Defendants"), by Plaintiff Yakov Weisler who is now, and has since June 25, 2004, been, a stockholder of Sycamore.  Defendants have engaged in certain transactions, including the back-dating, and canceling and reissuing of stock options, to let certain employees reap millions of dollars in unlawful profits at the expense of the Company.

2.      This action seeks redress for the harm done to Sycamore, by certain of its top executives who breached their fiduciary duties of loyalty and good faith to the Company by intentionally manipulating stock option grant dates between 1999 and 2004, in order to provide certain employees with huge financial windfalls at the expense of Sycamore and by misstating Sycamore's financial results from fiscal year 1999 to the present (the "Relevant Period"). Defendants' misconduct has resulted in the Company's need to restate its financial statements for each of the years ended July 31, 2000 through December 31, 2005 as well as for the interim quarters of 2006.  Sycamore is also unable to file its Annual Report on Form 10-K for the year ending July 31, 2006.

3.      A stock option granted to an employee or director of Sycamore allows the employee or director to purchase Company common stock at a specified price – referred to as the "exercise price" – for a specified period of time.  Stock options are granted as part of an employee's compensation package to create incentives for him or her to boost profitability and, hence, stock value.  When an employee or director exercises an option, he or she purchases the

2

stock from the Company at the exercise price, regardless of the stock's price at the time the option is exercised. Option pricing is based on the price of the Company's common stock on the day of the grant.

4. When an option grant is manipulated to a day on which a market price is lower than the price on the day the option is granted, as Sycamore has admitted here, the employee or director pays less and the Company gets less money for the stock when the option is exercised. Also, when a stock option is granted "in the money", the Company is required to record an immediate expense, and is disqualified from certain favorable tax treatment. Sycamore failed to record the proper non-cash stock based compensation expense and now faces adverse and serious tax and accounting consequences such as restating six years of financial statements. Furthermore, the purchaser of the option gets a greater compensation than that to which he or she is entitled. Such conduct conflicts with representations made by the Company in its public filings and is unlawful and improper.

5. From 1999 to 2004 Defendants authorized, modified, or failed to halt the back-dating of six new employee stock option grants, and the canceling and reissuing of existing stock option grants, in both cases, to provide a lower exercise price for these options.

6. As a result these employees were unjustly enriched to the detriment of Sycamore and its shareholders. Back-dating the options also breached defendants' fiduciary duties of care, loyalty, and good faith to Sycamore.

7. Here, the unlawful conduct occurred while certain Defendants were directing the Company. Defendants authorized, modified, or failed to halt backdating of options in dereliction of their fiduciary duties to the Company as directors, thus causing or allowing the Company to suffer millions of dollars in harm.

3

8.     As a result of this misconduct, Sycamore has suffered substantial harm.  The company has already restated it financial statements from 2000 to 2004 to reflect an additional non-cash stock compensation expense of $33.8 million.  Even more recently, however, Sycamore announced that all earnings press releases and similar communications issued by the Company, relating to fiscal years 2003 through 2005, as well as for subsequent interim periods in 2006, should not be relied upon.   Specifically, the Company determined that the appropriate measurement dates of certain stock option grants differed from the recorded grant dates of such awards and thus the Company would have to restate, again, to account for even more non-cash stock-based compensation.

9.     In its first restatement relating to options back-dating Sycamore admitted that the estimated $33.8 million in additional non-cash stock-based compensation expense would have the effect of increasing net loss by $0.8 million, $1.6 million and $29.9 million for the years ended July 31, 2003, 2002 and 2001, respectively and decreasing net income by $1.4 million for the year ended July 31, 2000, making its historic financial statements false and misleading.

10.     The Company is also subject to retroactive income tax liabilities, and faces millions in costs associated with the Audit Committee's review and the related restatements and its response to governmental investigations. Sycamore also will likely admit to material weakness in its financial controls resulting in a qualified opinion from its outside auditor.  Also, the Company's stock price and market capitalization has been and will continue to be harmed by the discount now applied to Sycamore stock by the market as result of the perceived unreliability of its public statements concerning its finances and accounting.

11.     This action seeks redress for Defendants' collective and individual breaches of their fiduciary duties of loyalty, good faith, candor, due care, and their knowing, reckless and/or

4

gross negligence in, *inter alia*: (i) failing to discover and/or prevent the improper manipulation of employee stock option grants; (ii) failing to discover and/or prevent the public misreporting of earnings caused by the manipulation of employee stock options, including its effect on stock option expenses and tax liabilities; (iii) failing to properly implement, oversee and maintain appropriate and adequate accounting and internal controls, practices and procedures, namely concerning the administration of the Company's stock-based compensation plan; (iv) failing to ensure that Sycamore operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (v) failing to ensure that Sycamore did not engage in any unsafe, unsound, or illegal business practices; and (vi) failing to ensure that Sycamore's financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

12.     This action states derivative claims for the Defendants' violation of Section 14(a) of the Securities and Exchange Act of 1934. This action also seeks disgorgement of bonuses or other incentive-based or equity-based compensation received by the Defendants Deshpande, Smith, Gaynor and Jewels, and for any profits realized from their sale of Sycamore securities, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 ("SOX").

13.     Defendants' malfeasance has caused, and will continue to cause Sycamore great harm, by (i) indelibly damaging its reputation and loss of goodwill in general, (ii) exposing the Company to an adverse opinion by its outside auditors, (iii) expending considerable financial cost in having to review and restate previously issued financial statements; (iv) difficulties in going to the capital and equity markets for financing, (v) exposing the Company to civil liability, including suits for violations of the securities laws, (vi) denying the Company payment for

common stock to which it was entitled; and (vii) exposing the Company to potential regulatory fines by the SEC and the Internal Revenue Service for failure to pay withholding taxes as a consequence of the backdating of options provided to Sycamore employees, including executive officers and directors.

## JURISDICTION AND VENUE

14.    This Court has subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. Section 78aa. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise in part under the Constitution and the laws of the United States, including the Sarbanes-Oxley Act of 2002. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1332(a)(1) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    Venue is proper in this Court pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391(a) because one or more of Defendants either resides or maintains executives offices in this Judicial District, and a substantial portion the acts and transactions constituting the violations of law alleged in this Complaint occurred in substantial part in this Judicial District. Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

## PARTIES

### The Plaintiff

16.    Plaintiff Yakov Weisler is a New York resident and has been a holder of the Company's common stock since June 25, 2004.

17.     As a current holder of Sycamore common stock and a holder during the period of the wrongs alleged herein, Plaintiff has standing to assert these claims on behalf of the Company and will fairly and adequately protect the interests of the Company and its other stockholders.

**The Nominal Defendant**

18.     Nominal Defendant Sycamore is a corporation duly organized and existing under the laws of the State of Delaware, with its principal executive offices and principal place of business at 220 Mill Road Chelmsford, Massachusetts 01824. Founded in 1998, the Company went public in October 1999. Sycamore engages in the development and marketing of optical networking products for domestic and international wire line and wireless network service providers, and government entities with private fiber networks. Its networking product portfolio includes optical switching products, network management products, and design and planning tools.

**The Director Defendants**

19.     The following parties, sometimes referred to herein as the "Director Defendants," during the relevant time period, served as members of the Board of Directors of the Company as follows:

20.     Defendant Gururaj Deshpande ("Deshpande") has served as Chairman of Sycamore's board of directors since its inception in February 1998. He served as Sycamore's Treasurer and Secretary from February 1998 to June 1999 and as Sycamore's President from February 1998 to October 1998. Defendant Deshpande resides in Andover, Massachusetts.

21.     Defendant Daniel E. Smith ("Smith") has served as Sycamore's President, Chief Executive Officer and as a member of Sycamore's board of directors since October 1998. Defendant Smith resides in Norwood, Massachusetts.

22.     Defendant Timothy A. Barrows ("Barrows") has served as a director since February 1998.  Mr. Barrows has been a member of the Compensation Committee since the Company went public.  Defendant Barrows resides in Cambridge, Massachusetts.

23.     Defendant Paul W. Chisholm ("Chisholm") has served as a director since October 2002.  Defendant Chisholm resides in Medford, Massachusetts.

24.     Defendant Paul J. Ferri ("Ferri") has served as a director since February 1998.  Mr. Ferri has been a member of the Compensation Committee since the Company went public.  Defendant Ferri resides in Weston, Massachusetts.

25.     Defendant John W. Gerdelman ("Gerdelman") has served as a director since September 1999.  Defendant Gerdelman resides in Williamsburg, Virginia.

**The Officer Defendants**

26.     The following parties, sometimes referred to herein as the "Officer Defendants," who, under the direction of Mr. Deshpande, served in direct and substantial management positions during the relevant time period as follows:

**Defendant Gaynor**

27.     Defendant Richard J. Gaynor ("Gaynor") joined the Company as Chief Financial Officer, Vice President of Finance and Administration, Treasurer and Secretary pursuant to a letter arrangement dated October 5, 2004.   Defendant Gaynor resides in Northhampton, Massachusetts.

28.     Since October 2004, Defendant Gaynor has supervised the Company's financial transactions and has signed and submitted several SEC fillings regarding the Company's financial conditions.

29.     In 2005, Defendant Gaynor conducted and/or supervised an internal investigation into the Company's prior stock option grants.  The investigation revealed, among other things

that the Company had been manipulating stock options in order to give certain employees more favorable exercise prices.

30.    As a result of the investigation Defendant Gaynor caused the Company to restate its financial statements for the years of 2000 to 2004.   However, as indicated in the Company's amended Form 10-K/A, signed and submitted by Defendant Gaynor to the SEC on September 12, 2005, defendant Gaynor failed to reveal the full extent of the improprieties and instead treated them as a mere accounting problem.

**Defendant Jewels**

31.    Defendant Frances M. Jewels ("Jewels") was Chief Financial Officer, Vice President of Finance and Administration, Treasurer and Secretary of Sycamore from 1999 until her resignation effective October 5, 2004.  Defendant Jewels resides in Sudbury, Massachusetts.

32.    At all times from 1998 until her resignation in 2004 Defendant Jewels was the Chief Financial Officer of the Company.   During this period Defendant Jewels authorized, modified, or failed to halt the back-dating and/or the cancellation and reissuing, of options in dereliction of her fiduciary duties to the Company, thus causing or allowing the Company to suffer millions of dollars in harm.

33.    On October 21, 2003, and on August 23, 2004, Defendant Jewels signed and submitted to the SEC Form 10-K annual reports that were false and misleading in that they concealed and failed to reveal Defendant's improper manipulation of stock option grants.

**The Other Officers**

34.    Defendant Anita Brearton ("Brearton") served as Vice President, Corporate Marketing and as Director of Marketing Programs at times during the relevant time period and

was a recipient of an illegal stock option grant. Defendant Brearton resides in Middlesex County, Massachusetts.

35. Defendant Kurt Trampedach ("Trampedach") served as the Company's Vice President of International Sales at times during the relevant time period and a recipient of an illegal stock option grant. Defendant Trampedach resides in Middlesex County, Massachusetts.

36. Defendant Jeffry A. Kiel ("Kiel") served as the Company's Vice President and General Manager, Core Switching, Vice President, Product Marketing and as Director of Marketing at times during the relevant time period. Defendant Kiel was the recipient of an illegal stock option grant. He resides in Middlesex County, Massachusetts.

37. Defendant Kevin J. Oye ("Oye") is currently the Company's Vice President of Systems and Technology. Oye served as Vice President of Systems and Technology and Vice President, Business Development at times during the relevant time period. Defendant Oye was the recipient of an illegal stock option grant. He resides in Middlesex County, Massachusetts.

38. The Director Defendants and Officer Defendants are sometimes collectively referred to herein as the "Defendants."

## ADDITIONAL FACTS

39. On June 7, 2005, the Company announced that it would delay the filing of its second quarter Form 10-Q with the SEC pending the conclusion of an internal investigation relating to the accounting of certain stock options granted during the period from 1999 to 2001, including whether additional stock compensation expenses should have been recorded during the period under review.

40. On August 26, 2005, the Company announced that it had concluded the investigation and that, "as a result, the Board of Directors, upon the recommendation of Sycamore's management, determined that the Company's financial statements should be restated

for fiscal years 2000 through 2004, to reflect the additional non-cash stock compensation expense amortized over the vesting period of the identified options.... [A]djustments are currently estimated to amount to an aggregate of $33.8 million of additional non-cash stock compensation expense over the six-year period." The Company further revealed that the investigation had revealed "the existence of a material weakness in the Registrant's internal controls related to stock option accounting." At no time did defendants reveal that stock options had been back-dated or manipulated in any way. No one was penalized and no executive lost his or her option grant.

     41.    On September 12, 2005, the Company filed with the SEC, a Form 10-K/A detailing its restated financials for the period from 2000 to 2004. In Note 3, buried at page 51, of this filing the Company admitted to having improperly manipulated the dates of grants of stock options, manipulating employment contracts and canceling and reissuing options to provide lower strike prices: The Company stated:

> The Company's decision to restate these financial statements was based on the findings of an independent investigation into the Company's stock option accounting that was conducted under the direction of the Audit Committee of its Board of Directors. **The independent investigation identified certain stock options granted during calendar years 1999 to 2001 that were erroneously accounted for under generally accepted accounting principles ("GAAP"). The options identified consisted of (i) six new employee stock option grants in which the employment start date records were deliberately modified and six existing stock option grants that were deliberately cancelled and reissued, in both cases, to provide a lower exercise price for these options, (ii) options granted under the April 14, 2000 broad based stock option grant program, where from a review of supporting records it appeared that the number of options granted likely was not ultimately determined until April 26, 2000,** (iii) three stock option grants that continued to vest following a change in grantees' employment status without the Company recording an appropriate corresponding stock compensation charge, and (iv) one stock

option grant that was improperly accounted for due to an inadvertent recording error.

**The restatement adjustments increased net loss by $0.8 million, $1.6 million and $29.9 million for the years ended July 31, 2003, 2002 and 2001, respectively and decreased net income by $1.4 million for the year ended July 31, 2000 and had a negligible impact on net loss for the year ended July 31, 2004.** The cumulative effect of the restatement adjustments on the Company's consolidated balance sheet at July 31, 2004 was an increase in additional paid-in capital offset by a corresponding increase in the accumulated deficit and deferred compensation which results in a net effect in the stockholders' equity section of $0. The adjustments reduced previously reported diluted earnings per common share by $.01 and $.12 for the years ended July 31, 2002 and 2001, respectively. There was no impact to previously reported diluted earnings per common share for the years ended July 31, 2004, 2003 and 2000. (Emphasis supplied)

As detailed above, irrespective of Sycamore's admission that it had illegally manipulated option grants, the Company continued to highlight only the accounting problems while down playing the importance of the inappropriate conduct. Furthermore, as a result of these findings the D&O Defendants did nothing to rectify the situation, no options grants were rescinded or reversed, and no actions were taken against any of the Defendants for these breaches of fiduciary duty.

42.    On May 19, 2006, The Wall Street Journal published an analysis of stock options granted to chief executive officers of half a dozen companies in an article titled, "U.S. INTENSIFIES STOCK-OPTIONS PROBE: Subpoenas by Prosecutors in Manhattan Office Signal Major Step-up in scrutiny." The subject matter of this article, and several others in previous and subsequent days, was the illegal backdating of stock option grants to senior executives at the expense of public companies like Sycamore and its shareholders.

43.    That same day, the staff of the Securities and Exchange Commission informed Sycamore that it had commenced a formal investigation related to certain stock options granted

by the Company during calendar years 1999 through 2001 that were erroneously accounted for under generally accepted accounting principles.

44.    Subsequently, on May 30, 2006, the Company filed a Form 8-K with the SEC informing the public that on May 26, 2006, the U.S. Attorney's Office for the District of Massachusetts issued a grand jury subpoena to the Company requesting that the Company produce documents relating to stock option grants.

45.    On July 10, 2006, Sycamore filed yet another Form 8-K with the SEC advising shareholders of a lawsuit against the Company by an ex-employee.    The lawsuit filed in Massachusetts state court names Sycamore as defendant and alleges, among other things, wrongful termination and retaliation and alleges claims relating to certain of the Company's stock option grant practices in 1999-2001.

46.    In the same filing, Sycamore also informed that, in conjunction with the ongoing external investigations, it too is conducting a review of its historical stock option grant practices.

**The Landry Complaint**

47.    Notably, while the impetus to conduct the 2005 internal investigation and the scope of the investigation was not disclosed to the Sycamore shareholders, or the authorities, the secret was revealed in June 2006 when a former executive of Sycamore filed suit against the Company disclosing many of the hidden details behind the options back-dating scheme.

48.    As disclosed by the Company on July 10, 2006, in or about June 2006, Stephen Landry ("Landry") filed a civil complaint (the "Landry Complaint," attached hereto as Exhibit A) against the Company in Massachusetts Superior Court alleging that Sycamore replaced him after he refused to manipulate the dates of stock options grants.    According to the Landry Complaint:

a.    the modification of start dates and options grant dates were expressly forbidden by Company policy. Landry Complaint ¶ 13.

b.    shortly after being hired in 1999, Landry was instructed by Defendant Jewels, then Sycamore's Chief Financial Officer, to change various employees' employment start dates to correspond with days on which the Company's stock prices were lower, so that the employees could receive stock options with lower exercise, or strike, prices. Landry Complaint ¶¶ 11-12.

c.    because Landry refused to follow instructions to modify employee start dates, Defendant Jewels decided to replace him with her friend, attorney Robin Friedman, who would follow her instructions. Landry Complaint ¶¶ 15, 16, 20.

d.    after Landry was relieved of his duties as Director of Human Resources, the Company began a pattern of changing employees' start dates to illegally and unjustly enrich favored individuals, and corresponding stock options grants were approved by Defendant Jewels and/or Defendant Smith, President of Sycamore for employees including: Gaston Pereira, Director of Sales for the Americas; Kevin Oye, Vice President of Systems and Technologies; Edward Zaval, Vice President of Customer Service; Attorney Somia Kirmani; and Attorney Marybeth Harper. Landry Complaint ¶¶ 14, 21-26.

49.    An internal Sycamore memo (the "Memo," attached hereto as Exhibit B), dated January 29, 2001, was attached to the Landry Complaint. According to the Landry Complaint,

the Memo was faxed by an employee to Robin Friedman, and listed employees whose start dates should be altered to take advantage of lower strike prices for their option grants. Landry Complaint ¶ 27. The Memo substantiates and evidences:

 a.  that it was the Company's practice to promise stock options with grant dates, corresponding to low stock prices, including quarterly lows.

 b.  that employees were instructed to modify employment agreements and offer letters in order to allow for modification of stock options grant dates. For example the instructions, "please change records" and "clean up date of hire" were handwritten on the margin of the Memo. Memo ¶¶ 2 – 3.

 c.  that Sycamore's internal audit controls were deficient and further, that management and other employees knew this and exploited these deficiencies to conceal their modification of options dates to the detriment of the company. One passage makes clear that changing the hire date of a certain employee would have "[n]o impact of [sic] W-2 issues since the last payroll period for calendar year 2000 ended 12/15/00, [and] [a]ll wages paid after payroll period ended 12/15/00 are reflected in calendar year 2001." Memo ¶ 1. Another passage provides that changing the employee's start date was a "[l]ow audit risk (exposure on actual payroll registers and on the medical insurance effective dates, both of which will remain unchanged, however, the auditors never reference these documents in their audits). Memo ¶¶ 2 - 3.

 50.  The Memo reveals that management and other employees knew that the practice of backdating stock options was not an "official" Company practice and further that it was

wrong. This is evidenced by managements' and employees' reissuance and modification of documents to escape detection in internal audits, and the "Risk Assessment" section contained in the Memo for each employee, including the designation of higher levels of audit risk when other employees and managers knew about the date modifications. Relevant passages evidencing the knowing wrongdoing include:

a.   "Employee will be told that this is not something the company does, however given that fact that the stock price dropped her first week of hire this change will be made." Memo ¶ 2. This statement is also contradicted by the fact that it is included in a memo listing six option grant dates that will be modified, some of which indicate that they have already been modified. See Memo ¶ 4 ("Employee understands that this will not be issued again should the stock price decrease in Q3.").

b.   "Maribeth's date of hire will reflect 12/21/00 and her stock option should be granted on 12/21/00. Requires new offer letter for the file to adjust the salary difference between her actual date of hire 11/27/00 and 12/21/00. Adjustment will be addressed in the offer letter in the form of a sign on bonus." Memo ¶ 3.

c.   In reference to the low audit risk of changing one employee's date of hire, the following statement was made: "she does have a relationship with Hassan Ahmed that could work to our advantage should the risk of exposure of this agreement surface." Memo ¶ 2.

d.   "If possible, this grant should appear as part of the refresh [of stock option grants] if the refresh occurs in Q2." Memo ¶ 4.

    e.     "Risk Assessment: Medium Risk. Employee and Manger [sic] (Eric Swanson) are aware of a cancellation and re-issuance of options. . . . The grant has been deleted from the system in its entirety. There is an audit risk since the grant was originally issued in Q1 and the cancellation occurred after the Q1 audit." Memo ¶ 4.

    f.     "Risk Assessment: Medium Risk. Employee and Manger [sic] (Kurt Trampedach) are aware of change from the 11/30/00 agreed to date of issuance. . . No audit risk since the 11/30/00 grant was not part of an audited period." Memo ¶ 5.

51.    The following chart indicates the significant gains instantly conferred on these employees, to the detriment of the Company, by illegally manipulating the option grants.

| Employee | Position | Original Grant Date | Amount of Shares Granted (if known) | Stock Price on Original Grant Date | Modified Grant Date | Stock Price on Modified Grant Date | Gain Due to Backdating |
|---|---|---|---|---|---|---|---|
| Ed Zaval | VP, Customer Service | 1/2/2001 | ? | $30.81 | 12/21/2000 | $29.13 | $1.68 per share |
| Samia Kirmani | Human Resources | 12/18/2000 | ? | $50.13 | 12/21/2000 | $29.13 | $21.00 per share |
| Maribeth Harper | Legal | 11/27/2000 | ? | $53.00 | 12/21/2000 | $29.13 | $23.87 per share |
| Bill Stevens | Sales | 11/30/2000 | 20,000 | $41.44 | 12/21/2000 | **$29.13** | **$246,200** |

52.    The Landry Complaint alleges that at a January 2005 meeting, Landry showed a copy of the Memo to Richard Gaynor, the Company's then new Chief Financial Officer, and Sycamore President Defendant Daniel Smith, and that, as a result of the information provided by Landry, the Audit Committee conducted an investigation regarding the changes to employees' start dates.  Landry Complaint ¶¶ 49-51.

53.    The Landry Complaint further alleges, however, that the Audit Committee's investigation focused only on the individuals specifically named in the Memo and did not expand their inquiry to determine whether changing employees' start dates was a more widespread practice.  Landry Complaint ¶ 54.  Similarly, Sycamore's amended 10-K for fiscal year ended July 21, 2004, filed on September 12, 2005, only identified several option grants that were improperly accounted for, including six new employee stock option grants awarded in which the employment start date records were deliberately modified to provide a lower exercise price for these options and a few more options grants that were improperly accounted for.  This Amended 10K also substantiates the details of the Memo with respect to the six new employees whose dates of hire and stock grants were manipulated.

**Additional Evidence of Back-Dating**

54.    In addition to manipulated options mentioned by Landry, Sycamore granted the following questionable options during the Relevant Period:

a.    On April 9, 2001, the Company granted  a total of 1,050,000 options to defendants Jewels, Trampedach, Brearton, Kiel, and Oye at an exercise price of $7.39 per share.  Less than three weeks after the option grants, by May 2, 2001, the stock had climbed nearly 63% to a price of $12.02 per share.

b.    On December 13, 2001, the Company granted a total of 90,000 options to defendants Barrows, Ferri, and Gerdelman at an exercise price of $4.60 per share.  Less than 3 weeks later, by January 3, 2002, the stock had appreciated over 29% to close at $5.95 per share.

c.    On April 29, 2002, the Company granted defendants Jewels and Oye a total of 1,500,000 options at the monthly low exercise price of $3.34 per share.  Immediately after the grant date the stock began to climb grew over 10% to a price of $3.68 per share, by May 8, 2002.

d.    On December 18, 2003, the Company granted a total of 120,000 options to defendants Barrows, Chisholm, Ferri, and Gerdelman at an exercise price of $4.59 per share.  Less than 3 weeks later, by January 8, 2004, the stock had appreciated nearly 31% to close at $6.00 per share.

55.     The aforementioned grants were all granted on lows in the Company's stock price that came right before a stock price run up.  The odds against this happening coincidentally are enormous.

**Failure of Committees of the Sycamore Board to Act**

56.     The Memo and the allegations in the Landry Complaint, taken together, indicate that Defendant Jewels and others were aware of the Company's practice of promising new employees option grants with prices at lows and modifying grant dates to comply with those promises, and further that Defendants Jewels and Smith approved, ratified, failed to halt and even enforced the manipulation of stock options.

57.     The Director Defendants, as directors of Sycamore, had ample opportunity to discuss the material information at issue with management and their fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at the numerous meetings of the Board committees.

58.     Despite these duties, Director Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, improper statements to be disseminated by Sycamore to the investing public and the Company's shareholders during the Relevant Period.

59.     During the Relevant Period, Director Defendants caused or allowed Sycamore executives to manipulate stock option grant dates so as to illegally maximize employee stock profits.  Specifically, certain Sycamore executives changed employee start dates in order to take obtain a lower exercise price on their option grants than the price on the actual grant date.

60.     Backdating these stock option grants brought an instant paper gain to these executives because the options were priced below the stock's fair market on the actual grant date.  Under GAAP, this instant paper gain was equivalent to paying extra compensation and was thus

a cost to Sycamore. These costs were also not properly recorded; as a result the company has already been forced to restate its financials to account for an additional $33.8 million in stock-based compensation. It is not, as of yet, known how much in additional stock-based compensation expense the company will be forced to take on as a result of the most recent proposed restatement.

**The Consequences**

61.    As a result of the back-dating and other manipulation of options issued to the Officer Defendants and certain Director Defendants, they have been unjustly enriched in the amount of millions of dollars at the expense of the Company. The Company has received and will receive less money from these Defendants when they exercise their options at prices substantially lower than they would have if the options had not been back-dated.

62.    The practice of back-dating stock options not only lined the pockets of the Company's executives at the direct expense of the Company, but also resulted in the overstatement of the Company's profits. This is because options priced below the stock's fair market value when they were awarded brought the recipient an instant paper gain that must be accounted for as additional compensation and treated as an expense to the Company. The Company must account for the options at a lower price, and may have to restate its results to reflect the previously unreported expenses.

63.    Pursuant to Section 162(m) of the Tax Code, 26 U.S.C. § 162(m) ("Section 162(m)"), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two

or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied. Defendants' back-dating of stock options made those grants ineligible for this tax deduction, and is likely to result in substantial tax liabilities to the Company.

64.     The practice of back-dating options has caused the Company to suffer additional adverse consequences, including (i) the drop in its stock price attributable to the market's loss of confidence in the Company's management, thus increasing the Company's cost of borrowing and otherwise harming its operations, and (ii) exposure to the cost of defending against and potential liability for regulatory actions and private securities class actions. In its public filings with the Securities and Exchange Commission and shareholder approved stock options plans, the Company represented that the exercise price of all of the stock options was in fact the fair market value of the Company's common stock, measured by the publicly traded closing price for the Company stock, on the date of the grant.

## OBLIGATIONS AND DUTIES OF DEFENDANTS

65.     By reason of their positions as directors, officers and/or fiduciaries of Sycamore and because of their ability to control the business, corporate and financial affairs of Sycamore, each of the Defendants owed Sycamore the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of loyalty, including full and candid disclosure of all material facts related thereto. Further, Defendants owed a duty to Sycamore to ensure that the Company operated in compliance with all applicable federal and state laws, rules, and

regulations; and that Sycamore not engage in any unsafe, unsound, or illegal business practices. The conduct of Defendants complained of herein involves knowing violations of their duties as officers and directors of Sycamore, and the absence of good faith on their part which Defendants were aware or should have been aware posed a risk of serious injury to Sycamore.

66.     To discharge these duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Sycamore.  By virtue of this obligation of ordinary care and diligence, Defendants were required, among other things, to:

(a)     manage, conduct, supervise, and direct the employees, businesses and affairs of Sycamore, in accordance with laws, rules and regulations, and the charter and by-laws of Sycamore;

(b)     neither violate nor knowingly or recklessly permit any officer, director or employee of Sycamore to violate applicable laws, rules and regulations, and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Sycamore;

(c)     remain informed as to how Sycamore was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of financial controls to gather and report information internally, to allow Defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

(d)    supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by Sycamore and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of Sycamore and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

(e)    preserve and enhance Sycamore's reputation as befits a public corporation and to maintain public trust and confidence in Sycamore as a prudently managed institution fully capable of meeting its duties and obligations.

67.    Defendants breached their duties of loyalty, due care and good faith by allowing other Defendants to cause, or by themselves causing, the Company to misrepresent its financial results, as detailed herein, and by failing to prevent other Defendants from taking such illegal actions. In addition, because of these illegal actions and course of conduct during the Relevant Period, the Company is now subject to various lawsuits that allege violations of federal laws. As a result, Sycamore has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending Sycamore and certain directors and officers in the various lawsuits.

68.    Defendants also breached their duties when they misrepresented and/or caused the Company to misrepresent in public SEC filings that the stock options were priced at no less than the fair market value of the stock on the date of the grant, thereby affirmatively concealing the misconduct set forth herein.

69.    Defendants further violated their fiduciary duties when even after being confronted with evidence of, and admitting to, the improper manipulation of stock option grants they caused the Company to disseminate false and misleading information to indicate that the improper conduct was a mere accounting problem, concealing the greater wrongdoing and taking no further action to correct the problems.

70.    Defendants' misrepresentations about their stock option pricing practices were known to be false or were made in reckless disregard of its truth or falsity, and the concealment could not have been discovered through reasonable diligence by the typical shareholder, prior to commencement of the SEC investigation.

71.    Moreover, these actions have irreparably damaged Sycamore's corporate image and goodwill. For at least the foreseeable future, Sycamore will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Sycamore's ability to raise equity capital or debt on favorable terms in the future is now impaired.

72.    Director Defendants, by their fiduciary duties of care, good faith and loyalty, owed to Sycamore a duty to insure that the Company's financial reporting fairly presented, in all material aspects, the operations and financial condition of Sycamore. In order to adequately carry out these duties, it is necessary for Director Defendants to know and understand the material, non-public information to be disclosed or omitted from the Company's public statements. This material, non-public information included the fact that Sycamore's internal controls were woefully defective and that the Company's executives were improperly backdating stock options.

## DUTIES AND RESPONSIBILITIES OF THE
## COMPENSATION AND AUDIT COMMITTEES

73.    During the Relevant Period Sycamore had a standing Compensation Committee and Audit Committee.

### The Compensation Committee

74.    The following Director Defendants served on the Compensation Committee of the Sycamore Board at certain times during the Relevant Period:

| Compensation Committee | | | | | | |
|---|---|---|---|---|---|---|
| Defendant | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| Ferri | M | M | M | M | M | M |
| Barrows | M | M | M | M | M | M |
| *Meetings per year* | *3* | *3* | *3* | *3* | *4* | *5* |
| M = Member | | | | | | |

75.    The Compensation Committee was established in 2000 shortly after the Company went public.

76.    During the relevant period the Company had in place two stock option plans the Compensation Committee had supervision over the 1999 Non-Employee Director Stock Option Plan (the "Director Plan"), and the 1998 Stock Incentive Plan (the "1998 Plan") both of which were to be administered by the Compensation Committee.  According to the Company's 2000 proxy, filed on November 6, 2000, the duties of the Compensation Committee were as follows:

> The Compensation Committee . . . is responsible for establishing and monitoring policies governing compensation of executive officers. The Committee has the responsibility to review the performance and compensation levels for executive officers, set salary and bonus levels for these individuals and make restricted stock awards or option grants for these individuals under the Corporation's option plan. The objectives of the Committee are to correlate executive officer compensation with the Corporation's business objectives, profitability and performance, and to enable the Corporation to attract, retain and reward executive officers who

contribute to the long-term success of the Corporation. The Committee will seek to reward executives in a manner consistent with the Corporation's annual and long-term performance goals and to recognize individual initiative and achievement among executive officers.

**The Audit Committee**

77.    The Audit Committee was created in 2000.  A formal Charter of the Audit Committee was adopted by the Company on August 18, 2004.  The members of the Audit Committee during the Relevant Period are as follows:

| Audit Committee | | | | | | |
|---|---|---|---|---|---|---|
| Defendant | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| Ferri | M | M | M | M | M | M |
| Barrows | M | M | M | | | |
| Gerdelman | M | M | M | M | M | M |
| Chisholm | | | | C | C | C |
| Meetings per year | 4 | 4 | 4 | 10 | 6 | 10 |
| M = Member   C = Chair | | | | | | |

78.    According its Charter the Audit was created to help the board fulfill its legal and fiduciary obligations.  Specifically, the Charter states:

> The purpose of the Committee is to assist the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the accounting, auditing, financial, reporting, internal control and legal compliance functions of the Company, including, without limitation, (a) overseeing, or assisting the Board's oversight of, (i) the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, (ii) the integrity of the Company's financial statements, (iii) the Company's compliance with legal and regulatory requirements, (iv) the Company's independent auditor's qualifications and independence, and (v) the performance of the Company's independent auditors, and (b) preparing the report required to be prepared by the Committee pursuant to the rules of the Securities and Exchange Commission (the "SEC") for inclusion in the Company's annual proxy statement.

## DERIVATIVE ACTION AND DEMAND FUTILITY ALLEGATIONS

79.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, by the Company as a direct result of the breach of fiduciary duty, waste of corporate assets, and unjust enrichment, alleged herein. The Company is named as a nominal defendant solely in a derivative capacity.

80.    Plaintiff will adequately and fairly represent the interest of the Company in enforcing and prosecuting its rights.

81.    Plaintiff did not make demand on the Board of Directors of the Company to bring this action on behalf of the Company because such a demand would have been a futile, wasteful and useless act for the following reasons:

(a)    Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Director Defendants and are not subject to the protection of any independent business judgment since it would undoubtedly be to the benefit of Sycamore to recover the damages caused by Defendants' wrongdoing and to assert these derivative claims;

(b)    Demand is excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the Board to the shareholders and are incapable of ratification by the current Board. The Director Defendants are subject to liability for breaching their fiduciary duties to Sycamore by, *inter alia*, failing to adequately monitor Sycamore's financial reporting, and to detect, prevent and/or halt the modification of stock option grant dates and the material misstatements complained of herein;

(c)    Director Defendants Ferri, Barrows, Chisholm and Gerdelman are recipients of illegal stock option grants. These four Director Defendants constitute a majority of the Board of Directors;

(d)    In addition to the conflicts that exist as a result of their participation in the improper conduct alleged herein, demand is also excused because the Director Defendants have continuously ratified the egregious actions outlined herein, and these same Director Defendants cannot be expected to prosecute claims against themselves, and persons with whom they have extensive inter-related business, professional and personal entanglements, if Plaintiff demanded that they do so. In particular, between 1999 and 2004, Defendants Barrows, Deshpande, Ferri, Gerdelman, and Smith were all part of the Board of Directors that approved, ratified or failed to halt the manipulation of stock options, they are interested and demand upon them is futile.

(e)    In 2005, the Director Defendants, after full review of the Company's stock option practices that revealed back-dating and canceling and reissuing of stock options, ratified or failed to rectify some or all of the back-dating stock option grants at issue herein.

(a)    Demand is also excused because all of the Director Defendants signed off on and submitted to the SEC a restatement of the Company's financials which failed to indicate the full extent of the problem and instead minimized it as a mere accounting irregularity.

(b)    Defendants Barrows and Ferri are the current members of the Compensation Committee and have continuously have been members of the Compensation Committee during the time in which the Company's financial statements were rendered inaccurate by the improper modification of stock option grant dates. The members of Sycamore's Compensation Committee are responsible for establishing and monitoring policies governing compensation of executive officers. The Committee has the responsibility to review the performance and compensation levels for executive officers, set salary and bonus levels for these individuals and make restricted stock awards or option grants for these individuals under the Corporation's option plan. Therefore, Defendants Barrows and Fend were responsible to review

the stock options grant to Sycamore executives during their respective tenures on the Compensation Committee. These Defendants did not fulfill this duty, therefore causing or allowing the Company's executives to obtain unreasonable and unreported compensation via the modification of stock option grant dates. One of the six new employees identified in the Memo is the Vice President of Customer Service, which is an executive office. The Memo provides that this new executive employee was promised that his stock option grants would be issued at the low of the quarter price. That he was made such a promise and that the Compensation Committee had responsibilities involving all compensation of executives further indicates that the members of the Compensation Committee did not fulfill their duties, thereby most likely causing, but at least allowing, the Company's executives to obtain unreasonable and unreported compensation via the modification of stock option grant dates. In addition, grants were made to several other executives including those executives sued herein. Accordingly, there is reasonable doubt that Defendants Barrows and Ferri are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Sycamore. Thus, demand is futile as to Defendants Barrows and Ferri. The back-dating, and canceling and reissuing as alleged herein was unlawful and not within Defendants' business judgment to acquire, authorize, ratify or facilitate;

(c)      The Audit Committee is currently comprised of Defendants Chisholm, Ferri and Gerdelman constituting a majority of the board under Delaware law. Defendants Barrows, Ferri and Gerdelman were on the Audit Committee during the time in which the Company's financial statements were rendered inaccurate by the improper backdating of stock option grants. As its charter states, the Audit Committee is obligated "to assist the Board in monitoring (1) the integrity of the financial statements of the Company, (2) the compliance by

the Company with legal and regulatory requirements and internal controls, and (3) the independence and performance of the Company's auditors." Defendants Barrows, Ferri and Gerdelman were responsible, as members of Sycamore's Audit Committee, for insuring that the Company's internal controls were adequate and that the Company's quarterly and annual financial statements were accurate. Sycamore's internal controls, however, were woefully deficient as evidenced by the easy identification and exploitation of the deficiencies as highlighted in the Memo as well as the improper modification of stock options granted to the Officer Defendants and other employees. Further, because the Memo indicates that it was apparently fairly widely known within the Company that the internal controls were inadequate, the Audit Committee members either knew about and thus ratified these inadequate controls or did not fulfill their duties as Audit Committee members in ensuring the reliability of the Company's internal controls. As a result of this improper modification of option grant dates, the Company's financials were rendered inaccurate because those financials did not account for the true amount of compensation being granted to Sycamore's executives. Based on the Landry allegations that the Audit Committee focused its internal investigation almost solely on the points raised in the Memo which indicated that the practice was widespread, the fact that a wider investigation was not conducted and no one was penalized and no executive lost his or her option grant also serves as a ratification of the improper modification of stock option grant dates by the Audit Committee. Accordingly, there is reasonable doubt that Defendants Barrows, Ferri and Gerdelman are disinterested because they face a substantial likelihood of liability for their breaches of fiduciary duty to Sycamore. Thus, demand is futile as to Defendants Barrows, Ferri and Gerdelman, constituting a majority of the Board as required under Delaware law.

(d)    There was no basis or justification for back-dating, and canceling and reissuing the stock options. It was illegal and/or designed solely to benefit of certain employees in a manner that was inconsistent with the Company's stock option plans, and the Company's public disclosures, to the detriment of the Company. Hence, the transactions constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by the Defendants;

(e)    All of the Defendants authorized the filing of shareholder approved stock option plans, which misrepresented that the options carry the stock price of the day of the award. Any suit by the Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

(f)    The back-dating and manipulation of options as alleged herein was unlawful and not within Director Defendants' business judgment to authorize, ratify or facilitate. There was no basis or justification for modifying stock option grant dates. Further, as highlighted in the Memo, the management and other employees knew that modifying the grant dates of stock options was wrong and they took steps to circumvent the audit procedures. Thus, the practice was designed solely to benefit the Defendants in a manner that was inconsistent with the Company's stock option plans, and the Company's public disclosures, to the detriment of the Company. Hence, the transactions were ultra vires and constituted a waste of corporate assets, and could not have been the product of the proper exercise of business judgment by the Defendants.

(g)    All of the Director Defendants authorized the filing of Proxy Statements, in support of their nomination as Directors, which failed to disclose that the dates of stock option grants to certain Director and Officer Defendants had been modified and failed to disclose the background and impetus for the internal investigation and failed to disclose the limited scope of the investigation. They also authorized the filing of shareholder approved stock option plans, which misrepresented that the options carry the stock price of the day of the award. Any suit by the Director Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

(h)    The Director Defendants signed the Company's Annual Reports on Form 10-K between 1999 and 2005, which contained the Company's financial statements and which failed to account for the back-dated stock options as compensation and an expense of the Company and failed to disclose the background and impetus for the internal investigation and failed to disclose the limited scope of the investigation. As a result, those financial statements of the Company may have overstated its profits and may need to be restated. In 2005, the Director Defendants signed the Amended Form 10-K which restated the Company's financials for the years 2000 through 2004. Any suit by the Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action.

(i)    The Director Defendants signed the Company's Annual Report on Form 10-K/A restating the Company's financials for the period between 2000 and 2004. Said

restatement was false and misleading in that it failed to fully disclose the nature and extent of the improper option grants. Further because Defendants breached their fiduciary duties by imposing the costs of these improper option grants on the Company, instead of on the wrongdoers, any suit by the Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud; thus, they are hopelessly conflicted in making any supposedly independent determination of a demand that they cause the Company to bring this action;

(j)     Despite Defendants' breaches of duty, the Board of Directors did not recommend that any Defendant be relieved of his or her duties as director or officer. By maintaining the *status quo* in light of these breaches of duty, the entire Board failed to exercise proper business judgment and therefore lacks independence.

(k)     The Board of Directors did not require that any employee disgorge all of their ill-gotten gains from their improper manipulation of their stock option grants and other misconduct, did not require them to return all unexecuted stock options to the Company, and did not require them to disgorge their bonuses and equity-based compensation to the Company, despite their indisputable breaches of fiduciary duties, which worked a direct harm to the Company. Nor did they take any other action, including commencing legal proceedings, to protect the interests of the Company.

82.     Although the underlying wrongful stock option grants alleged herein occurred during the period of 1999 - 2004, the resulting and continuing injuries to the corporation had been inherently unknowable to the plaintiff or to any independent and/or disinterested body capable of acting on the Company's behalf until 2005's public restatement and amendment of Form 10-K partially disclosing certain of the wrongs complained of herein. The wrongs complained of herein were acts of wrongful self-dealing by fiduciaries on whose good faith and

competence Plaintiff had reasonably relied, and were not disclosed by the wrongdoers who were responsible for public disclosure statements, which failed to adequately describe the manipulative timing and backdating practices engaged in by the Defendants and the true reasons for the internal investigation and its limited scope. As such, the applicable and analogous statutes of limitations are subject to the doctrine of equitable tolling. Further, the false disclosures made by Defendants prior to the restatement and amendment of Form 10-K constitute affirmative acts of concealment and/or misrepresentation by Defendants, especially when given the many opportunities to discover the practice of backdating of stock options and/or make proper disclosures with each subsequent filing of financial information, resulting in continuing harm to the Company. Thus, this also results in tolling of the applicable and analogous statutes of limitations.

## COUNT I

**Against the Director Defendants For Violations of
Section 14(a) of the Exchange Act**

83.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

84.    Director Defendants issued, caused to be issued and participated in the issuance of materially false and misleading statements to shareholders which was contained in the Company's Definitive Proxies filed on November 6, 2001, November 12, 2002, November 12, 2003, November 17, 2004, and November 17, 2005, which set forth in detail the Company's executive compensation, including stock option grants, for the preceeding three years, but misrepresented or failed to disclose, *inter alia,* the facts set forth above. By reasons of the conduct alleged herein, each Director Defendant violated Section 14(a) of the Exchange Act. The

information would have been material to the Company's shareholders in determining whether to elect directors to manage their company.

85.     Plaintiff, on behalf of the Company, thereby seeks to void the election of Director Defendants based upon the misleading and incomplete proxy materials, and to recover damages caused by Defendants' failure to disclose the improper compensation described herein.

## COUNT II

### Against Defendants Deshpande, Smith, Gaynor and Jewels
### For Disgorgement Under Sarbanes-Oxley Act Of 2002

86.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

87.     Pursuant to Sarbanes-Oxley Act of 2002 § 304, because the Company restated its financials for fiscal years 2000 to 2004 and the first two quarter of 2005, due to material noncompliance with GAAP, as a result of false and misleading financial statements, Director Defendant Deshpande, Director Defendant Smith, as the Company's CEO and Officer Defendants Gaynor and Jewels as CFOs during the restatement period, are required to reimburse the Company for all bonuses or other incentive-based or equity-based compensation received by them from the Company during fiscal years 2000 to 2004, and the first two quarters of 2005.

88.     Director Defendants Deshpande, Smith, Jewels, and Gaynor are also liable to Plaintiff for reasonable costs and attorneys' fees in the prosecution of this derivative action on behalf of the Company.

## COUNT III

### Against the Officer Defendants and Certain Director
### Defendants (Chisholm, Gerdelman, Ferri and Barrows) for Unjust Enrichment

87.     Plaintiff incorporates each and every allegation set forth above, as though fully set forth herein.

88.    As a result of the improper modification of the grant dates of options granted to them, the Executive Officer Defendants and certain Director Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of Sycamore.

89.    Accordingly, this Court should order the Officer Defendants and certain Director Defendants to disgorge all profits, benefits and other compensation obtained by the Executive Officer Defendants and certain Director Defendants and each of them, from their wrongful conduct and fiduciary breaches described herein, and should order the options held by the Executive Officer Defendants and certain Director Defendants which have not yet been exercised, to be rescinded or re-priced at the market price of Sycamore's stock on the dates the Court finds that those options were actually, in fact, granted.

90.    Plaintiff has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Breach of Fiduciary Duty

89.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

90.    The Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

91.    The Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision in that each of the Defendants authorized, or by abdication of duty, permitted the stock options granted to the D&O Defendants to be back-dated. Additionally, Defendants ratified the improper actions and concealed them by ratifying them and/or minimizing their importance as mere accounting errors.

These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

92.    Furthermore, even after an internal investigation into the Company's stock option practices, and commencement of a formal investigation by the SEC, the Defendants have done nothing to rectify the problem instead the Company was forced to absorb the additional expense. No employees were fired, no stock option grants were rescinded, and no action was taken to recover the money from those that had been unjustly enriched. This is a breach of their fiduciary duty to the Company.

93.    As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Defendants have caused, and will continue to cause, the Company to suffer substantial monetary damages as a result of the wrongdoing described herein, as well as further and greater damage in the future, including damage to the Company's reputation, business and good will.

94.    The Company has been directly and substantially injured by reason of the Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Company. Plaintiff, as a shareholder and representative of the Company, seeks damages and other relief for the Company, in an amount to be proven at trial.

## COUNT V

### Against All Defendants for Gross Mismanagement

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

96.    By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation, in that the Defendants concealed evidence of the improper and illegal back-dating of stock options by

not informing investors of the full scope of the problem but minimizing the improprieties as mere accounting issues.

97.    As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages in the millions of dollars.    Thus far Defendants' ratification of the improprieties have caused the Company to take on an additional expense of at least $33.8 million.

98.    As a result of the misconduct and breaches of duty alleged herein, the Defendants are liable to the Company.

## COUNT VI

### Against Defendants for Waste Of Corporate Assets

99.    Plaintiff incorporates by reference all paragraphs above as if set forth herein.

100.    By engaging in the wrongdoing alleged herein, Defendants wasted corporate assets by, among other things, ratifying and accepting the improperly granted stock option grants and the improperly manipulated stock options at the expense of the Company.  By ratifying and approving the improper manipulation and back-dating of stock options Defendants caused the Company to suffer damages as set forth herein.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Defendants and in favor of the Company for the amount of damages, including pre and post judgment interest, sustained by the Company as a result of the Defendants' violations of Section 14(a), breaches of fiduciary duties, gross mismanagement, waste of corporate assets and unjust enrichment;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that plaintiff on behalf of the Company have an effective remedy;

C.    Awarding to the Company restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants as a result of the conduct alleged herein, including pre and post judgment interest thereon;

D.    Awarding to the Company restitution for any Officer Defendant or Director Defendant not yet identifiable by Plaintiff who received profits or benefits from the illegal conduct alleged herein including pre and post judgment interest.

E.    Declaring null and void all improper stock option grants awarded during the Relevant Period, and granting an injunction preventing future exercise of any stock option grants by any current or former Director or Officer until such time as the complete scope of the illegal practice identified herein is determined;

F.    Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  October 4, 2006                    Respectfully submitted,

**CHIMICLES & TIKELLIS LLP**

Pamela S. Tikellis (#2172)
Robert J. Kriner, Jr. (#2546)
A. Zachary Naylor (#4439)
Daniel J. Brown (#4688)
One Rodney Square
Post Office Box 1035
Wilmington, DE  19899
Tel:  (302) 656-2500
Fax: (302) 656-9053

**WOLF HALDENSTEIN ADLER**
**FREEMAN & HERZ LLP**
Jeffrey G. Smith
Lawrence P. Kolker
Martin Restituyo
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

**LAW OFFICES OF JACOB T. FOGEL**
Jacob T. Fogel, Esq.
32 Court Street – Suite # 602
Brooklyn, New York 11201

EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

Middesex, ss.                                    Superior Court
                                                C.A No. 06-2333

```
                        )
Stephen Landry,         )
            Plaintiff   )
v.                      )
                        )
Sycamore Networks, Inc. )
            Defendant   )
                        )
```

## COMPLAINT

### A    NATURE OF THE ACTION

This is an action in law and equity seeking monetary damages and injunctive relief for breach of contract, fraud in the inducement of a contract, and retaliation.

### B    PARTIES TO THE ACTION

#### 1. PLAINTIFF

The Plaintiff, Stephen Landry is a resident of the Commonwealth of Massachusetts, County of Worcester.  During all relevant times, the Plaintiff was employed by the Defendant in Chelmsford, Massachusetts, County of Middlesex.

#### 2. DEFENDANT

The defendant Sycamore Networks, Inc., is a Corporation, doing business in the Commonwealth of Massachusetts and having its U.S. Corporate offices located at 220 Mill Road, City of Chelmsford, Commonwealth of Massachusetts, County of Middlesex.

## ALLEGATIONS COMMON TO ALL OF THE COUNTS

1. Sycamore Networks Inc. (hereinafter Sycamore) is a corporation that develops and markets optical networking products for telecommunications service providers.

2. Sycamore was founded in February 1998 and became a publicly traded company in October of 1999.

3. Presently, Gururaj Deshpande is the Corporation Chairman of the Board of Directors; Daniel Smith is the President and Chief Executive Officer; and Kevin Oye is the Vice President, Systems and Technology.

4. On or about October 21, 1999, Sycamore made its first public offering of stock and issued 22,425,000 shares of stock at an initial public offering price of $38.00 a share.

5. In or about the mid to latter part of 1999 the Corporation, through its founder principals and underwriter, participated in a scheme to improperly enrich themselves through the manipulation of the aftermarket trading in Sycamore common stock, following the Initial Public Offering.

6. The scheme included creating an artificial demand for Sycamore stock by conditioning share allocations in the IPO upon the requirement that customers agree to purchase shares of Sycamore stock in the aftermarket and artificially inflating stock prices.

7. In or about October of 1999, the Plaintiff, Stephen Landry, was hired by Sycamore as the Director of Human Resources.

8. The Plaintiff was recruited and convinced to leave his employer TASC where he was the Senior Vice President of Human Resources.

9. The Plaintiff was induced to leave his position at TASC based in part on the much-discussed prospect of a very successful public offering.

10. Once the Plaintiff began at Sycamore he worked very long hours and oversaw all aspects of Human Resources, including the recruitment and hiring of over 500 employees, as well as the establishment of a hiring plan, a compensation plan, and a benefit plan. During his tenure the Plaintiff made a significant contribution to the Company.

2

11. Within weeks of the Plaintiff joining the company, Fran Jewels, Chief Financial Officer of Sycamore, began asking the Plaintiff to do things that he believed to be illegal and/or unethical. The instructions given to the Plaintiff by Jewels included the writing of offer letters which the Plaintiff believed were inaccurate, unethical, and/or illegal.

12. The purpose of changing employee start dates was to change the strike price of the options granted, and therefore, the value of the stock to the employee.

13. The Plaintiff questioned Ms. Jewel's instructions on several occasions, believing they were inaccurate, unethical and/or illegal. The Company's orientation video specifically stated the parameters that were to be followed. The modification of start dates was expressly forbidden, something that the Plaintiff took very seriously as Director of Human Resources.

14. The Plaintiff, on information and belief, now believes that after he was relieved of his duties as the Director of Human Resources the company began a pattern of changing employees start dates for the purpose of illegally and unjustly enriching favored individuals.

15. Due to the fact that the Plaintiff refused to carry out instructions that he felt were inappropriate, unethical, and illegal, Fran Jewels decided to replace him with someone who would carry out the illegal and unethical action that Ms. Jewels wanted done.

16. Fran Jewels also knew and told many others in the Company that the Plaintiff had health problems. In fact, the Plaintiff was diagnosed with a debilitating illness which Ms. Jewels knew of. Jewels announced his health problems at the President's staff meeting when it was announced that Steve would be leaving.

17. Robin Friedman, an attorney and friend of Fran Jewels, was offered a position in the legal department with Sycamore in April of 2000.

18. In or about July of 2000, Attorney Robin Friedman began working as an employee of Sycamore. Prior to July 2000, Ms Friedman worked for the law firm of Jackson and Lewis.

19. The Plaintiff was asked by Fran Jewels to send an offer letter to Robyn Friedman during April of 2000. When Ms. Friedman did not report to the Company officially until July of 2000 the Plaintiff

3

questioned Ms. Jewels regarding her status. The Plaintiff was not allowed access to Ms. Friedman's file.

20. Ms. Friedman replaced the Plaintiff as Director of Human Resources, removing him from this sensitive position where he would be able to review all personnel information--including stock options and start dates. He believed that her start date was manipulated inappropriately by Ms. Jewels.

21. On information and belief, after the Plaintiff was relieved of his duties as director of Human Resources, Gaston Pereirra, who had been hired as the Director of Sales for the Americas, had his start date changed.

22. On information and belief, Kevin Oye, Vice President of Systems and Technology, had his start date altered.

23. On information and belief, Edward Zaval, Vice President of Customer Service had his start date altered so that he would have a stock strike price that was lower.

24. On information and belief, Attorney Somia Kirmani had her start date altered so as to provide her with a lower strike price.

25. On information and belief, Attorney Marybeth Harper had her start date altered so as to provide her with a lower stock price.

26. Stock Option grants were approved for all of the above individuals by Fran Jewels and/or Daniel Smith.

27. In or about January 29, 2001, after the Plaintiff was relieved of his duties as the Director of Human Resources, by Fran Jewels, employee Cheryl Kalinan sent a fax to Robin Friedman listing employees who should have their start date altered so as to affect their stock option strike price and grant. (See Attachment A)

28. In or about September, 2000, Robin Friedman informed the Plaintiff that Fran Jewels wanted him to leave the company. Friedman informed the Plaintiff that his life would be a living hell if he continued to work for the company. Friedman represented to the Plaintiff that the intent of the company was to provide the Plaintiff with a stock option package that would be worth $10.8 million.

4

29. CFO Fran Jewels ran much of the company by threats, fear and intimidation. On many occasions the Plaintiff was warned by senior managers, throughout the company, to be careful because of her reckless and retaliatory actions.

30. In a meeting between the Plaintiff and Fran Jewels, the Plaintiff disagreed with Ms. Jewels over a policy matter. Ms Jewels then informed the Plaintiff that she had made over one hundred million dollars, that she came from a tough neighborhood in New Jersey, referred to as; "like Buttafucoville," and that she could have anyone "removed."

31. Due to the fact that the Plaintiff believed that CFO Fran Jewels was capable of doing almost anything, including violence, and on account of the Plaintiff's deteriorating physical problems, the Plaintiff decided to enter into a settlement agreement with the Defendant Corporation.

32. Due to the fact that both parties to the proposed agreement understood that stock prices might fluctuate, a provision was added to allow the parties to extend the "special employment" date from year to year to protect the value of the agreement.

33. The primary purpose of the extension clause was to provide for Landry and to ensure that the "special employment" relationship would be extended if the value of the agreement fell below $10,800,000.

34. During the "special employment" period, the Plaintiff did provide advice to the company when specific requests were made for advice.

35. The "special employment" period was extended every year in keeping with the agreement and was terminated after the Plaintiff brought forward evidence of wrongdoing as requested.

36. At the time the Plaintiff signed the agreement on October 12, 2000, Sycamore stock was selling for approximately $77.00 a share.

37. On October 12, 2001, the time the agreement was to end and the Plaintiff would be fully vested of his stock options, the stock of Sycamore was down to approximately $4.58 per share, whereas the Plaintiff's strike price for the stock was $12.38 a share.

38. The stock price of Sycamore continued to decline to the point that the stock price as of June 29, 2004 was $3.46 a share.

39. Before and about the time the Plaintiff was contemplating accepting a "special employment" agreement, the Defendant Corporation, through its press releases and through public and private statements of CEO Daniel Smith, was providing the employees, including the Plaintiff, with false and misleading information.

40. The false and misleading information was a motivating factor in the Plaintiff's decision to accept the "special employment" agreement that included the accrual of stock options.

41. The false and misleading statements by the Corporation and by its CEO Smith were a motivating factor in the decision of the Plaintiff to hold on to his stock options and not exercise his options.

42. In October and November of 2000, the Corporation was informing the public and the Sycamore employees, including the Plaintiff, that Sycamore's growth potential remained strong while, in fact, the company knew that major customers, which included Enron and WorldCom, were reducing their expenditures, and in some cases canceling contracts. This change in the customers' ability to buy services and equipment would negatively impact Sycamore's revenues and profitability and therefore its stock price.

43. If the Plaintiff knew the truth about the condition of the Corporation, he would either have refused the "special employment" agreement and sued the Corporation or accepted the agreement and exercised his stock options as soon as possible.

44. During the four years of the separation agreement, the Plaintiff and Ms. Jewels would talk about her belief that the stock would recover sufficiently for the agreement to retain its intended value.

45. In or about September of 2004, the Plaintiff called Fran Jewels and asked about the company continuing to extend his contract. Ms. Jewels responded that she would be leaving the company and that she no longer had the authority to make such decisions. Ms. Jewels informed the Plaintiff that he should speak about his employment contract with someone else in the company.

46. On or about November 23, 2004, the Plaintiff had delivered a letter to Gururaj Deshpande, who was the Chairman of the Board of Directors, asking that Deshpande intercede on his behalf and extend his contract.

6

47. A few days after the above mentioned letter was delivered, the Plaintiff received a call from Richard Gaynor, who was Sycamore's new Chief Financial Officer. Mr. Gaynor asked to meet with the Plaintiff.

48. In December of 2004, the Plaintiff met with Mr. Gaynor. The Plaintiff discussed with Mr. Gaynor the fact that the Plaintiff had been eased out of Sycamore because the Plaintiff refused to perform unlawful and unethical acts. The Plaintiff also explained to Gaynor that the intent of the written agreement between the Plaintiff and the company was to ensure the Plaintiff received $10,800,000. The Plaintiff explained to Gaynor this amount of money was not out of line or unusual in that Mr. Deshpande and Mr. Smith earned hundreds of millions of dollars by selling their stock. Mr. Gaynor asked for proof of unlawful acts mentioned by the Plaintiff, and asked the Plaintiff if he was in possession of a smoking gun.

49. In January of 2005, the Plaintiff met with Mr. Gaynor and Sycamore President Daniel Smith. During the meeting the Plaintiff showed Mr. Gaynor and Mr. Smith a copy of a faxed memo (Attachment A) that constituted what was referred to as the smoking gun that proved Sycamore was engaging in unlawful actions and that Sycamore did not have sufficient internal controls to stop such activities.

50. On February 22, 2005, the Plaintiff received a letter from attorney Ronald Green who informed the Plaintiff that he represented Sycamore. Attorney Green informed the Plaintiff that Sycamore would not extend its employment contract with the Plaintiff. Attorney Green also, in the letter, informed the Plaintiff that as a result of the information provided to Sycamore by Landry, Sycamore informed the Securities and Exchange Commission that it was conducting an internal investigation of the grant of stock options to employees.

51. The Plaintiff was informed that an Audit Committee investigation was being conducted as a result of the information provided by him regarding the changes to the start date of employees. The Plaintiff was asked to speak with the investigators. The Plaintiff agreed to meet with the investigators but expressed his concerns that he would be sued by individuals as a result of his statements.

52. The Plaintiff asked the company to provide him with indemnification from suit if he were sued by individuals as a result of the information he provided to the Audit Committee investigators. The Company

7

refused to provide the Plaintiff with the requested indemnification and the Plaintiff therefore refused to meet with the investigators.

53. The Audit Committee investigation therefore proceeded without the testimony of the person who provided the information that sparked the investigation.

54. On information and belief, the Audit Committee investigation focused only on the individuals specifically named in a document provided by the Plaintiff to the Company and did not seek to determine whether the change to employee start dates was a widespread practice.

55. On June 30, 2005, Sycamore terminated the Plaintiff's contract.

56. At the time of Sycamore's termination of the contract, Sycamore stock was selling for approximately $3.44 a share.

# Causes of Action

## Count I    Breach of Contract

57. The Plaintiff reasserts, realleges, and incorporates by reference the facts and allegations stated in paragraphs 1-56.

58. The stated intention of the corporation was to provide an employment agreement and severance package to the Plaintiff that would have a value of $10,800,000.00 (Ten Million Eight Hundred Thousand Dollars).

59. By terminating the agreement in June of 2005, at a time when the value of the stock options offered to the Plaintiff was less than zero, Sycamore breached the agreement between Plaintiff and Sycamore.

## Count II    Retaliation and Wrongful Termination

60. The Plaintiff reasserts, realleges, and incorporates by reference the facts and allegations contained in paragraphs 1-59.

61. Sycamore terminated the contract with the Plaintiff and refused to renew the contract between Sycamore and the Plaintiff after, and on account of, the fact that the Plaintiff, at the request of the Company,

8

informed the Company of the unlawful actions of Company employees and principals.

## Count III  Fraud and Deception

62. The Plaintiff reasserts, realleges, and incorporates by reference the facts and allegations contained in paragraphs 1-61.

63. The Company entered into the "Special Employment" agreement and the Company represented that the agreement would provide the Plaintiff with a package worth $10, 800,000.00.

64. The actions and statements of Sycamore, through its agents, employees and Trustees, constituted fraud and deception that induced the Plaintiff to enter into the "Special Employment" agreement which he would not have entered into, absent the fraudulent and deceptive statement by the corporation.

## Count IV  Fraud and Deception

65. The Plaintiff reasserts, realleges, and incorporates by reference the facts and allegations contained in paragraphs 1-64.

66. As a result of false and misleading statements made by Sycamore, through press releases and public and private statements of CEO and President, Daniel Smith, the Plaintiff was induced to hold on to and not to exercise his stock options believing that the Company was solid and that the stock prices would continue to increase in price.

67. Unknown to the Plaintiff Sycamore had engaged in a scheme which artificially inflated the price of the stock.

68. As a result of the fraudulent and misleading statements, the Plaintiff has been economically harmed.

Wherefore, the Plaintiff requests that this Court order:

   a) That he be compensated for any present and future loss of wages and/or benefits incurred as a result of the wrongful action of the Defendant;

9

b) That he be awarded an amount of money which will fairly compensate him for his emotional and physical pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life and any consequential damages;

c) That the Defendant pay him interest on any judgment entered from the time of the filing of this suit;

d) Reinstate full medical benefits to him;

e) Order such other relief as may be just and proper and/or which will make the Plaintiff whole.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON EACH ISSUE SO TRIABLE**

The Plaintiff
By his Attorney,

_____
Kevin G. Powers, BBO #405020
Rodgers, Powers & Schwartz LLP
18 Tremont Street
Boston, MA 02108
(617) 742-7010

U:wordoc/landry/complaint.6.06

10

# EXHIBIT B

by: Sycamore Networks;                480 471 7498;              Jan-29-01  3:48PM;                    Page 1/2

## Q2 stock option grants issues-

1) Ed Zaval-VP of Customer Service-
   - Ed was promised his stock option grant would be issued at the low of the quarter price.
   - Ed's actual start date was 1/2/01.  The low of the Q2 was on 12/21/00 at $29.1250
   - **Action:** Change Ed's date of hire to reflect 12/21/00 and his stock option should be granted on 12/21/00. No change to offer letter will be required since there was no commencement date on the letter and the letter itself was dated prior to 12/21/00. No impact of W-2 issues since the last payroll period for calendar year 2000 ended on 12/15/00. All wages paid after payroll period ending 12/15/00 are reflected in calendar year 2001.  *Katy to do weekly stock issuance report.*
   - **Risk Assessment:** Low risk.  Senior level employee and the risk of exposure to this agreement is low.  No audit risk

2) Samia Kirmani-Human Resources
   - Samia's actual date of hire was 12/18/00 and our FMV on that day was $50.1250
   - After Samia started our stock price dropped considerably.  Samia requested her stock options to be granted on 12/21/00 when our FMV value was $29.1250.
   - At this point, nothing has been communicated to Samia.
   - **Action:** Change Samia's start date to 12/21/00 and issue her stock options on 12/21/00.  Requires change to offer letter for commencement date of employment. Robin should change date on letter and just initial, do not have Samia resign letter. Employee will be told that this is not something the company does, however given that fact that the stock price dropped in her first week of hire this change will be made.  Also in consideration of her hard work to date.
   - **Risk Assessment:**  Low risk.  She is a rank and file employee and the Company has no prior experience with her (although she does have a relationship with Hassan Ahmed that could work to our advantage should the risk of exposure of this agreement surface).  Low audit risk (exposure on actual payroll registers and on the medical insurance effective dates, both of which will remain unchanged, however the auditors never reference these documents in their audits)

3): Maribeth Harper-Legal
   - Maribeth was promised her stock option grant would be issued at the low of the quarter price.
   - Maribeth's actual start date was 11/27/00.  The low of the Q2 was on 12/21/00 at $29.1250
   - **Action:**  Maribeth's date of hire will reflect 12/21/00 and her stock option should be granted on 12/21/00.  Requires new offer letter for the file to adjust the salary difference between her actual date of hire 11/27/00 and 12/21/00.  Adjustment will be addressed in the offer letter in the form of a sign on bonus.
   - **Risk Assessment:** Low risk.  Company has prior history with this employee and the risk of exposure to this agreement is low.  Low audit risk (exposure on actual payroll registers and on the medical insurance effective dates, both of which will

Sycamore Networks;                480 471 7498;              Jan-29-01  3:48PM;              Page 2/2

remain unchanged, however the auditors never reference these documents in their audits)

4) Jinendra Ranka-Engineering

- Jinendra was issued 50k shares in Q1. In Q2 the stock price decreased. Jinendra requested his stock option grant to be issued in Q2.
- This grant was issued in consideration of his hard work and dedication.
- **Action:** Issue the grant at the low of Q2. Employee understands that this will not be issued again should the stock price decrease in Q3. PAN will be generated to reflect correct date of issuance of 12/21/00. If possible, this grant should appear as part of the refresh if the refresh occurs in Q2.
- **Risk Assessment:** Medium risk. Employee and Manger (Eric Swanson) are aware of a cancellation and re-issuance of options. Original stock option agreement was issued to the employee and has been surrender by the employee. The grant has been deleted from the system in its entirety. There is an audit risk since the grant was originally issued in Q1 and the cancellation occurred after the Q1 audit. Q1 options will not balance to audit records and diluted shares outstanding for Q1 will not balance.

*(handwritten notes right margin:)* – make sure Q1 PAN shrec – call Eric & confirm par refresh & that under won't chav vesting – of Q2 – gee PAN – nec – nerit new items Eri & Q2.

5) Bill Stevens-Sales

- Bill was promised 20k shares as a promo grant at the low of the quarter.
- Bill pushed to have the grant issued effective 11/30/00 which had a closing price of $41.4375. However, since low of the quarter was agreed to, the employee will most likely push for an issuance date of 12/21/00 at $29.1250.
- This grant is issued in consideration of his hard work and dedication.
- **Action:** Issue the grant at the low of Q2. Employee understands that this will not be issued again should the stock price decrease in Q3. PAN will be generated to reflect correct date of issuance. If possible, this grant should appear as part of the refresh if the refresh occurs in Q2.
- **Risk Assessment:** Medium risk. Employee and Manger (Kurt Trampedach) are aware of change from the 11/30/00 agreed to date of issuance. The stock option agreement was never sent to the employee. No audit risk since the 11/30/00 grant was not part of an audited period.

*(handwritten notes right margin:)* – Close Bill Stevens – need 12/21 PAN 20,000 shar

6) Mike Ambrogi-Engineering

- Mike was notified in advance of the number of shares he was to receive in the refresh (40k shares) in order to counter a job offer Mike had received.
- Mike was told he would receive these shares when the refresh shares were issued.
- **Action:** Shares will be issued as part of the normal refresh program.
- **Risk Assessment:** Low risk. Employee and Manger (Eric Swanson) are aware that he was promised shares in advance of actual issuance. No audit risk.

## CERTIFICATE OF SERVICE

I, Daniel J. Brown, do hereby certify that on this 4th day of October, 2006, I caused copies of the Amended Derivative Complaint and Redline Version to be served on the following:

### By Hand Delivery:

William O. LaMotte, III
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, Delaware 19899

Anthony W. Clark
Skadden Arps Slate Flom LLP
One Rodney Square
P.O. Box 363
Wilmington, Delaware 19899

Daniel J. Brown (#4688)